UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| RED LAKE BAND OF CHIPPEWA INDIANS, WHITE EARTH BAND OF OJIBWE, HONOR THE EARTH, and SIERRA CLUB,<br><br>    Plaintiffs,<br><br>  v.<br><br>UNITED STATES ARMY CORPS OF ENGINEERS,<br><br>    Defendant. | Case No. 1:20-cv-3817 |

**MEMORANDUM OF LAW
IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ iii

INTRODUCTION ....................................................................................................................... 1

STATUTORY OVERVIEW ........................................................................................................ 2

I.      THE CLEAN WATER ACT ............................................................................................ 2

II.     THE NATIONAL ENVIRONMENTAL POLICY ACT .................................................... 4

FACTUAL BACKGROUND ....................................................................................................... 7

ARGUMENT ............................................................................................................................. 12

I.      PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS OF THEIR
        CLAIMS THAT THE CORPS' DECISION DOES NOT COMPLY WITH NEPA
        OR THE CLEAN WATER ACT ..................................................................................... 14

        A.      The Corps' Failure to Consider the Risk of Oil Spills Violates NEPA. ............... 15

        B.      The Corps Failure to Consider the Risk of Oil Spills Violates the Clean
                Water Act. ......................................................................................................... 17

        C.      The Corps Erred in Failing to Consider Obvious Alternatives to the
                Project. .............................................................................................................. 18

II.     PLAINTIFFS WILL BE IRREPARABLY HARMED IN THE ABSENCE OF
        AN INJUNCTION. ......................................................................................................... 22

III.    THE BALANCE OF HARMS FAVORS AN INJUNCTION. ......................................... 24

IV.     THE PUBLIC INTEREST FAVORS AN INJUNCTION. .............................................. 25

CONCLUSION .......................................................................................................................... 26

# TABLE OF AUTHORITIES

*\* Authorities upon which we chiefly rely are marked with an asterisk.*

## CASES

**Page number(s)**

*Amoco Prod. Co. v. Village of Gambell, Alaska*,
 480 U.S. 531 (1987)..................................................................................22, 24

*Armstrong v. Bush*,
 807 F. Supp. 816 (D.D.C. 1992) ......................................................................13

*Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*,
 2020 WL 1450750 (M.D. La. Mar.25, 2020) ..................................................18

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
 462 U.S. 87 (1983).............................................................................................4

*Banks v. Booth*,
 No. 20-849, 2020 WL 1914896 (D.D.C. Apr. 19, 2020)..................................25

*Bowen v. Georgetown Univ. Hosp.*,
 488 U.S. 204 (1988)...........................................................................................4

*Brady Campaign to Prevent Gun Violence v. Salazar*,
 612 F. Supp. 2d 1 (D.D.C. 2009) ..............................................................22, 25

*Buttrey v. United States*,
 690 F.2d 1170 (5th Cir. 1982) ...........................................................................2

*Ctr. for Food Safety v. Salazar*,
 898 F. Supp. 2d 130 (D.D.C. 2012)..................................................................19

*Citizens Against Burlington, Inc. v. Busey*,
 938 F.2d 190 (D.C. Cir. 1991) ...........................................................................5

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
 401 U.S. 402 (1971)..........................................................................................13

*City of Dania Beach, Fla. v. U.S. Army Corps of Eng'rs*,
 2012 WL 3731516 (S.D. Fla., July 6, 2012)....................................................20

*Cmtys. Against Runway Expansion, Inc. v. F.A.A.*,
 355 F.3d 678 (D.C. Cir. 2004) ...........................................................................7

\* *Del. Riverkeeper Network v. U.S. Army Corps of Eng'rs*,
869 F.3d 148 (3d Cir. 2017)..............................................................2, 3, 22

*Del. Riverkeeper Network v. U.S. Army Corps of Eng'rs*,
870 F.3d 171 (3d Cir. 2017)..............................................................20

*In re Enbridge Energy, Ltd. P'ship*,
930 N.W.2d 12 (Minn. Ct. App. 2019)..............................................7

*Env't Def. Fund v. Corps of Eng'rs of U.S. Army*,
331 F. Supp. 925 (D.D.C. 1971)........................................................13

*F.C.C. v. NextWave Pers. Commc'ns, Inc.*,
537 U.S. 293 (2003)...........................................................................13

*Found. on Econ. Trends v. Heckler*,
756 F.2d 143 (D.C. Cir. 1985)...........................................................22

*Fox Television Stations v. FilmOn X*,
966 F. Supp. 2d 30 (D.D.C. 2013)......................................................13

*Friends of the Earth v. Hintz*,
800 F.2d 822 (9th Cir. 1986) .............................................................3, 20

*Friends of the Santa Clara River v. U.S. Army Corps of Eng'rs*,
887 F.3d 906 (9th Cir. 2018) .............................................................3

*Grand Canyon Trust v. F.A.A.*,
290 F.3d 339 (D.C. Cir. 2002) ..........................................................5

*Jones v. Nat'l Marine Fisheries Serv.*,
741 F.3d 989 (9th Cir. 2013) ............................................................2

*Kunaknana v. U.S. Army Corps of Eng'rs*,
2015 WL 3397150 (D. Alaska, May 26, 2015) .................................18

*League of Women Voters of the United States v. Newby*,
838 F.3d 1 (D.C. Cir. 2016)...............................................................25

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)...........................................................................22

*Nat'l Parks Conservation Ass'n v. Semonite*,
311 F. Supp. 3d 350 (D.D.C. 2018) ..................................................4

*Nat'l Wildlife Fed'n v. Burford*,
   835 F.2d 305 (D.C. Cir. 1987) ........................................................................23

*Nat. Res. Def. Council v. Morton*,
   337 F. Supp. 167 (D.C. Cir. 1971) ...................................................................14

*Ocean Advocates v. U.S. Army Corps of Eng'rs*,
   402 F.3d 846 (9th Cir. 2005) ...........................................................................15

*Ohio Valley Env't Coal. v. U.S. Army Corps of Eng'rs*,
   528 F. Supp. 2d 625 (S.D. W. Va. 2007) ...................................................25, 26

*Ohio Valley Env't Coal. v. U.S. Army Corps of Eng'rs*,
   723 F. Supp. 2d 886 (S.D. W.Va. 2010) ...........................................................13

*P.J.E.S. by & through Escobar Francisco v. Wolf*,
   No. CV 20-224, 2020 WL 6770508 (D.D.C. Nov. 18, 2020)............................25

*Park Cnty. Res. Council v. U.S. Dep't of Agric.*,
   817 F.2d 609, 618 (10th Cir. 1987) ..................................................................25

*Realty Income Trust v. Eckerd*,
   564 F.2d 447 (D.C. Cir. 1977) .........................................................................26

*Qualls v. Rumsfeld*,
   357 F. Supp. 2d 274 (D.D.C. 2005) ..................................................................12

*R.I.L-R v. Johnson*,
   80 F. Supp. 3d 164 (D.D.C. 2015) ....................................................................13

*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332 (1989).............................................................................................5

*Save Our Sonoran, Inc. v. Flowers*,
   227 F. Supp. 2d 1111 (D. Ariz. 2002) ..............................................................13

*Sierra Club v. Antwerp*,
   362 Fed. Appx. 100 (11th Cir. 2010)..................................................................3

*Sierra Club v. Sigler*,
   695 F. 2d 957 (5th Cir. 1983) ..........................................................................15

*Sierra Club v. U.S. Army Corps of Eng'rs*,
   645 F.3d 978 (8th Cir. 2011) ...........................................................................23

*S. Utah Wilderness All. v. Norton*,
  237 F. Supp. 2d 48 (D.D.C. 2002) .................................................................19

\* *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  255 F. Supp. 3d 101 (D.D.C. 2017) ................................................4, 5, 7, 14, 15, 16, 17, 21

*Stop the Pipeline v. White*,
  233 F. Supp. 2d 957 (S.D. Ohio 2002) ...........................................................15

*Sylvester v. U.S. Army Corps of Eng'rs*,
  882 F.2d 407 (9th Cir. 1989) ............................................................................3

*Theodore Roosevelt Conservation P'ship v. Salazar*,
  661 F.3d 66 (D.C. Cir. 2011) .........................................................................19

*TikTok, Inc. v. Trump*,
  2020 WL 7233557 (D.D.C. 2020) ...................................................................22

*Utahns for Better Transp. v. U.S. Dept. of Transp.*,
  305 F.3d 1152 (10th Cir. 2002) .........................................................................3

*Washington v. Reno*,
  35 F.3d 1093 (6th Cir. 1994) ..........................................................................25

*Winter v. Nat. Res. Def. Council*,
  555 U.S. 7 (2008)............................................................................................12

*Wisconsin Gas Co. v. Fed. Energy Regul. Comm'n*,
  758 F.2d 669, 674 (D.C. Cir. 1985) ................................................................25

## STATUTES

33 U.S.C. § 1251(a) ............................................................................................2

33 U.S.C. § 1344(a) ............................................................................................2

42 U.S.C. § 4332(C) ...........................................................................................5

## REGULATIONS

33 C.F.R. § 320.4(a).......................................................................................4, 17

33 C.F.R. § 320.4(b)(1).......................................................................................2

33 C.F.R. § 322.3................................................................................................2

33 C.F.R. Pt. 323.................................................................................................2

33 C.F.R. Pt. 325.................................................................................................2

40 C.F.R. § 1500.1(a) (2019) ...........................................................................................4

40 C.F.R. § 1501.4(e) (2019) ...........................................................................................5

40 C.F.R. § 1502.1 ...........................................................................................................18

40 C.F.R. § 1502.14 (2019) ...........................................................................................19

40 C.F.R. § 1506.2(b) .......................................................................................................6

40 C.F.R. § 1506.3 ......................................................................................................7, 20

40 C.F.R. § 1508.13 (2019) .............................................................................................5

40 C.F.R. § 1508.25(a) (2019) .........................................................................................6

40 C.F.R. § 1508.27(a) (2019) .........................................................................................5

40 C.F.R. § 1508.27(b) (2019) ......................................................................................5, 6

40 C.F.R. § 1508.7 (2019) ...............................................................................................6

40 C.F.R. § 1508.9(a) (2019) ...........................................................................................5

40 C.F.R. § 1508.9(b) (2019) ...........................................................................................5

40 C.F.R. § 230.1(c) .........................................................................................................3

40 C.F.R. § 230.10(a) ..........................................................................................2, 3, 17, 19

40 C.F.R. § 230.10(c) ..................................................................................................4, 17

## FEDERAL REGISTER

Executive Order 12,898, 59 Fed. Reg. 7629 (Feb. 16, 1994) .........................................7

Update to the Regulations Implementing the Procedural Provisions of the National
     Environmental Policy Act, 85 Fed. Reg. 43,304 (July 16, 2020) .......................................4

## OTHER AUTHORITIES

Fed. R. Civ. P. 65(c) ......................................................................................................12

Keystone XL FSEIS (2014) ........................................................................................8, 9

Lisa Song, *A Dilbit Primer: How It's Different from Conventional Oil*, InsideClimate News
     (June 26, 2012), http://insideclimatenews.org/news/20120626/dilbit-primer-diluted-
     bitumen-conventional-oil-tar-sands-Alberta-Kalamazoo-Keystone-XL-Enbridge ...........8

## INTRODUCTION

For the Anishinaabe Tribes and people of Northern Minnesota, water is life.  The citizens of the Red Lake Band of Chippewa Indians and the White Earth Band of Ojibwe rely on the waterways and wetlands in the area to provide them with life-sustaining resources such as game, fish, and wild rice.  These natural resources are vital parts of the Tribes' cultural and spiritual lives and histories.  For thousands of years, the Native people of the region have hunted, fished, and gathered in the lakes, marshes, and wetlands of their lands, a practice that continues today.

Paying little heed to the importance of these natural resources, the U.S. Army Corps of Engineers (the "Corps") authorized Enbridge Energy to construct a massive 330-mile pipeline through the area that will transport tar sands oil from Canada.  In doing so, the Corps refused to evaluate key aspects of the pipeline, including the risks of spills of tar sands oil and the potential effects such spills would have on tribes and tribal resources.  The Corps contends that it is not required to evaluate any potential impacts from the operation of the pipeline—a position that is flatly contradicted by this Court's precedent.  The Corps also unlawfully refused to consider important routing and construction alternatives that might serve to minimize the adverse impacts the pipeline will have on water and water-related resources.

Based on the Corps' legally flawed analysis, Enbridge is rapidly proceeding with construction.  The company is moving swiftly to clear the route, cutting down trees and removing other vegetation, moving heavy construction equipment into sensitive areas, and beginning to carve trenches through waterways and wetlands.  The damage the company is doing to the water, species, and lands of the Anishinaabe cannot be undone or compensated for.  The Corps' permit for the Project therefore must be enjoined until it completes the legally required review of the pipelines.

1

## STATUTORY OVERVIEW

### I.      THE CLEAN WATER ACT

The Clean Water Act has the sweeping goals to "restore and maintain the chemical,
physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a), and "to increase
the quality and quantity of the Nation's wetlands," *id.* § 2317(a).  The Act prohibits the discharge
of soil or other materials into wetlands unless authorized by a permit issued by the Corps under
Section 404 of the Act, 33 U.S.C. § 1344(a); 33 C.F.R. § 322.3; *id.* Pts. 323, 325, and provides
strict substantive limits on approving projects that degrade water quality or harm aquatic uses.
Taken together, these requirements create a "very strong" presumption that the "unnecessary
alteration or destruction of (wetlands) should be discouraged as contrary to the public interest."
*Buttrey v. United States*, 690 F.2d 1170, 1180 (5th Cir. 1982) (quoting 33 C.F.R. § 320.4(b)(1)).

First, the Corps may not issue a permit under Section 404 if there is any "practicable
alternative" to the project with less impact on the aquatic ecosystem.  40 C.F.R. § 230.10(a).
The Corps is required to conduct an alternatives analysis and determine what projects are
"available and capable of being done after taking into consideration cost, existing technology,
and logistics in light of overall project purposes."  *Id.*  The process for undertaking this analysis
is clearly set out in the Corps' guidelines implementing the Clean Water Act.  The Corps must
define the project's "overall project purposes" and determine whether a project is "water
dependent."  *Id.*  The Corps may not adopt an overly narrow definition of the project's purposes
such that the range of viable alternatives to the project is arbitrarily constricted.  *Del.
Riverkeeper Network v. U.S. Army Corps of Eng'rs*, 869 F.3d 148, 157 (3d Cir. 2017); *see also
Jones v. Nat'l Marine Fisheries Serv.*, 741 F.3d 989, 1002 (9th Cir. 2013) ("[T]he Corps may not
manipulate the project purpose so as to exclude alternative sites....").

If the project is not water dependent, the Corps must "apply a presumption that a practicable alternative that has a less adverse environmental impact on the wetland[s] is available." *Sierra Club v. Antwerp*, 362 Fed. Appx. 100, 106 (11th Cir. 2010) (citing 40 C.F.R. § 230.10(a)(3)). The burden then falls to the applicant to "'clearly demonstrate[e]' that a practicable alternative is not available." *Id.; see Utahns for Better Transp. v. U.S. Dept. of Transp.*, 305 F.3d 1152, 1163 (10th Cir. 2002). The applicant may not "define the project purpose narrowly 'in order to preclude the existence of any alternative sites and thus make what is practicable appear impracticable.'" *Friends of the Santa Clara River v. U.S. Army Corps of Eng'rs*, 887 F.3d 906, 912 (9th Cir. 2018) (quoting *Sylvester v. U.S. Army Corps of Eng'rs*, 882 F.2d 407, 409 (9th Cir. 1989)). Whether an alternative is practical takes account of "cost, existing technology, and logistics in light of overall project purposes," 40 C.F.R. § 230.10(a)(2), but costs and economic efficiency alone are not grounds for rejecting an alternative as impractical, *Del. Riverkeeper Network*, 869 F.3d at 159–60. Indeed, a higher cost "does not mean the alternative is not 'available' or 'capable of being done.' More information would be required to reach that conclusion." *Id.* (citing 40 C.F.R. § 230.10(a)(2)). The Corps must independently assess an applicant's discussion of alternatives and any assertions that no practicable alternative exists. *Friends of the Earth v. Hintz,* 800 F.2d 822, 835–36 (9th Cir. 1986).

Second, the Corps cannot issue the permit unless there is a demonstration that any discharge from the project "will not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern," 40 C.F.R. § 230.1(c), or if any discharge "will cause or contribute to significant

degradation of the waters of the United States," violating a water quality standard or toxic

effluent standard.  *Id.* § 230.10(c).

Third, the Corps must determine that the project is in the "public interest" by weighing all

"relevant" considerations and balancing all probable impacts of the proposed action against its

alleged benefits.  33 C.F.R. § 320.4(a).  Determining that a project is in the public interest

requires weighing its benefits against its costs.  *Nat'l Parks Conservation Ass'n v. Semonite*, 311

F. Supp. 3d 350, 376–77 (D.D.C. 2018).  The Clean Water Act requires that the Corps to conduct

its own "independently weighed" determination of the public interest and not rely on

determinations made by the application or any state authority.  *Id.*

## II.      THE NATIONAL ENVIRONMENTAL POLICY ACT

The National Environmental Policy Act ("NEPA") is the "basic national charter for

protection of the environment."  40 C.F.R. § 1500.1(a) (2019).[1]  As this Court has recognized, it

has two aims: to (1) "place[] upon an agency the obligation to consider every significant aspect

of the environmental impact of a proposed action," and (2) "ensure[] that the agency will inform

the public that it has indeed considered environmental concerns in its decisionmaking process."

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 112 (D.D.C.

2017) (quoting *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97

(1983). Although NEPA's requirements are procedural and do not require that an agency reach a

particular consequence, it nevertheless requires agencies "to imbue their decisionmaking,

---

[1] After the Permit application was submitted, the Council on Environmental Quality ("CEQ") revised its regulations implementing NEPA.  *See* Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43,304 (July 16, 2020).  This memorandum cites to the prior regulations, as the 2020 regulations apply only to "any NEPA process begun after" the regulations' effective date of September 14, 2020.  *Id.* at 43,372–73.  Moreover, without express statutory authority to the contrary, rules do not apply retroactively.  *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988).

through the use of certain procedures, with our country's commitment to environmental salubrity." *Id.* at 113 (quoting *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 193–94 (D.C. Cir. 1991)).  NEPA requires that an agency take a "hard look" at adverse environmental effects of a proposed action and ensure that all such effects are identified and evaluated. *Id.* at 123 (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)).

Under NEPA, an agency must prepare an environmental impact statement ("EIS") for any proposed major federal action "significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).  To assess whether an EIS is required, the agency first drafts an environmental assessment ("EA"), a "concise public document" that "provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact."  40 C.F.R. § 1508.9(a) (2019).  Although the EA may be brief, it must discuss the need for the project; alternatives to the project, including the alternative of not proceeding; and the environmental impacts of the proposed project and its alternatives.  *See id.* § 1508.9(b) (2019).  If the agency concludes that the project will not have a significant environmental effect, it must prepare a Finding of No Significant Impact ("FONSI") justifying its conclusion. *Id.* §§ 1501.4(e) (2019); 1508.13 (2019).

However, if the agency finds that *any* significant environmental impacts *might* result from the proposed agency action, then the agency must prepare an EIS before any agency action is taken.  *Standing Rock Sioux Tribe*, 255 F. Supp. 3d at 113; *see also Grand Canyon Trust v. F.A.A.*, 290 F.3d 339, 340 (D.C. Cir. 2002).  To determine whether a proposed action may significantly affect the environment, the agency must consider both the context and intensity of the proposed action, including whether the project will take place in "ecologically critical areas," and whether the project will affect endangered species.  40 C.F.R. §§ 1508.27(a), (b) (2019).

The agency also should consider "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial."  *Id.* § 1508.27(b)(4) (2019).

While evaluating any project under NEPA, a federal agency must analyze the project and all of its connected, cumulative, and similar actions together in an EA or EIS before the project is allowed to proceed.  *Id.* § 1508.25(a) (2019).  Connected actions are defined as actions that: "[c]annot or will not proceed unless other actions are taken previously or simultaneously;" or "[a]re interdependent parts of a larger action and depend on the larger action for their justification."  *Id.* § 1508.25(a)(1) (2019).  NEPA also mandates that the lead agency consider "whether the action is related to other actions with . . . cumulatively significant impacts."  *Id.* § 1508.27(b)(7) (2019).  NEPA defines "cumulative impact" to mean "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions."  *Id.* § 1508.7 (2019).  A federal action will significantly affect the environment "if it is reasonable to anticipate a cumulatively significant impact on the environment.  Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts."  *Id.* § 1508.27(b)(7) (2019).  NEPA requires that a reviewing agency consider in the same EIS any "connected" actions, including actions that are "interdependent parts of a larger action and depend on the larger action for their justification."  *Id.* § 1508.25(a)(1)(iii) (2019).

In addition, although NEPA regulations encourage federal agencies to cooperate with state agencies while conducting environmental reviews of projects where overlapping jurisdiction exists, *see* 40 C.F.R. § 1506.2(b), federal agencies must conduct their own independent review of projects.  Federal agencies may not adopt a state's environmental review

in whole or in part.  *See also id.* § 1506.3 (permitting federal agencies to "adopt a *Federal* draft or final environmental impact statement or portion thereof" but expressly omitting adopting a state EIS or portion thereof) (emphasis added).[2]

In addition, Executive Order 12,898 makes "each Federal agency," including the Corps, responsible for "identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations."  59 Fed. Reg. 7629 § 1-101 (Feb. 16, 1994).  The Order requires that, "[t]o the greatest extent practicable and permitted by law," federal agencies "shall make achieving environmental justice part of [their] mission."  *Id.*  Although the Order does not create a private right to judicial review, *id.* § 6-609, the D.C. Circuit has found that an agency's environmental justice analysis may be challenged under NEPA and the APA.  *See, e.g.*, *Cmtys. Against Runway Expansion, Inc. v. F.A.A.*, 355 F.3d 678, 689 (D.C. Cir. 2004) ("The [agency] exercised its discretion to include the environmental justice analysis in its NEPA evaluation, and that analysis therefore is properly subject to 'arbitrary and capricious' review under the APA."); *see also Standing Rock Sioux Tribe*, 255 F. Supp. 3d at 136.

## FACTUAL BACKGROUND

Enbridge is in the process of constructing a 330-mile portion of a 36-inch tar sands pipeline through the wetlands and waterways of northern Minnesota.  The Project would cross portions of thirteen counties in Minnesota alone: Kittson, Marshall, Pennington, Polk, Red Lake, Clearwater, Hubbard, Wadena, Cass, Crow Wing, Aitkin, St. Louis, and Carlton.  Ex. B at 2–3.

---

[2] To proceed, Enbridge was required to apply obtain a routing and siting permit from the Minnesota Public Utilities Commission ("MPUC") under state law, during which time, the MPUC conducted an EIS of the project under the Minnesota Environmental Protection Act.  Ex. C at 1–2.  The MPUC's EIS was overturned by the Minnesota Court of Appeals, *see In re Enbridge Energy, Ltd. P'ship*, 930 N.W.2d 12 (Minn. Ct. App. 2019), and is currently subject to a second round of litigation.

Construction of the pipeline will require crossing 227 waterways and 885 wetlands, mostly by digging trenches through the waterways and wetlands.  *Id.* at 28.

Although Enbridge and the Corps bill the Project as a "replacement" of an existing pipeline, the new Line 3 would operate at nearly twice the capacity of the existing line—with an initial capacity of 760,000 barrels of crude oil per day ("bpd"), compared to the existing pipeline current capacity of 390,000 bpd.  *Id.* at 16–17, 21.  The new Line 3 also would carry heavy high-sulfur "diluted bitumen" or dilbit from Alberta's tar sands region—the existing Line 3 carries mostly light crude—and will take longer and completely different route.  *See id.* at 4, 21.

The risks associated with the transportation of heavier crudes like dilbit are substantially different and greater than the transportation of lighter petroleum products.  As Plaintiffs noted in their comments to the Corps, top researchers of oil spills have stated that dilbit is "not considered crude oil by most people who deal with oil and oil spills."  Ex. D at 16 (quoting Lisa Song, *A Dilbit Primer: How It's Different from Conventional Oil*, InsideClimate News (June 26, 2012), http://insideclimatenews.org/news/20120626/dilbit-primer-diluted-bitumen-conventional-oil-tar-sands-Alberta-Kalamazoo-Keystone-XL-Enbridge).  The federal government has recognized in other EISs conducted on tar sands projects that "[d]ue to the capacity for dilbit to precipitate out in water and its resistance to biodegradation, in the event of a release to a waterbody, more difficult cleanup scenarios (e.g., dredging) for dilbit may be expected than with other types of crude oil."  Keystone XL FSEIS at 3.13-10 (2014).  Further, "[t]he release of dilbit to a river or other aquatic environment introduces the potential for additional impacts and additional recovery challenges for responders of such an event to the environment."  *Id.* at 4.13-84.  Unlike conventional crude, dilbit can become suspended in the water column or mix into sediment in the riverbed or shoreline and thus be incredibly difficult to clean up, as demonstrated by the

extremely costly and long-term cleanup efforts required to address Enbridge's spill in the Kalamazoo River.  *See id.*at 4.13-88.

The route of the new Line 3 also is substantially different than the existing line.  The new pipeline will extend for approximately 340 miles, compared to the existing line's approximately 280 miles and would be built in close proximity to the existing Line 3 for only a portion of the route, requiring significant amounts of greenfield construction.  The Project would cause significant disturbance along the entire route.  The vast majority of the 227 waterway crossings will consist of dry crossings, a more impactful construction method, where the water is diverted using various damming techniques while the trench is excavated through the bottom of the stream or river bed.  Ex. B at 29, tbl.2.  The dry cross method results in releases of sediment and fish and other aquatic life fatalities, and raises serious concerns about long-term stability of the banks of the waterways that are crossed, particularly when the increased sedimentation caused by loss of riparian vegetation and increased rainfall from climate change are factored in.  Ex. L, Decl. of Laura Triplett ¶¶ 19–26 (Dec. 23, 2020); *see also* Ex. B at 35 (trenching could cause unstable river banks).  Enbridge would use the less impactful method of crossing—horizontal direct drilling, where the resource is bypassed entirely by digging a tunnel under the waterway or wetlands—in only a handful of locations.  *See id.* at 39.

The Project will also adversely impact at least 1,049.58 acres of wetlands, according to the Corps' estimates.  *Id.* at 21.  Again, the vast majority of the 885 wetlands crossings will be done using a form of dry crossing where the wetland must be trenched.  *Id.* at 28.  According to the Corps, approximately 410.1 acres of wetlands within special wetland categories will be affected by the Project's construction, including various types of forested wetlands and wetlands that are hydrologically connected to key resources such as trout and wild rice waters.  *Id.* at 38.

The Project also will cross a calcareous fen that contains distinct groundwater inflows and provides a unique habitat for rare species of plants.  *Id.*

The Project will discharge fill into wetlands that will result in the permanent loss of 9.97 acres of wetland.  *Id.* at 21.  Enbridge will convert 81.36 acres of scrub-shrub wetland and 148.85 acres of forested wetland to "an emergent type wetland," permanently and substantially altering more than 230 acres of wetland.  *Id.* at 36.  Such alteration will result in the complete loss of the wetlands' original vegetation, the impaired or eradicated ability of the wetlands to mitigate flood risk, an increased risk of oil spills, and ongoing harm to many wildlife species. Ex. L, Triplett Decl. ¶ 7–10.

By the Corps' own estimation, Enbridge will remove vegetation along the entire route of the pipeline so that a 10-foot wide swath will remain entirely vegetation-free, while an additional 20-foot width would remain tree-free.  Ex. B at 36.  The Corps admits that "[t]he changing composition of vegetation could affect resident wildlife unable to adapt to changing conditions. This could be magnified by the permanent loss of trees and shrubs, habitat fragmentation, and changes in vegetation cover in large tracts of forest habitats within the pipeline right-of-way." *Id.*  In addition, the removal of vegetation associated with construction of the pipeline would result in potential fragmentation of wildlife habitat, including "a decrease in total habitat area, amount of interior habitat, biodiversity (richness), and connectivity" and also cause "an increase in amount of edge habitat, increase the risk of invasive species spread, and isolate some habitat types."  *Id.*

The Project's impacts will fundamentally alter local Tribes' traditional practices. Northern Minnesota is home to the Anishinaabe people, who have relied on the area's natural resources, lands, and waterways since time immemorial.  *See, e.g.*, Ex. H, Decl. of Michaa Aubid

¶ 3 (Dec. 24, 2020); Ex. K, Decl. of Samuel Strong ¶ 3 (Dec. 24, 2020).  Line 3 will pass in close

proximity to the Red Lake and White Earth Reservations, through lands, wetlands, and

waterways that tribal citizens hold sacred.  Ex. K, Strong Decl. ¶ 7, 11.  As the Tribal Secretary

for the Red Lake Band of Chippewa Indians explains, "[w]e rely heavily on the forest, the water

and all of Mother Earth," and "water is the lifeblood of our communities."  *Id.* ¶¶ 3, 5.

The Tribes use waterways and wetlands crossed and otherwise affected by Line 3 for

cultural and spiritual practices and for subsistence gathering, hunting, and fishing.  *See, e.g.*, *id.*

¶¶ 7; Ex. G, Decl. of Jaime Arsenault ¶ 5 (Dec. 24, 2020).  In particular, wild rice, or manoomin,

plays a key role in the Tribes' cultural life.  *Id.* ¶ 4; Ex. H, Aubid Decl. ¶ 4; Ex. J, Decl. of

Winona LaDuke ¶ 15 (Dec. 24, 2020); Ex. K, Strong Decl. ¶ 6.  Manoomin provides the

Anishinaabe people with "physical and spiritual sustenance."  Ex. K, Strong Decl. ¶ 6.  Any

direct or indirect degradation of waters that host wild rice, therefore, would be devastating to the

Anishinaabe.  *See id*. ¶ 9; Ex. H, Aubid Decl. ¶ 10.  Tar sands oil poses a substantial threat to

manoomin, particularly as it contains high sulfur content and wild rice is particularly sensitive to

any increase in sulfur levels in the waters in which it grows.  *Id.* ¶ 9; Ex. G, Arsenault Decl. ¶ 6;

*see also* Ex. E at 10–11.

Despite receiving extensive comments opposing the Project and highlighting Line 3's

adverse impacts to environmental resources, the Corps did not prepare an EIS for the Project and

issued only an EA and FONSI along with the Section 404 permit on November 23, 2020.  Exs.

A, B.  The Corps, however, did not make the documents explaining its decision to issue the

Section 404 Permit, including the EA and its analysis of the Project under Section 404, publicly

available.  Sierra Club was able to obtain some of those documents on December 8, 2020,

pursuant to a Freedom of Information Request that Sierra Club filed on December 1, 2020.  Ex. M, Decl. of Doug Hayes (Dec. 24, 2020).

Construction on the pipeline began in several locations on November 30, 2020[3] and has involved tree clearing, destruction of wetland vegetation, trenching through wetlands, and irreversible soil disruption and compaction.  Ex. L, Triplett Decl. ¶ 11.  Soil compaction, in particular, fundamentally alters the manner in which water circulates through wetland soil, resulting in a loss of wetland function and disruption to native plants.  *Id.* ¶ 16; *see also* Ex. I, Decl. of Jami Gaither at ¶ 10 (Dec. 24, 2020) (describing additional construction-related harm to native plants).  According to the Red Lake Tribal Secretary, workers have begun to clear land in the vicinity of the Red Lake River, the Clearwater River, and the Thief River, all of which are important sites for fishing, gathering, hunting, trapping, and other cultural and ceremonial activities.  Ex. K, Strong Decl. ¶ 12.  In addition, as the Tribal Historic Preservation Officer for the White Earth Band of Ojibwe explains, construction "has already threatened on important cultural site, and [it could] threaten others."  Ex. G, Arsenault Decl. ¶ 8.

## ARGUMENT

Plaintiffs' request for preliminary injunction should be granted, because they show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in their favor; and (4) that an injunction is in the public interest.  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).  Plaintiffs "bear the burdens of production and persuasion," *see Qualls v. Rumsfeld*, 357 F. Supp. 2d 274, 281 (D.D.C. 2005), and may rely on credible evidence "that is less complete than in a trial on the

---

[3] *See, e.g.*, Mohamed Ibrahim, Associated Press (Dec. 1, 2020), https://globalnews.ca/news/7495766/enbridge-line-3-work-begins-minnesota/.

merits," *see R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 173 (D.D.C. 2015) (citations omitted).

Plaintiffs satisfy these requirements and ask the Court to enjoin the Corps to suspend Line 3's

Section 404 permits pending resolution in this case.[4]  *See e.g., Ohio Valley Env't Coal. v. U.S.*

*Army Corps of Eng'rs,* 723 F. Supp. 2d 886, 899 (S.D. W.Va. 2010); *Save Our Sonoran, Inc. v.*

*Flowers*, 227 F. Supp. 2d 1111, 1115 (D. Ariz. 2002).

       Plaintiffs also request that the Court decline to impose a bond upon granting Plaintiffs'

request for an injunction.  Federal Rule of Civil Procedure 65(c) gives authority to require

security when issuing a preliminary injunction, but provides wide discretion in whether a bond

should be required.  *See, e.g., Fox Television Stations v. FilmOn X*, 966 F. Supp. 2d 30, 52

(D.D.C. 2013).  This Court has previously issued nominal bonds in injunction proceedings

against the Corps.  *See Env't Def. Fund v. Corps of Eng'rs of U.S. Army*, 331 F. Supp. 925

(D.D.C. 1971) (ordering a bond of one dollar to enjoin waterway project after construction had

already begun).  The Court should similarly waive or require only a nominal bond here.

Plaintiffs bring this motion to protect irreplaceable and pristine waterways and wetlands, as well

as natural resources that are critical to the Plaintiff Tribes.  The Plaintiff Tribes have scarce

financial resources, almost all of which are directed at providing for the security, safety, health,

and welfare of their tribal members.  The public interest of protecting the cultural resources of

the Tribes also favors a nominal bond.  *See Armstrong v. Bush*, 807 F. Supp. 816, 823 (D.D.C.

1992) ("Plaintiffs shall only be required to post $100 security because the public interest favors

granting the Temporary Restraining Order under these circumstances.").  Imposition of a

---

[4] If Plaintiffs prevail on the merits, they would be entitled to vacatur of the Section 404 permit.
*See F.C.C. v. NextWave Pers. Commc'ns, Inc.*, 537 U.S. 293, 300 (2003) ("In all cases agency
action must be set aside if the action was 'arbitrary, capricious, an abuse of discretion or
otherwise not in accordance with law.'") (quoting *Citizens to Preserve Overton Park, Inc. v.
Volpe*, 401 U.S. 402, 413–414 (1971)).

substantial bond also is not supported by the public interest, because it would have the effect of

denying the Plaintiffs their right to judicial review of the government's actions under NEPA.  *See*

*Nat. Res. Def. Council v. Morton*, 337 F. Supp. 167, 168–69 (D.C. Cir. 1971) (holding that

imposition of anything other than a nominal bond on nonprofit environmental organizations

would undermine Congress' intent to have private environmental organizations help in enforcing

NEPA).

I.   **PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS OF THEIR CLAIMS THAT THE CORPS' DECISION DOES NOT COMPLY WITH NEPA OR THE CLEAN WATER ACT.**

The Corps' review of the Project suffers from numerous and substantial deficiencies that

violate NEPA and the Clean Water Act.  A central stark and glaring omission is the Corps'

refusal to examine the potential impacts from the operation of the Project, primarily the risk of

and potential harms associated with oil spills.  This error alone invalidates much of the Corps'

NEPA analysis, leading to a gross underestimation of the Project's potential impacts to

waterways, wetlands, public health, the Tribes' cultural resources, habitats, and endangered

species to name a few.  It also undermines the Corps' findings under the Clean Water Act that

there is no practicable alternative to the Project with less impact on the aquatic ecosystem, that

the Project will not have an unacceptable adverse impact, or that approval of Line 3 is in the

public interest.

In addition, the Corps arbitrarily truncated its review of potential alternatives to the

Project under both NEPA and the Clean Water Act by refusing to consider routing options other

than what the Minnesota Public Utility Commission approved and failing entirely to consider

alternatives to the construction methods proposed by Enbridge.  These omissions violate both

NEPA and the Clean Water Act and invalidate the Corps' approval of Line 3 and clearly

demonstrate that Plaintiffs will prevail on the merits of their challenge.

14

**A.      The Corps' Failure to Consider the Risk of Oil Spills Violates NEPA.**

The Corps' Decision Document is entirely void of any analysis of the risks of and

potential harms associated with oil spills from the Project.  In Appendix A, the Corps admits that

"[a]t the time of the Public Notice, no spill analysis was completed."  Ex. C at 3.  The Corps

declared that "Congress has not authorized the [Corps]…to regulate the overall construction or

operation of oil pipelines.  Our regulatory authority and jurisdiction is limited to the

construction-related impacts to aquatic resources…The potential for oil spills is beyond the

scope of our regulatory authority…"  *Id.*  The Corps did not cite to any authority for this

proposition or explain why its lack of regulatory oversight over oil spills absolves it of

evaluating the effect of potential spills from the Project under NEPA or the Clean Water Act.

*See id.*

This Court's recent decision in *Standing Rock Sioux Tribe v. U.S. Army Corps of

Engineers* demonstrates that the Corps' position is entirely contrary to NEPA.  In *Standing Rock

Sioux Tribe*, the Court found that the Corps' NEPA analysis was deficient, because the Corps

had not adequately addressed the risk posed by oil spills.  The Court's holding expressly rebuts

the Corps' position here, concluding that "[t]he problem [with the Corps' NEPA analysis]

is…that the analysis covers only <u>construction</u> impacts, not <u>spill</u> impacts."  255 F. Supp. 3d at

139.  Other courts similarly have roundly rejected the Corps' position.  *Ocean Advocates v. U.S.

Army Corps of Eng'rs*, 402 F.3d 846, 868 (9th Cir. 2005) (finding that the Corps was required to

look at the risk of oil spills from a project that could increase oil tanker traffic); *Sierra Club v.

Sigler*, 695 F. 2d 957, 969–76 (5th Cir. 1983) (finding that the Corps was required to consider oil

spills under NEPA); *see also Stop the Pipeline v. White*, 233 F. Supp. 2d 957, 968 (S.D. Ohio

2002) (finding the Corps NEPA analysis adequate when it did properly consider spills).

As a result of the Corps' failure to adequately evaluate oil spills, the Court in *Standing Rock Sioux Tribe* found multiple bases under NEPA to invalidate the Corps' analysis and approval of the project.  First, as is the case here, although the Corps concluded that the Dakota Access Pipeline did not warrant preparation of an EIS, the Court found that the failure to properly evaluate oil spills invalidated that conclusion.  255 F. Supp. 3d at 129.  In particular, because the impacts associated with oil spills could be catastrophic, ignoring this risk meant that the Corps did not have the basis to decide whether the project was highly controversial and thus whether preparation of an EIS is required under NEPA.  *Id.*  The same is true here and by itself requires that the Court invalidate the Corps' decision.[5]

Second, just as in the instant case, the failure to evaluate oil spills undermined the Corps' evaluation of the Dakota Access Pipeline's potential impacts on resources of great cultural and economic importance to the Tribe.  *Id.* at 133–34.  Plaintiffs here submitted substantial evidence on the importance of the natural resources, including manoomin, to the Plaintiff Tribes and that an oil spill from the Project could severely and adversely impact those resources and the Tribes.  *See, e.g.,* Ex. D at 15–19, 58–60.  Just as in *Standing Rock Sioux Tribe*, "[w]ater is the lifeblood to [tribal] communities" in northern Minnesota.  *See* Ex. K, Strong Decl. ¶ 5.  The Red Lake and White Earth peoples depend on the waters that will be crossed and effected by Line 3 to provide physical and spiritual sustenance.  *See, e.g.*, *id.* ¶ 6.  Nevertheless, just as in *Standing Rock Sioux Tribe*, "[w]ithout any acknowledgment of or attention to the impact of an oil spill on the Tribe's fishing and hunting," the Corps failed to consider the devastating impact an oil spill from Line 3

---

[5] The Corps' cursory referral to the fact that the state MPUC conducted a review of the risk of oil spills does not remove the Corps' responsibility for considering operational risks under NEPA.  *See* Ex. C at 16.  This summary statement does not come close to the kind of "hard look" required under NEPA and by this Court.  *See Standing Rock Sioux Tribe*, 255 F. Supp. 3d at 134.

could have on those critical resources.  *See Standing Rock Sioux Tribe*, 255 F. Supp. 3d at 134.

Therefore, just as in *Standing Rock Sioux Tribe*, "the EA…[is] inadequate."  *See id.*

Third, as in *Standing Rock Sioux Tribe*, the failure to address oil spills fatally undermines the Corps' environmental justice analysis.  *See id.* at 139–40.  The Court found that the failure to adequately evaluate oil spills rendered it "hard pressed to conclude that the Corps' selection of a 0.5-mile buffer [for its environmental justice analysis] was reasonable."  *Id.* at 138.  The Corps here did not set a buffer based on miles but appears to have limited its environmental justice analysis to the Project's footprint.  *See* Ex. B at 125–26.  But the effects of an oil spill can easily stretch far beyond the limited swath of the construction corridor, as has occurred in another Enbridge pipeline spill in Kalamazoo, Michigan, which Plaintiffs noted in the extensive comments they submitted to the Corps.  Ex. D at 19–22.  Thus, as was the case in *Standing Rock Sioux Tribe*, it was unreasonable and unlawful for the Corps to limit the environmental justice analysis to such a narrow corridor without any kind of assessment of the risk of oil spills.  *See* 255 F. Supp. 3d at 138–40.

**B.**   **The Corps Failure to Consider the Risk of Oil Spills Violates the Clean Water Act.**

In addition to having violated NEPA by failing to consider the impact of oil spills, the Corps also failed to discharge its duties under Section 404 of the Clean Water Act by ignoring all operational impacts of Line 3.  The Corps' regulations under Section 404 require that the Corps determine whether there is a practical alternative to the project with less impact on the aquatic ecosystem, 40 C.F.R. § 230.10(a), any discharge from the project that will have an unacceptable adverse impact to ecosystems of concern or to water quality, 40 C.F.R. § 230.10(c), and if the project is in the public interest, 33 C.F.R. § 320.4(a).  None of these determinations can reasonably be made in the absence of considering the risk and impacts of oil spills.

Indeed, the Corps' own discussion of whether practical alternatives to the Project exist demonstrates the importance of oil spills in this key Section 404 determination.  Throughout the discussion of multiple systems alternatives such as transporting oil by rail or truck, the Corps made vague and unsupported statements about the overall risk of oil spills from particular methods of transportation without ever having actually evaluated the risk and potential consequences of oil spills from this particular project.  *See, e.g.*, Ex. B at 19–20.  The total failure to evaluate spills not only is unreasonable on its face, it is inconsistent with the Corps' treatment and evaluation of other oil pipeline projects.  *See, e.g., Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, 2020 WL 1450750, at *6–7, *13 (M.D. La. Mar. 25, 2020) (including an extensive discussion of how the Corps considered the risk of oil spills under its NEPA and Section 404 responsibilities, including the evaluation of whether the pipeline was in the public interest); *Kunaknana v. U.S. Army Corps of Eng'rs*, 2015 WL 3397150, at *14 (D. Alaska, May 26, 2015) (Corps asserting that oil spills need be considered "in determining whether an alternative has 'other significant adverse environmental consequences'").  The refusal to consider Line 3's potential oil spill risks, therefore, invalidates the Corps' assessment of the pipeline under Section 404 of the Clean Water Act.

**C.    The Corps Erred in Failing to Consider Obvious Alternatives to the Project.**

The Corps also failed to comply with NEPA and the Clean Water Act by refusing to consider routing and construction alternatives in the EA and 404 Determination.  NEPA requires the Corps' NEPA analysis inform decision-makers and the public of the "reasonable alternatives that would avoid or minimize adverse impacts or enhance the quality of the human environment."  40 C.F.R. § 1502.1.  This alternatives analysis is the "heart" of the NEPA review—the agency should "present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for

18

choice among options." *Id.* § 1502.14 (2019); *see also Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 69 (D.C. Cir. 2011); *Ctr. for Food Safety v. Salazar*, 898 F. Supp. 2d 130, 147 (D.D.C. 2012) ("An agency's consideration of alternatives' must be more than a pro forma ritual. Considering environmental costs means seriously considering alternative actions to avoid them.'") (quoting *S. Utah Wilderness All. v. Norton*, 237 F. Supp. 2d 48, 52 (D.D.C. 2002)). The alternatives analysis is particularly important in the Clean Water Act Section 404 context because the Corps must ensure that there are no less environmentally damaging practicable alternative that exists. 40 C.F.R. § 230.10(a). Where, as here, a project is not "water dependent," *see* Ex. B at 17, the law presumes that a less environmentally damaging practicable alternative does exists and requires that Enbridge clearly demonstrate that practicable alternatives which would not involve discharge of fill material into special aquatic sites are available. 40 C.F.R. § 230.10(a)(3).

Nevertheless, the Corps improperly and unlawfully assumed that it could not consider alternative routes based on a decision by the MPUC and failed entirely to address in its EA or 404 Determination whether Enbridge might employ different construction techniques at specific locations to lessen the environmental impact of Line 3.

**1.      The Corps Is Not Permitted to Ignore Route Alternatives.**

Although the Corps admitted that the choice of route of Line 3 can have substantially different impacts to the environment, it refused to consider any different routing options for the Project.[6] It instead the Corps claimed that "the range of alternatives is limited to the route corridor designated by the MPUC. The Corps does not regulate the siting of pipelines." Ex. B at 17. The Corps may not, however, abdicate its responsibilities under NEPA or the Clean Water

---

[6] For example, the Corps explicitly concluded that "[e]ffects to wildlife may be more pronounced in Greenfield routes as a result of habitat fragmentation." Ex. B at 37.

Act to a state entity governed by entirely different statutes and standards.  In particular, under the

Clean Water Act, when a project is not water dependent, the Corps must "presume that the

applicant can select a different pipeline route or other alternative that does not affect an aquatic

site." *Del. Riverkeeper Network v. U.S. Army Corps of Eng'rs*, 870 F.3d 171, 180 (3d Cir.

2017).  There is no authority that suggests that this presumption disappears in the face of a state

agency determination.  *Cf. City of Dania Beach, Fla. v. U.S. Army Corps of Eng'rs*, 2012 WL

3731516 (S.D. Fla., July 6, 2012) (finding that the Corps properly deferred to findings by the

Federal Aviation Administration ("FAA") where the FAA was the lead agency, had rejected an

alternative as impractical, and where a federal statute directed that other agencies defer to the

FAA).  To the contrary, the Corps here is required to independently evaluate the information

presented to it, not to blindly eliminate options based on a state agency's decision.  *See Friends*

*of the Earth v. Hintz,* 800 F.2d at 835–36.  Similarly, as is discussed above, there is federal

agencies must conduct their own independent review of projects under NEPA and have no

authority to defer to a state agency's conclusion in whole or in part.  *See also* 40 C.F.R. § 1506.3

(2019).

Indeed, MPCA expressly identified less environmentally-damaging routes that Corps did

not even consider.  *See, e.g.,* Ex. F.  As Plaintiffs discussed in comments submitted to the Corps:

> MPCA analyzed the environmental damages associated with various alternatives
> according to several factors, including (1) the number of altered watercourses, (2)
> soil erodibility, (3) groundwater vulnerability, and (4) the extent of forested uplands
> and woody wetlands on each route. . . . These factors are critical to determining
> alternatives' true impacts to the environment.  For example, the number of altered
> watercourses along a route is important, because unaltered watercourses provide
> higher levels of ecological function and diversity.   Construction in unaltered
> watercourses, therefore, would result in greater ecological harm than construction
> in less valuable altered watercourses.  *Id.* at 4–5.  Areas with higher soil erodibility
> have a greater risk of sedimentation both during and after construction.  Not only
> are waterways in areas with higher erodibility at risk for greater turbidity due to the
> project, but the pipeline itself also is at risk of being exposed or undermined due to

> water movement.  Based on these factors, MPCA concluded that other routes, offer greater "potential to minimize potential adverse effects to surface water and groundwater resources" than the route Enbridge is proposing to the Corps.

Ex. D at 50–51 (citations and footnote omitted).  The Corps cannot ignore such obvious alternatives or refuse to consider alternative routes that might avoid impacts to additional resources, including those that are critical to Plaintiffs Tribes.  The Corps' failure to do so renders its decision irrational.

> ### 2.        The Corps Is Not Permitted to Ignore the Impacts of Potential Construction Alternatives.

The Corps' EA and 404 Determination impermissibly fails to discuss the impacts of potential alternatives to Enbridge's planned construction methods at each crossing.  Plaintiffs submitted extensive comments about how the choice of construction method at each location can have extremely disparate adverse impacts to the environment in general and water quality specifically.  *See* Exs. D and E.  However, the Corps' only discussion of Enbridge's choice of construction method—and refusal to use the crossing method that is most protective of waterways and wetlands except at only a handful of locations—is a terse and conclusory paragraph that offers no actual analysis:

> The Corps worked closely with Enbridge and State agencies to review proposed pipeline construction methods at waterbody and wetland crossings.  Construction-related project impacts to [waters of the United States] associated with the Designated Route were avoided and minimized to the extent practicable.  This review took into account site characteristics which may have led to a trenched crossing method potentially being less environmentally damaging than a bore method.

Ex. C at 5.  The Corps' conclusory statement fails to explain the potential different impacts associated with alternative construction methods at different locations, as the Corps is required to do under NEPA.  *See Standing Rock Sioux Tribe*, 255 F. Supp. 3d at 134.  And the statement does not discharge the Corps' duty to eliminate all practicable alternatives—including different

construction methods—based on a meaningful analysis of practicability.  *See Del. Riverkeeper Network*, 869 F.3d at 159–60.

## II.    PLAINTIFFS WILL BE IRREPARABLY HARMED IN THE ABSENCE OF AN INJUNCTION.

The harm to Plaintiffs and their members warrants injunctive relief because that harm is "certain, great and actual—not theoretical—and imminent."  *TikTok, Inc. v. Trump*, 2020 WL 7233557, at *15 (D.D.C. 2020) (citation and emphasis omitted).[7]  The U.S. Supreme Court has recognized that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable."  *Amoco Prod. Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 545 (1987); *see also Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 25 (D.D.C. 2009) ("[E]nvironmental and aesthetic injuries are irreparable.").  "When a procedural violation of NEPA is combined with a showing of environmental or aesthetic injury," as it is here, courts do not hesitate to find irreparable harm.  *Brady Campaign to Prevent Gun Violence*, 612 F. Supp. 2d at 24 (citations omitted); *see also Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 157 (D.C. Cir. 1985) ("The NEPA duty is more than a technicality; it is an extremely important statutory requirement to serve the public and the agency *before* major federal actions occur.").

Here, the Corps has acknowledged that the Project will inflict irreparable harm.  For instance, the Corps admits that the Project will "result in the permanent loss of 9.97 acres of wetlands."  Ex. B at 21.  The Corps also admits that the Project will "permanently convert[]" more than 81 acres of scrub-shrub wetland and 148 acres of forested wetland to emergent

---

[7] Plaintiffs have demonstrated that they satisfy the elements of standing in the numerous declarations attached hereto as Exhibits G–L which show irreparable harm in the absence of a preliminary injunction, as well as injury in fact that is traceable to the Corps' approval of Line 3 and will be redressed by a favorable decision by this Court.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

wetland. *Id.* at 36.  Not only will this conversion irreversibly alter the wetlands' aesthetic appearance, but it also will increase the risk of flooding and associated damage to surrounding communities, stream bank stability, and water quality; result in a net loss of carbon storage, thereby increasing the Project's total harm to our climate; and displace wildlife species that rely on scrub-shrub and forested wetlands, including a variety of species of special importance to Plaintiffs' members.  Ex. L, Triplett Decl. ¶¶ 7–10 (Dec. 23, 2020).  Even by the most generous estimates, some wetlands that are to be "restored" will never fully recover.  *Id.* ¶¶ 14, 15.  By the Corps' own admission, therefore, the Project will cause certain, great, and actual harm that cannot be repaired by legal remedies.  *See, e.g.*, *Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 995 (8th Cir. 2011) (concluding that the filling of wetlands constituted irreparable harm); *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 323–26 (D.C. Cir. 1987) (affirming a finding of irreparable injury based on the permanent destruction of wildlife habitat, water quality, natural beauty, and other environmental and aesthetic values and interests).

Plaintiffs' members, who hold close and vital ties to the affected areas, consequently will be irreversibly injured.  For instance, the Tribal Secretary for the Red Lake Band of Chippewa Indians ("Red Lake Band" or "Band"), together with other Band members, "continue[s] to practice [the Red Lake Band's] traditional ways, and . . . continue[s] to hold the land and water sacred."  Ex. K, Strong Decl. ¶ 3 (Dec. 24, 2020).  The pipeline will pass within 10 miles of the Red Lake Reservation, through lands and waters that the Secretary and other Red Lake Band members regularly use "for gathering, hunting, trapping, fishing, and harvesting wild rice, along with other cultural and ceremonial purposes."  *Id.* ¶ 7.  Similarly, the Corps has authorized Enbridge to dredge and fill waters of longstanding and "vital importance" to members of the White Earth Band of Ojibwe, actions that will "forever" damage those resources and, potentially,

threaten the Band's survival.  Ex. H, Aubid Decl. ¶ 7.  In addition, one Sierra Club member lives

within 500 feet of the pipeline's proposed path.  *See* Ex. I, Gaither Decl. ¶ 6.  She and her

husband purchased their property "for its peace and quiet," and she "derive[s] great aesthetic and

spiritual fulfillment from watching wildlife and spending time in nature, both on [her] property

and nearby."  *Id*. ¶ 5.  She will be injured by the permanent destruction of wetlands in Clearwater

County, which will displace wildlife—potentially including sandhill cranes that nest "just

outside" her kitchen window, near the pipeline's path.  *Id*. ¶ 5, 9.

Indeed, Enbridge already has begun to inflict irreparable harm, in reliance on the Corps'

legally infirm Permit.  Construction workers have cut "wetland vegetation—including trees and

shrubs— . . . to the ground," driven "heavy equipment . . .over wetlands," and begun to "trench[]

through wetlands and [bury] pipe . . . in sensitive wetland areas."  Ex. L, Triplett Decl. ¶ 11.

Crews have uprooted native plants, and timber trucks rumble through rural communities early in

the morning and regularly throughout the day.  Ex. I, Gaither Decl. ¶¶ 10, 12.  And construction

workers have disturbed and imperiled irreplaceable cultural sites.  Ex. G, Arsenault Decl. ¶ 11.

Absent intervention, this destruction will continue.  *Id.* ¶ 12; see also Ex. K, Strong Decl. ¶ 12

("The workers are destroying cultural natural resource areas that are integral to our people's

survival and to our way of life, and—unless something happens to halt construction, they likely

will continue."); Ex. H, Aubid Decl. ¶ 12 ("The government's continued and blatant disregard of

our treaties and disrespect for our land causes trauma that harms me and all of my people.").

## III.     THE BALANCE OF HARMS FAVORS AN INJUNCTION.

In cases involving environmental protection, the balance of harms generally favors an

injunction.  *See Amoco*, 480 U.S. at 545 ("If [environmental] injury is sufficiently likely . . . the

balance of harms will usually favor the issuance of an injunction to protect the environment.").

Here, the ongoing and imminent irreparable harm to Plaintiffs' members plainly outweighs the lack of harm to the Corps, tipping the equities sharply in favor of injunctive relief.

As explained above, the Project will result in irreparable harm to the environment and irreversible injury to Plaintiffs' members.  By contrast, an injunction would not prejudice the Corps, which has no stake in the Project.  *P.J.E.S. by & through Escobar Francisco v. Wolf*, No. CV 20-224, 2020 WL 6770508, at *34 (D.D.C. Nov. 18, 2020) ("There is no harm to the [g]overnment when a court prevents unlawful practices.") (citing *Banks v. Booth*, No. 20-849, 2020 WL 1914896, at *12 (D.D.C. Apr. 19, 2020)).  And, although an injunction might delay Enbridge's construction schedule, it is well established that "economic loss does not, in and of itself, constitute irreparable harm."  *Wisconsin Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985); *see also Ohio Valley Env't Coal. v. U.S. Army Corps of Eng'rs*, 528 F. Supp. 2d 625, 632 (S.D. W. Va. 2007) ("[T]emporary economic harm can be outweighed by the permanent harm to the environment that comes from the filling of streams and valleys . . . . Money can be earned, lost, and earned again: a valley once filled is gone.").  To the contrary, NEPA "contemplates just such a delay."  *Park Cnty. Res. Council v. U.S. Dep't of Agric.*, 817 F.2d 609, 618 (10th Cir. 1987), *overruled on other grounds, Village of Los Ranchos de Albuquerque v. Marsh*, 956 F.2d 970, 973 (10th Cir.1992).

## IV.     THE PUBLIC INTEREST FAVORS AN INJUNCTION.

The requested preliminary injunction is also in the public interest.  First, the public has a substantial interest "in having governmental agencies abide by the federal laws that govern their existence and operations."  *League of Women Voters of the United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)); *see also Brady Campaign to Prevent Gun Violence*, 612 F. Supp. 2d at 26 ("There is no question that the public has an interest in having Congress' mandates in NEPA carried out accurately and

completely.").  Accordingly, in situations like the present, "when an action is being undertaken in violation of NEPA, there is a presumption that injunctive relief should be granted against continuation of the action until the agency brings itself into compliance."  *Realty Income Trust v. Eckerd*, 564 F.2d 447, 456 (D.C. Cir. 1977); *see also id.* ("[C]ourts will not hesitate to stop projects that are in the process of affecting the environment when the agency is in illegal ignorance of the consequences.").

Second, "[i]n addition to seeing the policies of federal law enforced and upheld, the public citizens have an interest in maintaining environmental quality in the places they choose to live," "ensuring the health and safety of all [their] members," "ensuring the integrity of the biological and ecological systems," and "seeing beautiful landscapes preserved for posterity." *Ohio Valley Env't Coal.*, 528 F. Supp. 2d at 633–34.  Here, these interests weigh strongly in favor of an injunction.  Absent preliminary relief, the Project will permanently alter or destroy hundreds of acres of wetlands, jeopardizing wildlife, water quality, and irreplaceable aesthetic, recreational, cultural, and spiritual resources.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request this Court GRANT its motion for a preliminary injunction.

Respectfully submitted this 24th day of December, 2020.

s/Seth L. Johnson____
Seth L. Johnson, D.C. Bar No. 1001654
Earthjustice
1001 G St. NW, Ste. 1000
Washington, D.C. 20001
(202) 667-4500
sjohnson@earthjustice.org

Moneen Nasmith
*[Pro Hac Vice Application Pending]*
Alexis Andiman

26

*[Pro Hac Vice Application Pending]*
Mekela Panditharatne
*[Pro Hac Vice Application Pending]*
Earthjustice
48 Wall Street, 15th Floor
New York, NY 10005
(212) 845-7376
mnasmith@earthjustice.org
aandiman@earthjustice.org
mpanditharatne@earthjustice.org

*Attorneys for Plaintiffs*