UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RED LAKE BAND OF CHIPPEWA INDIANS<br>15484 Migizi Dr.<br>Red Lake, MN 56671 | |
| WHITE EARTH BAND OF OJIBWE<br>35500 Eagle View Rd.<br>Ogema, MN 56569 | Case No. |
| HONOR THE EARTH<br>607 Main Ave.<br>Callaway, MN 56521 | |
| SIERRA CLUB<br>2101 Webster St.<br>Ste. 1300<br>Oakland, CA 94612 | COMPLAINT FOR DECLARATORY<br>AND INJUNCTIVE RELIEF |
|        Plaintiffs, | |
|   v. | |
| UNITED STATES ARMY CORPS OF<br>ENGINEERS<br>441 G St. NW<br>Washington, DC 20314-1000 | |
|        Defendant. | |

**INTRODUCTION**

1.       This complaint challenges authorizations by the United States Army Corps of

Engineers ("Corps") in connection with a so-called pipeline "replacement" project in Minnesota

("Project") proposed by Enbridge Energy, Limited Partnership ("Enbridge").

2.       Enbridge currently operates a 34-inch diameter pipeline ("Existing Line 3") with

an average annual capacity of 430,000 barrels per day ("bpd") and a design capacity of

approximately 478,000 bpd or 332 barrels per minute.  Enbridge currently uses Existing Line 3

to carry mostly lighter grades of oil, not the heavier "diluted bitumen" or "dilbit" extracted in the

Alberta tar sands region.  Existing Line 3 crosses from Canada into the U.S. border near Neche,

North Dakota, and then travels across the northeastern corner of North Dakota and northwestern Minnesota to Enbridge's Clearbrook Terminal in northcentral Minnesota, and from there across northern Minnesota, including the Leech Lake and Fond du Lac Indian Reservations, to Enbridge's Superior Terminal in Superior, Wisconsin. The Superior Terminal is located on the banks of the Nemadji River approximately 3.5 miles upriver from Lake Superior.

3.      Enbridge would construct a new pipeline to "replace" Existing Line 3. The new pipeline is also called "Line 3," but it would transport heavy sour "dilbit" from the tar sands region in Alberta, Canada to the Clearbrook and Superior Terminals. The Project consists of the portion of Line 3 that would travel across approximately 338 miles in Minnesota and about three-quarters of a mile in North Dakota. The Project would cross 227 waterbodies and more than 800 protected wetlands. The Project also would cross ceded lands in Minnesota where Plaintiffs Red Lake Band of Chippewa Indians and White Earth Band of Ojibwe (collectively, "Tribes") exercise claimed hunting, fishing, and gathering rights.

4.      On November 23, 2020, the Corps granted Enbridge's request for a Clean Water Act ("CWA") Section 404 permit to discharge dredged and fill material into waters of the United States. 33 U.S.C. § 1344. The Corps also authorized the alteration of Rivers and Harbors Act navigable waters, pursuant to Section 10 of the Rivers and Harbors Act of 1899 ("RHA"), 33 U.S.C. § 403. At the same time, the Corps issued a letter authorizing work altering the Lost River, Minnesota Flood Control Project under Section 14 of the RHA, 33 U.S.C. § 408, which is commonly referred to as a "Section 408 Permit." These authorizations are referred to collectively in this complaint as the "Permit" and are required for Enbridge to construct the proposed pipeline.

5.      Although promoted as a replacement, significant portions of the Project would travel along a new route. Moreover, the initial average annual capacity of the new Line 3, of which the Project is an integral part, would almost double to approximately 760,000 bpd, as would its initial design capacity, which would increase to 844,000 bpd, or 586 barrels per minute. Line 3, including the Project, would be constructed with pipe and other fittings that would allow Line 3 ultimately to have an average annual capacity of 915,000 bpd and a design capacity of 1,016,000 bpd, or 705 barrels per minute, by the inclusion of additional pumping horsepower.

6.      Spills of tar sands oil can devastate entire ecosystems and are deleterious to human health. The increased extraction and use of Canadian tar sands oil that the Project will facilitate also will cause significant damage, estimated in the hundreds of billions of dollars, due to its contribution to climate change.

7.      Plaintiffs Red Lake Band of Chippewa Indians, White Earth Band of Ojibwe, Honor the Earth, and Sierra Club bring this case because the Corps' issuance of the Permit authorizing the pipeline violates multiple federal laws and treaties, harming Plaintiffs and their members.

8.      Although the Corps purports to find that the Project will have no significant impact on the environment, both construction and operation of the Project would have significant impacts.

9.      Construction would require clearcutting vegetation from a 50 foot-wide permanent right-of-way and a 95- to 125-foot temporary construction right-of-way for the entire route of the Project; excavation of a minimum 7 foot-deep trench; stockpiling of removed soils; transportation of approximately 60 foot-long, 36-inch diameter pipe segments to the trench;

welding the pipe segments into a continuous pipeline; re-filling of the trench; and construction of ancillary facilities, including pump stations, valves, electrical substations, access roads, horizontal directional drilled waterbody crossings, cathodic protection equipment, and communications facilities. These activities also would utilize a substantial amount of heavy equipment that will produce noise and air emissions, damage roads, and compact soils. These construction-related activities alone make the Corps' finding of no significant impact indefensible.

10.     In addition, the Corps ignored significant operational impacts the Permit would authorize, including impacts to water quality and drinking water; impacts to hunting, fishing, and gathering; oil spill risks; indirect air quality impacts resulting from the significant amounts of electrical power needed for the additional pumps; environmental justice concerns; and climate impacts.

11.     By ignoring these impacts, the Corps improperly decided not to prepare an Environmental Impact Statement.

12.     The construction and operation of the Project, as authorized by the Corps, will harm the environment, including resources supporting the Tribes' hunting, fishing, and gathering activities on and off their Reservations. The environmental harm brought about by the project will also harm the interests of members of Honor the Earth, the Sierra Club, and all Minnesotans who hunt, fish, and recreate in Northern Minnesota. The Project will, among other things, damage or destroy a significant amount of wetlands and uplands within federal jurisdiction, damage or destroy important waters and culturally significant resources, likely result in spills of harmful tar sands oil, and increase greenhouse gas emissions. The Corps' failure to take a hard

look at these impacts under the National Environmental Policy Act ("NEPA") renders the approvals unlawful.

13.     Moreover, the Corps failed to fully evaluate whether construction of the pipeline meets the requirements of a CWA § 404 permit, including whether the pipeline is the least environmentally damaging practicable alternative.

14.     The Corps failed to comply with its own regulations for CWA § 404 permits and RHA Section 14 authorizations when it improperly concluded that the pipeline is in the public interest.

15.     Plaintiffs seek a declaration that the Corps' issuance of the Permit authorizing construction and operation of the Project was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and without observance of procedure required by law in violation of the Administrative Procedure Act ("APA"), NEPA, the CWA, and the Corps' own permit regulations. Plaintiffs ask that the Permit authorizing the Project be vacated and that construction of the Project be enjoined.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over the claims set forth in this complaint pursuant to 28 U.S.C. §§ 1331 (federal question), 1346 (United States as defendant), and 1362 (civil actions brought by federally recognized tribes when the matter in controversy arises under the Constitution, laws, or treaties of the United States). The relief sought is authorized by 28 U.S.C. §§ 2201(a) and 2202, and 5 U.S.C. § 706.

17.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because it is the district in which the defendant resides.

## PARTIES

18.     The Red Lake Band of Chippewa Indians is a federally recognized Indian tribe with a government-to-government relationship with the United States. The Band originates from the Anishinaabe, who have always held the land and water sacred. The Red Lake Band and its people are inextricably bound to the cultural landscape and tied to the ecosystem and broader environment. Prior to treaties, forced land cessions, congressional proceedings, and other United States government actions, the Red Lake Band held over 15 million acres of land in what is now north central Minnesota and in the Red River Valley of Minnesota and North Dakota.

19.     The Band has historically been a party to major treaties that impact Anishinaabe Territory, beginning with the 1825 Treaty of Prairie du Chien, that acknowledged the Chippewa's sovereignty over the entire territory of northern Minnesota and that no other tribe could hunt within that territory without the Chippewa's permission. Treaty with the Sioux, Etc., Aug. 19, 1825, 7 Stat. 272, arts. 5, 13. The Band also participated in the 1837 Treaty with the Chippewa.

20.     The Band now occupies the Red Lake Reservation in Northwest Minnesota, which was established by the 1863 Treaty at the Old Crossing of the Red Lake River, in which the Band ceded nearly 11 million acres of land. In 1889, 1902, and 1904, the Band was forced to cede over 3 million additional acres of land reserved under the 1863 Treaty. Approximately 250,000 acres of lands that were ceded to the United States through the Treaties of 1889 and 1904 were restored to the Red Lake Band through the Red Lake Reservation, Minnesota Order of Restoration, 10 Fed. Reg. 2,448-03 (Mar. 2, 1945). The restored ceded lands are scattered throughout the 1889 and 1904 Treaty ceded territory, and the Line 3 corridor is in close proximity to several of the Red Lake Band's restored ceded parcels.

21.     The Project's proposed route travels through Red Lake lands ceded to the United States in 1863 and 1889. The Project's proposed route also travels within 10 miles of the Red Lake Reservation boundaries.

22.     Since time immemorial, Red Lake members have depended on the natural freshwaters of Red Lake itself—which lies both within the formal reservation and on ceded lands adjacent to it—for their sustenance and economic livelihood. The Red Lake Tribal Council, the governing body of the Red Lake Band, currently issues permits to Band members to hunt, fish and gather on the Red Lake Reservation and on the lands that were ceded to the United States through the 1863 Treaty. Red Lake tribal members currently hunt large and small game, fish for many species of fish, and gather wild rice, edible plants, medicinal plants and other plant and animal species throughout the Red Lake Reservation, and on the lands that were ceded to the United States through the 1863 Treaty.

23.     The White Earth Band of Ojibwe is one of the six Chippewa bands comprising the Minnesota Chippewa Tribe. The Minnesota Chippewa Tribe is a federally recognized Indian tribe organized under the Indian Reorganization Act of 1934, 25 U.S.C. § 5101-5129.

24.     The White Earth Band occupies the White Earth Reservation in Northwest Minnesota, which was a relocation reservation established by the 1867 Treaty between the United States and the 1855 Mississippi Bands of Chippewa Indians. Treaty with the Chippewa of the Mississippi, Mar. 19, 1867, 16 Stat. 719.

25.     The White Earth Band is comprised mostly of the Chippewas of the Mississippi and has historically been a party to most major treaties that impact Anishinaabe Territory, beginning with the 1825 Treaty of Prairie du Chien, that acknowledged the Chippewa's sovereignty over the entire territory of northern Minnesota and that no other tribe could hunt

within that territory without the Chippewa's permission. Treaty with the Sioux, Etc., Aug. 19, 1825, 7 Stat. 272, arts. 5, 13; 1826 Treaty of Fond du Lac, 7 Stat. 290, art. 1.

26.     The Chippewas of the Mississippi also participated in the 1837 Treaty, the 1842 Treaty, and the 1854 and 1855 Treaty land cessions, which cover most of the lands, rivers and cultural places crossed and impacted by the Project.

27.     The White Earth Band is a successor-in-interest tribal government to the Chippewas of the Mississippi signatories of the 1855 Treaty of Washington between the United States and the Mississippi, Pillager, and Winnibigoshish Bands of Chippewa Indians. Treaty with the Chippewa, Feb. 22, 1855, 10 Stat. 1165.

28.     Since time immemorial, the Chippewas of the Mississippi have depended on the natural freshwaters of the Mississippi itself for their sustenance and economic livelihood. White Earth tribal members currently hunt large and small game, fish for many species of fish, and gather wild rice, edible plants, medicinal plants, and other plant and animal species throughout the White Earth Reservation, and on the lands that were ceded to the United States.

29.     The White Earth tribal members attach religious and cultural significance to the land ceded in the1855 Treaty as the traditional homelands of the Chippewas of the Mississippi. The Project's proposed route travels primarily through the ceded territories adjacent to the White Earth Reservation boundaries and the Headwaters of the Mississippi River. The Project path crosses hundreds of streams, rivers, wetlands and aquifers, risking the freshwater resources that are essential to sustain treaty-reserved foods of wild rice, fish, and maple syrup, which all require abundant, high quality freshwater resources.

30.     Wild Rice is the central, most important part of the Chippewa traditions, spirituality, and cultural practices. The White Earth Band of Ojibwe has adopted resolutions

providing for the Rights of Manoomin (wild rice) to provide additional environmental

protections for this essential resource.

     31.



Fig. 1, Map of Minnesota with Reservations and Ceded Territory by Treaty Year[1]

---

[1] *Minnesota Territory 1849-1858*, Minn. Hist. Soc'y,
https://www.mnhs.org/talesoftheterritory/territory/treaty/treaty13.php.



Fig. 2, Map of Proposed Pipeline Route[2]

32.      Honor the Earth is an Indigenous-led organization working primarily on issues of advocacy and support for Native communities. The organization works nationally and internationally with Indigenous peoples, many of whom are impacted by pipeline projects, including the Enbridge Line 3 pipeline. Honor the Earth has also been involved in protecting and acknowledging the sacredness of water. The organization is headquartered on the White Earth Reservation and its leadership is comprised of tribal members from the Anishinaabe of Northern Minnesota (which include the Ojibwe, or Chippewa). The organization is committed to a sustainable economy predicated on ecological and cultural vitality. Many of Honor the Earth's members continue the way of life of their ancestors by hunting, fishing, and gathering in the territory ceded in the 1855 Treaty.

33.      Sierra Club is one of the oldest environmental organizations in the United States. Sierra Club is incorporated in the State of California as a Nonprofit Public Benefit Corporation

---

[2] Line 3 Replacement Project, Enbridge, https://www.enbridge.com/projects-and-infrastructure/public-awareness/minnesota-projects/line-3-replacement-project.

with headquarters in Oakland, California. The organization has over 3.8 million members and supporters nationwide, of whom approximately 20,680 are in Minnesota. Sierra Club is dedicated to protecting and preserving the natural and human environment, and its purposes are to explore, enjoy, and protect the wild places of the earth; to practice and promote the responsible use of the earth's ecosystems and resources; and to educate and enlist humanity to protect and restore the quality of the natural and human environments. In support of this mission, Sierra Club has taken extensive actions on climate change, including participating in state and federal rulemaking, opposing further buildout of fossil fuel infrastructure, and working to reduce greenhouse gas emissions from existing facilities.

34.     Sierra Club members and staff live, work, and recreate in places threatened by the Line 3 Project, and use, study, and cherish the land, water, wildlife, and other resources that may be irrevocably damaged by the project. Sierra Club members own property on and/or near the proposed pipeline route, and some of those properties are located downstream of and/or near waterways that the pipeline would cross. The project threatens members' use and enjoyment, and the economic value, of their property, as well as the waters that members use and enjoy both as a resource and for the habitat they provide for plants and animals. Sierra Club members also enjoy hiking, picnicking, fishing, and/or observing wildlife in parks and along rivers and streams near and on the proposed pipeline route, and plan to return to those areas to pursue such activities in the future.

35.     By refusing to prepare and publish an adequate and complete environmental review of Line 3, the Corps failed to analyze and address the project's negative impacts on and threats to the interests of Plaintiffs. The declaratory and injunctive relief Plaintiffs seek in this

lawsuit will redress their injuries by setting aside the Corps' approvals and requiring the Corps to comply with NEPA, the CWA, and the APA.

36.     Defendant is the U.S. Army Corps of Engineers, an agency within the executive branch of the federal government. The Corps is the lead agency for permitting the discharge of dredged or fill material into navigable waters of the United States under CWA § 404, 33 U.S.C. § 1344, and granting authorizations under RHA §§ 10 and 14, 33 U.S.C. §§ 403, 408. The Corps is responsible for NEPA compliance for its permitting and authorization decisions.

## STATUTORY AND REGULATORY BACKGROUND

## I.     THE NATIONAL ENVIRONMENTAL POLICY ACT

37.     NEPA, 42 U.S.C. §§ 4321–4370m, is our "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a) (2019).[3] It makes environmental protection part of the mandate of every federal agency, 42 U.S.C. § 4331, and requires federal agencies to take environmental considerations and "any irreversible and irretrievable commitments of resources" into account in their decisionmaking "to the fullest extent possible," *id.* § 4332; 40 C.F.R. § 1500.2 (2019).

---

[3] After the Permit application was submitted, the Council on Environmental Quality (CEQ) revised its regulations implementing NEPA. *See* Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43,304 (July 16, 2020). This Complaint cites to the prior regulations, which were in effect during most of the environmental review process for Line 3, including both of the Corps' public comment periods, and therefore apply here. The new regulations are also already subject to four lawsuits. *See* Compl. for Declaratory and Injunctive Relief, *California v. Council on Env't Quality*, No. 3:20-cv-06057 (N.D. Cal. Aug. 28, 2020); Compl., *Env't Just. Health All. v. Council on Env't Quality*, No. 1:20-cv-06143 (S.D.N.Y. Aug. 6, 2020); Compl., *Wild Va. v. Council on Env't Quality*, No. 3:20-cv-00045 (W.D. Va. July 29, 2020); Compl. for Declaratory and Injunctive Relief, *Alaska Cmty. Action on Toxics v. Council on Env't Quality*, No. 3:20-cv-05199 (N.D. Cal. July 29, 2020). Moreover, without express statutory authority to the contrary, rules do not apply retroactively. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988).

38.     NEPA seeks to ensure that federal agencies take a "hard look" at environmental consequences before taking a major action. *Friends of the Boundary Waters Wilderness v. Dombeck*, 164 F.3d 1115, 1128 (8th Cir. 1999). One of NEPA's primary purposes is to ensure that an agency, "in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). NEPA also "guarantees that the relevant information [concerning environmental impacts] will be made available to the larger audience," including the general public, "that may also play a role in both the decisionmaking process and the implementation of that decision." *Id.*

39.     NEPA requires federal agencies to fully disclose in "every recommendation or report on proposals for . . . major Federal actions significantly affecting the quality of the human environment, a detailed statement" on, among other things, "the environmental impact of the proposed action" and "any adverse environmental effects which cannot be avoided should the proposal be implemented." 42 U.S.C. § 4332(C). This statement is referred to as an Environmental Impact Statement ("EIS").

40.     NEPA also requires agencies to use high quality, accurate scientific information and to ensure the scientific integrity of the analysis. 40 C.F.R. §§ 1500.1(b) (2019), 1502.24 (2019).

41.     Major federal actions include "new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies," 40 C.F.R. § 1508.18(a) (2019), and "[a]pproval of specific projects, such as construction or management activities located in a defined geographic area. Projects include actions approved by permit or other regulatory decision as well as federal and federally assisted

13

activities." *Id.* § 1508.18(b)(4) (2019). The word "major" "reinforces but does not have a meaning independent of significantly." *Id.* § 1508.18 (2019).

42.    If it is unclear whether impacts are significant enough to warrant an EIS, a federal agency may prepare an "environmental assessment" ("EA") to assist in making that determination. *Id.* §§ 1501.3 (2019), 1508.9 (2019). If the agency determines that no EIS is required, it must document that finding in a "finding of no significant impact" ("FONSI"). *Id.* § 1508.13 (2019).

43.    When a project cannot go forward without a permit, then the environmental impacts of the entire project must be reviewed under NEPA. *White Tanks Concerned Citizens, Inc. v. Strock*, 563 F.3d 1033, 1039–40 (9th Cir. 2009); *see also* 33 C.F.R. Pt. 325, App. B §§ 7(b)(1), 7(b)(2)(A).

44.    If the agency concludes in an EA that a project may have significant impacts on the environment, then an EIS must be prepared. 40 C.F.R. § 1501.4 (2019).

45.    To determine whether a proposed action may significantly affect the environment, the agency must consider both the context (i.e., the import of the action on society, the regions or localities affected, and the interests affected by the action) and intensity (i.e., the "severity of impact") of the proposed action, including whether the project will take place in "ecologically critical areas" and whether the project will affect endangered species. *Id.* § 1508.27 (2019).

46.    With respect to the latter, the regulations lay out ten factors that are to be considered. Examples of these criteria include the degree to which: the proposed action affects public health or safety; the possible effects on the human environment are likely to be highly controversial; the possible effects on the human environment are highly uncertain or involve unique or unknown risks; the action may establish a precedent for future actions with significant

effects or represents a decision in principle about a future consideration; the action is related to other actions with individually insignificant but cumulatively significant impacts; and the action may adversely affect an endangered or threatened species or its habitat. *Id.*

47.    An EIS must include a "range of actions, alternatives, and impacts." 40 C.F.R. § 1508.25 (2019). For example, an agency must consider direct and indirect impacts, or effects, of an action when determining the scope of an EIS. *Id*. § 1508.25(c)(1)–(2) (2019). The direct effects of an action are those effects "which are caused by the action and occur at the same time and place." *Id*. § 1508.8(a) (2019). The indirect effects of an action are those effects "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id*. § 1508.8(b) (2019).

48.    An agency also must analyze and address the cumulative impacts of a proposed project. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 (1976); 40 C.F.R. §§ 1508.7 (2019), 1508.25(c)(3) (2019). Cumulative impacts are the result of any past, present, or reasonably foreseeable future actions, regardless of who takes them. Such effects "can result from individually minor but collectively significant actions taking place over a period of time." *Id*. § 1508.7 (2019).

49.    "[A] meaningful cumulative impact analysis must identify (1) the area in which the effects of the proposed project will be felt; (2) the impacts that are expected in that area from the proposed project; (3) other actions—past, present, and proposed, and reasonably foreseeable—that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate." *Del. Riverkeeper Network v. Fed. Energy Regul.*

*Comm'n*, 753 F.3d 1304, 1319 (D.C. Cir. 2014) (quoting *Grand Canyon Trust v. F.A.A.*, 290 F.3d 339, 345 (D.C. Cir. 2002)).

50.     Cumulative impact analyses are insufficient when they discuss only the direct effects of the project at issue on a small area and merely contemplate other projects but have no quantified assessment of their combined impacts. *Bark v. U.S. Forest Serv.*, 958 F.3d 865, 872 (9th Cir. 2020).

51.     "The impact of greenhouse gas emissions on climate change is precisely the kind of cumulative impacts analysis that NEPA requires agencies to conduct." *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 508 F.3d 508, 550 (9th Cir. 2007).

52.     NEPA calls for a quantification of the incremental impacts that the proposed project's emissions will have on climate change or on the environment more generally in light of other past, present, and reasonably foreseeable actions. *See Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1216 (9th Cir. 2008). NEPA requires analysis of the "*actual* environmental effects resulting from those emissions." *Id.*

53.     NEPA requires consideration of separate components of a single project in a single NEPA review. 40 C.F.R. § 1508.25 (2019). NEPA regulations state that connected actions should be considered in a single EIS, defining them as actions that "cannot or will not proceed unless other actions are taken previously or simultaneously," and "are interdependent parts of a larger action and depend on the larger action for their justification." *Id.*

54.     NEPA requires federal agencies to analyze "both the probability of a given harm occurring *and* the consequences of that harm if it does occur." *New York v. Nuclear Regul. Comm'n*, 681 F.3d 471, 482 (D.C. Cir. 2012).

55.     Agencies cannot avoid their responsibility to consider future effects by claiming they are uncertain, because NEPA requires some element of predictive behavior. *N. Plains Res. Council, Inc. v. Surface Transp. Bd*., 668 F.3d 1067, 1078–79 (9th Cir. 2011); *see also* 40 C.F.R. § 1502.22 (2019).

56.     Federal courts have found that NEPA requires analysis of the risk that an oil spill will occur and an assessment of the potential impacts of a spill on particular resources and into Corps jurisdictional waterways. *See, e.g., Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 867–68 (9th Cir. 2005) (Corps was required to analyze effects of increased tanker traffic, and attendant risks of oil spills, before issuing Section 404 permit for dock extension); *Sierra Club v. Sigler*, 695 F.2d 957, 968–75 (5th Cir. 1983) (Corps violated NEPA in issuing a permit for a dredging project by failing to analyze worst-case scenario of oil tanker spill); *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 133–34 (D.D.C. 2017) (EA inadequate because it did not describe the potential impacts of an oil spill on specific tribal hunting and fishing rights).

57.     In addition, NEPA mandates that agencies analyze cultural resource impacts in environmental impact statements. 40 C.F.R. §§ 1502.16(g) (2019), 1508.8 (2019).

58.     "NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." *Id*. § 1500.1(b) (2019). Agencies are required to make environmental documents, including environmental assessments and findings of no significant impact, available to the public. *Id*. §§ 1501.4(e)(1) (2019), 1506.6(b) (2019), 1508.10 (2019).

59.     An agency's failure to include and analyze information that is important, significant, or essential renders an EA and FONSI inadequate. *See id*. § 1500.1 (2019).

60.     The Corps' regulations incorporate these requirements by reference. 33 C.F.R. Pt. 325, App. B § 2.

61.     The Corps' regulations explain that the scope of a NEPA analysis includes the impacts of the specific activity requiring a Corps permit and "those portions of the entire project over which the district engineer has sufficient control and responsibility to warrant Federal review." *Id.*, App. B § 7(b)(1).

62.     The Corps' regulations provide that the NEPA analysis should include direct, indirect and cumulative impacts. *Id*, App. B § 7(b)(3).

63.     The Corps' regulations further state: "In all cases, the scope of analysis used for analyzing both impacts and alternatives should be the same scope of analysis used for analyzing the benefits of a proposal." *Id.*

## II.     THE CLEAN WATER ACT

64.     Congress enacted the Clean Water Act "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." CWA § 101(a), 33 U.S.C. § 1251(a).

65.     The Clean Water Act also established, as part of the Corps' water resources development program, the long-term goal "to increase the quality and quantity of the Nation's wetlands." 33 U.S.C. § 2317(a)(1).

66.     To accomplish these goals, the Clean Water Act prohibits the discharge of dredged and fill materials into "waters of the United States" absent a permit issued by the Corps under CWA § 404. Unless statutorily exempt, all discharges of dredged or fill material into waters of the United States must be authorized under a permit issued by the Corps. *Id.* §§ 1344(a)–(e).

67.     The Corps issues individual permits under CWA § 404(a) on a case-by-case basis after taking "all appropriate and practicable steps to avoid and minimize adverse impacts to

waters of the United States." 40 C.F.R. § 230.91(c)(2); *see* 33 U.S.C. § 1344(a). Such permits are issued after a review involving, among other things, site-specific documentation and analysis of waters and wetlands and potential effects to them, public interest analysis, and a formal determination pursuant to the statutory and regulatory criteria. *See* 33 C.F.R. § 322.3 and Parts 323, 325.

68.     Under the Clean Water Act, there are strict substantive limits on approving projects that degrade water quality or harm aquatic uses.

69.     First, the Corps may not issue a permit under Section 404 if there is a "practicable alternative" to the project with less impact on the aquatic ecosystem. 40 C.F.R. § 230.10(a). The Corps is required to conduct an alternatives analysis and determine what projects are "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." *Id.* § 230.10(a)(2). "If it is otherwise a practicable alternative, an area not presently owned by the applicant which could reasonably be obtained, utilized, expanded, or managed in order to fulfill the basic purpose of the proposed activity may be considered." *Id.*

70.     The process for undertaking this analysis is set out in the guidelines implementing CWA § 404. The Corps must define the project's "overall project purposes." *Id.* If a project with a proposed discharge to a special aquatic site—a "geographic area, large or small, possessing special ecological characteristics of productivity, habitat, wildlife protection, or other important and easily disrupted ecological values," *id.* § 230.3(m)—is not water dependent, that is, if it "does not require access or proximity to or siting within the special aquatic site in question to fulfill its basic purpose," the Corps must presume that a practicable alternative that does not involve a special aquatic site is available and will have less adverse environmental impact on the

site and its ecosystem. *Id.* § 230.10(a)(3). The applicant must rebut the presumption with detailed, clear, and convincing information proving that a less adverse practicable alternative is not available. *Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1269 (10th Cir. 2004).

71.    The Corps cannot arbitrarily restrict the range of viable alternatives by adopting an overly narrow definition of the project's purposes. *Friends of the Santa Clara River v. U.S. Army Corps of Eng'rs*, 887 F.3d 906, 912 (9th Cir. 2018); *Del. Riverkeeper Network v. U.S. Army Corps of Eng'rs*, 869 F.3d 148, 157 (3d Cir. 2017).

72.    Cost alone is not sufficient to show that an alternative is not practicable. *Del. Riverkeeper Network*, 869 F.3d at 159–60.

73.    Second, the Corps cannot issue the permit unless there is a demonstration that any discharge from the project "will not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern," 40 C.F.R. § 230.1(c). The Corps also may not issue the permit if it will result in a discharge that "will cause or contribute to significant degradation of the waters of the United States," *id.* § 230.10(c).

74.    Where no less damaging, practicable alternative is available, the applicant must show that all "appropriate and practicable steps" will be taken to "minimize potential adverse impacts of the discharge on the aquatic ecosystem." *Id.* § 230.10(d).

75.    Moreover, the Corps must independently verify all the information in the permit application. *See, e.g.*, *Greater Yellowstone Coal.*, 359 F.3d at 1269; *see also* 40 C.F.R. § 1506.5(a).

## III.    THE RIVERS AND HARBORS ACT

76.    The RHA is the nation's oldest environmental law. The statute prohibits certain activities that impair ports, channels, and other navigable waters.

77. The RHA applies to "navigable" waters, defined as waters "subject to the ebb and flow of the tide," or waters that are "presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commerce." 33 C.F.R. § 329.4.

78. Section 10 of the RHA, 33 U.S.C. § 403, makes it unlawful, among other things, "to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of" any navigable water without a permit from the Corps.

79. Tunneling under a navigable water requires a Section 10 permit from the Corps, even without any discharge into navigable waters. 33 C.F.R. § 322.3(a) ("For purposes of a section 10 permit, a tunnel or other structure or work under or over a navigable water of the United States is considered to have an impact on the navigable capacity of the waterbody.").

80. A separate provision of the RHA, known as Section 408, makes it unlawful to "build upon, alter, deface, destroy, move, injure, obstruct by fastening vessels thereto or otherwise, or in any manner whatever impair the usefulness of any sea wall, bulkhead, jetty, dike, levee, wharf, pier, or other work built by the United States" without a permit from the Corps. 33 U.S.C. § 408(a). Prior to issuance of a Section 408 permit, the Corps must determine that the use or occupation at issue will not be injurious to the public interest and will not impair the usefulness of the project. *Id.*; *see also* 33 C.F.R. § 320.4(a).

81. A decision on a Section 408 request is a federal action, and therefore subject to NEPA and other environmental compliance requirements.

## IV.   CORPS' PERMITTING REGULATIONS

82. Before issuing any CWA or RHA permit, the Corps must determine that the project is in the "public interest" by weighing all "relevant" considerations and balancing all probable impacts of the proposed action against its alleged benefits. 33 C.F.R. § 320.4(a).

83.     The Corps must base its decision to issue a permit on "an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest." *Id.* § 320.4(a)(1).

84.     The Corps must balance "the benefits which reasonably may be expected to accrue from the proposal" against "its reasonably foreseeable detriments." *Id.*

85.     Full evaluation of the general public interest requires that the Corps give due consideration to the effect of the proposed action on historic, cultural, scenic, and recreational values, including Indian religious or cultural sites. *Id.* § 320.4(e).

86.     The District Engineer is authorized to make an "independent review of the need for the project from the perspective of the overall public interest." *Id.* § 320.4(q).

87.     Consistent with NEPA, *see* 40 C.F.R. §§ 1500.1(b) (2019), 1502.24 (2019), the Corps must independently verify the information submitted by the permit applicant. *Sierra Club v. Van Antwerp*, 709 F. Supp. 2d 1254, 1265–68 (S.D. Fla. 2009).

88.     The District Engineer should reject any permit application that does not include "[a]ll activities which the applicant plans to undertake which are reasonably related to the same project and for which a [Corps] permit would be required." 33 C.F.R. § 325.1(d)(2).

## V.     TREATY RIGHTS AND FEDERAL GOVERNMENT TRUST OBLIGATIONS

89.     The United States entered into a series of at least 44 treaties with the Chippewa Indians. In the early 1800s, the United States negotiated with the Chippewa Indians as one single group. In 1825 and 1826, the United States signed treaties that acknowledged the Chippewa's complete sovereignty over the entire territory of northern Minnesota, including rights to hunt, fish and gather. *See* Treaty with the Sioux and Chippewa, Sacs and Fox, Menominie, Ioway, Sioux, Winnebago, and a portion of the Ottawa, Chippewa, and Potawattomie, Tribes, Aug. 19, 1825, 7 Stat. 272, art. 13; 1826 Treaty of Fond du Lac, 7 Stat. 290, art. 1;  *see also United States*

22

*v. Winans*, 198 U.S. 371, 381 (1905); *State v. Jackson*, 16 N.W.2d 752, 755 (Minn. 1944) (quoting *Winans*, 198 U.S. at 381) ("The ancient and immemorial right to hunt and fish, which was 'not much less necessary to the existence of the Indians than the atmosphere they breathed,' remained in them unless granted away.").

90.     On July 29, 1837, the Chippewa entered into a treaty with the United States which ceded lands located in present-day Minnesota and Wisconsin. Treaty with the Chippewa, July 29, 1837, 7 Stat. 536, art. 1 ("1837 Treaty"). The 1837 Treaty expressly preserved and guaranteed the Chippewa tribes "the privilege of hunting, fishing, and gathering the wild rice, upon the lands, the rivers and the lakes included in the territory ceded." *Id.* art. 5.

91.     In 1855, certain bands of Chippewa Indians entered into a treaty designed to transfer additional Chippewa land to the United States. 10 Stat. 1165 (1855). The treaty did not expressly mention rights to hunt, fish, or gather.

92.     In *Minnesota v. Mille Lacs Band of Chippewa Indians*, the Supreme Court held that the 1855 Treaty did not abrogate hunting, fishing, and gathering rights reserved in the lands ceded in the 1837 Treaty. 526 U.S. 172, 200 (1999). The Court explained that that the 1855 Treaty contains no language providing money for the abrogation of hunting, fishing, and gathering rights and "[t]he historical record, purpose, and context of the negotiations all support the conclusion that the 1855 Treaty was designed to transfer Chippewa land to the United States, not terminate usufructuary rights." *Id.* at 173. The Court noted that the United States treaty drafters had the "sophistication and experience to use express language" to abrogate treaty rights, as evidenced by another treaty a few months prior that expressly revoked the Chippewa of Sault Ste. Marie's earlier reserved fishing rights. *Id.* at 195.

93.     On October 2, 1863, the Red Lake and Pembina Bands of Chippewa Indians entered into a treaty with the United States in which the Bands ceded lands to the United States. Treaty with the Chippewa, Red Lake and Pembina Bands, Oct. 2, 1863, 13 Stat. 667, art. 2 ("1863 Treaty"). On April 12, 1864, the United States and the Red Lake and Pembina Bands of Chippewa Indians entered into a treaty that increased the annuity payments. Treaty with the Chippewa, Red Lake and Pembina Bands, Apr. 12, 1864, 13 Stat. 689, art. 2 ("1864 Treaty"). Neither the 1863 Treaty nor the 1864 Treaty reference or restrict in any way the previously unfettered hunting, fishing, or gathering rights of the Red Lake Band and its members.

94.     The White Earth Reservation in Northwest Minnesota was established by the 1867 Treaty between the United States and the Mississippi Band of Chippewa Indians. 16 Stat. 719 (1867). The 1867 Treaty also made no express reference to previously unfettered hunting and fishing rights.

95.     In 1926, Congress passed an act setting aside Rice Lake and contiguous lands on the White Earth Reservation, together with lands owned by the state of Minnesota, as the Wild Rice Lake Reserve for the exclusive use and benefit of the Chippewa Indians of Minnesota. Act of June 23, 1926, 44 Stat. 763, as amended by Act of July 24, 1935, 49 Stat. 496; *see also Minnesota v. United States*, 125 F.2d 636 (8th Cir. 1942).

96.     Treaties are "the supreme Law of the Land." U.S. Const. art. VI, cl. 2.

97.     Treaty rights to hunt, fish, and gather, such as in the treaties implicated here, require water quality sufficient to protect the habitat supporting those rights. *United States v. Adair*, 723 F.2d 1394, 1411, 1414–15 (9th Cir. 1983).

98.     The federal government, including federal agencies, cannot abrogate treaty rights without specific and clearly expressed Congressional authorization. *Herrera v. Wyoming*,

139 S. Ct. 1686, 1696, 1698 (2019); *Menominee Tribe of Indians v. United States*, 391 U.S. 404, 412–13 (1968).

99.    Treaties are liberally construed in favor of the Indians, *Choctaw Nation v. United States*, 318 U.S. 423, 431–32 (1943), and courts consider the purpose of the treaty and give effect to how the Indian signatories to the treaty understood the agreement, *Mille Lacs Band of Chippewa Indians*, 526 U.S. at 196.

100.    The United States, including the Corps and all other federal agencies, is responsible for ensuring that treaty rights are given full effect and not abrogated or impinged upon by agency actions absent an act of Congress. *See Nw. Sea Farms, Inc. v. U.S. Army Corps of Eng'rs*, 931 F. Supp. 1515 (W.D. Wash. 1996); *Confederated Tribes of the Umatilla Indian Reservation v. Alexander*, 440 F. Supp. 553 (D. Or. 1977); *see also Nance v. E.P.A.*, 645 F.2d 701, 710–11 (9th Cir. 1981) ("It is fairly clear that any Federal government action is subject to the United States' fiduciary responsibilities toward the Indian tribes.").

101.    Along with their treaty rights, the Tribes have reserved water rights that protect the Tribes' uses of their water. *Winters v. United States*, 207 U.S. 564, 576–78 (1908). The Tribes' reserved water rights and the waters that satisfy those rights are trust assets subject to federal protection. *See, e.g.*, Working Group in Indian Water Settlements; Criteria and Procedures for the Participation of the Federal Government in Negotiations for the Settlement of Indian Water Rights Claims, 55 Fed. Reg. 9,223, 9,223 (Mar. 12, 1990).

102.    The United States has a trust responsibility to recognize and protect tribal lands, assets, and resources, which include the water that flows over and through tribal lands and the natural resources that depend on that water. *See, e.g.*, *Seminole Nation v. United States*, 316 U.S.

286, 296–97 (1942) (United States has "moral obligations of the highest responsibility and trust").

103.    The Corps states in its Tribal Consultation Policy that "[t]he Trust responsibility will be honored and fulfilled" and that the Corps "will ensure that it addresses Tribal concerns regarding protected tribal resources, tribal rights (including treaty rights) and Indian lands."[4]

104.    The federal trust responsibility requires that agencies take into consideration tribal treaty and other rights during the NEPA process. *Nw. Sea Farms*, 931 F. Supp. at 1520. The Department of Defense's American Indian and Alaska Native Policy notes, "[w]here agency actions may affect Indian lands or off-reservation treaty rights, the trust duty includes a substantive duty to protect these lands and treaty rights 'to the fullest extent possible.'"[5]

105.    The United Nations Declaration on the Rights of Indigenous Peoples, endorsed by the United States in 2011, states: "States shall consult and cooperate in good faith with the indigenous peoples concerned through their own representative institutions in order to obtain their free and informed consent prior to the approval of any project affecting their lands or territories and other resources, particularly in connection with the development, utilization or exploitation of mineral, water or other resources." G.A. Res. 61/295, annex, United Nations Declaration on the Rights of Indigenous Peoples, art. 32(2) (Sept. 13, 2007).[6]

---

[4] U.S. Army Corps of Eng'rs Tribal Nations Cmty. of Prac., *Tribal Consultation Policy*, at 2–3 (2013), https://www.spk.usace.army.mil/Portals/12/documents/tribal_program/USACE%20 Native%20American%20Policy%20brochure%202013.pdf.

[5] U.S. Dep't of Def., *American Indian and Alaska Native Policy*, at 3 n.(g) (2000), https://www.spk.usace.army.mil/Portals/12/documents/tribal_program/American-Indian-and-Alaska-Native-Policy-Booklet-Version-2-for-Web-Posting.pdf.

[6] Press Release, U.S. Dep't of State, Announcement of U.S. Support for the United Nations Declaration on the Rights of Indigenous Peoples (Jan. 12, 2011), https://2009-2017.state.gov/documents/organization/154782.pdf.

## VI.    ENVIRONMENTAL JUSTICE

106.    Executive Order 12,898 requires that, "[t]o the greatest extent practicable and permitted by law," federal agencies "shall make achieving environmental justice part of [their] mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of [their] programs, policies, and activities on minority populations and low-income populations." Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations, 59 Fed. Reg. 7629, 7629 (Feb. 11, 1994).

107.    "The purpose of an environmental justice analysis is to determine whether a project will have a disproportionately adverse effect on minority and low income populations." *Standing Rock Sioux Tribe*, 255 F. Supp. 3d at 140 (quoting *Allen v. Nat'l Insts. of Health*, 974 F. Supp. 2d 18, 47 (D. Mass. 2013)).

108.    Although the Executive Order does not create a private right to judicial review, Exec. Order 12,898 § 6-609, an agency is required under NEPA to take a "hard look" at environmental justice issues. *See Sierra Club v. Fed. Energy Regul. Comm'n*, 867 F.3d 1357, 1368 (D.C. Cir. 2017); *Cmtys. Against Runway Expansion, Inc. v. F.A.A.*, 355 F.3d 678, 689 (D.C. Cir. 2004).

### FACTUAL ALLEGATIONS

109.    On September 21, 2018, Enbridge submitted to the Corps a permit application pursuant to Section 404 of the CWA, 33 U.S.C. § 1344, and Section 10 of the RHA, 33 U.S.C. § 403, and a request for approval pursuant to Section 14 of the RHA, 33 U.S.C. § 408, to conduct activities in Minnesota necessary to construct the Project.

110.    In January 2020, Enbridge submitted updated application materials that included changes to Project workspaces and certain wetland crossing designations.

111.     The Corps' issuance of the Permit covering these requests, individually and

collectively, constitutes "major federal action" that requires the Corps to comply with NEPA.

The Corps is the only federal agency with pre-construction permitting authority over the Project,

and as such, no other federal agency has evaluated the Project under NEPA.

**I.      THE PROJECT**

112.     The Existing Line 3 pipeline in Minnesota was originally built in 1962 and 1963

and runs from the Canadian border to Superior, Wisconsin, and Enbridge currently uses it to

transport lighter grades of oil. In the application, Enbridge proposes to "replace" the existing

pipeline, but with a new larger pipeline, with up to double the capacity, carrying heavy "tar

sands" oil, that will travel along a different route.

113.     Within Minnesota, Enbridge proposes replacement of approximately 282 miles of

the existing 34-inch diameter Line 3 pipeline with approximately 338 miles of 36-inch diameter

pipeline and associated facilities.

114.     Enbridge's proposed route follows the Existing Line 3 pipeline corridor from the

North Dakota/Minnesota border in Kittson County to the Clearbrook Terminal in Clearwater

County, traveling in between the Red Lake and White Earth Reservations. At that point,

however, the route turns south to generally follow an existing third-party crude oil pipeline right-

of-way south to Hubbard County. The designated route then turns east to generally follow

electric transmission lines until it rejoins the Enbridge Mainline System right-of-way in St. Louis

County and proceeds through the Fond du Lac Reservation to the Minnesota/Wisconsin border in

Carlton County.

115.     Installation of the new 36-inch pipeline would allow Enbridge to expand the

average annual capacity of its "Mainline" system of pipelines from the Canadian tar sands region

to around 760,000 bpd and potentially even to 915,000 bpd in the future.

116.    Enbridge proposes to decommission and abandon-in-place the majority of the Existing Line 3 pipeline, with its 430,000 bpd capacity for carrying lighter grades of oil.

117.    Enbridge proposes to construct associated facilities, including eight pump stations (four adjacent to existing pump stations and four at new locations), electric transmission lines, access roads, and 37 mainline valves. Enbridge also proposes to expand the Clearbrook Terminal.

118.    The entire Line 3 project includes construction of a portion of the pipeline in North Dakota and Wisconsin as well as a significant length of pipeline in Canada. 27.3 miles of pipeline have already been replaced in North Dakota, 13 miles of pipeline have already been replaced in Wisconsin, and all of Line 3 from Edmonton, Alberta to the U.S. border near Gretna, Manitoba has already been replaced.

119.    The Project will cross 227 water bodies, 78.3 linear miles of wetlands, and sixteen major watersheds. The Project will result in the discharge of dredged and fill materials into 1,050.71 acres of waters of the United States, including wetlands. Approximately 9.97 acres of wetlands will be permanently filled to construct new above-ground pump stations and valves.

120.    The Project will cross three traditionally navigable waters: Red River of the North, Red Lake River, and the Mississippi River. The Project will also cross the Lost River Flood Control Project, a channel clearing and snagging project, located in Red Lake County, Minnesota.

121.    The Project will also temporarily convert 107.09 acres of scrub-shrub wetland and 194.81 acres of forested wetland to another wetland type through the clearing required for mainline workspace and access roads. The Project will permanently cause 81.36 acres of scrub-shrub wetland and 148.85 acres of forested wetland to be converted to an emergent-type wetland

as a result of maintaining an area over the pipeline to facilitate inspection. These conversions will cause, among other things, the loss of critical wetland functions, including decrease in above-ground biomass; loss of forest interior habitat; decrease in structural diversity; loss of visual screening and aural screening from human activity; decrease in local climate amelioration; loss of evergreen winter cover for wildlife; loss of habitat for shade-tolerant or shade-loving plants; loss of wildlife food sources (e.g., acorns); and increase in and replacement of native plants by invasive and exotic plant species.

122.    The Project will cross and impact the Fond du Lac Indian Reservation, and cross or otherwise impact land ceded to the United States government under a number of treaties with the affected Tribes, including the 1837 Treaty; the 1855 Treaty; the 1863 Treaty; and the 1867 Treaty. The Project will cross land, and will impact land and waters, where the Chippewa Indians in general and the Tribes in particular, hunt, fish, and gather wild rice.

123.    The Project is slated to cross and disturb large, high quality wetlands with significant vegetative species diversity and high aquatic organism habitat value. Constructing more than two dozen wetland crossings will be particularly damaging to these special aquatic sites and will impair aquatic resources. The Project would cross the Mississippi Headwaters region, which possesses some of the highest surface water quality in Minnesota. The Mississippi River also is the source of drinking water for more than one million downstream residents in Minnesota alone.

124.    The Project also will cause damage by crossing or passing within 1,000 feet of four ecologically sensitive, unique and high-quality calcareous fen wetlands near Clearbrook. These wetlands support a disproportionately large number of rare plant species in Minnesota, four of which occur almost exclusively in this community. Calcareous fen wetlands are highly

susceptible to disturbance and, under Minnesota law, "may not be filled, drained, or otherwise degraded, wholly or partially, by any activity, unless the commissioner, under an approved management plan, decides some alteration is necessary." Minn. Statutes § 103G.223.

125.    The Project would threaten important groundwater resources. The north and central portions of the Project contain extensive, high quality groundwater resources and areas of sandy surficial soils, resulting in the high vulnerability of groundwater to contamination from surface spills of hazardous materials such as petroleum.

126.    The Project would travel through and threaten the Straight River Basin, an important Minnesota aquifer.

127.    The Project would cross within one-half mile of numerous wild rice locations; these locations are irreplaceable and provide vital cultural and nutritional resources to the Tribes.

## II.    THE PERMIT APPLICATION

128.    Enbridge's Permit application largely consists of generic and conclusory statements that do not provide the information the Corps must have to evaluate the Project.

129.    The deficiencies in the application also made it impossible for the public to comment in a meaningful fashion on whether the Project complies with CWA § 404.

130.    There are numerous alternatives other than the Project that would fulfill Enbridge's stated desire to address the integrity and safety issues associated with the continued operation of Line 3. Enbridge could upgrade other pipeline systems, replace or repair damaged sections of Line 3, transport oil by rail, or some combination of those options to fulfill the same purpose as stated for the Project.

131.    Enbridge has not shown that other alternatives are not practicable, 40 C.F.R. § 230.10(a), and in fact there are alternatives that would be feasible or cheaper than the Project.

For example, the alternative of repairing and replacing sections of Existing Line 3 is substantially less expensive than the Project.

132.    Moreover, Enbridge's application provides no explanation for why its preferred route is required to meet the Project's purpose. The pipeline could take any number of other routes and still fulfill Enbridge's stated purpose.

133.    Enbridge's application does not provide the clear demonstration that would rebut the presumption that a practicable alternative is available, 40 C.F.R. § 230.10(a)(3); indeed, the evidence shows alternatives that are less environmentally damaging than what Enbridge proposes.

134.    For example, Enbridge could make upgrades to its existing pipeline system that would allow it to achieve the same capacity increase that the Project would achieve, if there is in fact demand for such an increase. Enbridge has not shown that the repairs the company would need to make to Existing Line 3 would be more environmentally damaging than the proposed installation of an entirely new 338-mile pipeline crossing 227 waterbodies and 16 major watersheds within Minnesota, large sections of which would be constructed along an entirely new right-of-way.

135.    Selecting an alternative route also could have fewer environmental impacts than the Project. For example, Enbridge could remove the existing pipeline and install the new Line 3 pipeline in the same trench, which would avoid environmentally harmful expansion activities and minimize potential adverse effects to surface and groundwater resources.

136.    Enbridge has not shown that its planned methods of construction are the least environmentally damaging. The company's proposed methods of crossing at each of the proposed 227 water crossings are based on inadequately conducted wetland delineation surveys.

It is impossible for Enbridge to know the extent of the wetlands impact its Project will cause, or whether the construction method it has selected will avoid adverse environmental impacts to the maximum extent practicable.

137.    Without explanation, Enbridge proposes to use horizontal directional drilling, which is the crossing method that most avoids wetland and waterway impacts and limits vegetation disturbance, at only 21 of the crossings.

138.    At these 21 crossings, horizontal directional drilling presents a threat of "frac-out," which occurs when pressurized fluids and drilling lubricants escape the active bore, migrate up through the soils, and come to the surface at or near the construction site or in the waterbody. The Corps does not consider this threat in its Decision Document.

## III.    THE CORPS' ISSUANCE OF THE PERMIT

139.    On November 23, 2020, the Corps issued a permit under CWA § 404 authorizing Enbridge to discharge dredged and fill material into waters of the United States. This action purported to simultaneously satisfy the requirement for a permit in RHA § 10.

140.    The Permit references a November 2020 Environmental Protection Plan, which has not been made publicly available at this time.

141.    At the same time, the Corps issued an authorization pursuant to Section 408 of the RHA for the Project work that will alter the Lost River, Minnesota Flood Control Project. The Corps stated that the requested alteration is not injurious to the public interest and will not impair the usefulness of the federal project. The Corps further stated that "This permission is based on the information included in your 21 September 2018 request letter," and "was made in reliance on the information [Enbridge] provided."

142.    The Corps prepared a combined Environmental Assessment, Section 404(b)(1) Guidelines Evaluation, Public Interest Review, and Statement of Findings for the Project

33

("Decision Document"). The Corps failed to make these documents public when it released the Permit, and indeed the Corps refused to make them public except pursuant to a request made under the Freedom of Information Act ("FOIA"). Although the Army's internal policy provides that Tribes should not be required to seek documents containing information about infrastructure projects the Army is considering via FOIA, U.S. Dep't of the Interior et al., *Improving Tribal Consultation and Tribal Involvement in Federal Infrastructure Decisions* 18 (2017), https://www.bia.gov/sites/bia.gov/files/assets/as-ia/pdf/idc2-060030.pdf, the Corps did not provide these documents to the Tribes. Sierra Club filed a FOIA request on December 1, 2020, seeking any Decision Document(s) explaining or justifying the Corps' decision(s) to issue permits for the Project and any Environmental Assessment, Finding of No Significant Impact and/or Record of Decision prepared by the Corps as part of its compliance with NEPA for the Project.  On December 9, 2020, Sierra Club received the Decision Document and the Corps' Public Notice Comments and Responses. In addition, the Corps indicated that it is still reviewing documents for potential redactions and will provide those documents at a later date.

143.    The Permit states, "The determination of this office that issuance of this permit is not contrary to the public interest was made in reliance on the information you [Enbridge] provided." Although the Corps states in response to comments that it reviewed the information, it does not state that it verified it. Decision Document, App. A (Public Notice Comments and Responses) at 6.

144.    The Corps limited its environmental analysis to "regulated activities in waters of the U.S. associated with linear crossings as well as uplands adjacent to, and in some cases between, waterbodies where the Corps has sufficient control and responsibility to expand its analysis." Decision Document at 13.

145.    The Corps stated that "The scope does not extend to the entire pipeline construction, or operation, because the Corps does not have sufficient control and responsibility over the entire project to warrant an expanded analysis." *Id.* at 14.

146.    The Decision Document fails to evaluate the direct, indirect, and cumulative impacts of the Project or the entire Line 3 replacement, of which the Project is an integral part, and instead limits the scope of its analysis to segments of the pipeline over which the Corps determined it has control and responsibility.

147.    The Decision Document does not analyze or provide any evidence that the construction method Enbridge plans to use at each water crossing location will be sufficiently protective.

148.    The Decision Document does not consider the Project's impacts on wetlands that are hydrologically connected to trout streams, wild rice, lakes, and other protected waters of high or outstanding biological significance, despite these wetlands' unique ecological features and their importance to local communities, particularly the Tribes.

149.    The Decision Document does not evaluate the Project's potential to result in oil spills, either into the Corps' jurisdictional waterways or on uplands portions of the pipeline, or the impact such a spill would have on the environment, the Tribes' rights to hunt, fish, and gather and to clean water, or human health, let alone evaluate the potential for larger spills resulting from construction of a larger, higher capacity pipeline. The Decision Document also does not analyze whether Enbridge has measures in place to adequately guard against or respond to such spills.

150.    The Decision Document mentions the higher percentage of oil spills likely to occur from rail and truck alternatives in comparison with pipelines, but it also acknowledges that

pipeline oil spills occur and are likely to involve larger volumes of oil. Decision Document, at 19–20, 26. Despite this acknowledgment, the Decision Document fails to evaluate the impacts of those spills.

151.    A separate Response to Comments document states that the Corps' authority is limited to construction-related impacts to aquatic resources and the potential for oil spills is beyond the scope of its regulatory authority. Decision Document, App. A at 3. Although the same document states that the Corps did not adopt an EIS that was prepared under Minnesota law, the Corps nevertheless relies on that EIS, stating that "environmental consequences of oil spills of varying types over representative terrains, which are outside of the regulatory authority, are disclosed in the State EIS." *Id.* at 2–3.

152.    The Decision Document concludes that the "proposed activities within the Corps' federal control and responsibility likely would result in a negligible release of greenhouse gases into the atmosphere when compared to global greenhouse gas emissions." Decision Document at 51. That evaluation was limited to emissions caused by impacts to aquatic resources that sequester carbon dioxide and impacts from operating construction equipment. *Id.* The Decision Document notes that "[a]n analysis of greenhouse gas emissions was conducted by the Minnesota Department of State [sic] and included in the State EIS." *Id.*

153.    The Decision Document does not evaluate the cumulative impacts of the Project approval and approvals of other sections of Line 3, which will allow for an increase in average annual capacity to approximately 760,000 bpd and ultimately an average annual capacity of 915,000 bpd.

154.    In the Response to Comments, the Corps states that its analysis is limited because the Corps "does not regulate the overall construction or operation of pipelines, nor does it

regulate the siting of any type of pipeline/utility line, or any substance being transported within a pipeline." Decision Document, App. A at 4.

155.    The Corps further states in response to a comment about climate impacts that "Social costs of carbon pollution are not with [sic] the Corps' regulatory authority." *Id.* The Corps also made no effort to study or assess how changes due to increasing global temperatures could increase the risks the Project poses to Minnesota's waterways.

156.    The Decision Document notes that the Project traverses territory ceded by the Tribes and other Chippewa Bands under various treaties and that the Bands retain the rights to hunt, fish, and gather resources within the ceded territories. Decision Document at 53. The Decision Document recognizes that "[n]atural resources and the lands on which they are gathered are important to the Bands for a number of reasons, including cultural, spiritual, and/or historical meanings." *Id.*

157.    Referring to those natural resources and lands, the Decision Document states:

> The Project would result in direct and indirect environmental effects due to ground-disturbing activities. Construction across waterbodies could result in increased turbidity and sedimentation, stormwater runoff and erosion from cleared vegetation, changes to stream flow due to HDD testing water, or degradation of aquatic habitat from in-stream construction which has the potential to affect wild rice. With implementation of mitigation measures, impacts would be minor and temporary.

*Id.*

158.    In the Decision Document's Environmental Justice section, the Corps concludes:

> Based on information available to the Corps, including the information provided in the State EIS, as well as the details of the Project that is within the Corps' regulatory authority, the Project would not have disproportionately high and adverse impacts to minority populations.

*Id.* at 126.

159.    The Corps reached this conclusion by identifying the census tracts the Project would cross that have "a meaningfully higher minority population." (The Corps found that none has "a meaningfully greater proportion of the population with income less than 185 percent of the poverty level" of their respective counties.) *Id.* The Corps stated that most of the impacts from the Project would be related to construction, but the Decision Document lacks an explanation of the basis for its conclusion, or how it analyzed construction-related impacts on the minority census tracts.

160.    The Corps' Environmental Justice section did not consider the impact of an oil spill on the Tribes' rights to hunt, fish, and gather and to clean water.

161.    The Decision Document states that the Corps prepared a Biological Assessment and consulted with the U.S. Fish and Wildlife Service pursuant to Section 7 of the Endangered Species Act of 1973, as amended, 16 U.S.C. §§ 1531–1544, because Line 3 may affect federally listed endangered or threatened species or designated critical habitat.

162.    For federally listed species and designated critical habitat within the federal action areas of the Project, the Corps concluded the Project may affect but is not likely to adversely affect the Gray Wolf and the Canada Lynx, and would have no effect on their critical habitat. The Corps also concluded that the Project may affect the Northern Long-Eared Bat, but that incidental take is not prohibited for that species.

## IV.    RISK OF OIL SPILLS

163.    The Project poses a great risk of tar sands oil spills, the impacts of which tend to be much greater than the impacts of conventional crude oil spills. Effective clean-up methods simply do not yet exist and may never exist for the type of oil that Enbridge plans to transport in large quantities through the Line 3 pipeline.

164.    Unlike conventional crude, tar sands oil is derived from sand that is impregnated with viscous, extra-heavy oil known as bitumen.

165.    Because it is so viscous and heavy, tar sands oil must be diluted with lighter hydrocarbons before it can be pumped through a pipeline.

166.    Bitumen has a propensity to sink in water, attach itself to the bottom of waterbodies, and persist in the affected environment, polluting impacted areas indefinitely.

167.    For example, on July 26, 2010, Enbridge reported that its 30-inch diameter 6B Pipeline had ruptured and released an estimated 840,000 gallons (approximately 94 semi-tanker trucks) of diluted bitumen about one mile south of Marshall, Michigan. Investigation showed that the oil flowed into a culvert, which led to Talmadge Creek, and then followed the creek to the Kalamazoo River, ultimately contaminating about 30 to 35 miles of the River before it was contained.

168.    In the Kalamazoo River, the heavy bitumen sank to the river bottom, coating wildlife, rocks and sediment. The lighter chemicals used to dilute the bitumen stayed on the surface and evaporated. Resulting toxic fumes forced local residents to flee from their homes and over 300 people suffered from immediate illness due to benzene exposure.

169.    The cleanup costs have exceeded one billion dollars, required more than 2000 personnel, over 150,000 feet of boom, 175 heavy spill response trucks, 43 boats, and 48 oil skimmers. The river may never be restored and the response to this spill is likely to continue for decades.

170.    The transportation of diluted bitumen presents higher risks to communities, wildlife and natural resources than conventional crude.

171.    An oil spill from the Project could destroy the fish, wildlife, and wild rice that the Tribes rely on for sustenance and for their cultures' survival. In addition to the harmful characteristics described above, tar sands oil has a high sulfur content and wild rice stands are particularly sensitive to sulfur.

172.    The pipeline runs through some of the most popular recreational regions in the state. These areas support a recreational and tourism industry that generates millions of dollars in revenue for Minnesota's economy will be destroyed should a spill occur. By failing to consider these economic risks, the Corps has failed to account for an important economic impact of the Project.

173.    Despite the abundance of evidence about the harms of tar sands oil spills, the Corps has not considered oil spill risks associated with the Project, including the additional volumes of oil that the Corps' authorization permits, and which could spill throughout Line 3's entire route.

## V.    CLIMATE IMPACTS

174.    Climate change threatens the nation with extended periods of heat, greater numbers of heavy downpours, more regional drought, increased wildfires in parts of the American West, permafrost thawing in Alaska, ocean acidification, and sea-level rise in coastal communities.

175.    Minnesota is already experiencing the effects of climate change more than areas closer to the equator due to positive feedback effects such as a weakening albedo (a measure of the amount of solar energy reflected from Earth back into space) and the release of methane into the atmosphere from melting permafrost. Minnesota's average temperature has risen about two degrees Fahrenheit in the past century, and seven of Minnesota's ten warmest years occurred since 2000. Every county in Minnesota is experiencing more climate-related stresses: extreme

storms, flash floods, excessive heat, and droughts. Lake Superior has warmed substantially and Great Lake ice cover has dropped precipitously.

176.    Tar sands oil production generates almost triple the global warming pollution as conventional oil production due to the massive amounts of energy needed to extract, upgrade, and refine the oil.

177.    Extraction of bitumen from tar sands requires the combustion of large amounts of natural gas to turn water into steam, which is then pumped underground to heat the bitumen so it will flow. The raw bitumen must then be processed, blended with diluent, and transported long distances to refineries. Thus, tar sands oil requires significantly more energy input to generate the same amount of usable energy output than the refining of conventional crude oil.

178.    The Corps' approval of the Project will result in increased levels of tar sands production in Alberta and increased levels of emissions associated with that production.

179.    Line 3 initially will be capable of transporting 760,000 bpd of oil to refineries, and ultimately as many as 915,000 bpd. If not for the Project, some portion or even all of this oil would not be developed and transported to refineries.

180.    Thus, there is a causal connection between the Project and the greenhouse gas emissions associated with the initial 760,000 bpd and ultimately up to 915,000 bpd of heavy and light crude oil.

181.    The Corps is aware of and already possesses information regarding studies estimating the well-to-wheel GHG emissions associated with tar sands crude oil.

182.    The "social cost of carbon" is a common measurement used by government agencies to contextualize the greenhouse gas emissions associated with a project. The Corps

failed to consider information showing that approval of the Project will result in hundreds of billions of dollars in social costs.

## FIRST CLAIM FOR RELIEF

**The Corps' Failure to Adequately Consider the Direct, Indirect and Cumulative Impacts of Its Permit Action Violated the National Environmental Policy Act and the Administrative Procedure Act**

183.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

184.    The Corps' NEPA obligations when issuing a CWA § 404 dredge and fill permit extend beyond consideration of the effects of the discharge of dredged or fill material in jurisdictional waters and include nonaquatic effects of the installations that the Corps' dredge and fill permits authorize. *Sierra Club, Inc. v. Bostick*, 787 F.3d 1043, 1063–64 (10th Cir. 2015) (McHugh, J., concurring); *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1121–22 (9th Cir. 2005).

185.    The Corps' review failed to analyze the indirect and cumulative impacts of all sections of the Line 3 pipeline, including those portions requiring federal approval and those which fall outside federal jurisdiction, on surface waters, groundwater, fish, wildlife, waterfowl, wild rice, and plants. The Corps also failed to analyze the broader environmental consequences resulting from the Project.

186.    The Corps' review also failed to analyze other infrastructure projects within the Project area that may result in cumulative effects to surface waters, groundwater, fish, wildlife, waterfowl, wild rice, and plants and that may have broader environmental consequences, such as projects that may result in forested wetland conversion or otherwise impact wetlands in the same watershed.

187.    The Corps unlawfully segmented its NEPA review into separate components, including by separately analyzing associated facilities and actions outside Minnesota.

42

188.     The Corps failed to evaluate the risks and impacts of oil spills along the pipeline route, including but not limited to spills into Corps jurisdictional waterways and an examination of the various types of crude oil products transported by the Project and their respective properties, characteristics, environmental impacts, or spill response requirements.

189.     The transportation of diluted bitumen presents significant risks to communities, wildlife, and natural resources, and impacts of spills can be much greater than conventional crude oil. Given the potentially catastrophic nature of an oil spill from the Project, NEPA requires analysis of both the risk of a spill and its impact on important resources, which the Corps failed to perform.

190.     The Corps failed to analyze the threats and consequences of its choice of crossing methods, including the likelihood of "frac-outs" during horizontal directional drilling for water crossings.

191.     The Corps failed to adequately evaluate and analyze alternatives, including but not limited to route alternatives and crossing methods.

192.     The Corps failed to quantify and evaluate the cumulative and incremental effects of climate change, including the potential for increased lifecycle greenhouse gas emissions and their associated costs, resulting from the approval of the Project and connected actions.

193.     The Corps failed to fully assess the impacts that approving the Permit would have on the Tribes' treaty rights, which the Tribes hold in their reservation lands and in off-reservation lands that the Project would cross or that would otherwise be impacted by the Project. The Tribes' treaty rights include the right to clean, safe water to sustain a livable permanent homeland and self-sufficiency for the Tribes and their people. The Tribes' rights also include

reserved water rights and off-reservation treaty rights to hunting, fishing, and gathering of wild rice.

194.     By restricting the scope of review, providing no explanation of its analysis, and not evaluating oil spill risks, the Corps also failed to present a rational environmental justice review.

195.     The Corps' failure to consider reasonably foreseeable direct, indirect, and cumulative upstream and downstream impacts, including risks and impacts from oil spills and climate change, violates NEPA and is arbitrary, capricious, and not in accordance with the law, in violation of the APA, 5 U.S.C. § 706(2)(A).

## SECOND CLAIM FOR RELIEF

**The Corps' Failure to Prepare an EIS Violated the National Environmental Policy Act and the Administrative Procedure Act**

196.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

197.     The Corps' issuance of the Permit, which authorized dredge and fill activities under CWA § 404, horizontal directional drilling under RHA § 10, and alteration of a public work under RHA § 408, was a major federal action which required compliance with NEPA.

198.     The Project could not go forward without the Permit from the Corps and would have significant environmental impacts. The Project would affect public health and safety; be constructed in the proximity of historic and cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, and ecologically critical areas; and adversely affect protected species and habitat.

199.     The Project is related to other projects that would together have significant cumulative effects.

200.    The Project's construction-related impacts, including clearcutting vegetation from a 50 foot-wide permanent right-of-way and a 95 to 125 foot temporary construction right-of-way for the entire route of the Project; excavation of a minimum seven-foot-deep trench; stockpiling of removed soils; transportation of approximately 60-foot-long 36-inch diameter pipe segments to the trench; welding the pipe segments into a continuous pipeline; re-filling of the trench; and construction of ancillary facilities including pump stations, valves, electrical substations, access roads, horizontal directional drilled waterbody crossings, cathodic protection equipment, and communications facilities, will significantly impact the environment.

201.    Of the 338 miles of linear pipeline that comprise the Project, 78.3 miles would travel through wetlands, resulting in the loss or conversion of important wetlands, and essentially all of the proposed route would go through or near lands in which the Tribes claim rights to hunt, fish, and gather.

202.    The impacts of the Project are also highly controversial, uncertain, and involve unique and unknown risks, including the potential for the Project's operation to cause significant greenhouse gas emissions, pollute Minnesota's waterways, and destroy historic and culturally significant resources of tribal nations.

203.    The Corps acted arbitrarily, capriciously, and contrary to the evidence before it, in violation of NEPA and contrary to the APA, 5 U.S.C. §§ 706(2)(A), (D), in failing to prepare a full EIS on the Project.

### THIRD CLAIM FOR RELIEF

**The Corps' Failure to Evaluate All Relevant Factors, Including Cumulative Impacts, and to Choose the Least Damaging Practicable Alternative Violated Clean Water Act § 404 and the Administrative Procedure Act**

204.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

205.    Under Section 404 of the CWA, the Corps is required to conduct an alternatives analysis and determine what projects are "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2).

206.    Numerous alternatives that are practicable and less environmentally harmful would fulfill what Enbridge claims is the Project's purpose to address the integrity and safety issues associated with the continued operation of Line 3. Enbridge could upgrade other pipeline systems, replace or repair damaged sections of Line 3, transport crude by rail, or some combination of those options, to fulfill its claimed purposes.  If the purpose and need of the Project were defined properly –as a way to make Canadian tar sands oil more competitive in the global marketplace—there are many less environmentally damaging alternatives available.

207.    The Corps' rejected these alternatives mainly due to cost. In rejecting these alternatives, the Corps also considered the potential for oil spills but did not evaluate their likelihood or impact in the context of the Project alternative.

208.    The Corps did not assess any off-site alternatives and limited its range of on-site alternatives to the route corridor designated by the Minnesota Public Utilities Commission.

209.    The Corps also failed to independently verify the information needed to determine whether the Project was the least damaging practicable alternative.

210.    The Corps' approval of the Project, without showing that there were no practicable and less environmentally harmful alternatives, violated CWA § 404 and 40 C.F.R. §§ 230.10(a), (c) and is arbitrary, capricious, and not in accordance with the law in violation of the APA, 5 U.S.C. § 706(2)(A).

## FOURTH CLAIM FOR RELIEF

**The Corps' Inadequate Public Interest Review Violated the Clean Water Act, the Rivers and Harbors Act, the Corps' Own Permitting Regulations, and the Administrative Procedure Act**

211.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

212.    Prior to issuance of a CWA § 404 permit or an RHA § 408 approval, the Corps must conduct a "public interest" review consistent with its governing regulations, 33 C.F.R. § 320.4(a).

213.    In conducting a public interest review, the Corps must consider the probable impacts of the proposed action and weigh "all those factors which become relevant," including the extent of public and private need for the proposal, and the existence of unresolved conflicts around resources use. *Id.* § 320.4(a)(1). The Corps must balance the benefits "which reasonably may be expected to accrue" from the action against the "reasonably foreseeable detriments." *Id.*

214.    The Corps' public interest review suffered from the same flaws as the NEPA and CWA reviews identified above.

215.    Specifically, the Corps conducted an arbitrary and segmented approach that ignored the indirect and cumulative effects of its decision to issue the Permit for construction and operation of the Project.

216.    The Corps' public interest review unlawfully limited the scope of its consideration of detrimental effects to water impacts associated with construction of the Project, even though the Corps considered beneficial effects beyond the construction, such as "services provided not related to the Project" and benefits to others in the United States who would use the products of crude oil transported by the pipeline. Decision Document at 48.

217.    By failing to undertake a lawful and rational public interest review of the actions authorized by the Permit, the Corps violated the CWA, RHA, and its own permitting regulations,

47

and acted in a manner that is arbitrary, capricious, and not in accordance with law, and without

observance of procedure required by law, in violation of the APA, 5 U.S.C. §§ 706(2)(A), (D).

## REQUEST FOR RELIEF

Plaintiffs respectfully request that the Court:

      1.     Declare that the Corps' approval of the Permit violated NEPA, the CWA, the RHA,

the Corps' own regulations, and the APA;

      2.     Vacate and set aside the challenged Permit;

      3.     Issue preliminary and permanent injunctions against pipeline construction;

      4.     Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys'

fees, associated with this litigation; and

      5.     Grant Plaintiffs such further and additional relief as the Court may deem just and

proper.

Respectfully submitted this December 24, 2020,

<div style="margin-left:40%">

*s/Seth Johnson*

Seth L. Johnson, D.C. Bar No. 1001654
Earthjustice
1001 G St. NW, Ste. 1000
Washington, D.C. 20001
(202) 667-4500
sjohnson@earthjustice.org

Moneen Nasmith
*[Pro Hac Vice Application Pending]*
Alexis Andiman
*[Pro Hac Vice Application Pending]*
Mekela Panditharatne
*[Pro Hac Vice Application Pending]*
Earthjustice
48 Wall Street, 15th Floor
New York, NY 10005
(212) 845-7376
mnasmith@earthjustice.org
aandiman@earthjustice.org
mpanditharatne@earthjustice.org

*Attorneys for Plaintiffs*

</div>