**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| RED LAKE BAND OF CHIPPEWA INDIANS, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Civil Action No 1:20 cv-03817 (CKK) |
| UNITED STATES ARMY CORPS OF ENGINEERS, | ) ) ) | |
| Federal Defendant. | ) ) | |

**FEDERAL DEFENDANT'S RESPONSE IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

TABLE OF CONTENTS

Statutory and Regulatory Framework ........................................................................ 2

    I.      National Environmental Policy Act.................................................... 2

    II.     Clean Water Act .............................................................................. 3

    III.    Rivers and Harbors Act ................................................................... 5

Factual Background .................................................................................................. 6

Standard of Review ................................................................................................10

    I.      Preliminary injunctive relief .........................................................10

    II.     The Administrative Procedure Act.................................................11

Argument ..............................................................................................................12

    I.      Plaintiffs are not likely to succeed on the merits of their NEPA and CWA claims .......................................................................................12

        A.    Plaintiffs fail to show that the Corps' consideration of the potential effects of oil spills and leaks is deficient ...................................12

            1.    The Corps satisfied NEPA by taking a "hard look" at oil spills and leaks ........................................................16

            2.    Plaintiffs are not likely to prevail on their merits of their claim that the Corps violated the Clean Water Act by failing to consider the risk of oil spills.................................19

                a.    The Corps was not required to consider the risk of oil spills in its consideration of alternatives under 40 C.F.R. § 230.10(a)......................................19

                b.    The Corps was not required to consider the risk of oils spills in its analysis under 40 C.F.R. § 230.10(c).......21

                c.    The Corps adequately considered potential oil spills as part of its public interest analysis ...............................21

        B.    Plaintiffs fail to show that the Corps' alternatives analysis is deficient ...........................................................................25

            1.    The Corps satisfied NEPA when it considered a reasonable range of alternatives.................................................25

i

2.     The Corps' consideration of alternatives satisfied the CWA ........31

3.     The Corps thoroughly evaluated alternative construction methods .................................................................................31

II.     Plaintiffs have not shown immediate and irreparable injury ..............................34

III.     The balance of equities tip in favor of the Corps and the issuance of an injunction would harm the public interest...........................................................37

Conclusion ....................................................................................................................41

TABLE OF AUTHORITIES

## Cases

*Am. Paper Inst., Inc., v. Am. Elec. Power Serv. Corp.*,
    461 U.S. 402 (1983) .................................................................................................. 11

*Amoco Prod. Co. v. Vill. of Gambell*,
    480 U.S. 531 (1987) .................................................................................................. 35

*Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*,
    894 F.3d 692 (5th Cir. 2018) .................................................................................... 35

*Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*,
    Civ. A. 18-23-SDD-EWD, 2020 WL 1450750 (Mar. 25, 2020) ............................. 23

*Cal. Ass'n of Private Postsecondary Schools v. DeVos*,
    344 F. Supp. 3d 158 (D.D.C. 2018) ........................................................................ 34

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) ................................................................................. 34

*\*Citizens Against Burlington, Inc. v. Busey*,
    938 F.2d 190 (D.C. Cir. 1991) ................................................................. 26, 29, 30, 33

*City of Alexandria v. Slater*,
    198 F.3d 862 (D.C. Cir. 1999) ................................................................................. 29

*Communities Against Runway Expansion, Inc. v. FAA*,
    355 F.3d 678 (D.C. Cir. 2004) ................................................................................. 25

*Confederated Tribes of the Grand Ronde Cmty. of Or. v. Jewell*,
    75 F. Supp. 3d 387 (D.C. Cir. 2016) ....................................................................... 11

*Ctr. for Food Safety v. Jewell*,
    83 F. Supp. 3d 126 (D.D.C. 2015) .......................................................................... 16

*\*Dep't of Transp. v. Pub. Citizen*,
    541 U.S. 752 (2004) ............................................................................................... 3, 19

*Friends of Capital Crescent v. FTA*,
    877 F.3d 1051 (D.C. Cir. 2017) ............................................................................... 29

*Gordon v. Holder*,
    632 F.3d 722 (D.C. Cir. 2011) ................................................................................. 35

*Hoosier Environmental Council v. U.S. Army Corps of Eng'rs*,
    105 F. Supp. 2d 953 (S.D. Ind. 2000) ..................................................................... 22

*Hoosier Envtl. Council v. U.S. Army Corps of Eng'rs*,
    722 F.3d 1053 (7th Cir. 2013) ................................................................................. 13

*In re Applications of Enbridge Energy*,
    930 N.W.2d 12 (Minn. Ct. App. 2019) ............................................................... 14, 24

*James Cty., Va. v. EPA*,
    955 F.2d 254 (4th Cir. 1992) .................................................................................31

*Kleppe v. Sierra Club*,
    427 U.S. 390 (1976) .............................................................................................12

*Konarski v. Donovan*,
    763 F. Supp. 2d 128 (D.D.C. 2011) ....................................................................10

*Kunaknana v. U. S. Army Corps of Eng'rs*,
    No. 3:18-cv-00044-SLG, 2015 WL 3397150 (D. Alaska, May 26, 2015) ............20

*League of Women Voters of the United States v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ................................................................................11

*Marsh v. Or. Nat. Res. Council*,
    490 U.S. 360 (1989) .............................................................................................36

*Mdewakanton Sioux Indians of Minn. v. Zinke*,
    255 F. Supp. 3d 48 (D.D.C. 2017) ......................................................................11

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) .........................................................................................11, 22

*Munaf v. Geren*,
    553 U.S. 674 (2008) .............................................................................................10

*Myersville Citizens for a Rural Cmty., Inc. v. FERC*,
    783 F.3d 1301 (D.C. Cir. 2015) .....................................................................26, 30

*Mylan Pharm. v. Shalala*,
    81 F. Supp. 2d 30 (D.D.C. 2000) ........................................................................35

*Nken v. Holder*,
    556 U.S. 418 (2009) .............................................................................................37

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989) .........................................................................................3, 15

*Sherley v. Sebelius*,
    644 F.3d 388 (D.C. Cir. 2011) ............................................................................11

*Sierra Club v. Dep't of Energy*,
    867 F.3d 189 (D.C. Cir. 2017) ............................................................................29

*Sierra Club v. Marita*,
    46 F.3d 606 (7th Cir. 1995) .................................................................................22

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
    255 F. Supp. 3d 101 (D.D.C. 2017) ....................................................................38

*Theodore Roosevelt Conservation P'ship v. Salazar*,
    744 F. Supp. 2d 151 (D.D.C. 2010) ....................................................................33

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
  136 S. Ct. 1807 (2016) ............................................................................................... 4

*U.S. Postal Serv. v. Gregory*,
  534 U.S. 1 (2001) ........................................................................................... 11, 12, 19

*United States v. Pa. Indus. Chem. Corp.*,
  411 U.S. 655 (1973) ................................................................................................... 5

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
  435 U.S. 519 (1978) ....................................................................................... 3, 12, 29

*W. Ala. Quality of Life Coal. v. U.S. Fed. Highway Admin.*,
  302 F. Supp. 2d 672 (S.D. Tex. 2004) ...................................................................... 35

*WildEarth Guardians v. Jewell*,
  738 F.3d 298 (D.C. Cir. 2013) .................................................................................. 3

*\*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ................................................................................. 10, 11, 34, 37

*Wisc. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) ................................................................................ 34

**Statutes**

33 U.S.C. § 1311(a) ...................................................................................................... 3, 4

33 U.S.C. § 1341 .............................................................................................................. 41

33 U.S.C. § 1344 ........................................................................................................... 4, 8

33 U.S.C. § 403 .......................................................................................................... 1, 5, 8

33 U.S.C. § 408 .......................................................................................................... 5, 8, 15

42 U.S.C. § 4332 ................................................................................................................ 1

42 U.S.C. § 4332(2)(C) ................................................................................................... 2, 3

5 U.S.C. § 706(2)(A) ....................................................................................................... 11

**Regulations**

33 C.F.R. § 320.2(b) ......................................................................................................... 5

33 C.F.R. § 320.2(d) ......................................................................................................... 5

33 C.F.R. § 320.2(e) ...................................................................................................... 5, 6

33 C.F.R. § 320.4 ............................................................................................................ 19

33 C.F.R. § 320.4(a)(1) .................................................................................................. 5, 21

33 C.F.R. § 322.1 .............................................................................................................. 5

33 C.F.R. § 325.2(a)(13) ................................................................................................... 4

33 C.F.R. § 325.2(a)(2) ................................................................................. 4

33 C.F.R. § 325.3(a) ..................................................................................... 4

33 C.F.R. pt. 325 ............................................................................ 3, 13, 26

40 C.F.R. § 1501.4 ........................................................................................ 3

40 C.F.R. § 1502.14(a) ................................................................................26

40 C.F.R. § 1508.13 ...................................................................................... 3

40 C.F.R. § 1508.9 ........................................................................................ 3

40 C.F.R. § 1508.9(a) ..................................................................................16

40 C.F.R. § 230 ............................................................................................. 4

40 C.F.R. § 230.10 .....................................................................................4, 9

40 C.F.R. § 230.10(a) ....................................................................... *passim*

40 C.F.R. § 230.10(c) ..............................................................................19, 21

40 C.F.R. pt. 1500 ........................................................................................ 3

40 C.F.R. pt. 230 .......................................................................................... 9

43 Fed. Reg. 55978 (Nov. 29, 1978) ........................................................... 3

51 Fed. Reg. 15618 (Apr. 25, 1986) ............................................................ 3

Plaintiffs Red Lake Band of Chippewa Indians, the White Earth Band of Ojibwe, Honor the Earth, and the Sierra Club oppose the Enbridge Line 3 Replacement Project (Replacement Line 3), a state-approved private project designed to satisfy consent decree requirements by replacing aging pipeline infrastructure with a modern pipeline that incorporates corrosion resistant technology and other safety improvements.[1] On November 23, 2020, the U.S. Army Corps of Engineers (Corps) issued Enbridge Energy Limited Partnership a Section 404 Permit to allow for the discharge of fill material into jurisdictional waters of the United States during the construction of portions of Replacement Line 3, along with a Rivers and Harbors Act (RHA), 33 U.S.C. § 403, authorization for crossings of RHA Section 10 waters (Corps Permit). In addition to the Corps' permit review, Replacement Line 3 has been the subject of an extensive state administrative process and state litigation over, among other things, oil spill risk and route alignment.

Now, Plaintiffs request that the Court preliminarily enjoin the Section 404 Permit. In order to obtain this extraordinary relief, Plaintiffs must show a combination of a substantial likelihood of success on the merits, irreparable injury, and that the public interest favors such an order. Plaintiffs have failed to establish that they are entitled to emergency relief.

Plaintiffs cannot show that they are likely to succeed on the merits of their National Environmental Policy Act (NEPA), 42 U.S.C. § 4332, and Clean Water Act (CWA) claims because they are based on flawed assumptions about the extent of the Corps' jurisdiction and environmental analysis, as well as misunderstandings regarding the CWA 404 permitting process. For example, Plaintiffs' motion is strongly tied to their belief that the Corps' record is "entirely void" of any analysis of the potential impacts of oil spills and leaks. Pls.' Mot. for a

---

[1] *See* Consent Decree ¶ 22, *United States v. Enbridge Energy Ltd. Partnership*, Case No. 16-cv-914 (W.D. Mich.) ECF No. 14 (May 23, 2017) (Consent Decree).

Prelim. Inj. & Supp. Mem., at 15, ECF No. 2-2 (Pls.' Mem.). This is incorrect. The Corps analyzed potential impacts of oil spills and leaks when formulating alternatives in its Section 404 Environmental Assessment (EA) and in its Section 408 EA evaluating Enbridge's request to cross a Corps project. The Corps also considered a reasonable range of alternatives to the project, alternative construction methods for waterbody and wetlands crossings, and the other direct, indirect, and cumulative impacts of issuing the Corps Permit.

Additional reasons exist for denying the requested extraordinary emergency relief. Notably, Plaintiffs fail to show that any immediate irreparable injury will occur if their motion is denied. Approximately 90 percent of Replacement Line 3's route will be co-located with other pipelines, utilities, roads, railroads, or highways. Further, the vast majority of wetlands impacts from the construction of Replacement Line 3 will be temporary and mitigation will be performed to compensate for the small amount of loss of aquatic resource function. The Corps Permit also incorporates important protections for wetlands, wild rice, and cultural resources. Finally, the public interest will not be served by delaying the construction of Replacement Line 3, which has been routed to avoid the Chippewa National Forest and the Leech Lake Band's Reservation, both of which are traversed by Existing Line 3. Replacement Line 3 also improves public safety and protects the environment by replacing a pipeline that is more than 50 years old, has a large number of identified defects, and is substantially similar to the pipe that failed and caused the Marshall, Michigan spill.

## Statutory and Regulatory Framework

### I.    National Environmental Policy Act

NEPA focuses governmental and public attention on potential environmental effects from any proposed "major Federal actions." *See* 42 U.S.C. § 4332(2)(C). But NEPA is "essentially

procedural." *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978). It does not mandate particular results; it prescribes a process to ensure that federal decision-makers consider, and that the public is informed about, potential environmental consequences. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). Thus, a court may not require agencies "to elevate environmental concerns over other appropriate considerations." *WildEarth Guardians v. Jewell,* 738 F.3d 298, 314 (D.C. Cir. 2013) (quoting *Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983)).

To meet NEPA's purposes, agencies prepare an environmental impact statement (EIS) for any "major [f]ederal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). If the significance of any potential effect is not readily apparent, agencies may prepare an EA—a much more concise document—to determine whether an EIS is necessary. 40 C.F.R. §§ 1501.4, 1508.9;[2] 33 C.F.R. part 325, App. B., para. 7. If, based upon an EA, an agency issues a finding of no significant impact, no EIS is required. 40 C.F.R. § 1508.13; 33 C.F.R. part 325, App. B., para. 7. Agency compliance with NEPA is bound by a "rule of reason." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004).

## II.    Clean Water Act

The Clean Water Act prohibits the discharge of pollutants (including dredged spoil, rock, and sand) into the waters of the United States (including wetlands) from any point source. 33 U.S.C. § 1311(a). Section 404 of the Act, *id*. § 1344, authorizes the Corps to issue permits for the

---

[2] The Council on Environmental Quality promulgated regulations implementing NEPA in 1978, 43 Fed. Reg. 55978 (Nov. 29, 1978), and a minor substantive amendment to those regulations in 1986, *see* 51 Fed. Reg. 15618 (Apr. 25, 1986). More recently, the Council published a new rule, effective September 14, 2020, further revising the 1978 regulations. The claims in this case arise under the 1978 regulations, as amended in 1986. All citations to the Council's regulations in this brief refer to those regulations as codified at 40 C.F.R. Part 1500 (2018).

discharge of dredged or fill material when certain conditions are met. *Id.* §§ 1311(a); 1344. Section 404 Permits are issued by the Corps through a public notice and comment process pursuant to regulations promulgated by the Corps and the Environmental Protection Agency (EPA). 33 C.F.R. Parts 320-334; 40 C.F.R. Parts 230-232. Section 404 Permits are enforced by both agencies, consistent with an inter-agency Memorandum of Understanding. *See e.g., U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1812 (2016).

When a Section 404 Permit application is complete, the Corps first issues a public notice providing "sufficient information to give a clear understanding of the nature and magnitude of the activity to generate meaningful comment," including "information which may assist interested parties in evaluating the likely impact of the proposed activity . . . on factors affecting the public interest." 33 C.F.R. §§ 325.2(a)(2), 325.3(a) , (a)(13) . Supplemental notice only issues "if *in [the Corps'] view* there is a change in the application data that would affect the public's review of the proposal." *Id.* § 325.2(a)(2) (emphasis added). In this case, notice was given on December 20, 2018, with a 30 day public comment period. The comment period was subsequently extended until January 21, 2019.

The Corps next evaluates various alternatives (*e.g.,* different pipeline routes, rail or marine transport) to determine whether any of them is practicable as that term is defined in 40 C.F.R. § 230.10(a) and whether any practicable alternative would have a lesser impact on the aquatic ecosystem. 40 C.F.R. § 230.10. If so, the permit application must be denied. *Id.* § 230.10(a). In addition, the Corps considers guidelines for CWA permits set forth in 40 C.F.R. § 230. These guidelines have been promulgated under CWA § 404(b)(1) and are known as "404(b)(1) Guidelines."

4

Finally, the Corps conducts a "public interest review" to evaluate the probable impacts of the proposed activity, balancing its reasonably foreseeable benefits and detriments to determine "whether to authorize [the] proposal" and "the conditions under which it will be allowed to occur." 33 C.F.R. § 320.4(a)(1). That "decision should reflect the national concern for both protection and utilization of important resources . . . [and] a permit will be granted unless the [Corps] determines that [the activity] would be contrary to the public interest." *Id.* Under the CWA, the public interest analysis is only undertaken for the project that will be permitted (not for any alternatives). It also is the very last step in the 404 permitting process, and is only performed after every alternative has been disqualified because it is not practicable or would not have a lesser impact on the aquatic environment than the project for which the permit is sought.

## III.    Rivers and Harbors Act

The RHA had its genesis over a century ago, when Congress passed a series of laws designed to preserve and protect the Nation's navigable waterways, all of which were subsequently re-enacted in one package known as the Rivers and Harbors Act. *United States v. Pa. Indus. Chem. Corp.*, 411 U.S. 655, 663 (1973). Section 10 of the RHA, 33 U.S.C. § 403, prohibits structures and activities that obstruct navigable waters unless they are expressly authorized by the Department of the Army through individual permits that are granted only after case-by-case evaluations, or through authorizations to proceed under nationwide permits that authorize activities that fall within specified parameters. *See* 33 C.F.R. §§ 322.1, 320.2(b), (d), (e). Section 14 of the RHA, 33 U.S.C. § 408, also known as (and referred to herein as) Section 408, provides that actions that impair the usefulness of federal works that, among other things, preserve or improve waters of the United States require prior permission from the Department of the Army. *Id.* § 408(a). Such permission is granted through documents that allow the temporary

occupation of such projects, instead of permits. 33 C.F.R. § 320.2(e). In this case, Plaintiffs challenge both the Corps' CWA Section 404 Permit and its Section 408 permission under the RHA, but seek a preliminary injunction only as to the Section 404 Permit.

### Factual Background

Starting in September 2015, Enbridge Energy Limited Partnership sought Corps permits to allow temporary and permanent impacts to waters of the United States by the Enbridge Line 3 Replacement Project. Enbridge Line 3 Replacement Project, Dep't of the Army EA and Statement of Findings (Section 404 EA) at 4.[3] Existing Line 3 was completed in 1968 and was designed to transport light, medium, and heavy crude oil at an operating capacity of 760,000 barrels per day. *Id.* at 8. Existing Line 3 has a "large number of identified pipe defects and anomalies." *Id.* at 16. It is currently operating at a reduced capacity due to pipeline integrity issues and risk of a spill. *Id.* at 8. Replacement Line 3 is designed, in part, to "improve public safety and protection of the environment" by decommissioning Existing Line 3 in accordance with Enbridge's 2017 Consent Decree with EPA and the United States Coast Guard, which requires Enbridge to replace Line 3 as expeditiously as possible, provided all necessary approvals and permits are received. Section 404 EA at 16; Mem. in Supp. of the Unopposed Mot. of the United States for Entry of the Consent Decree at 11-12, *United States v. Enbridge Energy Ltd. P'ship*, Case No. 16-cv-914 (W.D. Mich.), ECF No. 9 (Jan. 19, 2017) (Consent Decree Mem.). *See also* Consent Decree ¶ 22 ("Enbridge shall seek all approvals necessary for the replacement of Original US Line 3, and provide approval authorities with complete and

---

[3] This document contains the Section 404 EA and is also the record of decision for the Corps Permit. The Court ordered the parties to file a stipulation indicating their agreement on the pertinent portions of the administrative record relied on in the parties' briefing on Plaintiff's motion for a preliminary injunction and the agreed-upon records by January 20, 2021. The documents cited in this brief will be filed at that time.

adequate information needed to support such approvals, as expeditiously as practicable").[4]
Enbridge plans to replace the 282 miles of 34-inch diameter pipeline that currently runs from the
Red River valve in North Dakota to the Minnesota/Wisconsin border with approximately 330
miles of 36-inch diameter pipeline. Section 404 EA at 4.

Existing Line 3 traverses the Chippewa National Forest and the Leech Lake and Fond du
Lac Bands of Chippewa Indians' Reservations. *Id.* at 22, 24. Replacement Line 3 avoids the
Chippewa National Forest and Leech Lake Reservation. *Id.*[5] Even with the deviation around the
Chippewa National Forest and Leech Lake Reservation, approximately 90 percent of the total
project route will be co-located with other pipelines, utilities, roads, railroads, or highways.
Section 404 EA at 8. Construction of the pipeline will be conducted in accordance with
Enbridge's Environmental Protection Plan, which outlines site-specific environmental
procedures and mitigation measures. *Id.* at 22.

The Corps' role with respect to the Replacement Line 3 project is a highly circumscribed
one. The Corps does not regulate the operation of pipelines or transport of oil. The state

---

[4] Following the Marshall oil spill in south-central Michigan, the United States obtained a
Consent Decree requiring Enbridge to work to replace Existing Line 3 expeditiously. Consent
Decree Mem. at 12 ("[T]he Consent Decree mandates that Enbridge replace US Original Line 3
as expeditiously as practicable, provided that Enbridge receives all regulatory approvals and
permits necessary to build the new pipeline. Unless and until the pipeline is replaced, Enbridge
must implement enhanced measures to ensure the integrity of the pipeline, including an
accelerated inspection schedule starting on December 31, 2017. Further, Enbridge must limit the
operating pressure in Line 3 so the pressure in the pipeline does not exceed the maximum
operating pressure . . . ."); Enbridge Spill Response Timeline, available at
https://www.epa.gov/enbridge-spill-michigan/enbridge-spill-response-timeline (Marshall spill
estimated to have released approximately 843,000 gallons).

[5] *See also* Project map, available at:
https://www.mvp.usace.army.mil/Portals/57/docs/regulatory/Enbridge/Revised%20Plans/L3R_P
roject_Overview_Map_NEW.pdf?ver=2020-02-03-121740-860 (last visited Jan. 15, 2021);
https://www.bia.gov/sites/bia.gov/files/assets/public/webteam/pdf/idc1-028635.pdf (showing
location of Leech Lake Reservation) (last visited Jan. 15, 2021).

agencies that played a role in reviewing Replacement Line 3 include Minnesota's Public Utilities Commission; the State of Minnesota Department of Commerce, Energy Environmental Review and Analysis Unit; the Minnesota Department of Natural Resources; and the Minnesota Pollution Control Agency. Section 404 EA at 9. The Corps is only implicated because some portions of the project would impact waters of the United States, a waterway's navigable capacity, or certain public works, thus requiring permits from the Corps under Sections 10 and 14 of the Rivers and Harbors Act of 1899 and Section 404 of the CWA. 33 U.S.C. §§ 403, 408 & 1344.

The Corps gave public notice in December 2018 and January 2019 that Enbridge had applied for a Section 404 permit, Section 10 authorization, and Section 14 permission. Section 404 EA at 11. Specifically, Enbridge requested a Section 404 Permit to permanently fill 9.97 acres of waters of the United States and temporarily fill 1,050.71 acres of waters of the United States. *Id*. at 4. Enbridge also requested authorization under Section 10 of the RHA to install underground crossings at the Red River of the North, the Red Lake River, and the Mississippi River using horizontal directional drilling (HDD). *Id*. at 56. Finally, Enbridge requested permission under Section 14 of the RHA to alter a federal project, the Lost River Flood Control Project. *Id*. at 33. Less than 1% of the overall work in waters of the United States would occur in association with non-linear aspects of the project, including expanding three pump stations at the Donaldson, Plummer, and Clearbrook facilities and installing new pump stations at two inlets, Swatara, and North Gowan North. *Id*. at 13. Overall, only 24% of Replacement Line 3 involves activities in waters of the United States requiring a Corps permit. *Id*.

In response to public comments regarding Enbridge's permit application, the Corps requested additional information from Enbridge in October 2019. *Id*. at 11. Specifically, the Corps instructed Enbridge to address public concern and questions regarding wetland and impact

characterization, construction methods, impact minimization, post-construction monitoring, and compensatory mitigation. *Id*. Enbridge responded in December 2019, identifying changes that would reduce temporary and permanent wetland impacts. *Id*. The Corps issued another Public Notice seeking comment on these revisions on February 4, 2020. *Id*. at 12. Additionally, the Corps engaged in extensive consultation with tribes, such as the Fond du Lac, Grand Portage, Bois Forte, Leech Lake and White Earth Bands of the Minnesota Chippewa Tribe; and the Red Lake Nation/Red Lake Band of Chippewa Indians. *Id*. at 53; *id*, App. D, Letter from Fond du Lac to Corps (May 18, 2020) (concurring with the Corps' conclusion that "the Federal undertaking, as it is currently proposed, would not adversely affect historic properties"). To protect cultural resources, the Corps coordinated an Avoidance, Mitigation, and Implementation Plan for Construction (AMIP) with the Minnesota State Historic Preservation Office and consulting tribes. *Id*. The AMIP includes provisions pertaining to tribal and archeological monitors, unanticipated discoveries, and "protection of historic properties and sensitive resources of cultural importance to the Tribes." *Id*. at 107.

On November 23, 2020, the Corps finalized its Section 404 EA, which thoroughly reviewed and considered the environmental impacts of issuing the Corps Permit. After reviewing its findings, considering alternatives, and addressing public comments, the Corps reasonably concluded that issuing the permit would not have significant impacts on the quality of the human environment. *Id*. at 128.

Additionally, based on its analysis of the alternatives, the Corps concluded that there was no practicable alternative that would have a lesser impact on the aquatic ecosystem. 40 C.F.R. § 230.10. The Corps also considered the projected human and environmental impacts, and the other 404(b)(1) guidelines as set forth in 40 C.F.R. Part 230.

On the same day, the Corps issued the Corps Permit to Enbridge.  The Corps' Permit imposes a total of 23 special conditions that Enbridge must fulfill, including compliance with wetlands restoration, monitoring, and mitigation, the Environmental Protection Plan, and the AMIP.  Corps' Permit at 3-6.

Plaintiffs filed this action on December 24, 2020, a month after the Corps Permit issued, alleging violations of NEPA, the CWA, the RHA, and the APA, and seeking declaratory and injunctive relief.  Compl. ¶¶ 183–217; ECF No. 1.  Plaintiffs also filed a motion for preliminary injunction on December 24, 2020, requesting that the court "enjoin the U.S. Army Corps of Engineers to withdraw the permit issued on November 23, 2020 authorizing Enbridge Energy to discharge dredged and fill material into 1050.71 acres of waters of the United States for construction activities associated with the Line 3 project."  Pls.' Mot. for a Prelim. Inj., at 1, ECF No. 2.[6]

## Standard of Review

### I.    Preliminary injunctive relief

The grant of a preliminary injunction is an "extraordinary and drastic remedy."  *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (citation omitted).  "As an extraordinary remedy, courts should grant such relief sparingly."  *Konarski v. Donovan*, 763 F. Supp. 2d 128, 133 (D.D.C. 2011).  A party seeking a preliminary injunction must demonstrate four elements: (1) a substantial likelihood of success on the merits; (2) that he would suffer irreparable injury if the injunction were not granted; (3) that the balance of the equities tips in his favor; and (4) that the public interest would be furthered by the injunction.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7,

---

[6] The Corps Permit authorizes Enbridge to temporarily discharge dredged and fill material into 1,050.71 acres of waters of the United States, including wetlands and waterbodies, and permanently discharge fill material into 9.97 acres of waters of the United States for construction activities.  Corps Permit at 1.

20 (2008); *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011); *Mdewakanton Sioux Indians of Minn. v. Zinke*, 255 F. Supp. 3d 48, 51 (D.D.C. 2017) (the party moving for injunctive relief carries the burden of persuasion). Plaintiffs must make "a clear showing that [the] four factors, taken together, warrant relief." *League of Women Voters of the United States v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (internal quotations omitted); *see also Winter*, 555 U.S. at 21 (rejecting the idea, that "when a plaintiff demonstrates a strong likelihood of prevailing on the merits, a preliminary injunction may be entered based only on a 'possibility' of irreparable harm.").

## II.     The Administrative Procedure Act

The APA directs the Court to uphold an agency's decision unless it is deemed to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Although the inquiry must be thorough, the standard of review is narrow and highly deferential, an agency's decisions are entitled to a "presumption of regularity," and the Court cannot substitute its judgment for that of the agency decision maker. *U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001). The Court need not find that an agency decision "is the only reasonable one, or even that it is the result [the court] would have reached." *Am. Paper Inst., Inc., v. Am. Elec. Power Serv. Corp.*, 461 U.S. 402, 422 (1983).

The Court must determine whether the agency: (1) relied on factors which Congress had not intended it to consider; (2) entirely failed to consider an important aspect of the problem; (3) offered an explanation for its decision that runs counter to the evidence before the agency; or (4) offered an explanation so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Confederated Tribes of the Grand Ronde Cmty. of Or. v. Jewell*, 75 F. Supp. 3d 387, 396 (D.C. Cir. 2016).

## Argument

I.    **Plaintiffs are not likely to succeed on the merits of their NEPA and CWA claims.**

Here, the Corps fully considered the potential environmental consequences of issuing the Corps Permit for Replacement Line 3. The Corps' determinations are entitled to heightened deference and their validity is presumed. *U.S. Postal Serv.*, 534 U.S. at 10. The Section 404 EA, the Section 408 EA, and the additional documents, analyses, and public comments considered by the Corps, including materials from the extensive and robust state regulatory proceedings, show that the agency reached a fully informed and well-considered decision regarding the Corps Permit. *Vt. Yankee*, 435 U.S. at 558. In their motion, Plaintiffs selectively pick and choose parts of the Corps' analysis to focus on, but they fail to offer the requisite detailed and specific evidence showing that the Corps' conclusions were arbitrary and capricious. *Kleppe v. Sierra Club*, 427 U.S. 390, 412-14 (1976). Hence, Plaintiffs are unlikely to succeed on their claim that the Corps violated NEPA or CWA.

A.    **Plaintiffs fail to show that the Corps' consideration of the potential effects of oil spills and leaks is deficient.**

Plaintiffs' claim that the Corps' decision document "is entirely void" of any analysis of the potential impacts of oil spills and leaks blatantly misreads the record. Pls.' Mem. at 15. The Corps addressed the risk of oil spills and leaks in its EA for the Section 404 Permit and in the EA for the Section 408 authorization,[7] and through its consideration of the materials from the state regulatory proceedings. The Corps' analysis was informed by an EIS prepared as part of the state proceedings and the Minnesota Public Utilities Commission's extensive analysis of this

---

[7] As noted above, the Corps issued a permit under Section 404 of the CWA and authorization under Section 408 of the RHA. Although Plaintiffs challenge both in their Complaint, they only seek preliminary injunctive relief as to the Section 404 Permit. Therefore, the Corps addresses the Section 404 components in its response.

issue. Accordingly, there is no legal or factual basis for Plaintiffs' allegations of NEPA and CWA violations in considering the potential impacts of oil spills and leaks.

Plaintiffs selectively quote from the Corps' response to public comments to argue that "the Corps admits that '[a]t the time of the Public Notice, no spill analysis was completed.'" Pls.' Mem. at 15 (quoting Section 404 EA, App. A at 3 (unnumbered)). In the next sentence, the Corps states that "[s]ince then, a spill analysis has been completed" as required by the Minnesota Public Utilities Commission. Section 404 EA, App. A at 3 (unnumbered). The Corps discusses and relies on this information to support its conclusions in the EA. *See, e.g., id.* at 23, 28. The Corps also explains that the environmental consequences of oil spills are disclosed in the state EIS. *Id.*, App. A at 3 (unnumbered).[8]

Indeed, the Minnesota Public Utilities Commission held extensive proceedings evaluating Enbridge's application for a certificate of need for the pipeline project. *See* Section 404 EA at 9-12 (summarizing the history of environmental review and permit applications for the project including the Commission's process); *id.* at 10 (the Commission held 16 public hearings in eight different counties to receive comments on the certificate of need and route permit applications). A significant issue considered by the Commission was the risk of accidental oil release. *See* Reissuance Notice – Order Granting Certificate of Need As Modified And Requiring Filings (May 2020) at 27-28 (Reissued Sept. 2018 CN Order). Based in part on an evidentiary hearing held by an administrative law judge from the Minnesota Office of Administrative Hearings, the

---

[8] Plaintiffs suggest that the Corps relied too heavily on the Minnesota Public Utilities Commission's analysis, Pls.' Mem. at 16 n.5, but the Corps is permitted to rely on NEPA documents and information prepared by other agencies and submissions from permit applicants. *Hoosier Envtl. Council v. U.S. Army Corps of Eng'rs*, 722 F.3d 1053, 1061 (7th Cir. 2013) (although the Corps had an independent responsibility to enforce the CWA, it is permitted to rely on another agency's analysis relating to the central functions of that agency in making the Corps' own decision); 33 C.F.R. part 325, App. B., para. 3.

Commission concluded the "evidence in the record is clear that the Project will significantly reduce the risk of an accidental oil release." *Id.* at 28. In June 2019, the Minnesota Court of Appeals remanded to the Commission for further consideration of potential impacts to the Lake Superior Watershed. *In re Applications of Enbridge Energy*, 930 N.W.2d 12, 27 (Minn. Ct. App. 2019). After additional environmental analysis was completed, the Commission reissued the certificate of need, concluding that "the consequences to society of granting the modified certificate of need are more favorable than the consequences of denial." *See* Order Finding Environmental Impact Statement Adequate, Granting Certificate Of Need As Modified, And Granting Routing Permit As Modified (May 2020) at 15 (May 2020 CN Order). The Commission found that "Existing Line 3 is deteriorating at an alarming rate, increasing the public safety and environmental risks to Minnesota and requiring constant and disruptive maintenance impacting hundreds of thousands of acres of land." *Id.* The Commission also found it significant that the Leech Lake Band urged the Commission "to grant the certificate of need and remove the risks to its reservation lands posed by Existing Line 3." *Id.*

The Corps' Section 404 EA specifically relies on the Commission's conclusions, noting that the Commission "indicated that the existing Line 3 is deteriorating at an accelerating rate and continued operation of the existing Line 3 poses a far greater risk of an accidental release and resulting environmental damage than [Replacement Line 3]." Section 404 EA at 23; *see also id.* ("[s]ince 1990, Line 3 has experienced 15 total failures resulting in over 50 barrels of oil being released during each failure"). And the Corps found that the Replacement Line 3 will address these very concerns, as it "would have cathodic protection systems to prevent corrosion of pipes." Section 408 EA at 15.

14

The Corps also discusses the spill risk of transporting oil using trains or trucks as compared to pipelines.  Section 404 EA at 19-20.  And the Corps concluded that Replacement Line 3 "is expected to result in an increase in safety and reliability attributable to the use of new equipment and modern-day technologies, manufacturing, and coating processes; and a reduction in the number of integrity digs required for ongoing maintenance." *Id.* at 21.  In addition, the Corps explained that Enbridge has outlined its spill prevention, containment, and control measures in the pipeline's Environmental Protection Plan. *Id.*, App. A at 14 (unnumbered).

Because Replacement Line 3 will cross the Lost River Flood Control Project, the Corps also prepared the Section 408 EA for Enbridge's request to modify a federal project, 33 U.S.C. § 408.  The Section 404 Permit EA discusses this document, *id.* at 109, 126-127, and it is attached as Appendix E to the Section 404 EA.  In the Section 408 EA, the Corps analyzed the risks and potential impacts of release of oil from the pipeline.  The Corps' oil spill analysis considered the reliability and safety of the pipeline by assessing the following components:  (1) failure probabilities related to potential pinhole leaks; (2) modeling of worst-case discharge spill scenarios "to help in the consideration of potential contingency planning requirements and to evaluate the range of potential environmental impacts of an accidental release;"[9] (3) an analysis of the potential impacts (including secondary impacts) of a release of oil from the pipeline on the aquatic and human environments; (4) spill prevention, leak detection, and spill response measures; and (5) Enbridge's record as an operator including the failure of its Line 6B near Marshall, Michigan and subsequent changes to improve the safety and reliability of its operations.  Section 408 EA at 10-17.

---

[9] NEPA does not actually require agencies to consider "worst case scenarios." *Robertson*, 490 U.S. at 354.

In order to evaluate the risk of a spill from the pipeline, the Corps also reviewed sections 10.2 (behavior of crude oil releases), 10.3 (crude oil trajectory and fate modeling), and 10.4 (assessment of potential crude oil exposures and impacts) from the state EIS, as well as the Assessment of Accidental Releases: Technical Report. *Id*. at 10, 12. After completing its review, the Corps found that, when pipelines are monitored with supervisory control and data acquisition systems, combined with computational pipeline monitoring or model-based leak detection systems, the risk of long undetected pinhole leaks is greatly lowered. *Id*. at 10. The Corps concluded that the spill prevention and leak detection measures described in the Section 408 EA "will reduce the risk of a spill resulting in environmental and human impacts." *Id*. at 17.

1.    **The Corps satisfied NEPA by taking a "hard look" at oil spills and leaks.**

Plaintiffs do not acknowledge that the Corps analyzed oil spill risks in any way because they ignore the oil spill analysis in the Section 404 EA and the Section 408 EA. Plaintiffs express concern about the effects of a potential oil spill on wild rice, hunting, fishing, and environmental justice issues. But Plaintiffs have identified no basis for concluding that the Corps' analysis fell short of NEPA's requirements. *See Ctr. for Food Safety v. Jewell*, 83 F. Supp. 3d 126, 133-34 (D.D.C. 2015) ("An Environmental Assessment is a 'concise public document' that '[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.'") (quoting 40 C.F.R. § 1508.9(a)).

The Section 408 EA demonstrates that the Corps examined how an accidental oil release might affect wild rice plants at each life stage. Section 408 EA at 13. The Corps concluded that "[w]ild rice would be most sensitive during the floating leaf stage; however, after the stem has emerged from the water, contact between floating crude oil and the stem would be unlikely to

result in plant death." *Id.*; *see also id.* (summarizing potential effects on seed and/or plant viability, mature wild rice plants, and wild rice stands). In order to evaluate the risk of a spill on wild rice, the Corps also reviewed the report Potential Effects of the Line 3 Replacement Project on Wild Rice – Revised. That report supports the Corps' conclusions here by determining that, in the "unlikely" event of a crude oil release, the "crude oil release is unlikely to affect lakes that are not the first downstream lake." Potential Effects of the Line 3 Replacement Project on Wild Rice – Revised at 3, 12 (Oct. 2017).

Plaintiffs contend that the Corps failed to consider how an oil spill could impact hunting and fishing. Pls.' Mem. at 16-17. But the Corps considered the effects of a crude oil release on fish, "birds (e.g., ducks, geese, shorebirds, raptors) and semi-aquatic mammals (e.g., muskrat, beaver, mink and otter)" and other species that are "present in many areas along the proposed pipeline route." Section 408 EA at 12-13; *see also id.* (citing MN Final Envtl. Impact Statement § 10.2 (Dec. 9, 2019) (behavior of crude oil releases). The Corps explained that potential impacts to fish depend on the characteristics of the released crude oil and environmental conditions at the time of the release. *Id.* at 13 (contrasting the potential for acute toxicity between light crude oil and heavier crude oils and discussing increased potential for phototoxicity in the summer). The Corps also discussed the potential impacts to birds and mammals if they are exposed to external oiling including potential hypothermia and toxicological stresses. *Id.* The Corps explained that the greatest impact would be to waterfowl, semi-aquatic birds, and mammals in the affected rivers and lakes. *Id.* "Animals upstream, farther downstream, or occupying other nearby habitats would likely be less affected, as it is assumed that emergency response measures to prevent or reduce further possible downstream transport of crude oil would be in place within 24 hours of the release." *Id.* The Corps also

found that timely capture and rehabilitation of oiled birds and mammals may help to mitigate the environmental effects of a crude oil release. *Id*. The Corps further examined potential impacts to the human environment including recreational activities. *Id*. at 13-14 (finding that air quality impacts can temporarily disrupt human use, occupancy, and recreation).

Plaintiffs also cannot support their claim that "the failure to address oil spills fatally undermines the Corps' environmental justice analysis." Pls.' Mem. at 17 (citation omitted). In analyzing environmental justice issues, the Corps considered the spill risk analysis included in the Section 408 EA. Section 404 EA at 126-27. Ultimately, the Corps explained that "[c]onstruction, operation, or an accidental release at the Lost River crossing would not result in disproportionate and adverse effects to meaningful higher minority populations or low-income populations." *Id*. at 127. And the Corps' conclusions are supported by an extensive record of tribal coordination and consultation. *See, e.g., id*. at 53-54, 109-125; *id*., App. D, Letter from Fond du Lac to Corps (May 18, 2020).

The Corps thus took the requisite hard look at the potential impacts of an accidental release on the issues of importance to Plaintiffs. Plaintiffs' motion offers no meaningful critique of the oil spill analysis other than speculative and conclusory allegations. For example, Plaintiffs argue that ignoring oil spill risks allowed the Corps to avoid preparing an EIS for the issuance of the Corps Permit. Pls.' Mem. at 16. But this allegation is simply incorrect. The Corps complied with the procedural requirements of NEPA when it took a hard look—as noted above—at the potential environmental consequences of issuing the Corps Permit. After reviewing the information provided by Enbridge and all interested parties and assessing the environmental impacts, the Corps reasonably concluded that—issuing the Corps Permit would not have a significant impact on the quality of the human environment. Section 404 EA at 128. Thus, an

EIS was not required. *Id*. While Plaintiffs disagree with the Corps' conclusions, mere disagreement does not satisfy their burden. The Court should not substitute Plaintiffs' views for the reasoned judgment of the Corps. *Gregory*, 534 U.S. at 7. As the Supreme Court has held, "[a]n agency's decision not to prepare an EIS can be set aside only upon a showing that it was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Pub. Citizen*, 541 U.S. at 763.

> **2.     Plaintiffs are not likely to prevail on their merits of their claim that the Corps violated the Clean Water Act by failing to consider the risk of oil spills.**

Plaintiffs also assert that the Corps' alleged failure to consider the risks of oil spills is fatal to its consideration of project alternatives under 40 C.F.R. § 230.10(a); its analysis under 40 C.F.R. § 230.10(c) of the possibility of "significant degradation of the waters of the United States"; and its public interest analysis under 33 C.F.R. § 320.4. Pls.' Mem. at 17. Plaintiffs' arguments fail for many of the same reasons their NEPA arguments fail.

> **a.     The Corps was not required to consider the risk of oil spills in its consideration of alternatives under 40 C.F.R. § 230.10(a).**

The analysis of alternatives that the Corps performs under the CWA is set forth in 40 C.F.R. § 230.10(a), which provides that "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem . . . ." In analyzing an alternative under Section 230.10(a), the Corps first must determine whether it is practicable. The term "practicable" is defined in Section 230.10(a)(2): "An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." In this case, as discussed in Section 5 of the Section 404 EA, the Corps considered numerous alternatives to the Replacement Line 3 project, including

transportation by rail and truck, maintaining the existing pipeline, and replacing the existing pipeline in the same location (rather than using the route ultimately approved by the Minnesota Public Utilities Commission). For the reasons set forth in the Section 404 EA, the Corps concluded that each alternative was not practicable. *See* Section 404 EA at 19-27. This ends the inquiry. Once an alternative is deemed not to be practicable no further analysis is required under Section 230.10(a).[10]

Plaintiffs insist, however, without explanation or analysis, that the failure to consider oil spills renders the Corps' analysis of alternatives deficient. To the extent Plaintiffs are asserting that the Corps was required to consider the risk of oil spills from Replacement Line 3 as part of its consideration of whether other alternatives were "practicable," Plaintiffs are mistaken. Nothing in the language of Section 230.10(a) requires such a comparison.

To the extent Plaintiffs are asserting that the Corps was required to consider the risk of oil spills with respect to each alternative, they also are mistaken. Each alternative is evaluated separately to determine "if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." *Id*. § 230.10(a)(2). If an alternative is practicable, then the Corps evaluates whether it "would have less adverse impact on the aquatic ecosystem" than the project proposed for permitting. *Id*. § 230.10(a). In this case, however, none of the alternatives considered by the Corps was found to be practicable. The question of any alternative's potential impact on the aquatic environment therefore never arose.

---

[10] Thus, this case is distinguishable from *Kunaknana v. U. S. Army Corps of Engineers*, No. 3:18-cv-00044-SLG, 2015 WL 3397150 (D. Alaska, May 26, 2015), on which Plaintiffs rely. In that case, there was a practicable alternative. The question was which alternative would have less environmental impact. *Id*. at **12-15. Here, no practicable alternative was identified.

**b.      The Corps was not required to consider the risk of oils spills in its analysis under 40 C.F.R. § 230.10(c).**

The Corps was not required to consider the post-construction operation of Replacement Line 3, including oil spills, under 40 C.F.R. § 230.10(c).  Section 230.10 sets forth certain requirements that must be met to obtain a Section 404 Permit to discharge "dredged or fill material" into waters of the United States.  Section 230.10(c) provides that "no discharge of dredged or fill material shall be permitted which will cause or contribute to significant degradation of the waters of the United States."  In this case, the discharge of dredged or fill material that is to be permitted is for the *construction* of Replacement Line 3.  Enbridge did not seek, and the Corps did not issue, a Section 404 permit to discharge oil into waters of the United States during the *operation* of the pipeline after construction.  Therefore, by its express terms, Section 230.10(c) did not require the Corps to consider whether the risk of post-construction operational oil spills will cause or contribute to significant degradation of the waters of the United States.

**c.      The Corps adequately considered potential oil spills as part of its public interest analysis.**

The final step in the 404 permitting process is a balancing test of benefits and detriments posed by the project that would result in the discharges for which a permit is being sought to determine whether a permit is "contrary to the public interest." 33 C.F.R. § 320.4(a)(1).  In performing this public interest analysis, the Corps engages in a "general balancing process" using a non-exclusive list of factors that may be considered—including environmental concerns but also such things as economics, aesthetics, recreation, and energy needs.

"The agency is in the best position to determine which impacts are relevant to performing the balance … but the court is expected to review the agency's determination for an abuse of

discretion." *Hoosier Environmental Council v. U.S. Army Corps of Eng'rs*, 105 F. Supp. 2d 953, 1010 (S.D. Ind. 2000). The Corps need not consider all twenty enumerated factors, apply the same weight to each factor, or consider factors for which the analysis could not meaningfully inform the Corps' decision because the Corps does not have authority to prevent or enforce the effect. "Even though a court is required to conduct a searching and thorough review of the agency's exercise of discretion, it is not allowed to substitute its own judgment for that of the agency." *Hoosier Environmental Council*, 105 F. Supp. 2d at 1010 (citing *Sierra Club v. Marita*, 46 F.3d 606, 619 (7th Cir. 1995)). The scope of the court's review is limited to assessing whether the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* (citing *Motor Veh. Mfrs. Assoc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

In this case, Enbridge filed an application to construct a new pipeline to comply with a Decree requirement to replace an aging pipeline that is "deteriorating at an alarming rate" and prone to oil spills with a new, state-of-the art pipeline. This fact is reflected in the Section 404 EA and also in the state regulatory proceedings that the Corps independently reviewed and analyzed. After extensive proceedings, including multiple evidentiary contested case hearings, the Minnesota Public Utilities Commission concluded that the new pipeline "will significantly reduce the risk of an accidental oil release." Reissued Sept. 2018 CN Order at 28. The Corps itself also found that the new pipeline would reduce the risk of accidental release from the 1960s-era Existing Line 3. Section 404 EA at 58. And as the Corps noted in its alternatives analysis, maintaining the existing Line 3 is estimated to require over 6,000 integrity digs in the next 15

year to maintain the pipeline. *Id.* at 22. These digs have the potential to negatively impact waters of the United States. *Id.* at 23. Plaintiffs point to nothing suggesting that further or additional analysis of oil spills by the Corps could result in a different conclusion under any set of possible circumstances.

Nevertheless, the Corps did consider the risk of oil spills. As Plaintiffs themselves note in their brief, Section 5 of the EA discusses the risks of oil spills in its discussion of alternatives of rail and truck transfer. In addition, in its public interest analysis, the Corps discussed the risk of the accidental release of hazardous materials "during transportation, storage, handling, and/or use at the" Replacement Line 3, Section 404 EA at 51, and found that Replacement Line 3 would reduce the risk of oil spills compared to Existing Line 3. *Id.* at 58.

Further, as noted above, the Corps also considered the risk of oil spills in connection with its Section 408 EA for Lost River. In its consideration of the "no action alternative"—not replacing the Existing Line 3—the Corps concluded that, "The pipeline is deteriorating at an accelerating rate and the continued operation of the existing Line 3 poses a risk for accidental release and environmental damage. Currently, there is no feasible technology or operational changes that can stop or reverse the external corrosion on Line 3 and/or remove the defects that were inherent in the way the pipe was originally manufactured. The No-Action Alternative would pose a greater risk of accidental release and subsequent environmental damage than the proposed [Replacement Line 3]." Section 408 EA at 4.[11]

---

[11] In one of the cases relied on by Plaintiffs, *Atchafalaya Basinkeeper v. U.S. Army Corps of Engineers*, Civ. A. 18-23-SDD-EWD, 2020 WL 1450750, at *8 (Mar. 25, 2020), the court held that the Corps could rely on a Section 408 EA analysis of the risk of oil spills to support its public interest analysis under Section 404 of the CWA.

Among the things the Corps considered in reaching this conclusion was modeling of hypothetical worst-case scenarios of oil spills at eight sites that were intended to be representative of the entire pipeline. Section 408 EA at 10-12. As discussed in the Section 408 EA, this modeling was also utilized in the state proceedings, and it is described in detail in the state EIS. *Id.* at 10. In reviewing the state EIS, the Minnesota Court of Appeals approved both the methodology used to analyze the risk of oil spills and its utilization, noting that the EIS "focuses on analyzing the potential resource impacts of a spill at all locations along [the approved pipeline route] and alternatives." *In re Enbridge Energy,* 930 N.W.2d at 28. [12]

Through comprehensive and robust regulatory proceedings, the State of Minnesota determined that the risk of oil spills from Replacement Line 3 was substantially less than from any of the other alternatives considered, including keeping the existing, aging pipeline in place and other transportation alternatives, such as rail or truck. The Corps considered the state EIS and the decisions of the Minnesota Public Utilities Commission and supporting documents as part of its review under the CWA and RHA. Section 404 EA, App. A at 6, 8. The Corps did not adopt the state EIS, nor did it attempt to delegate to the state or abdicate its obligation to conduct an independent review. The Corps did, however, utilize the information from the state proceedings so as not to duplicate additional review requirements. *Id.* at 2.

Plaintiffs do not dispute the Corps' conclusion that the risk of oil spills from Replacement Line 3 is less than from the other alternatives. Plaintiffs also do not acknowledge that the Corps properly considered that Replacement Line 3 would avoid the substantial ongoing environmental

---

[12] The Court of Appeals found the state EIS inadequate due to its "failure to specifically address the potential impacts to the Lake Superior watershed." *In re Enbridge Energy,* 930 N.W.2d at 28. Following remand, a revised EIS was prepared, which specifically addressed the risk of oil spills to the Lake Superior watershed. Following an opportunity for public comment and two public meetings, the Minnesota Public Utilities Commission approved the revised EIS on May 1, 2020.

impacts of current spill and leak detection and prevention measures for the deteriorated Line 3 pipeline.  *See* Section 404 EA at 22-23.  Instead, Plaintiffs' request for a preliminary injunction is based solely on the naked and inaccurate assertion that the Corps "total[ly] fail[ed] to evaluate spills."  Pls.' Mem. at 18.  While it is true that the Corps stated that the potential for oil spills is beyond the scope of its regulatory authority, it is also true that the Corps, in fact, considered the risk of oil spills in its Section 404 EA, in its Section 408 EA, and through its consideration of the state EIS and other documents from the state regulatory proceedings, which contained a robust analysis of the risk of oil spills.  Although the Corps was not necessarily required to consider this as a factor in its public interest review, once it exercised its discretion to consider it, then it became subject to arbitrary and capricious review under the APA. *See Communities Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 689 (D.C. Cir. 2004).  Accordingly, Plaintiffs cannot obtain a preliminary injunction on the ground that the Corps failed to consider the risk of oil spills at all.

### B.      Plaintiffs fail to show that the Corps' alternatives analysis is deficient.

#### 1.      The Corps satisfied NEPA when it considered a reasonable range of alternatives.

Plaintiffs argue that the Corps failed to consider "obvious" alternatives to Replacement Line 3 and relied too heavily on the route corridor established by the Minnesota Public Utilities Commission.  Pls.' Mem. at 18-21.  These arguments fail.  First, Plaintiffs ignore the detailed alternatives analysis included in the Corps' Section 404 EA.  Section 404 EA at 18-28.  Second, the Corps' Section 404 EA properly recognized that the Minnesota Public Utilities Commission is the unit of state government with authority over oil and gas pipeline route decisions, Minn. Stat. ch. 216G, and examined the Commission's process in designating the route alignment and

the factors that shaped the route.  Third, Plaintiffs provide little support for their claim that the Corps was required to consider other route alternatives.

Plaintiffs argue that the Corps' alternatives analysis was "pro forma," Pls.' Mem. at 19, but the record belies this claim.  The Corps satisfied NEPA when it considered multiple alternatives including several utilizing the current route of the pipeline.  *See* 40 C.F.R. § 1502.14(a) (agencies must consider a reasonable range of alternatives); 33 C.F.R. part 325, App. B., para. 7 (a Corps' environmental assessment "shall include a discussion of the reasonable alternatives").  The alternatives analysis required for environmental assessments is less rigorous than that for environmental impact statements. *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1323 (D.C. Cir. 2015).  Courts are to "uphold [an agency's] discussion of alternatives so long as the alternatives are reasonable and the agnoency discusses them in reasonable detail." *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991).

The EA prepared for the Corps Permit includes a detailed analysis of alternatives.  For example, the Corps considered "no action" alternatives that would not require a Section 404 Permit.  Section 404 EA at 18-21.  The Corps concluded that transporting crude oil by either rail or truck would result in the need for increased infrastructure, such as 14 miles of new rail line, 7,200 new tank rail cars, or 12,000 new tanker trunks.  *Id*. at 19-20.  And the Corps found that other effects would occur, including increased logistical issues regarding rail space, the addition of a substantial amount of tanker truck traffic, increased costs, and potential delays due to extreme weather conditions.  *Id*.  Using trains or trucks for oil transportation also results in a higher percentage of overall volume of crude oil spillage when compared to pipelines.  *Id*.

The Corps also analyzed the applicant's preferred alternative, Replacement Line 3. Because Enbridge intends to use a wider, thicker pipe with a greater yield strength for the replacement, it will "resist fatigue growth of cracks from pressure cycling." *Id*. at 21. The Corps concluded that adopting the preferred alternative will increase the safety and reliability of the pipeline. *Id*. (considering the pipeline's design, manufacturing, coating and installation techniques combined with the wider, thicker pipe). Replacement Line 3 will also reduce the number of integrity digs needed to maintain the pipeline. *Id*. The Section 404 EA also discussed the project's route, costs, and potential wetland impacts. *Id*. at 21-22. And the Corps described the environmental procedures and mitigation measures that will be implemented during construction of this alternative, noting that additional details are provided in Enbridge's Environmental Protection Plan. *Id*. at 22.

The Corps further considered an alternative that would use a pipe with a smaller diameter. *Id*. at 25. The Corps concluded that a 34-inch diameter pipeline would pose engineering and logistical constraints and increase costs because it is not standard industry size. *Id*. In comparison, the agency noted that Replacement Line 3's proposed 36-inch diameter pipeline will result in "significant energy savings" and similar impacts to waters of the United States. *Id*.

Plaintiffs object to Replacement Line 3's route, describing it as "substantially different than the existing line." Pls.' Mem. at 9. But the Corps did not limit its analysis to considering only the new route for the pipeline. Instead, the Corps examined several alternatives involving Existing Line 3 and its current route. Section 404 EA at 22-26. The Corps described the potential impacts of maintaining Existing Line 3, installing a new pipeline in the existing trench, and supplementing Existing Line 3 with oil transported by either rail or truck. *Id*. But each of

these alternatives had significant drawbacks. For example, an extensive dig and repair program would be required to address corrosion, stress corrosion cracking, and long seam cracking on Existing Line 3. *Id.* at 16, 22. "In Minnesota, maintaining existing Line 3 would require approximately 6,250 integrity digs over the next 15 years." *Id.* at 22. The integrity digs would also affect two Native American reservations and the Chippewa National Forest. *Id.* (estimating that 484 digs would be required in these areas for the same timeframe). And, as discussed above, the Minnesota Public Utilities Commission concluded that the "continued operation of the existing Line 3 poses a far greater risk of accidental release and resulting environmental damage" than Replacement Line 3. *Id.* at 23.

Replacing Line 3 in the same trench would result in a 16-month interruption of service, greater environmental impacts at wetland and waterbody crossings, and extended construction periods. *Id.* at 23-24. It would also require an easement extension to allow the pipeline to continue to cross the Leech Lake Band's Reservation and a portion of the Chippewa National Forest co-managed by the Band. *Id.* at 24. But the Leech Lake Band has consistently opposed granting the required easement. *Id.* Supplementing Existing Line 3 with oil transported by either rail or truck would require continued maintenance on the pipeline, while also increasing costs, logistical issues, safety concerns, and possible impacts to waters of the United States. *Id.* at 25-26. The EA demonstrates, that consistent with NEPA, the Corps considered a reasonable range of alternatives. And Plaintiffs have failed to show that the Corps' alternatives analysis was arbitrary or capricious.

In Plaintiffs' view, the Corps artificially constrained its analysis based on the route approved by the Minnesota Public Utilities Commission. Pls.' Mem. at 19-20. This is incorrect. An agency's analysis of alternatives is closely tied to the purpose and need for agency action,

*City of Alexandria v. Slater*, 198 F.3d 862, 867 (D.C. Cir. 1999), which in turn is tied to the agency's congressional authority, *Busey*, 938 F.2d at 196.  An agency's alternatives analysis also "must be moored to some notion of feasibility," *id*. at 195 (quotation and citations omitted), and alternatives are not reasonable if they are not feasible.  *Vt. Yankee*, 435 U.S. at 551.

As the Corps explained in its EA, the route approved by the state Commission "is the corridor within which Enbridge is legally obligated to construct the Project under Minnesota law."  Section 404 EA at 9; Minn. Stat. § 216G.02, subd. 2 ("A pipeline requiring a permit may only be constructed on a route designated by the commission.").  Plaintiffs contend that the Corps should have examined other route options for Replacement Line 3, Pls.' Mem. at 20, but they fail to explain how additional analysis would have meaningfully informed the Corps' consideration of the potential impacts of issuing the Corps Permit.  *See Sierra Club v. Dep't of Energy*, 867 F.3d 189, 200 (D.C. Cir. 2017) (analysis is not necessary under NEPA if the information could not inform the decision before the agency).

The Corps was neither arbitrary nor capricious in relying on the route corridor established by the Minnesota Public Utilities Commission when evaluating the route for the new pipeline. *Busey*, 938 F.2d at 199 ("An agency cannot redefine the goals of the proposal that arouses the call for action; it must evaluate alternative ways of achieving its goals, shaped by the application at issue and by the function that the agency plays in the decisional process."); *see also Friends of Capital Crescent v. FTA*, 877 F.3d 1051, 1063-64 (D.C. Cir. 2017) (federal agency permissibly narrowed its range of alternatives based on state's choice of a preferred light rail option).  The Corps examined the significant actions related to the Commission's process in designating the route alignment.  Section 404 EA at 9-12 (noting that public and evidentiary hearings were held). The Section 404 EA also details the geographic requirements and factors that were used to

develop the route for the Replacement Line 3.[13]  Thus, there is no support for Plaintiffs' claim that the Corps "abdicate[d] its responsibilities under NEPA" to the Minnesota Public Utilities Commission.  Pls.' Mem. at 19.

Finally, Plaintiffs rely on a 2017 comment letter from the Minnesota Pollution Control Agency to the Minnesota Public Utilities Commission proposing route alternatives. Pls.' Mem. at 20-21.  But this offers little to show that the Corps should have considered other route alternatives.  The Minnesota Pollution Control Agency is the state 401 Water Quality Certification agency. Section 404 EA, App. B., MPCA 401 Water Quality Certification at 1.  In issuing its certification determination, the Minnesota Pollution Control Agency acknowledged that the Minnesota Public Utilities Commission is the state entity with decision authority over pipeline route decisions and relied upon the Utilities Commission approved route. *Id*. at 1-2.  In any event, agencies need not consider every conceivable alternative and the Corps' "specification of the range of reasonable alternatives is entitled to deference." *Myersville Citizens*, 783 F.3d at 1323 (citation omitted).  *See also Busey*, 938 F.2d at 195 (a "rule of reason governs both *which* alternatives the agency must discuss, and the *extent* to which it must discuss them") (internal quotation marks omitted).  The Corps explained how the proposed route was developed and NEPA does not require an endless examination of alternatives, particularly given

---

[13] The following are some of the factors used to develop Replacement Line 3's route:  1) avoiding sensitive areas, such as state forests; 2) avoiding wetlands and/or minimizing wetland impacts where possible; 3) minimizing tree clearing; 4) avoiding close proximity to historic properties, residential areas, and communities;  5) ensuring reasonably level grade; 6) ensuring that the site spacing provides sufficient clearances to allow effective operation and maintenance of all components; 7) ensuring reasonable highway access with minimal upgrading of municipal roads; 8) ensuring reasonable access to suitable power and utilities;  9) ability to locate on the correct side of the mainline corridor to prevent pipe cross-overs for station suction and discharge lines; and, 10) land availability.  Section 404 EA at 6-7.

the Corps' lack of authority over the pipeline route and the extensive state administrative process. The Corps fully met NEPA's requirements here.

### 2. The Corps' consideration of alternatives satisfied the CWA.

As discussed above, in Section 5 of the Section 404 EA, the Corps considered numerous alternatives to the Replacement Line 3 project under 40 C.F.R. § 230.10(a), including transportation by rail and truck, maintaining the existing pipeline, and replacing the existing pipeline in the location of the existing pipeline (rather than using the route ultimately approved by the Minnesota Public Utilities Commission). The Corps concluded that none of these alternatives was practicable within the meaning of that term in Section 230.10(a). *See* Section 404 EA at 19-27. This satisfied the Corps' obligation under the CWA to consider alternatives because once an alternative is deemed not to be practicable no further analysis is required under Section 230.10(a). With respect to route alternatives in particular, as the Corps noted in the Section 404 EA, the state, not the Corps, controls pipeline routing. *See* Section 404 EA at 21. A route the state has declined to approve is not practicable under Section 230.10(a). *See James Cty., Va. v. EPA*, 955 F.2d 254, 260 (holding that groundwater was not a practicable alternative to a proposed dam project where the state water control board had prohibited further groundwater withdrawals).

### 3. The Corps thoroughly evaluated alternative construction methods.

Plaintiffs allege that the Corps failed to consider alternative construction methods, Pls.' Mem. at 21, but Plaintiffs misread the record. Contrary to Plaintiffs' assertions, the Corps conducted a detailed review of the proposed construction methods. The Corps' Section 404 EA specifies the proposed pipeline construction methods at waterbody and wetland crossings:

> A total of 227 waterbodies would be[] crossed by the Project. Ditches account for 95 of the waterbodies, many of which are roadside ditches. Seventy-four of the

> ditches would be crossed via a trench method and 21 would be crossed via bore method.  The proposal would cross 132 streams (84 with perennial flow, 16 with intermittent flow, 20 with ephemeral flow, and 12 streams where no flow regime was identified).  Of the streams, 21 would be crossed via Horizontal Directional Drill (HDD) or bore method, and 111 will be crossed via a trench method.

Section 404 EA at 5; *see also id*. at 28-29 (summary of construction methods).  The

Section 404 EA also discloses the potential impacts from the use of specific construction

methods.[14]

The Corps further explained that the Environmental Protection Plan provides a more

detailed discussion on the criteria used to identify the proposed crossing method for each

affected waterbody and wetland feature and "compares the constructability advantages and

disadvantages associated with each type of crossing method."  *Id*. at 22; Environmental

Protection Plan at Secs. 2.0 & 3.0 (Jan. 2020).  After reviewing this information, the Corps,

along with other agencies, made recommendations regarding construction methods "in the

interest of minimizing impacts or reducing potential for impacts" for specific waterbodies.

Section 404 EA at 22.

Although not detailed in their motion, Plaintiffs apparently believe that HDD should be

employed "at all or at least substantially more crossings."  Pls.' Ex. D, ECF No. 2-6.  When

responding to comments, the Corps acknowledged that generally, "with respect to the 404(b)(1)

guidelines, the HDD method would be viewed as the Least Environmentally Damaging

---

[14] *See id*. at 29-32, 34-35, 39, 53 (discussing impacts to wetlands; streambeds; suspended particulates/turbidity;  water quality, circulation, and fluctuations;  fish, crustaceans, mollusk, and other aquatic organisms; riffle and pool complexes; municipal and private water supplies; recreational and commercial fisheries; water-related recreation; aesthetics; and natural resources and lands of importance to Native American tribes).  The Corps does not regulate wild rice waters per se, but as it explained in its response to public notice comments, HDD will be used at the majority of non-jurisdictional waters with wild rice present and will be used at one Section 10 water where wild rice was observed.  *Id.*, App. A at 22 (unnumbered).

Alternative." Section 404 EA, App. A at 5 (unnumbered). But the Corps explained that HDD is not practicable at every waterbody crossing because of site specific concerns, availability of HDD equipment, and costs. *Id*. For example, using HDD at some sites might pose too high of risk of release of drilling mud ("frac outs") that would potentially affect the waterbody or biota. *Id*. "Extensive geotechnical studies and other multi-year analyses of site-specific conditions" at LaSalle Creek, Spring Brook, and Scout Camp Pond showed that "HDD had a significant potential to adversely affect the aquatic environment . . . ." *Id*. Working together, the Corps, Minnesota Department of Natural Resources, Minnesota Pollution Control Agency, and Enbridge determined that using an alternate method would be the least damaging practicable alternative at such crossings. *Id*.; *see also id*. at 13 (interagency coordination was used to determine the appropriate crossings for waterbodies).

In sum, the Corps took a hard look at the construction methods proposed for each waterbody and wetland crossing, the potential environmental effects of such methods, and considered alternative methods. Plaintiffs have identified no basis for contending that the Corps' analysis fell short of NEPA's requirements. *Theodore Roosevelt Conservation P'ship v. Salazar*, 744 F. Supp. 2d 151, 159 (D.D.C. 2010) ("NEPA requires that an agency take a 'hard look' at the environmental consequences of the proposed course of action.") (citations omitted); *see also Busey*, 938 F.2d at 195-96 (agencies are only required to discuss alternatives in "reasonable detail").[15]

---

[15] As discussed above, the only alternatives analysis needed under the CWA is under 40 C.F.R. § 230.10(a): (1) whether a practicable alternative exists (as defined in Section 230.10(a)(2)) and, if so, (2) whether a practicable alternative has a lesser impact on the aquatic ecosystem (as defined in Section 230.3(b)). In this case, as noted above, the Corps examined alternative construction methods for each water crossing, and specifically found HDD not to be practicable at several water crossings. The Corps made no finding for any water crossing that an alternative construction method was practicable and would have less impact on the aquatic ecosystem. This is sufficient to satisfy the CWA.

## II.     Plaintiffs have not shown immediate and irreparable injury.

Plaintiffs have not shown that the issuance of the Corps Permit has caused the sort of immediate and irreparable injury that would justify this Court's using its equitable authority to grant preliminary relief. To obtain the requested injunction, Plaintiffs must demonstrate that irreparable harm is likely, not just a "possibility." *Winter*, 555 U.S. at 22. The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). Plaintiffs must provide actual evidence, not simply conclusory statements or unsupported allegations. "'Bare allegations of what is likely to occur are of no value;' the movant must, instead, '*substantiate* the claim that irreparable injury is likely to occur.'" *Cal. Ass'n of Private Postsecondary Schools v. DeVos*, 344 F. Supp. 3d 158, 171 (D.D.C. 2018) (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)) (alterations omitted).

Plaintiffs contend that construction of Replacement Line 3 has already caused irreparable harm, but Plaintiffs' actions belie this contention. Pls.' Mem. at 24. The public has been aware of Replacement Line 3 and the associated application for the Corps Permit for at least two years. Section 404 EA at 11. And Plaintiffs participated in various stages of the Corps' decision-making process by commenting on issues related to the permit application. Pls.' Mem. at 8-9. Citing news reports, Plaintiffs state that construction started on November 30, 2020. Pls.' Mem. at 12; *see also* Decl. of Douglas P. Hayes ¶ 3 ("On November 23, 2020, I became aware that the Corps had issued the Permits for the Line 3 Project through news reports and the Corps' own press release."). Rather than seeking relief promptly, Plaintiffs waited over a month after the Corps Permit was granted before filing their complaint and motion for a preliminary injunction on December 24, 2020. ECF Nos. 1, 2. After filing suit, Plaintiffs then took little action to

promptly effect service on Federal Defendant; service did not occur until eleven days later. ECF No. 5. Plaintiffs' delay in seeking emergency relief undercuts the proposition that there is a threat of immediate irreparable injury. *See Gordon v. Holder*, 632 F.3d 722, 725 (D.C. Cir. 2011) (delay in seeking emergency relief "may support a conclusion that the plaintiff cannot satisfy the irreparable harm prong"); *Mylan Pharm. v. Shalala*, 81 F. Supp. 2d 30, 44 (D.D.C. 2000) (although delay "is not dispositive of the issue, it further militates against a finding of irreparable harm").

There is no automatic presumption of irreparable harm when plaintiffs allege a violation of an environmental statute. *See Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 544-45 (1987) (rejecting as contrary to traditional equitable principles the notion that irreparable harm may be presumed whenever "an agency fails to evaluate thoroughly the environmental impact of a proposed action"). Here, Plaintiffs rely, in part, on alleged harms outside the Corps' regulatory authority. *See*, *e.g.*, Supp. Decl. of Laura Tripplett ¶¶ 1, 3-8, ECF No. 25 (discussing tree removal). But "the Corps' responsibility under the CWA is to ensure the protection of aquatic functions and services, which does not include the protection of tree species as such." *Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, 894 F.3d 692, 701-02 (5th Cir. 2018).

Further, "[t]o be considered irreparable, the injury must be permanent or of long duration." *W. Ala. Quality of Life Coal. v. U.S. Fed. Highway Admin.*, 302 F. Supp. 2d 672, 683 (S.D. Tex. 2004) (citing *Amoco Prod. Co.*, 480 U.S. at 545 (1987)). In this case, however, the vast majority of the impacts to wetlands will only be temporary. Section 404 EA at 52 (1,049.58 acres will be temporarily impacted in comparison to 9.97 acres permanently impacted). Although Plaintiffs complain that they will be harmed by the permanent loss of less than ten acres of wetlands, Pls.' Mem. at 22-23, Plaintiffs only offer general statements and do not tie

their harm allegations to the specific wetlands that are to be permanently filled.[16]  Plaintiffs

allege that they will be harmed by the conversion of a portion of land from forested wetlands to

emergent herbaceous wetlands. *Id.* But Plaintiffs' allegations stand in contrast to the expert

analysis performed by the Corps regarding the effects of Replacement Line 3 on wetlands. *See*,

*e.g.*, Section 404 EA at 37-39; 51-52. The Corps also determined that the unavoidable impacts to

wetlands will be cumulatively small and offset by appropriate mitigation. *Id.* at 7-8. Based on

avoidance, minimization, and compensation measures undertaken by Enbridge, the Corps

concluded that the overall impacts to wetlands would be minor. *Id.* Because the Corps' decision

requires technical expertise, it is accorded an especially high level of deference. *Marsh v. Or.*

*Nat. Res. Council*, 490 U.S. 360, 377 (1989).

Finally, to the extent that Plaintiffs assert that Replacement Line 3 will injure cultural

resources, Pls.' Mem. at 24, Plaintiffs fail to justify the issuance of an injunction pending review

of the merits. A tribal cultural resources survey was conducted along the entire route of

Replacement Line 3, including those areas outside of the Corps' control and responsibility.

Section 404 EA at 102 (noting that archaeological investigations began in 2013 and continued

through 2020); 113; 116. Based on this survey and extensive tribal consultation, the AMIP was

created to implement avoidance, minimization, and protection measures before and during

construction as recommended by the tribal investigations; require tribal monitoring throughout

construction; and outline a process to follow should discoveries be made during construction. *Id.*

at 116-123. The Corps Permit requires Enbridge's compliance with this plan, *id.* at 53, and

Plaintiffs have not shown that imminent, irreparable injury will result from the Corps Permit.

---

[16] *See*, *e.g.*, Decl. of Jaime Arsenault ¶ 7, ECF No. 2-9; Decl. of Michaa Aubid  ¶ 7, ECF No. 2-10; Decl. of Jami Gaither ¶ 9, ECF No. 2-11; Decl. of Winona LaDuke ¶¶ 16-17, 25 ECF No. 2-12; Decl. of Samuel Strong ¶ 11, ECF No. 2-13.

**III.    The balance of equities tip in favor of the Corps and the issuance of an injunction would harm the public interest.**

Plaintiffs' request for a preliminary injunction should also be denied because the equities and the public interest favor the Corps. Where the federal government is a party, the third and fourth injunction factors—the balance of equities and the public interest—"merge." *Nken v. Holder*, 556 U.S. 418, 420, 435 (2009). Courts must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief[,] [and] [i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences." *Winter*, 555 U.S. at 24 (citations omitted).

Plaintiffs cannot establish that enjoining the Corps Permit is in the public interest because Replacement Line 3 will "improve public safety and protection of the environment by replacing Existing Line 3, a pipeline with a large number of identified pipe defects and anomalies, with a new pipeline constructed with the latest construction practices, technology, and materials." Section 404 EA at 16. Indeed, expediting Existing Line 3's decommissioning advances the public interest because that pipeline "is more than 50 years old and includes segments of pipe that are substantially similar to the pipe that failed and caused the Marshall [Michigan] spill." Consent Decree Mem. at 11-12. As the Minnesota Public Utilities Commission concluded "there are real, immediate, and potentially catastrophic risks associated with continuing to use Existing Line 3." May 2020 CN Order at 15. "The environmental, sociological, cultural, and economic cost of a serious leak on Existing Line 3 would be severe, and leaks become more likely as the pipeline continues to age." *Id*. Plaintiffs' efforts to prevent or delay replacement of Existing Line 3, if successful, will actually harm the public interest by shifting oil transportation to more risky and environmentally problematic forms of oil transport that increase the risk that the public will be adversely impacted by oil spills.

Plaintiffs' single page discussion of the public interest factor, Pls.' Mem. at 25-26, fails to meet Plaintiffs' burden. Plaintiff does not address, much less overcome, the EA's many statements establishing that the Corps' actions advance the public interest. *See generally*, Section 404 EA at 16-26 (replacing Existing Line 3 with a modern pipeline will decrease spill risk). The Court's analysis need proceed no farther. *See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 126-27 (D.D.C. 2017) ("in setting out the specific factors that undergirded its risk analysis and explaining their application to DAPL, the EA reasonably gives the necessary content to its top-line conclusion that the risk of a spill is low").

As discussed above, Replacement Line 3's modern construction, including "wider, thicker pipe" that "resist[s] fatigue growth of cracks" is expected to increase pipeline safety and reliability. Section 404 EA at 21; Section 408 EA at 15 (cathodic protection). In contrast, maintaining the operating Existing Line 3 imposes spill risk on the public. Section 404 EA at 22-23. Existing Line 3 requires an extensive "dig and repair program" to maintain its integrity. *Id*. And even with the integrity digs, "continued operation of the existing Line 3 poses a far greater risk of an accidental release and resulting environmental damage" than transporting oil through the a modern, corrosion-resistant pipeline. *Id*. at 22-23 (describing how extensive repairs cannot eliminate "risks inherent to the" Existing Line 3's materials and construction and that Existing Line 3 has failed 15 times since 1990, releasing over 50 barrels of oil each time). Indeed, the 2017 Consent Decree requires Enbridge to address Existing Line 3's risks by replacing it and taking Existing Line 3 out of service "as expeditiously as practicable" if Enbridge receives necessary approvals. Consent Decree Mem. at 12. And while the Consent Decree also imposed conditions on Enbridge's continued operation of Existing Line 3, those conditions do not eliminate the spill risk posed by Existing Line 3's older materials and

construction.  Section 404 EA at 22-27.  The Corps' conclusion that replacing Existing Line 3 would improve public safety is therefore well-supported.

To the extent that Plaintiffs suggest that pipelines provide no public interest benefit relative to transporting oil via rail and truck, Pls.' Mem. at 18, Plaintiffs are mistaken.  As the Corps noted, "Trains (and trucks) are more likely to result in small to medium spills when compared to spills from pipelines" and the higher number of spills from trains and trucks "results in a higher percentage of the overall volume being spilled when compared to pipelines."  Section 404 EA at 19-20.  Contrary to Plaintiffs' assertion that the Corps "made vague and unsupported statements about the overall risk of oil spills from particular methods of transportation" without evaluating risk, Pls.' Mem. at 18, Minnesota's EIS establishes that truck and rail transportation trains spill a higher percentage of oil than pipelines.  MN Final Envtl. Impact Statement § 10.7.1 (Dec. 9, 2019) ("Compared to pipelines, both truck and rail transportation alternatives have a higher likelihood of accidents and spills due to the number of transits required to transport the crude oil and the associated increase in risk due to human error. . . . When total volume of releases is compared to the volume of crude oil transported, rail and truck transport release a significantly higher percentage of the volume transported, 0.309 percent and 0.154 percent respectively.  Comparatively, pipeline transport releases an average of 0.006 percent of the volume of crude oil transported.").  The Minnesota EIS is well-supported by a recent Pipeline and Hazardous Materials Safety Administration (PHMSA) study that found, based on data from 2007 to 2016, that:

> If percent spilled is used as a proxy for safety, shipping crude oil by water would be safer than by pipeline, by pipeline would be safer than by truck, and by truck would be safer than by rail.  If incident rate is used as a proxy for safety, shipping crude by pipeline would be considered safer than by truck, and by truck would be considered safer than by rail.

PHMSA, Report on Shipping Crude Oil by Truck, Rail, and Pipeline at 9 (Oct. 2018) (2018 PHMSA Report).  As found in this report, transporting oil by modern pipelines reduces the risk of spills vs. rail/truck transport.  For this reason as well, Plaintiffs fall short of establishing that the public interest is not served by the challenged actions.

Plaintiffs also fail to establish that an injunction is in the public interest based on Replacement Line 3's route.  Plaintiffs omit that Replacement Line 3's route avoids the Chippewa National Forest and the Leech Lake Band's Reservation, which are traversed by Existing Line 3.  Section 404 EA at 22, 24.  The Leech Lake Band participated in the Minnesota Public Utilities Commission's proceedings and asserted that Replacement Line 3 is necessary to "remove the risks to its reservation lands posed by Existing Line 3" and repeatedly made clear that Existing Line 3's route is not a feasible alternative by, among other things, refusing to grant Enbridge the new easement required to traverse the Band's Reservation.  May 2020 CN Order at 15; *see also* Leech Lake Band's Exceptions to ALJ Report at 5-6 (May 9, 2018) ("The Band's interests in this Project cannot be understated: the existing Line 3 *crosses the Leech Lake Reservation*, and the ALJ has recommended that it be dug up from the middle of the Mainline Corridor and then be put back in the same place.  With respect, the Band's Reservation is different than ceded territories, and crossing the Reservation is different than crossing private property within a ceded territory, and it is different than crossing in proximity to any other tribal lands."); MPUC Hearing Tr. at 69:24-78:20 (June 18, 2018) ("From Leech Lake's perspective, the consequences of not granting the certificate of need, which means that existing Line 3 will continue to operate where it's at with the intense maintenance program necessary to keep it safe has more negative consequences for Leech Lake than granting the certificate.").[17]  And while

---

[17] Plaintiffs may argue that Minnesota Pollution Control Agency's comments show that the Existing Line 3 route has the lowest potential impacts to surface water and groundwater.  Pls.'

both Existing and Replacement Line 3 traverse the Fond du Lac Reservation, Fond du Lac's Office of Water Protection certified that installing the Replacement Line 3 "will not violate applicable water quality standards" under 33 U.S.C. § 1341. Section 404 EA, App. B, Fond du Lac 401 Water Quality Certification (Apr. 15, 2019). Replacing Existing Line 3 with a modern, corrosion and crack resistant pipeline that avoids reservation and national forest land advances the public interest.

Plaintiffs' suggestion that Replacement Line 3 will produce only economic benefits, Pls.' Mem. at 25, fails to address, much less overcome, the substantial environmental benefits of reducing spill risk. Plaintiffs fall far short of establishing that the permanent loss of less than ten acres of wetlands outweighs the benefit of reducing spill risk along the current pipeline route and throughout the region. Because Replacement Line 3 both improves pipeline safety and avoids protected reservation and national forest land, Plaintiffs fail to show that the Corps Permit is not in the public interest.

## Conclusion

Plaintiffs have failed to meet their burden of proof on each of the requirements for this Court to consider the extraordinary remedy of a preliminary injunction. Plaintiffs have not shown any likelihood of success on the merits of their claims. The Corps fully complied with NEPA and the CWA and Plaintiffs have offered nothing to establish that the Corps' decision to

---

Mem. at 20. But that argument is unconvincing. The Leech Lake Band has refused to grant Enbridge the new easement required to traverse the Band's Reservation, buttressing the reasonableness of Replacement Line 3's route. Section 404 EA at 24. Plaintiffs also fail to establish that the SA-04 pipeline route suggested by the Minnesota Pollution Control Agency is in the public interest. That route would enter Minnesota well south of the point where Existing Line 3 enters the State. *Compare* Section 404 EA at 4 *with* Pls.' Ex. F at 7-8, ECF No. 2-8. This route would reduce the benefit of replacing Existing Line 3 by failing to take advantage of co-location opportunities and to connect with the Clearbrook Terminal. *Id.*; EA at 6 ("geographic requirements necessary to meet Project purpose" include "cross[ing] into Minnesota in Kittson County" and "mak[ing] deliveries to and interconnect[ing] with" other pipelines at Clearbrook).

issue the Corps Permit was arbitrary or capricious.  As the Section 404 EA, Section 408 EA and related documents show, the Corps appropriately considered oil spills and leaks, a reasonable range of alternatives to the project, and alternative construction methods for waterbody and wetlands crossings, along with the other direct, indirect, and cumulative impacts of the Corps Permit.

Plaintiffs also will not suffer irreparable harm without a preliminary injunction. Plaintiffs' claims of harm are not borne out by the lengthy environmental analysis performed by the Corps and the measures incorporated in the Corps Permit to protect, avoid, and minimize impacts to wetlands, wild rice, and other resources of importance to Plaintiffs.  Finally, Plaintiffs do not address the Corps' finding that Replacement Line 3 will improve public safety and protection of the environment by replacing an aging pipeline with a large number of defects. Replacement Line 3 will reduce oil spill risk along the current pipeline route and throughout the region and avoid protected reservation and national forest land.  Hence, the balance of equities and the public interest weighs heavily in favor of denying injunctive relief.  Plaintiffs have not shown that they are entitled to emergency relief and their motion should be denied.

Respectfully submitted this 15th day of January, 2021.

PAUL E. SALAMANCA
Deputy Assistant Attorney General
Environment & Natural Resources Division


/s Sara E. Costello
SARA E. COSTELLO (KS Bar No. 20898)
MATTHEW MARINELLI
Trial Attorneys
Natural Resources Section
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7611
Washington, DC 20044-7611

202-305-0484
sara.costello2@usdoj.gov

MARK L. WALTERS
Trial Attorney
HEATHER E. GANGE
Senior Counsel
Environmental Defense Section
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7611
Washington, DC 20044-7611

OF COUNSEL:

MELANIE CASNER
Assistant Counsel
Office of Chief Counsel
U.S. Army Corps of Engineers