UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RED LAKE BAND OF CHIPPEWA INDIANS, WHITE EARTH BAND OF OJIBWE, HONOR THE EARTH, and SIERRA CLUB,<br><br>       Plaintiffs,<br><br>    v.<br><br>UNITED STATES ARMY CORPS OF ENGINEERS,<br><br>       Defendant,<br><br>ENBRIDGE ENERGY, LP<br><br>       Defendant-Intervenor. | Case No. 1:20-cv-03817-CKK |

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

Moneen Nasmith
*[Admitted Pro Hac Vice]*
Alexis Andiman
*[Admitted Pro Hac Vice]*
Mekela Panditharatne
*[Admitted Pro Hac Vice]*
Earthjustice
48 Wall Street, 15th Floor
New York, NY 10005
(212) 845-7376
mnasmith@earthjustice.org
aandiman@earthjustice.org
mpanditharatne@earthjustice.org

Seth L. Johnson, D.C. Bar No. 1001654
Earthjustice
1001 G St. NW, Ste. 1000
Washington, D.C. 20001
(202) 667-4500
sjohnson@earthjustice.org

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ................................................................................................................1

ARGUMENT .......................................................................................................................2

I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. ...................................2

          A.      Plaintiffs Are Likely to Succeed on Their Claims that the Corps Violated NEPA and the Clean Water Act by Failing to Analyze Oil Spills..........................2

                  1.      The Corps Must Consider Oil Spills, and It Cannot Rely Uncritically on State Analyses.....................................................................2

                  2.      The Corps Did Not Adequately Consider Oil Spills....................................6

          B.      The Corps' Failure to Consider Reasonable Alternatives to Enbridge's Proposal Violated the Clean Water Act and NEPA.................................................10

                  1.      The Corps' Failure to Evaluate All Reasonable Routing Alternatives Violated the Clean Water Act. .................................................10

                  2.      The Corps' Failure to Evaluate All Reasonable Routing Alternatives Violated NEPA......................................................................12

II.     PLAINTIFFS WILL SUFFER IMMEDIATE AND IRREPARABLE HARM IN THE ABSENCE OF A PRELIMINARY INJUNCTION. .................................................15

III.    THE BALANCE OF HARMS FAVORS AN INJUNCTION. ........................................20

IV.    A PRELIMINARY INJUNCTION IS IN THE PUBLIC INTEREST............................22

**TABLE OF AUTHORITIES**

*\* Authorities upon which we chiefly rely are marked with an asterisk.*

**FEDERAL CASES**

                                                                              **Page number(s)**
*A Squared Joint Venture v. United States*,
        133 Fed. Cl. 291 (2017) ......................................................................................21

*Abbot GmbH & Co. KG v. Yeda Rsch. &, Dev. Co.*,
        No. 00-1720, 2006 WL 8427271 (D.D.C. July 17, 2006) ...................................6

*All. for the Wild Rockies v. Cottrell*,
        632 F.3d 1127 (9th Cir. 2011) ..........................................................................23

*Amoco Prod. Co. v. Village of Gambell, Alaska*,
        480 U.S. 531 (1987)............................................................................................20

*Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*,
        894 F.3d 692 (5th Cir. 2018) .............................................................................17

*Audubon Naturalist Soc'y of Cent. Atl. States, Inc. v. U.S. Dep't of Transp.*,
        524 F. Supp. 2d 642 (D. Md. 2007)......................................................................5

*Brady Campaign to Prevent Gun Violence v. Salazar*,
        612 F. Supp. 2d 1 (D.D.C. 2009) ...............................................................15, 22

*Citizens Against Burlington, Inc. v. Busey*,
        938 F.2d 190 (D.C. Cir. 1991)......................................................................13, 14

*Citizen's Alert Regarding Env't v. U.S. Dep't of Justice*,
        No. 95-1702, 1995 WL 748246 (D.D.C. Dec. 8, 1995)....................................21

*City of Alexandria, Va. v. Slater*,
        198 F.3d 862 (D.C. Cir. 1999) ...........................................................................13

*Comanche Nation v. United States*,
        2008 WL 4426621 (W.D. Okla. Sept. 23, 2008) ........................................18, 21

*Comm. of 100 on Fed. City v. Foxx*,
        87 F. Supp. 3d 191 (D.D.C. 2015)......................................................................17

*Cuomo v. U.S. Nuclear Regul. Comm'n*,
        772 F.2d 972 (D.C. Cir. 1985) ......................................................................21, 25

*Dep't of Transp. v. Pub. Citizen*,
        541 U.S. 752 (2004)..............................................................................................3

\* *Friends of Capital Crescent Trail v. Fed. Transit Admin.*,
877 F.3d 1051 (D.C. Cir. 2017) ............................................................4, 5, 13, 14

*Gjellum v. City of Birmingham, Ala.*,
829 F.2d 1056 (11th Cir. 1987) .....................................................................19

*Gordon v. Holder*,
632 F.3d 722 (D.C. Cir. 2011) ......................................................................20

*Greater Yellowstone Coal. v. Flowers*,
359 F.3d 1257 (10th Cir. 2004) .....................................................................11

\* *Hoosier Env't Council v. U.S. Army Corps of Eng'rs*,
722 F.3d 1053 (7th Cir. 2013) ...................................................................4, 13

*James City County, Virginia v. EPA*,
955 F.2d 254 (4th Cir. 1992) ...................................................................11, 12

*League of Women Voters of the United States v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ...........................................................................22

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*,
752 F.3d 755 (9th Cir. 2014) .........................................................................17

*Lichterman v. Pickwick Pines Marina, Inc.*,
2007 WL 4287586 (N.D. Miss. Dec. 6, 2007) ...............................................17

*MBI Grp., Inc. v. Credit Foncier Du Cameroun*,
616 F.3d 568 (D.C. Cir. 2010) .........................................................................6

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983).............................................................................................2

*Mylan Pharm., Inc. v. Shalala*,
81 F. Supp. 2d 30 (D.D.C. 2000) ..................................................................20

*Nat'l Ass'n for Advancement of People of Color v. U.S. Postal Serv.*,
No. 20-CV-2295, 2020 WL 5995032 (D.D.C. Oct. 10, 2020) ........................24

*New York v. Nuclear Regul. Comm'n*,
681 F.3d 471 (D.C. Cir. 2012) .........................................................................3

*Novosteel SA v. United States*,
284 F.3d 1261 (Fed. Cir. 2002)........................................................................6

*Ocean Advocates v. U.S. Army Corps of Eng'rs*,
  402 F.3d 846 (9th Cir. 2005) .............................................................................2

\* *Ohio Valley Env't Coal. v. U.S. Army Corps of Eng'rs*,
  528 F. Supp. 2d 625 (S.D. W. Va. 2007) ...............................................21, 22, 23

*Park Cnty. Res. Council v. U.S. Dep't of Agric.*,
  817 F.2d 609 (10th Cir. 1987) ..........................................................................22

*Quechan Tribe of Fort Yuma Indian Rsrv. v. U.S. Dep't of Interior*,
  755 F. Supp. 2d 1104 (S.D. Cal. 2010) .........................................................18, 21

*Rufer v. Fed. Election Comm'n*,
  64 F. Supp. 3d 195 (D.D.C. 2014) .....................................................................24

*Safadi v. Novak*,
  574 F. Supp. 2d 52 (D.D.C. 2008) .....................................................................25

*Saunders v. Wash. Metro Area Transit Auth.*,
  359 F. Supp. 457 (D.D.C. 1973) ........................................................................17

*Save Strawberry Canyon v. Dep't of Energy*,
  613 F. Supp. 2d 1177 (N.D. Cal. 2009) .............................................................24

*Sierra Club v. Sigler*,
  695 F. 2d 957 (5th Cir. 1983) .............................................................................3

*Sierra Club v. U.S. Army Corps of Eng'rs*,
  645 F.3d 978 (8th Cir. 2011) .............................................................................23

*Sierra Club v. U.S. Army Corps of Eng'rs*,
  701 F.2d 1011 (2d Cir. 1983)..............................................................................9

*Sierra Club v. U.S. Dep't of Energy*,
  825 F. Supp. 2d 142 (D.D.C. 2011) ...............................................................17, 18

\* *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  255 F. Supp. 3d 101 (D.D.C. 2017).............................................................2, 3, 8, 9

*Steubing v. Brinegar*,
  511 F.2d 489 (2d Cir. 1975)...............................................................................22

*Stop the Pipeline v. White*,
  233 F. Supp. 2d 957 (S.D. Ohio 2002) ...............................................................4

*Univ. of Tenn. v. Elliott*,
    478 U.S. 788 (1986) ..........................................................................................................19

*Univ. of Tex. v. Camenisch*,
    451 U.S. 390 (1981) ..........................................................................................................24

*Washington v. Reno*,
    35 F.3d 1093 (6th Cir. 1994) ...........................................................................................22

*Winter v. NRDC*,
    555 U.S. 7 (2008) .......................................................................................................15, 24

**STATE CASES AND HEARINGS**

Findings of Fact, Conclusions of Law, and Recommendation,
    *In the Matter of Draft 401 Certification for the Line 3 Replacement Project*,
    OAH 60-2200-36909 (Minn. Off. of Admin. Hr'gs Oct. 16, 2020) ..................................19

*In re Enbridge Energy, L.P.*,
    930 N.W.2d 12 (Minn. Ct. App. 2019) ..............................................................................6

*In the Matter of the Application of Enbridge Energy, L.P., for a Certificate of*
    *Need and a Routing Permit for the Proposed Line 3 Replacement Project in Minnesota*
    *from the North Dakota Border to the Wisconsin Border*,
    No. A20-1071 (Minn. Ct. App. filed Aug. 18, 2020) ...................................................6, 15

**STATUTES**

33 U.S.C. § 1344 ............................................................................................................................11

Minn. Stat. 216G.02 ......................................................................................................................12

**REGULATIONS**

40 C.F.R. § 230.5 ...........................................................................................................................10

40 C.F.R. § 230.10 .........................................................................................................................10

40 C.F.R. § 1506.2 ....................................................................................................................4, 13

40 C.F.R. § 1506.3 ...........................................................................................................................4

40 C.F.R. § 1506.5 .........................................................................................................................11

40 C.F.R. § 1508.8 (2019) ...............................................................................................................3

40 C.F.R. § 1508.9 (2019) .............................................................................................................12

Minn. Admin. R. 7852.1900 ..........................................................................................................12

**OTHER AUTHORITIES**

Intent to Prepare a Draft EIS for the Installation of a Terminal Groin Structure at Shallotte River
Inlet, in Brunswick County, NC, 77 Fed. Reg. 58,530-01 (Sept. 21, 2012)........................5

Minn. Dep't of Com., Final Environmental Impact Statement Line 3 Project
(2d revision Dec. 9, 2019), https://mn.gov/eera/web/file-list/13765/...............................12

MPCA, Enbridge Line 3 Project 401 Certification Findings of Fact, Conclusion of Law, and
Order (Nov. 12, 2020)........................................................................................................15

Notice of Intent to Prepare a Joint EIS for the Gateway Pacific Terminals Bulk Dry Goods
Shipping Facility and the Custer Spur Rail Expansion Projects,
77 Fed. Reg. 58,531-01 (Sept. 21, 2012)............................................................................5

## INTRODUCTION

In issuing a permit under Section 404 of the Clean Water Act to Enbridge Energy, LP ("Enbridge") for a 330-mile tar sands pipeline (the "Project"), the U.S. Army Corps of Engineers ("Corps") failed to comply with its responsibilities under the Clean Water Act and the National Environmental Policy Act ("NEPA").  Amid other deficiencies, the Corps refused to address the risk of oil spills to the lands, water, species, and people of northern Minnesota and refused to consider whether alternative routes might result in fewer impacts to wetlands and waterways. Included among the most egregious of its errors is the Corps' utter refusal to consider how oil spills might affect, and indeed potentially devastate, the Anishinaabe people who rely on the land crossed by the Project and the resources it provides for basic physical and spiritual survival.  The excuses the Corps and Enbridge attempt to provide for these failings do not absolve the Corps. Their reading of the law is wrong, and the Corps may not shirk its duty to comply with the Clean Water Act or NEPA by abdicating authority to state agencies operating under entirely different statutes and standards.

The injuries suffered by the Plaintiffs and their citizens and members are evident, ongoing, and irreparable.  Enbridge continues to cut down vast swaths of trees, convert wetlands, dig trenches, and otherwise damage the lands and resources Plaintiffs' members use and enjoy and that Tribal Plaintiffs hold sacred.  A preliminary injunction is not only appropriate but necessary to temporarily halt the destruction and ensure that such a massive project with the potential to harm huge swaths of Minnesota does not proceed illegally and without proper adherence to the Clean Water Act and NEPA.  The Corps and Enbridge have not demonstrated otherwise, and the Court should grant Plaintiffs' motion for a preliminary injunction.

## ARGUMENT

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

### A.    Plaintiffs Are Likely to Succeed on Their Claims that the Corps Violated NEPA and the Clean Water Act by Failing to Analyze Oil Spills.

The Corps and Enbridge variously and somewhat confusingly argue that the Corps lacks authority to evaluate oil spills, the Corps adequately evaluated oil spills by relying on state analyses, and the Corps conducted its own evaluation of oil spills through its Environmental Assessment: 408 Request to Install Line 3 Replacement Pipeline Across the Lost River ("408 EA").[1]  Each argument fails.

First, the clear weight of authority holds that the Corps must consider oil spills in evaluating the consequences of its permitting decisions for projects that carry *some* risk of spills. The Corps cannot discharge this responsibility by uncritically relying on state analyses.  Second, the Corps' narrow, conclusory 408 EA does not adequately analyze the effects of oil spills on the aquatic environment, the human environment, or environmental justice.  The Corps' failure to consider oil spills renders its decision to approve the Project arbitrary and capricious.  *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

### 1.    The Corps Must Consider Oil Spills, and It Cannot Rely Uncritically on State Analyses.

Although the Corps and Enbridge seek to minimize the federal government's role in approving the Project, they cannot erase the Corps' well-established responsibility to evaluate the environmental effects of both "(1) the construction of the pipeline, *and* (2) an unanticipated oil spill."  *See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 131 (D.D.C. 2017) (emphasis added); *see also Ocean Advocates v. U.S. Army Corps of Eng'rs*,

---

[1] The 408 EA is Appendix E to Army Corps of Eng'rs, Enbridge Line 3 Replacement Project Environmental Assessment and Statement of Findings (Nov. 23, 2020) ("404 EA").

402 F.3d 846, 868 (9th Cir. 2005) (concluding that, under NEPA, the Corps had a duty to explore

the increased risk of oil spills that would result from its permitting decision); *Sierra Club v.

Sigler*, 695 F.2d 957, 975 (5th Cir. 1983) (finding that the Corps could not proceed with the

issuance of certain permits unless it evaluated the consequences of an oil spill under NEPA).

Contrary to Enbridge's argument, nothing in *Standing Rock Sioux Tribe* or any other cited case

suggests that this responsibility hinges on the type of property interest at stake.  *But see* Enbridge

Mem. in Opp'n to Pls.' Mot. for Prelim. Inj. ("Enbridge Mem.") at 27.[2]  To the contrary, this

Court has explained that the Corps "may dispense with the consequences portion of the analysis"

"*[o]nly if* the harm in question is so 'remote and speculative' as to reduce the effective

probability of its occurrence to zero."  *Standing Rock Sioux Tribe*, 255 F. Supp. 3d at 132

(quoting *New York v. Nuclear Regul. Comm'n*, 681 F.3d 471, 482 (D.C. Cir. 2012)) (emphasis

added).  The Corps and Enbridge do not argue that there is no probability of an oil spill, nor

could they.  Therefore, the Corps unambiguously has an obligation analyze the effects of oil

spills—and it failed to do so here.

---

[2] Contrary to Enbridge's assertion, the Corps' authority over the Project easily satisfies the test set out in *Department of Transportation v. Public Citizen*, 541 U.S. 752 (2004).  There, the Court held that "where an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant 'cause' of the effect," and, thus, it need not consider that effect in its NEPA analysis. *Id.* at 770.  The Corps' authority to deny or condition a 404 permit enables it to prevent oil spills or reduce their likelihood and severity.  Because the Corps has sufficient authority over the Project, Enbridge's attempt to distinguish the cases on which Plaintiffs rely fails.  Enbridge Mem. at 27–28.  And, in any event, the factual distinctions that Enbridge highlights in its brief were immaterial to the courts' analyses in those cases.  For example, in *Standing Rock Sioux Tribe*, the scope of the Corps' authority over the project did not factor into this Court's conclusion that the Corps must consider oil spills.  In addition, to the extent that Enbridge argues that the Corps cannot analyze oil spills because they stem "from activities outside the Corps' control," Enbridge Mem. at 18, Enbridge is mistaken.  NEPA regulations require the Corps to consider the direct and indirect effects of issuing a 404 permit.  *See* 40 C.F.R. § 1508.8(b) (2019).  Defendants do not argue that oil spills are not indirect effects of issuing a permit authorizing an oil pipeline, nor could they.

Although the Corps previously denied authority to evaluate oil spills, *see* 404 EA, App. A, at 3 (unnumbered) ("The potential for oil spills is beyond the scope of [the Corps'] regulatory authority. . .")—a position which Enbridge supports, *see* Enbridge Mem. at 25—the Agency now contends it *did* properly analyze oil spills by incorporating Minnesota agencies' analyses and conclusions wholesale into its NEPA review.  As the cases cited by the Corps and Enbridge confirm, however, even when the Corps relies on an analysis conducted by a sister *federal* agency under NEPA, it must complete a "critical, independent verification" of that analysis.  *See Stop the Pipeline v. White*, 233 F. Supp. 2d 957, 968 (S.D. Ohio 2002);[3] *see also* 40 C.F.R. § 1506.3(a) (stating that an agency may adopt a *federal* environmental analysis, in whole or in part, *provided that* the analysis meets federal standards); *Hoosier Env't Council v. U.S. Army Corps of Eng'rs*, 722 F.3d 1053, 1061 (7th Cir. 2013) (explaining that, although the Corps can rely on another *federal* agency's "responsible analysis" in making its own decision, it cannot "rubberstamp" *any* environmental review).  When the Corps seeks to cooperate with a *state* agency, its burden is much greater.

To cooperate with a state in evaluating a project under NEPA, "to the fullest extent practicable," the Corps must work with the state agency to implement joint planning processes, conduct joint environmental research and studies, hold joint public hearings, and prepare joint environmental assessments.  40 C.F.R. § 1506.2(b).  *Friends of the Capital Crescent Trail v. Federal Transit Administration*, 877 F.3d 1051 (D.C. Cir. 2017), presents a clear example of the

---

[3] Enbridge seizes on dicta in *Stop the Pipeline* to suggest that the Corps may "defer" to state environmental analyses.  *See* Enbridge Mem. at 28.  Enbridge is incorrect.  First, in *Stop the Pipeline*, the Corps consulted with the Office of Pipeline Safety, a federal agency within the Department of Transportation, not with any state agency.  *See* 233 F. Supp. 2d at 961.  Second, Plaintiffs do not contend that the Corps cannot *consult* with state agencies.  Instead, as explained more fully below, Plaintiffs argue that NEPA prohibits the Corps from *uncritically* adopting state analyses, in contravention of the regulatory procedures governing cooperation.

manner in which this cooperative process should unfold.  There, the Federal Transit Administration ("FTA") worked with the Maryland Transit Administration to evaluate a project and develop a joint draft EIS over the course of five years.  *Id.* at 1056.  The agencies jointly engaged the public and jointly studied a range of proposed alternatives *before* FTA issued its Final Environmental Impact Statement ("EIS").  *Id.*  This type of cooperation is a process the Corps knows well, having conducted numerous joint environmental reviews and close collaborations under NEPA with various state and local entities.[4]

In sharp contrast, here the Corps seeks to adopt portions of Minnesota's review wholesale, without adhering to the process NEPA requires.  Although the Corps claims to have "worked collaboratively" with state agencies, *see* 404 EA at 2, there is scant evidence of formal cooperation in the record.  For instance, the Corps reports that the Minnesota Public Utilities Commission ("PUC") collaborated with other state agencies to review Enbridge's application— but it fails to indicate what role, if any, the Corps played in that process.  *See* 404 EA at 9.  Similarly, the Corps relies completely on the Minnesota PUC's oil spill analysis without providing any evidence of joint planning, joint studies, joint public hearings, or a joint EA.  *See* 404 EA, App. A at 16 (unnumbered) (contending that the Corps lacks authority to evaluate oil

---

[4] *See, e.g.*, *Audubon Naturalist Soc'y of Cent. Atl. States, Inc. v. U.S. Dep't of Transp.*, 524 F. Supp. 2d 642, 686–87 (D. Md. 2007) (finding that the Corps cooperated appropriately with the Maryland State Highway Administration, because it engaged in joint review of the project at issue and "exercise[d] independent judgement throughout the process"); *see also* Intent to Prepare a Draft EIS for the Installation of a Terminal Groin Structure at Shallotte River Inlet, in Brunswick County, NC, 77 Fed. Reg. 58,530-01, 58,531 (Sept. 21, 2012) (announcing the Corps' intention to work closely with North Carolina agencies to "consolidate" the NEPA process with state environmental review requirements); Notice of Intent to Prepare a Joint EIS for the Gateway Pacific Terminals Bulk Dry Goods Shipping Facility and the Custer Spur Rail Expansion Projects, 77 Fed. Reg. 58,531-01, 58,532 (Sept. 21, 2012) (announcing the Corps' intention to work closely with a Washington agency, but explaining that the Corps will serve as "lead agency for compliance with NEPA").

spills, but asserting that "[a] spill analysis has been completed . . . by the PUC"); *see also* Fed. Def.'s Resp. in Opp'n to Pls.' Mot. for Prelim. Inj. ("Corps Mem.") at 13 (referring to the PUC's oil spill analysis).  In short, the Corps fails to show that it performed *any* critical, independent verification of the state analyses on which it relies, let alone the type of sustained, formal cooperation necessary under NEPA.  Without such evidence, the Corps cannot discharge its responsibility to evaluate oil spills through reliance on state analyses alone.[5]

### 2.    The Corps Did Not Adequately Consider Oil Spills.

The Corps cannot cure its failure to consider the effects of oil spills by relying on its 408 EA, which the Corps released to Plaintiffs more than two weeks *after* Plaintiffs filed their complaint and motion for preliminary injunction.[6]  Crucially, although the Corps' Section 404

---

[5] The risks of uncritical, informal reliance on state agency analyses are particularly apparent here, where the very analysis on which the Corps seeks to rely is currently subject to challenge in state court under state law.  The Minnesota Court of Appeals already has concluded once that the state's analysis did not adequately analyze the effects of an oil spill in the Lake Superior watershed, *see In re. Enbridge Energy, L.P.*, 930 N.W.2d 12, 27–28 (Minn. Ct. App. 2019), and a revised version of that analysis remains subject to ongoing litigation.  *See In the Matter of the Application of Enbridge Energy, L.P., for a Certificate of Need and a Routing Permit for the Proposed Line 3 Replacement Project in Minnesota from the North Dakota Border to the Wisconsin Border*, No. A20-1071 (Minn. Ct. App. filed Aug. 18, 2020).

[6] The Corps' suggestion that Plaintiffs "ignore[d]" the 408 EA, *see* Corps Mem. at 16, disingenuously elides that the Corps did not disclose this document to Plaintiffs until January 11, 2021, fifty days after Plaintiffs first attempted to obtain the Corps' decision documents, forty-two days after Plaintiffs submitted a formal request for those documents under the Freedom of Information Act, and nineteen days after Plaintiffs filed their complaint and motion for preliminary injunction.  *See* Suppl. Hayes Decl. ¶ 4; *see also* Hayes Decl. ¶ 8 (noting that the Corps' December 8, 2020 production provided Plaintiffs with the 404 EA and Appendix A only, and Plaintiffs received no additional documents as of December 24, 2020).  It is hardly surprising that Plaintiffs initially were unable to reference a document to which the Corps denied them access.  And, contrary to Enbridge's suggestion, Plaintiffs are not now precluded from discussing the 408 EA.  *But see* Enbridge Mem. at 28.  "Reply briefs *reply* to arguments made in the response brief," and that is exactly what Plaintiffs do here.  *MBI Grp., Inc. v. Credit Foncier Du Cameroun*, 616 F.3d 568, 575 (D.C. Cir. 2010) (quoting *Novosteel SA v. United States*, 284 F.3d 1261, 1274 (Fed. Cir. 2002)); *cf. Abbot GmbH & Co. KG v. Yeda Rsch. & Dev. Co.*, No. 00-1720, 2006 WL 8427271, at *2 n.4 (D.D.C. July 17, 2006) (denying the defendant's motion to

permit allows the Project to cross 227 waterways and 885 wetlands, the 408 EA applies only to a single site: the Lost River crossing.  *See generally* 408 EA.  And, contrary to assertions by the Corps and Enbridge, this document contains little analysis at all.  The "[w]orst-case [s]cenario [d]ischarge" discussion, to which the Corps and Enbridge both repeatedly point, is especially striking.  Instead of analyzing the environmental effects that would result from such a discharge, the Corps merely reports that the state modeled hypothetical spill scenarios, without restating the conclusions of that modeling in any detail, let alone assessing its validity or rigor.  *Id.* at 10.  The Corps goes on to regurgitate "information . . . provided by [Enbridge]" comparing sites included in the state's modeling effort with the Lost River crossing, again without clearly endorsing or evaluating Enbridge's statements.  *Id.*  A table at the conclusion of this section indicates without further analysis that an oil spill at the Lost River crossing would result in "potential" harm to recreational water use, drinking water, a populated area, and a sensitive ecosystem—that is, every "identified use" at issue.  *Id.* at 12.

The 408 EA also fails to grapple with the effects of an oil spill on the aquatic environment.  As the Corps' summary reveals, *see* Corps Mem. at 17–18, this "discussion" includes only general statements about the potential effects of oil in the environment.  *See* 408 EA at 12–13.  The Corps fails to analyze any site- or action-specific consequences, including the number and type of aquatic animals likely to die as a result of an oil spill at the Lost River crossing; the ecosystem-wide effects of those individual deaths; and the consequences of spilling dilbit, in particular, which does not merely float away but, instead, mixes with sediment, leading to long-term contamination and the need for extensive—and, often, habitat-destroying—clean-up

---

strike the plaintiff's reply because the court "discern[ed] nothing new in the reply, which simply respond[ed] to the . . . argument the defendant originally submitted").

efforts. *See* Comments on Application No. 2014-01071-TJH at 15–19 (Feb. 21, 2019) ("2019

Comments"). And nothing in the 408 EA or 404 EA discusses the potential ecosystem-wide

effects of spills at the hundreds of other locations where the Corps has permitted construction.

The 408 EA also falls far short in its treatment of harm to the human environment and

environmental justice, particularly with regard to the assessment—or lack thereof—of the effect

an oil spill would have on Tribes and Tribal resources. In discussing harm to the human

environment, the Corps notes that an oil spill would disrupt "recreational activities," and

"[f]isheries regulators and public health officials typically close fisheries [following an oil spill]

until it is confirmed through monitoring that fish consumption is not a threat to public health."

408 EA at 14. According to the Corps, "[t]his standard approach" constitutes an "effective

mitigation strategy." *Id*. But the Corps altogether ignores the consequences that a fishery

closure would have on Tribal members, who engage in subsistence fishing, as well as hunting

and gathering. The 408 EA contains no independent environmental justice analysis, and the 404

EA's environmental justice analysis dismisses the significance of oil spills in a single sentence:

"Construction, operation, or an accidental release at the Lost River crossing would not result in

disproportionate and adverse effects to meaningful higher minority populations or low-income

populations." 404 EA at 127.

This is precisely the sort of "bare-bones conclusion" that this Court held unlawful in

*Standing Rock Sioux Tribe*. 255 F. Supp. 3d at 140. Here, as in *Standing Rock Sioux Tribe*, the

Tribes' "distinct cultural practices," along with other "social and economic factors," will

"amplify [their] experience of the environmental effects of an oil spill." *Id*. For instance,

according to a member of the White Earth Band of Ojibwe, "[f]ishing is . . . critical to [him] and

[his] community." Aubid Decl. at ¶ 4; *see also* Arsenault Decl. at ¶ 4 (explaining that fishing is

a culturally significant subsistence activity for the White Earth Band).  This member explained that losing the ability to fish "would be traumatic and would damage [his] ability to make a living."  Aubid Decl. at ¶ 10.  Similarly, members of the Red Lake Band of Chippewa Indians "live sustainably by utilizing different [harvesting and gathering] sites at different times."  Strong Decl. at ¶ 10.  "The loss of any one site . . . would threaten [Band members'] ability to live off the land, causing mental and physical anguish."  *Id.*

In the words of the Red Lake Band's Tribal Secretary, "We are an impoverished people, and we rely on the natural environment to survive.  By threatening that environment, the government is threatening the lives of our people."  *Id.* at ¶ 15.  The Corps turned a blind eye to the Tribes' unique vulnerability to oil spills and, thereby, failed to comply with NEPA's mandate to take a hard look at the Project's environmental consequences.  *See Standing Rock Sioux Tribe*, 255 F. Supp. at 140.

* * *

All of the above applies with equal force with respect to the Corps' exercise of jurisdiction under the Clean Water Act.  Even when the Corps acts as a joint lead agency with another *federal* agency under NEPA, the Corps still is bound under the Clean Water Act to "conduct its own investigation in order to reach a decision, on a reasoned administrative record, as to whether to issue the [permit]."  *See Sierra Club v. U.S. Army Corps of Eng'rs*, 701 F.2d 1011, 1042 (2d Cir. 1983).  For the same reasons that the Corps' efforts do not satisfy its obligations under NEPA, they also fail to satisfy the Corps' burden under Section 404, which requires that the Corps independently certify that the alternative selected is the least environmentally damaging alternative practicable.

**B.    The Corps' Failure to Consider Reasonable Alternatives to Enbridge's Proposal Violated the Clean Water Act and NEPA.**

The Corps' refusal to consider any routing alternatives other than the existing Line 3 corridor and Enbridge's preferred route is arbitrary and capricious and contrary to both the Clean Water Act and NEPA.  The Corps wrongly claims that it was not required to consider additional routing alternatives because the Minnesota PUC already had selected a route for the Project.[7] But neither the Clean Water Act nor NEPA allows the Corps to rely so completely on an analysis of alternatives conducted by a state agency under a state statute.

**1.    The Corps' Failure to Evaluate All Reasonable Routing Alternatives Violated the Clean Water Act.**

The Clean Water Act's implementing regulations require the Corps to consider "practicable alternatives to the proposed discharge,"[8] including "discharging into an alternative aquatic site with potentially less damaging consequences."  *See* 40 C.F.R. § 230.5(c).  The regulations further mandate that, when a project is not water dependent, as is the case here, the Corps must presume that there is a practicable alternative to the project that would have less adverse environmental impact on the affected wetlands.  *See* 40 C.F.R. § 230.10(a)(3).  The Clean Water Act vests exclusive jurisdiction over these determinations and the protection of the

---

[7] The Corps also wrongly states that it did consider alternate routes.  *See* Corps Mem. at 27. Neither the 404 EA nor the 408 EA discusses any environmental impacts of alternative routes or compares those impacts to the impacts associated with Enbridge's preferred route.  Indeed, the 404 EA admits "[n]o off-site pipeline alternatives were assessed as alternatives are limited to the corridor designated by the [Minnesota PUC]."  404 EA at 21.  The Corps fails to explain this fact in its brief, which highlights, instead, a discussion of maintaining the existing Line 3, replacing the existing Line 3 with a new 36-inch pipeline, replacing the existing Line 3 with a 34-inch pipeline, and supplementing the existing Line 3 with transportation via rail.  *See id.* at 22–26.

[8] "Practicable" describes an option that "is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes."  40 C.F.R. § 230.10(a)(2).

nation's waters from dredging and filling activities with the Corps, not with any state agency. *See* 33 U.S.C. § 1344.[9]  The Corps also is obligated to independently verify all information presented to it in a Section 404 application.  *See, e.g.*, *Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1269 (10th Cir. 2004); *see also* 40 C.F.R. § 1506.5(a).  Nothing in the Clean Water Act or the Corps' regulations even suggests that the Corps should account for determinations by state utility commissions in identifying alternatives, let alone sanctions wholesale refusal to consider reasonable or practicable alternatives based on conclusions by a state PUC.

Moreover, no case law suggests that the Corps may refuse to consider alternatives that could have fewer adverse impacts to wetlands—thus, abdicating its responsibilities under the Clean Water Act—based on a state agency's selection of one particular route.  The Corps cites only to *James City County, Virginia v. EPA* to support its flawed argument that a state's routing choice renders all other routes not "practicable" within the meaning of the Corps' regulations. *See* Corps Mem. at 31 (citing 955 F.2d 254, 260 (4th Cir. 1992)).  However, the Corps mischaracterizes both the holding in *James City* and the nature of the PUC decision at issue here.

In *James City*, the court reviewed the availability of practicable alternatives *de novo*, and all parties agreed that an alternative involving groundwater was not practicable, because a state agency had prohibited further groundwater withdrawals based on shortages.  955 F.2d at 259–60. The court agreed that the state agency's refusal to allow withdrawals rendered the groundwater alternative not practicable for purposes of Section 404 review.  *Id.*  But, contrary to the Corps' suggestion, did *not* hold that a state agency's dismissal of certain alternatives based on different factors than those enumerated in the Corps' regulations automatically makes those alternatives

---

[9] States may formally take over administration of the Section 404 program from the Corps, but Minnesota is not one of the handful of states that has chosen to do so.  *See* 33 U.S.C. § 1344.

not practicable under the Clean Water Act.  *See id.*  Here, the PUC did far more than the *James City* agency by acknowledging that various route alternatives were feasible, considering a number of alternatives in the state EIS, and then selecting an alternative according to standards other than the least environmentally damaging practicable alternative standard that governs the Corps' Section 404 decisionmaking.  *See* Minn. Dep't of Com., Final Environmental Impact Statement, Line 3 Project ch. 4 (2d revision Dec. 9, 2019); *see also* Minn. Stat. 216G.02; Minn. Admin. R. 7852.1900 (establishing criteria for route selection, including pipeline cost and accessibility, planned future land use, and economies within the route).  *James City* does not sanction the abdication of responsibility under the Clean Water Act that the Corps has displayed in this case—nor could it, given the clear commands in the Act and the Corps' regulations.

The Corps' position that it must defer to the PUC's decision also makes no practical sense.  It was the Corps' choice to sit by while the PUC completed its EIS and made its routing decision.  There is nothing in any statute or regulation that requires this sequence of events.  Neither is there any authority to show that the mere timing of the PUC's decision can alter the Corps' responsibilities under the Clean Water Act.  Moreover, it does not make sense that the PUC's decision would affect the Corps' evaluation of some alternatives but not others.  If the Corps can consider one option that the PUC did not approve—*e.g.*, requiring installation of the new Line 3 in the same location as the existing Line 3—then there is no rational basis why the Corps cannot consider other options that the PUC rejected, including routes in other locations.

## 2. The Corps' Failure to Evaluate All Reasonable Routing Alternatives Violated NEPA.

Under NEPA, even in an EA, the Corps must discuss a reasonable range of alternatives; it cannot arbitrarily exclude a whole category of options.  *See* 40 C.F.R. § 1508.9 (2019).  Although agencies are accorded some deference in their selection of alternatives, "[d]eference

. . . does not mean dormancy, and the rule of reason does not give agencies license to fulfill their own prophecies." *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991). "[A]n alternative is properly excluded from consideration in [a NEPA review] only if it would be reasonable for the agency to conclude that the alternative does not 'bring about the ends of the federal action.'" *City of Alexandria, Va. v. Slater*, 198 F.3d 862, 867 (D.C. Cir. 1999) (quoting *Citizens Against Burlington*, 938 F.2d at 195). And "[t]he reasonableness of the analysis of project alternatives . . . is resolved . . . by the nature of the underlying agency action." *Friends of the Capital Crescent Trail*, 877 F.3d at 1063.

As discussed above, NEPA encourages cooperation between state and federal agencies, but it strictly governs the manner in which that cooperation can occur. *See* 40 C.F.R. § 1506.2. Not only did the Corps fail to adhere to those requirements, but, in refusing to consider an entire class of alternatives based on the PUC's routing decision, the Corps also ran afoul of an additional regulation, which expressly bars federal agencies from relying on conflicts with state plans or laws to avoid addressing an impact or issue. *Id.* § 1506.2(d). If a conflict arises, federal agencies must describe the conflict and "the extent to which the agency would reconcile its proposed action with the plan or law," if reconciliation is possible. *Id.* Reconciliation, however, is not required. *Id.* Thus, the Corps could have acknowledged that alternative route options would not comply with the PUC's decision, but it was not permitted to use the PUC's decision as an excuse to ignore those otherwise entirely reasonable alternatives altogether.

The cases cited by the Corps and Enbridge do not support a different conclusion. In *Hoosier Environmental Council*, the federal agency was relying on an analysis conducted by another federal agency, as is expressly permitted by the NEPA regulations. 722 F.3d at 1061. In *Friends of the Capital Crescent Trail*, the range of alternatives assessed was narrowed in a joint

process undertaken by the state and federal agency.  877 F.3d at 1056–57.  And in *Citizens Against Burlington*, the federal agency narrowed the range of alternatives it considered under NEPA based on factors Congress expressly enumerated in a federal statute.  938 F.2d at 197.

In addition, unlike in *Friends of the Capital Crescent Trail*, requiring the Corps to consider routing alternatives here would not "elevate form over function."  *See* 877 F.3d at 276. Contrary to the Corps' assertion, *see* Corps Mem. at 29, Plaintiffs have explained why consideration of alternate routes would aid the Corps' analysis under both NEPA and the Clean Water Act.  *See* 2019 Comments; Comments on Updated Application No. 2014-01071-TJH (Mar. 6, 2020).  In their comments to the Corps, Plaintiffs raised and discussed a number of alternatives, including:

1. The RA-03AM route, which would avoid the Mississippi River Headwaters area and Minnesota's Lakes region.  This route would primarily focus construction activities and operation impacts that already are affected by parallel crude oil pipelines.  It, therefore, would avoid fens, fish hatcheries, Wildlife Management Areas, and some communities that Enbridge's preferred route would not.

2. The RA-06 route, which would go farther north than Enbridge's proposal and avoid the Mississippi Headwaters and crossing Minnesota's Lake region.

2019 Comments at 45–46, 55.  As Plaintiffs noted, the Minnesota Pollution Control Agency expressly concluded to the PUC that the other routes offered greater "potential to minimize potential adverse effects to surface water and groundwater resources" than the route Enbridge is proposing to the Corps.  *Id.* at 50–51 (quoting Letter from Bill Sierks, Minnesota Pollution

Control Agency to Scott Ek, Minnesota PUC (Nov. 2017)).[10]  These routes and other routes the

Corps ignored offer real alternatives that the Corps was required to consider under NEPA.  Its

failure to do so is irrational, arbitrary, and capricious.

## II.   PLAINTIFFS WILL SUFFER IMMEDIATE AND IRREPARABLE HARM IN THE ABSENCE OF A PRELIMINARY INJUNCTION.

Although Enbridge and the Corps seek to inflate Plaintiffs' burden to near certainty,

Enbridge Mem. at 31; Corps Mem. at 36, Plaintiffs must show only "that irreparable injury is

*likely* in the absence of an injunction" under a preponderance of evidence standard.  *See Winter*

*v. NRDC*, 555 U.S. 7, 22 (2008); *see also Brady Campaign to Prevent Gun Violence v. Salazar*,

612 F. Supp. 2d 1, 24–25 (D.D.C. 2009) ("When a procedural violation of NEPA is combined

with a showing of environmental or aesthetic injury, courts have not hesitated to find a likelihood

of irreparable injury.").  Plaintiffs have more than met their burden by offering unrefuted

evidence of harm from the extensive tree clearing, the loss of wetlands, and the damage to

cultural resources.

As a result of Corps' decision to permit the Project, since December 23, 2020, Enbridge

has continued to fell "innumerable large trees" and clearcut wetlands "dominated by forests" at

---

[10] To the extent Enbridge and the Corps point to the Minnesota Pollution Control Agency's ("MPCA") approval of Enbridge's preferred route in its decision under Section 401 of the Clean Water Act as evidence that this route is, in fact, the most environmentally benign option, Enbridge and the Corps are misreading MPCA's decision.  The only reason MPCA did not persist in its view that another route would be less environmentally degrading and require that Enbridge adopt a different route than the one proposed is that it holds the same wrongheaded view as the Corps that the PUC's routing determination is binding upon the MPCA.  MPCA, Enbridge Line 3 Project 401 Certification Findings of Fact, Conclusion of Law, and Order (Nov. 12, 2020).  Plaintiffs and other groups have appealed MPCA's determination on a variety of grounds, including that MPCA's interpretation of its authority and the authority of the PUC is contrary to Section 401 of the Clean Water Act and Minnesota state law.  *In the Matter of the Application of Enbridge Energy, Limited Partnership, for a Certificate of Need and a Routing Permit for the Proposed Line 3 Replacement Project in Minnesota from the North Dakota Border to the Wisconsin Border*, Case No. A20-1071 (Minn. Ct. App. filed Aug. 18, 2020).

an "aggressive" pace.  Triplett Suppl. Decl. ¶¶ 3, 5, 13.  There is no dispute that the Project will involve extensive tree removal.  404 EA at 36, 56.  As a result, Plaintiffs' members are experiencing—and, absent a preliminary injunction, will continue to experience—irreparable harm.  Plaintiffs' members have witnessed Enbridge cutting down trees and experience such tree removal as "damaging."  Strong Decl. ¶¶ 10–12.

Enbridge's removal of trees from wetlands and stream banks degrades natural resources upon which Plaintiffs' members rely for survival, as well as aesthetic, cultural, spiritual, and environmental fulfillment.  All wetlands, including forested wetlands, are sacred to the Tribes. *Id.* ¶ 12.  "Many of [the Red Lake Band's] ceremonial practices also incorporate trees" from the Project area.  *Id.* ¶ 4.  Enbridge has cleared trees "in the vicinity of the Red Lake River, the Clearwater River, and the Thief River," interfering with Red Lake Band members' hunting, gathering, and trapping, as well as other cultural and ceremonial activities.  *Id.* ¶ 12.

The clearing of large trees also permanently disrupts ecosystems, resulting in "loss and fragmentation of wildlife habitat" and soil destabilization.  Triplett Suppl. Decl. ¶ 6.  The loss of tree habitat and consequent likely displacement of forest-dwelling moose will cause further imminent, irreparable harm to the Tribes.  "Anything that causes additional harm to the moose population or prevents the population from recovering, including construction and operation of the Project, would put further strain" on Red Lake Band members.  Strong Decl. ¶ 11.  Other members of Plaintiff groups will also be irreparably injured by the loss of the forested habitat of wetland species like waterfowl, which are hunted by Tribal members.  LaDuke Decl. ¶ 15; Triplett Suppl. Decl. ¶ 3.

Neither the Corps nor Enbridge contest the *evidence* that tree removal injures Plaintiffs' members.  Instead, the Corps illogically and incorrectly suggests that trees are "outside the

Corps' regulatory authority."[11]  Corps. Mem. at 35.  Even if the Corps were correctly

interpreting its authority—which it is not—the scope of the Corps' authority is irrelevant to the

existence of irreparable harm.  Irreparable harm "must be caused by the conduct in dispute and

remedied by the relief sought."  *Sierra Club v. U.S. Dep't of Energy*, 825 F. Supp. 2d 142, 153

(D.D.C. 2011).  That is the case here. The clearing of trees from wetlands and stream banks

would not occur "but for" Enbridge's Corps-permitted activities and would stop if the Court

granted Plaintiffs' motion.  *See id.*  It is also well established that the construction-related

clearing of trees constitutes irreparable harm, including where the tree removal was not the focus

of the permitting at issue.  *See, e.g., League of Wilderness Defs./Blue Mountains Biodiversity

Project v. Connaughton*, 752 F.3d 755, 764 (9th Cir. 2014) (finding irreparable harm from

logging mature trees and holding that "[n]either the planting of new seedlings nor the paying of

money damages can normally remedy" such harm); *Comm. of 100 on Fed. City v. Foxx*, 87 F.

Supp. 3d 191, 204–05 (D.D.C. 2015) (finding the planned removal of approximately 200 trees

supported an irreparable harm determination, despite the possibility of compensation);

*Lichterman v. Pickwick Pines Marina, Inc.,* 2007 WL 4287586, at *6 (N.D. Miss. Dec. 6, 2007),

*aff'd,* 308 Fed. Appx. 828 (5th Cir. 2009); *Saunders v. Wash. Metro Area Transit Auth.*, 359 F.

Supp. 457, 462 (D.D.C. 1973) (enjoining subway construction where "[p]laintiffs would suffer

irreparable injury in the removal of trees from their neighborhood").  On this basis alone,

---

[11] Contrary to the Corps' suggestion, trees are squarely within the Corps' authority under NEPA
and the Clean Water Act.  The sole case on which the Corps relies to suggest otherwise,
*Atchafalaya Basinkeeper v. U.S. Army Corps of Engineers*, 894 F.3d 692 (5th Cir. 2018),
contradicts the Corps' position.  The *Atchafalaya Basinkeeper* court's narrow finding that the
Corps' chief concern under the Clean Water Act should be with the impact of trees on "aquatic
functions and services" in no way precludes the Corps from protecting trees in and near wetlands
and other waterbodies.  *Id.* at 701.  Indeed, the court in that case found that the Corps is
authorized under the permit to require "replanting of desirable native tree species . . . ."  *Id.* at
703–04.

Plaintiffs have demonstrated that they will suffer irreparable harm in the absence of a halt to construction.

Similarly, the Corps' insistence that the Court should ignore harm to cultural and spiritual resources is without basis.  Corps. Mem. at 36.  The Project route traverses an area that is rich in historical and cultural significance to the Tribes.  Aubid Decl. ¶ 12; Arsenault Decl. ¶¶ 7–14; Strong Decl. ¶ 12.  And damage to cultural sites constitutes irreparable harm.  *Quechan Tribe of Fort Yuma Indian Rsrv. v. U.S. Dep't of Interior*, 755 F. Supp. 2d 1104, 1120 (S.D. Cal. 2010); *see also Comanche Nation v. United States*, 2008 WL 4426621, at *19 (W.D. Okla. Sept. 23, 2008).  Although the Corps and Enbridge point to aspirational plans for protecting cultural resources, they cannot refute Plaintiffs' evidence that those plans have, thus far, failed to prevent harm.  *See* Arsenault Decl. ¶¶ 7–14.  Plaintiffs' evidence that damage to their cultural resources would not have occurred or continue to occur "but for" Enbridge's Corps-permitted construction activities remains undisputed.  *See Sierra Club*, 825 F. Supp. 2d at 153; *see also* Arsenault Decl. ¶¶ 10–11 (explaining that Project workers placed a "stake right in the center" of a spiritual lodge to facilitate construction); Strong Decl. ¶ 12 ("The workers are destroying cultural natural resource areas that are integral to our people's survival and to our way of life, and—unless something happens to halt construction, they likely will continue.").

The Corps and Enbridge also fail to minimize and dismiss irreparable harm to Plaintiffs' interests in pristine waters and wetlands.  All parties agree that the Project will permanently destroy some acreage of wetlands.  404 EA at 28; Enbridge Mem. at 11.  But the Corps' and Enbridge's briefs ignore the undisputed fact that further long-term damage will occur to wetlands, as construction of the Project will result in the permanent conversion of scrub-shrub and forested wetland to emergent wetland.  *But see* 404 EA at 36 (acknowledging that

conversion of wetlands involves "the permanent loss of trees and shrubs, habitat fragmentation, and changes in vegetation cover in large tracts of forests habitats").  And there is no dispute that the Project will result in loss of wetland acreage and conversion of wetland types within the Red Lake Watershed, *id.* at 65–66, or that Red Lake Band and White Earth Band members regularly use that watershed "for gathering, hunting, trapping, fishing, and harvesting wild rice, along with other cultural and ceremonial purposes," Strong Decl. ¶ 7.  On the basis of this evidence, it is plain that Enbridge's Corps-permitted activities are causing permanent harm to Plaintiffs' members, supporting the grant of preliminary injunction.  *See also* Aubid Decl. ¶ 7 (stating that Enbridge will "forever" damage waters of longstanding and "vital importance" to the White Earth Band).[12]

Lastly, contrary to the Corps' disingenuous argument, the timing of Plaintiffs' challenge to the Corps' decision and when Plaintiffs were able to effectuate service is irrelevant to whether a preliminary injunction should be granted.  *See* Corps Mem. at 34–35.  As Plaintiffs have explained, the Corps frustrated their ability to challenge the Corps' decision more promptly, despite Plaintiffs' diligence.  Upon issuing the permit, the Corps failed to make public its underlying decision documents, including the 404 and 408 EAs, and it did not affirmatively

---

[12] Although the state administrative law judge's ("ALJ") findings do not contradict that there will be permanent conversion of wetlands, contrary to Enbridge's claim, none of the ALJ's findings have preclusive effect here.  Identical issues of law and fact were not squarely before the ALJ. *See Univ. of Tenn. v. Elliott*, 478 U.S. 788, 799 (1986).  Indeed, the ALJ was deciding definitional questions under Minnesota state law, not federal law, and expressly declined to address several issues raised by the Red Lake and White Earth Tribes that relate to claims raised here.  *See* Findings of Fact, Conclusions of Law, and Recommendation at 15, *In the Matter of Draft 401 Certification for the Line 3 Replacement Project*, OAH 60-2200-36909 (Minn. Off. of Admin. Hr'gs Oct. 16, 2020).  This, therefore, is not an instance where the parties are "relitigating factual issues decided adversely to them" in state proceedings.  *See Gjellum v. City of Birmingham, Ala.*, 829 F.2d 1056, 1062 (11th Cir. 1987) (distinguishing *Elliot* on those grounds).

inform the public that a Freedom of Information Act ("FOIA") request would be necessary to obtain those documents.  *See* Hayes Decl. ¶¶ 3–6.  Despite repeated calls and emails to the Corps, Plaintiffs did not learn that a FOIA request would be necessary until December 1, 2020, a full eight days after the permit was issued.  *Id.* ¶¶ 5–6.  Plaintiffs submitted a FOIA request that same day, and the Corps released two of the decision documents to Plaintiffs on December 8, 2020.  *Id.* ¶ 7–8.  Although Plaintiffs knew the Corps might produce additional documents at some point, they forged ahead with their lawsuit and filed as expeditiously as possible in the midst of a global pandemic that has hit the Tribal members of the Plaintiff group particularly hard.  *See* Aubid Decl. ¶ 11.  Neither the roughly two-week timeline Plaintiffs took to put together their complaint and preliminary injunction papers, nor the handful of days it took to effectuate service during a holiday period and postal service crisis, provide any basis for denying Plaintiffs' motion for preliminary injunction.  *See Gordon v. Holder*, 632 F.3d 722, 724–25 (D.C. Cir. 2011) (declining to evaluate whether a delay of three months would bear on the question of irreparable harm); *cf. Mylan Pharm., Inc. v. Shalala*, 81 F. Supp. 2d 30, 43–44 (D.D.C. 2000) (finding that a delay of *eight months* undermined plaintiff's request for a preliminary injunction).

### III.     THE BALANCE OF HARMS FAVORS AN INJUNCTION.

"If [environmental] injury is sufficiently likely . . . the balance of harms will usually favor the issuance of an injunction to protect the environment."  *Amoco Prod. Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 545 (1987).  As discussed above, Plaintiffs are suffering irreparable harm as a result of damage to and destruction of the environment and their cultural resources, and they will continue to suffer if an injunction is not granted.  Neither the Corps nor Enbridge dispute that the grant of an injunction would not harm the Corps.  *See generally* Corps Mem. at 37; Enbridge Mem. at 35–36.  In contrast to the grave and irreparable harms faced by

Plaintiffs, the harm to Enbridge from a preliminary injunction is insufficient to warrant denying Plaintiffs' motion.  The financial costs that Enbridge might bear from the limited delay needed to ensure that the Project approval complied with federal law do not outweigh the irreparable damages that Plaintiffs are suffering from construction.[13]

First, it is well established that financial harm to Enbridge—even if significant—does not outweigh irreparable environmental and spiritual injury to Plaintiffs.  *See, e.g.*, *Quechan Tribe*, 755 F. Supp. 2d at 1121 (finding that the balance of equities "tips heavily" in Tribe's favor despite private party's substantial investment); *Comanche Nation v. United States*, 2008 WL 4426621, at *19 (explaining that monetary harm to project developer would "pale in comparison to the prospect of irreparable harm to sacred lands and centuries-old religious traditions which would occur absent injunctive relief"); *Ohio Valley Env't Coal. v. U.S. Army Corps of Eng'rs*, 528 F. Supp. 2d 625, 632 (S.D. W. Va. 2007) ("[T]emporary economic harm can be outweighed by the permanent harm to the environment that comes from the filling of streams and valleys . . . .  Money can be earned, lost, and earned again: a valley once filled is gone.").  Any economic harm to Enbridge is also entirely self-inflicted, and hence cannot tip the balance of equities.  *A Squared Joint Venture v. United State*s, 133 Fed. Cl. 291, 300 (2017); *see Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 977 (D.C. Cir. 1985) (finding that costs created by hiring personnel despite the risk of the project's delay were self-imposed).  Enbridge started construction with two lawsuits and one motion for a stay already pending at the state level and

---

[13] Enbridge's assertion that Plaintiffs must post a substantial bond is incorrect.  *See* Enbridge Br. at 42.  "The federal courts have broadly recognized that a nominal bond is sufficient and appropriate where public interest groups seek enforcement of environmental laws."  *Citizen's Alert Regarding Env't v. U.S. Dep't of Justice*, No. 95-1702, 1995 WL 748246, at *12 n.10 (D.D.C. Dec. 8, 1995) (setting a "nominal fee of $100.00").  Here, Plaintiffs, including Plaintiff Sierra Club, are public interest groups and Tribes and, thus, a substantial bond is inappropriate.

with the knowledge that additional lawsuits were possible.  The need to ensure compliance with

NEPA before construction continues far outweighs the economic harms Enbridge alleges here.

*See, e.g.*, *Park Cnty. Res. Council v. U.S. Dep't of Agric.*, 817 F.2d 609, 618 (10th Cir. 1987),

*overruled on other grounds, Village of Los Ranchos de Albuquerque v. Marsh*, 956 F.2d 970,

973 (10th Cir.1992).  Moreover, Congress enacted NEPA with the understanding that it would

"invariably result[] in delay and concomitant cost increases," and "the jobs created by a

construction project might be interrupted and . . . the initial employment of some persons might

be postponed."  *Steubing v. Brinegar*, 511 F.2d 489, 497, 497 n.15 (2d Cir. 1975).

## IV.     A PRELIMINARY INJUNCTION IS IN THE PUBLIC INTEREST.

The public has a "substantial" interest "in having governmental agencies abide by the

federal laws that govern their existence and operations."  *League of Women Voters of the U.S. v.*

*Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th

Cir. 1994)).  Inherent in the public's interest in compliance with NEPA, in particular, is an

interest "in ensuring that the [action at issue] . . . does not give way to unintended environmental

consequences that have not (but should have) been evaluated by [the defendant]."  *Brady*, 612 F.

Supp. 2d at 26.  As discussed above, the Corps has violated both NEPA and the Clean Water

Act.  Because of these violations, the Project is moving forward without adequate assurance that

it will not cause unintended environmental consequences.  A preliminary injunction will provide

this assurance and, thus, is in the public interest.

The public also has an interest in "maintaining environmental quality in the places they

choose to live," "ensuring the safety and health of all its members," "ensuring the integrity of the

biological and ecological systems," and "seeing beautiful landscapes preserved for posterity."

*Ohio Valley Env't Coal.*, 528 F. Supp. 2d at 633–34.  As Plaintiffs have made clear, the Project

will result in permanent loss and conversion of wetlands and dredging and filling of waters that

have longstanding cultural and economic significance to members of the Red Lake and White Earth Bands.  And the Project has already caused tree clearing and trenching in sensitive wetland areas and disturbed irreplaceable cultural sites.  *See supra* pp. 16–20.  A preliminary injunction will serve the public interest by ensuring that these harms do not continue.

In light of these permanent environmental harms, Defendants' claims that a preliminary injunction is not in the public interest are unpersuasive.  First, a temporary delay of employment, tax revenue, or other economic benefits does not render a preliminary injunction contrary to the public interest.  Rather, where, as here, "[t]he 'environmental dangers at stake . . . are serious,' . . . the public interests that might be injured by a preliminary injunction, such as temporary loss of jobs or delays in increasing energy output in the region, 'do not outweigh the public interests that will be served.'"  *Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 997–98 (8th Cir. 2011) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1138 (9th Cir. 2011)).  In addition, the public has an "interest in maintaining the balance Congress sought to establish between economic gain and environmental protection" when it enacted NEPA.  *Ohio Valley Env't Coal.*, 528 F. Supp. 2d at 633.  A preliminary injunction will restore that balance here.

Second, Defendants' conclusion that a preliminary injunction is not in the public interest because continuing to use the existing Line 3 risks more environmental harm than allowing the Project to go forward is fundamentally flawed and without support.  Defendants' attempts to raise concerns about public safety over the lifetime of the Project confuse the question currently before the court of whether a brief delay to construction is in the public interest.  The safety issues associated with operating the existing Line 3 over the long term are not relevant to the question of whether a *preliminary* injunction should be granted.  The purpose of a preliminary injunction is "to preserve the relative positions of the parties until a trial on the merits can be

held," *Rufer v. Fed. Election Comm'n*, 64 F. Supp. 3d 195, 205 (D.D.C. 2014) (quoting *Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395 (1981)), and "not to conclusively determine the rights of the parties," *Nat'l Ass'n for Advancement of People of Color v. U.S. Postal Serv.,* No. 20-CV-2295, 2020 WL 5995032, at *13 (D.D.C. Oct. 10, 2020) (quoting 451 U.S. at 395).

Defendants' attempts to raise the specter of potential oil spills from the existing Line 3 over the life of the Project also fail, because, as a result of the Corps' refusal to properly consider oil spills for the new Line 3, an apples-to-apples comparison of the risk of oil spills is impossible. *See Winter,* 555 U.S. at 23 ("Part of the harm NEPA attempts to prevent in requiring an EIS is that, without one, there may be little if any information about prospective environmental harms and potential mitigating measures."). The Corps and Enbridge cannot have it both ways by invoking the oil spill risk of not proceeding with the Project while refusing to consider the oil spill risks of the Project itself.

Enbridge fails to substantiate its claim that the public interest would not be served by a temporary halt in construction during the pendency of this case because of the harms arising from ongoing use of existing Line 3. Indeed, assuming that the permit were stayed for six months, Enbridge indicates that any "defects" in the existing Line 3 could be addressed by twenty integrity digs. Enbridge Mem. at 37. The impact of this modest activity pales in comparison to the ongoing irreparable environmental and spiritual injuries that Plaintiffs are suffering. To the extent that existing Line 3 poses a safety risk during the limited period of a preliminary injunction, federal regulators can issue a corrective action order. *See* 49 U.S.C. § 60112(d). And Enbridge could eliminate the risk entirely by stopping use of existing Line 3.[14]

---

[14] Enbridge's claims of market demand are wholly unsupported. *See Save Strawberry Canyon v. Dep't of Energy*, 613 F. Supp. 2d 1177, 1190 (N.D. Cal. 2009) (rejecting the defendants' "entirely conclusory and unexplained" assertions).

Thus, Defendants fall far short of the showing Enbridge needs to make to support its allegations of harm stemming from issuance of a preliminary injunction.  *See Cuomo*, 772 F.2d at 977 ("As with irreparable harm to the movant, we test harms [alleged by parties opposing a motion for a stay] for substantiality, likelihood of occurrence and adequacy of proof.").

Lastly, contrary to Enbridge's assertion, the Minnesota PUC's determination that a stay pending appeal of its May 1, 2020 order was not in the public interest is not entitled to preclusive effect.  Issue preclusion applies "only when the facts pertinent to a previously-litigated issue are *identical* in the subsequent suit."  *Safadi v. Novak*, 574 F. Supp. 2d 52, 56 (D.D.C. 2008) (emphasis added).  Here, the facts pertinent to this Court's assessment of the public interest are not identical to those before the PUC when it made its determination.  Far from it.  The PUC concluded that a stay pending appeal was not in the public interest after hearing argument on December 4, 2020.  At that time, construction on the Project had barely started, and the harms the Plaintiffs are suffering had not truly begun.  For example, an Enbridge construction crew had not yet discovered a ceremonial lodge, failed to notify tribal representatives of the discovery, or "placed a stake right in the center of the lodge."  Arsenault Decl. ¶ 10.  And "broad swaths of forest" had not yet been "clearcut."  Triplett Decl. ¶ 11.  These events reshape the analysis and make clear that a preliminary injunction to protect cultural, spiritual, and environmental resources is in the public interest.  Similarly, the Corps' contention that Plaintiffs must "overcome" its determination in its EA that the Project is in the public interest is also mistaken.  Corps Mem. at 38.  The question here is whether a preliminary injunction, not the Project, is in the public interest.  For all the reasons above, it is.

DATED: January 20, 2021

_s/ Moneen Nasmith___
Moneen Nasmith
*[Admitted Pro Hac Vice]*
Alexis Andiman
*[Admitted Pro Hac Vice]*
Mekela Panditharatne
*[Admitted Pro Hac Vice]*
Earthjustice
48 Wall Street, 15th Floor
New York, NY 10005
(212) 845-7376
mnasmith@earthjustice.org
aandiman@earthjustice.org
mpanditharatne@earthjustice.org

_s/ Seth Johnson___
Seth L. Johnson, D.C. Bar No. 1001654
Earthjustice
1001 G St. NW, Ste. 1000
Washington, D.C. 20001
(202) 667-4500
sjohnson@earthjustice.org

*Attorneys for Plaintiffs*

26