**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

RED LAKE BAND OF CHIPPEWA
INDIANS, *et al.*,

       Plaintiffs,

  v.

UNITED STATES ARMY CORPS OF
ENGINEERS,

      Defendant,

ENBRIDGE ENERGY, LIMITED
PARTNERSHIP,

      Defendant-Intervenor.

Civil Action No. 20-3817 (CKK)

---

**MEMORANDUM OPINION**
(February 7, 2021)

Plaintiffs Red Lake Band of Chippewa Indians, White Earth Band of Ojibwe, Honor the

Earth, and the Sierra Club ("Plaintiffs") bring this action against Defendant United States Army

Corps of Engineers (the "Corps"), alleging violations of the National Environmental Policy Act

("NEPA"), the Clean Water Act ("CWA"), the Rivers and Harbors Act ("RHA"), and the Corps'

permitting regulations. *See* Compl. ¶¶ 183–217, ECF No. 1. Specifically, Plaintiffs challenge the

Corps' issuance of a permit to Intervenor-Defendant Enbridge Energy, Limited Partnership

("Enbridge"), authorizing Enbridge to discharge dredged and fill material into waters of the

United States under Section 404 of the CWA and to cross waters protected by the RHA in its

construction of a replacement for the Line 3 oil pipeline, which transports oil from Canada to

Wisconsin, traversing North Dakota and Minnesota. *See id.* ¶¶ 3, 4, 7.

Presently before the Court is Plaintiffs' [2] Motion for a Preliminary Injunction.

Plaintiffs argue that the Corps' environmental assessment underlying its decision to authorize the

1

construction of Line 3 falls short of the requirements of NEPA and the CWA. Specifically,

Plaintiffs challenge the adequacy of the Corps' discussion of the effects of potential oil spills,

alternative construction routes, and alternative construction methods. Upon consideration of the

pleadings,[1] the relevant legal authorities, and the record before the Court,[2] the Court shall DENY

Plaintiffs' [2] Motion for a Preliminary Injunction because Plaintiffs fail to demonstrate a

likelihood of success on the merits and that they will suffer irreparable harm.

## I.   BACKGROUND

### A.  Statutory and Regulatory Background

#### 1.  National Environmental Policy Act

NEPA requires the federal government to "identify and assess in advance the likely

environmental impact of its proposed actions, including its authorization or permitting of private

actions." *Sierra Club v. U.S. Army Corps of Engineers*, 803 F.3d 31, 36 (D.C. Cir. 2015) (citing

---

[1] The Court's consideration has focused on the following documents:
- Plaintiffs' Motion for a Preliminary Injunction ("Pls.' Mot."), ECF No. 2;
- Intervenor-Defendant Enbridge's Opposition to Plaintiffs' Motion for a Preliminary Injunction ("Enbridge's Opp'n"), ECF No. 28;
- Defendant U.S. Army Corps of Engineers' Opp'n to Plaintiffs' Motion for a Preliminary Injunction ("Corps' Opp'n"), ECF No. 29;
- Plaintiffs' Reply in Support of Motion for a Preliminary Injunction ("Pls.' Reply"), ECF No. 33;
- Plaintiffs' Notice of Supplemental Authority ("Pls.' Suppl. Auth."), ECF No. 36;
- Defendant U.S. Army Corps of Engineers' Response to Plaintiffs' Notice of Supplemental Authority ("Corps' Resp. to Pls.' Suppl. Auth."), ECF No. 35;
- Defendant-Intervenor Enbridge's Notice of Supplemental Authority ("Enbridge's Suppl. Auth."), ECF No. 37; and
- Defendant-Intervenor Enbridge's Response to Plaintiffs' Notice of Supplemental Authority ("Enbridge's Resp. to Pls.' Suppl. Auth."), ECF No. 38.

[2] The record considered by the Court consists of the portions of the administrative record stipulated by the parties. *See* Stipulation on Agreed Joint List of Pertinent Portions of the Administrative Record, ECF No. 32. All citations to the administrative record shall use the designation "Joint Exhibit," referring to the parties' joint submissions at ECF No. 32.

*Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756–57 (2004)). NEPA "serves the twin purposes of ensuring that (1) agency decisions include informed and careful consideration of environmental impact, and (2) agencies inform the public of that impact and enable interested persons to participate in deciding what projects agencies should approve and under what terms." *Id.* at 36–37 (citing *Pub. Citizen*, 541 U.S. at 768). NEPA accomplishes these purposes by requiring agencies to take a "'hard look' at their proposed actions' environmental consequences in advance of deciding whether and how to proceed." *Id.* at 37 (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350–51 (1989). NEPA "does not mandate particular results," but prohibits "uninformed—rather than unwise—agency action." *Robertson*, 490 U.S. at 350–51. "Agency actions with adverse environmental effects can thus be NEPA compliant where the agency has considered those effects and determined that competing policy values outweigh those costs." *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 255 F. Supp. 3d 101, 113 (D.D.C. 2017) (internal citation marks and quotation marks omitted).

NEPA's "major action-forcing provision . . . is the requirement that all agencies of the Federal government prepare a detailed environmental analysis"—an Environmental Impact Statement ("EIS")—for "major Federal actions *significantly* affecting the quality of the human environment." *Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 146 (D.C. Cir. 1985) (quoting 42 U.S.C. § 4332(C) (internal quotation marks omitted)). An EIS must assess the action's anticipated "direct and indirect environmental effects," and consider "alternatives that might lessen any adverse environmental impact." *Sierra Club*, 803 F.3d at 37 (citing 42 U.S.C. § 4332(C); 40 C.F.R. § 1508.11)). "If *any* significant environmental impacts *might* result from the proposed agency action, then an EIS must be prepared *before* the agency action is taken." *Grand*

*Canyon Trust v. FAA*, 290 F. 3d 339, 340 (D.C. Cir. 2002) (quoting *Sierra Club v. Peterson*, 717 F.2d 1409, 1415 (D.C. Cir. 1983)).

If it is unclear whether an action will "*significantly* affect[ ] the quality of the human environment," the federal agency "may first prepare an Environmental Assessment ("EA")." *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 503 (D.C. Cir. 2010) (emphasis added) (internal citations and quotation marks omitted). An EA is "essentially, a preliminary consideration of potential environmental effects in a concise public document, designed to provide sufficient evidence and analysis for determining whether an EIS is needed." *Sierra Club*, 803 F.3d at 37 (internal citations and quotation marks omitted). The EA must discuss the "purpose and need for the proposed action, alternatives . . . and the environmental impacts of the proposed action and alternatives." 40 C.F.R. § 1501.5(c)(2).

To determine whether a federal action will "significantly" affect the quality of the environment (requiring an EIS), the agency must consider both direct and indirect effects of its decision.  40 C.F.R. §§ 1501.3; 1508.1(g). Indirect effects include those "caused by the actions and are later in time or farther removed in distance, but are still reasonably foreseeable."  *Id.* § 1508.1(g). An effect is "reasonably foreseeable" if a "person of ordinary prudence would take it into account in reaching a decision." *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, --- F.3d ---, 2021 WL 244862, at *10 (D.C. Cir. Jan. 26, 2021) (quoting *City of Shoreacres v. Waterworth*, 420 F.3d 440, 453 (5th Cir. 2005)). Effects "do not include those effects that the agency has no ability to prevent due to its limited statutory authority or would occur regardless of the proposed action." 40 C.F.R. § 1508.1(g)(2).

If the agency determines based on its EA that an EIS is *not* required, the agency must issue a "finding of no significant impact ("FONSI"), which "briefly presents the reasons why the

proposed agency action will not have a significant impact on the human environment." *Pub. Citizen*, 541 U.S. at 757–58 (internal citations omitted). "Each form of NEPA analysis— EA/FONSI or EIS—requires public notice and comment, . . . and each is subject to judicial review." *Sierra Club*, 803 F.3d at 37–38 (citing *Pub. Citizen*, 541 U.S. at 763–64; *Grand Canyon Trust*, 290 F.3d at 340–42).

### 2. Clean Water Act

The CWA seeks to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" and to "increase the quality and quantity of the Nation's wetlands." 33 U.S.C. §§ 1251(a), 2317(a). The CWA, therefore, prohibits the discharge of dredged or fill materials into navigable waters of the United States absent authorization by the Corps pursuant to Section 404, 33 U.S.C. § 1344. Section 404 of the CWA assigns the Corps jurisdiction to issue permits authorizing the discharge of fill material into "navigable waters." 33 U.S.C. §§ 1342(a)(1), (4), 1344(a); *see Sierra Club*, 803 F.3d at 38. The Corps' permitting authority also extends to "wetlands adjacent to navigable waters." *Nat'l Ass'n of Mfrs. v. Dep't of Defense*, 138 S. Ct. 617, 625 (2018) (citing *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 132 (1985)); *see also* 33 C.F.R. § 328.3(a)(4) ("For the purposes of the Clean Water Act . . . the term 'waters of the United States' means . . . adjacent wetlands.").

Before the Corps issues a Section 404 permit, it must determine that there is "no practicable alternative" to the proposed activity "which would have less adverse impact on the aquatic ecosystem." 40 C.F.R. § 230.10(a). A practicable alternative is one which is "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." *Id.* § 230.10(a)(2). If there is any practicable alternative that would have a lesser impact on the aquatic ecosystem, the Corps must deny the application permit. *Id.* § 230.10(a). The Corps must also evaluate the "probable impacts" of the proposed

activity and will grant the permit "unless the district engineer determines that [the activity] would be contrary to the public interest." 33 C.F.R. § 320.4(a)(1).

### 3. Rivers and Harbors Act

Section 10 of the Rivers and Harbors Act prohibits structures and activities that would obstruct navigable waters unless "the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army[.]" 33 U.S.C. § 403. Section 14 of the RHA— commonly referred to as "Section 408"—provides that actions impairing "work[s] built by the United States" require authorization by the Corps. 33 U.S.C. § 408; 33 C.F.R. § 320.2(e).

### B. Factual Background

Intervenor-Defendant Enbridge operates "Line 3" a 34-inch diameter pipeline, running 1,097 miles from Edmonton, Alberta to Superior, Wisconsin and traversing portions of North Dakota and Minnesota ("Existing Line 3"). Compl. ¶ 2; Joint Ex. 2, Dep't of the Army Environmental Assessment and Statement of Findings ("EA-SOF") at 4; Joint Ex. 32, Decl. of Barry Simonson ("Simonson Decl.") ¶ 4. Enbridge and the Corps indicate that Existing  Line 3, which was originally constructed in the 1960s, now suffers from corrosion and integrity issues, including a "large number of identified pipe defects and anomalies." Joint Ex. 2, EA-SOF at 16; Joint Ex. 32, Simonson Decl. ¶¶ 7, 8, 16. Enbridge represents that "operational and integrity-based safety concerns" including "corrosion and stress corrosion cracking on the pipeline" have required Enbridge to reduce the capacity of Existing Line 3 from its historical average of 760,000 barrels/day to 390,000 barrels/day. Joint Ex. 32, Simonson Decl. ¶ 7; *see* Joint Ex. 2, EA-SOF at 8. Enbridge explains that maintaining Existing Line 3 requires "integrity digs," which are intrusive to local homeowners and the environment. Joint Ex. 32, Simonson Decl. ¶¶ 7, 70, 71; *see* Joint Ex. 2, EA-SOF at 16. Enbridge estimates that it would need to undertake approximately 6,250 integrity digs over the next 15 years to maintain Existing Line 3, which

would be "nearly equal" to the cost of replacing the pipeline, and would result in "year-over-year impacts" to landowners and the environment. Joint Ex. 32, Simonson Decl. ¶ 7; *see* Joint Ex. 2, EA-SOF at 16.

In 2017, Enbridge entered a Consent Decree with the U.S. government, obligating Enbridge to "seek all approvals necessary for the replacement of [Existing] Line 3" and upon receipt of those approvals, to "complete the replacement of [Existing Line 3] and take [Existing] Line 3 out of service . . . as expeditiously as practicable." *See* Consent Decree, ECF No. 14, *United States v. Enbridge Energy Ltd. P'ship*, No. 16-cv-914 (W.D. Mich. May 23, 2017) ("Consent Decree").[3] To comply with its obligation to decommission Existing Line 3, Enbridge plans to construct a new pipeline. In so doing, Enbridge will replace the existing 34-inch-diameter Line 3 pipeline with a 36-inch-diameter pipeline using "modern pipeline design, manufacturing, materials, coating, and installation techniques." Joint Ex. 2, EA-SOF at 21; Joint Ex. 32, Simonson Decl. ¶¶ 11, 13. A wider and stronger pipe, according to Enbridge, will allow oil to move more safely and efficiently. Joint Ex. 32, Simonson Decl. ¶¶ 11, 13.

Whereas Existing Line 3 currently transports light crude oil, the Corps notes that Replacement Line 3 will allow Enbridge to carry "heavy, light, and mixed service." Joint Ex. 2, EA-SOF at 21. Enbridge represents that Replacement Line 3 is "generally expected" to "transport the same products as the existing Line 3 throughout its operating history." Joint Ex. 32, Simonson Decl. ¶ 10. Plaintiffs suggest that the new pipeline's service will include "heavy high-sulfur diluted bitumen" or "dilbit." Pls.' Mot. at 8. Plaintiffs contend that dilbit's "capacity . . . to precipitate out in water and its resistance to biodegradation, in the event of a

---

[3] The Consent Decree arises from a Complaint against Enbridge in 2010 "as the result of unlawful discharges of oil from two Lakehead System pipelines." *See* Consent Decree at 1.

release to a waterbody" create "more difficult cleanup scenarios" than for other types of crude oil. Pls.' Mot. at 8; Joint Ex. 7, Pls.' Comments on Application No. 2014-01071-HJ at 16–17 (citing KeystoneXL FSEIS § 3.13-10 (2014)). Unlike "conventional crude oil," Plaintiffs argue, dilbit can "become suspended in the water column or mix into sediment in the riverbed or shoreline and thus be incredibly difficult to clean up." Joint Ex. 7, Pls.' Comments on Application No. 2014-01071-HJ at 17 (quoting KeystoneXL FSEIS § 4.13-88). The parties do not dispute that Replacement Line 3 would also transport a greater capacity of oil than does Existing Line 3 currently. Pls.' Mot. at 8 (citing Joint Ex. 2, EA-SOF at 16–17, 21); Joint Ex. 32, Simonson Decl. ¶¶ 7, 10. Enbridge notes that this increased capacity would simply restore earlier historical averages of Existing Line 3. *See* Joint Ex. 32, Simonson Decl. ¶ 10.

Enbridge has already completed segments of the new Line 3 pipeline in Wisconsin and North Dakota. Joint Ex. 32, Simonson Decl. ¶ 14. At issue in this lawsuit is the final phase of replacing Existing Line 3: the replacement of approximately 282 miles of existing pipeline in Minnesota with 340 miles of new pipeline and associated facilities (the "Project"). Approximately 90% of the Project route is "co-located with other Enbridge pipelines, third-party pipelines, roads, railroads, or highways." Joint Ex. 2, EA-SOF at 8. But the remainder of the route would be constructed in a new corridor, illustrated in green in Figure 1 below. *See id*. Unlike the existing route, the new corridor will avoid the Chippewa National Forest and the Leech Lake and Fond du Lac Bands of Chippewa Indians' Reservations. *Id.* at 22, 24.

**Figure 1: Line 3 Replacement Project Route[4]**



The Project has undergone extensive state and federal administrative proceedings. *See,*
*e.g.* Joint Ex. 2, EA-SOF at 9–12 (providing timeline of "Project History); Joint Ex. 14, Order
Granting Certificate of Need as Modified and Requiring Filings (Sept. 5, 2018) at 1–5
(summarizing procedural history of state administrative proceedings). The proposed route of the
Project was selected after several years of state-level administrative proceedings. The Minnesota
Public Utilities Commission ("MPUC") is responsible under state law for certifying the need for
oil pipelines and selecting the route. *See* Minn. Stat. §§ 216B.243, 216G.02. Enbridge submitted
applications for a Certificate of Need and Route Permit in 2015. *See* Joint Ex. 14, Order Granting
Certificate of Need at 1. The MPUC conducted public information meetings along Enbridge's
proposed routes and solicited public comments. *Id.* at 1–2. In February 2016, the MPUC granted

---

[4] Enbridge, *Line 3 Replacement Project*, https://www.enbridge.com/projects-and-infrastructure/public-awareness/minnesota-projects/line-3-replacement-project (last accessed
Feb. 7, 2021).

contested case proceedings, which were held in the fall of 2017 and included sixteen public hearings in eight cities and two weeks of evidentiary hearings. *Id.* at 3. Plaintiffs in this action participated in the contested case proceedings. *Id.* at 4. In April 2018, the state ALJ issued a report recommending a route and associated proposed conditions. *Id.*

While the MPUC oversaw route proposals, the Minnesota Department of Commerce, Energy Environmental Review and Analysis ("DOC-EERA") developed an Environmental Impact Statement ("State EIS") pursuant to Minnesota's Environmental Policy Act, Minn. Stat § 116D.01-.11, which mandates preparation of an EIS for Certificate of Need and Route Permit proceedings, *see In re Enbridge Energy, Ltd. P'ship*, 930 N.W.2d 12, 20 (Minn. Ct. App. 2019). DOC-EERA issued its first draft of the State EIS on May 15, 2017 for public comment. Joint Ex. 15, Order Finding EIS Adequate at 2. The agency held 22 public information meetings and "considered thirty possible route combinations." Simonson Decl. ¶ 25; *see* Joint Ex. 14, Order Granting Certificate of Need at 2. The State EIS includes sections examining alternatives to the proposed project, *see* Joint Ex. 11, State EIS Chapter 4 ("Alternatives to the Proposed Project"), and analyzing issues related to the accidental release of crude oil, *see* Joint Ex. 17, State EIS Chapter 10 ("Accidental Crude Oil Releases").

DOC-EERA finalized its EIS on February 12, 2018—which was "found adequate" by the MPUC on May 1, 2018. *See* Joint Ex. 15, Order Finding EIS Adequate. MPUC held oral argument regarding the Project Route, and then issued its approved route in October 2018. *See* Joint Ex. 18, Transcript of MPUC Deliberations; Joint Ex. 2, EA-SOF at 10. According to Enbridge, the route approved by the MPUC "captured numerous modifications to Enbridge's originally proposed route to minimize potential effects of the project on cultural and environmental resources." Joint Ex. 32, Simonson Decl. ¶ 26.

Plaintiffs challenged the State EIS and route determination in the Minnesota Court of Appeals, contesting the adequacy of the State EIS under state law. *See In re Enbridge Energy, Limited Partnership*, 930 N.W.2d 12 (Minn. Ct. App. 2019). The court concluded that the MPUC correctly found that the State EIS was adequate—except that the oil spill model upon which the State EIS relied failed to address the impact of an oil spill on the Lake Superior watershed. *Id.* at 28, 36. The court, therefore, remanded to the MPUC for further proceedings. *Id.* at 36. Minnesota DOC-EERA prepared a revised State EIS in accordance with the court's order and issued its revised analysis for public notice and comment. *See* Joint Ex. 16, Order Finding EIS Adequate, Granting Certificate of Need as Modified, and Granting Routing Permit as Modified at 3–4. The MPUC issued an Order on May 1, 2020 finding the revised State EIS adequate, and approving the Certificate of Need and Route Permit for the Project. *See id.* Plaintiffs again challenged the MPUC's Order and filed for a stay on November 25, 2020. The MPUC denied the motion in December 2020, *see* Joint Ex. 37, Order Denying Motion for Stay Pending Appeal. Plaintiffs then sought a stay pending appeal from the Minnesota Court of Appeals, which the court denied on February 2, 2021. *See* Enbridge's Suppl. Auth., Ex. 1. Plaintiffs' appeal before the Minnesota Court of Appeals is pending. *See In the Matter of the Application of Enbridge Energy*, Nos. A20-1071, A20-1072, A20-1074, A20-1075, A20-1077 (Minn. Ct. App.).

Because the Project will cross 227 waterways, Enbridge was also required to obtain a permit from the Corps to authorize the discharge of dredged or fill materials into "waters of the United States" under Section 404 of the CWA. Joint Ex. 2, EA-SOF at 28. The Project also crosses the Corps' Lost River Flood Control Project, which required Enbridge to obtain an authorization from the Corps under Section 408 of the RHA. *Id.* at 109. Enbridge first applied for

an individual CWA permit in 2015 and submitted a revised application on September 21, 2018. *Id.* at 9–10. On December 20, 2018, the Corps issued a Public Notice for the Section 404 permit and Section 408 authorization, which was followed by a 60-day period for comments. *Id.* at 11. After this first public notice and comment period, the Corps requested additional information from Enbridge in October 2019 regarding concerns about wetland impact, construction methods, impact minimization, post-construction monitoring, and compensatory mitigation. *Id.* After Enbridge responded in December 2019, the Corps issued another public notice seeking comment on these revisions on February 4, 2020. *Id.* at 11–12.

The Corps prepared an Environmental Assessment and Statement of Findings. *See* Joint Ex. 2, EA-SOF. Based on its EA, the Corps concluded that issuing the Section 404 permit would not "have significant impacts on the quality of the human environment." *Id.* at 128. The Corps, therefore, did not produce an EIS for the Project. Appended to the Corps' EA-SOF is an additional EA pursuant Section 408 of the RHA ("Section 408 EA")—regarding the authorization for the Project to cross the Lost River Flood Control Project. *See* Joint Ex. 2, EA-SOF, App'x E; *see also* Joint Ex. 2, EA-SOF at 109.

On November 23, 2020, the Corps granted Enbridge a CWA Section 404 permit to discharge dredged and fill materials into water of the United States. *See* Joint Ex. 1, Permit. The Corps also authorized the alteration of the Lost River Flood Control Project under Section 408 of the RHA. *Id.* Construction on the Project began around December 1, 2020 at several sites and is expected to take seven to nine months. Joint Ex. 32, Simonson Decl. ¶¶ 56–57. According to Enbridge, certain portions of the Project are scheduled to be completed in cold conditions to reduce impact to the environment. *Id.* ¶ 61. As of the date of this decision, construction crews have begun clearing trees and trenching. *Id.* ¶ 64. Plaintiffs contend that these construction

activities have already caused "irreversible soil compaction and soil disruption." Joint Ex. 29,

Decl. of Dr. Laura Triplett, ("Triplett Decl.") ¶ 11; *see also* Joint Ex. 31, Suppl. Decl. of Dr.

Laura Triplett ("Suppl. Triplett Decl.") ¶¶ 3–5 (detailing observations of "extensive tree

clearing" and removal of vegetation by construction crews).

      Plaintiffs also argue that the Project will cause significant, irreversible environmental

harm and will "alter local Tribes' traditional practices," as they rely on the affected waterways

and wetlands for cultural and spiritual practices, as well as hunting, gathering, and fishing. Pls.'

Mot. at 10–11. Plaintiffs cite specifically the Corps' finding that the Project will result in a

permanent loss of 9.97 acres of wetlands and the conversion of 81.36 acres of scrub-shrub

wetland and 148.85 acres of forested wetland into "an emergent type wetland." *Id.* at 10 (citing

Joint Ex. 2, EA-SOF at 21, 36).  Plaintiffs claim that these alterations will result in the "complete

loss of the wetlands' original vegetation, the impaired or eradicated ability of the wetlands to

mitigate flood risk, an increased risk of oil spills, and ongoing harm to many wildlife species."

*Id.* (citing Joint Ex. 29, Triplett Decl. ¶¶ 7–10).

      **C.  Procedural Background**

      Plaintiffs filed their Complaint and  Motion for a Preliminary Injunction in this action on

December 24, 2020. *See* Compl.; Pls.' Mot.  Plaintiffs seek to "enjoin [the Corps] to withdraw

the permit issued on November 23, 2020 authorizing Enbridge Energy to discharge dredged and

fill material into 1050.71 acres of waters of the United States for construction activities

associated with the Line 3 project." Pls.' Mot. at 1. As discussed more fully *infra* Part III,

Plaintiffs argue that the Corps' EA is deficient under NEPA and the CWA because the Corps

failed to consider "the risk of and potential harms associated with oil spills" and "truncated its

review of potential alternatives to the Project." *Id.* at 14.  Plaintiffs contend that these

deficiencies undermine the Corps' conclusion that there would be no "significant" impact to the environment—the finding underlying the Corps' decision not to prepare an EIS for the Project. *See id.* Plaintiffs request that the "Corps' permit for the Project" be "enjoined until [the Corps] completes the legally required review of the pipelines." *Id.* at 1.

Enbridge moved to intervene as a defendant on January 5, 2021, which neither the Corps nor Plaintiffs opposed. *See* Enbridge's Mot. to Intervene, ECF No. 19; Corps' Resp., ECF No. 20; Pls.' Resp., ECF No. 22. The Court granted Enbridge's motion to intervene as of right under Federal Rule of Civil Procedure 24(a). *See* Order, ECF No. 23; Mem. Op., ECF No. 24.

The Court held teleconferences in this matter on December 30, 2020 and January 6, 2021 to discuss with the parties their proposed schedule for briefing Plaintiffs' motion and submitting the administrative record.[5] At the January 6, 2021 hearing, the Corps indicated that the breadth of the administrative record would prevent it from compiling the record in its entirety within the expedited timeline sought by Plaintiffs. *See* Jan. 6, 2021 Hr'g Tr. 10:15–25. The Court brought to the parties' attention the D.C. Circuit's decision in *American Bioscience, Inc. v. Thompson*, 243 F.3d 579 (D.C. Cir. 2001), in which the court held that the parties should have been required to file the administrative record before the district court could assess plaintiffs' likelihood of success on the merits of their claims. *Id.* at 582; *see* Jan. 6, 2021 Hr'g Tr. 4:15–6:5. Unlike *American Bioscience*, the claims at issue in Plaintiffs' motion pertain to the sufficiency of the Corps' EA (which the parties have filed, *see* Joint Ex. 2, EA-SOF) and the Corps' decision not produce an EIS. Accordingly, the parties agreed to submit to the Court a stipulated list and copies of documents pertinent to the Corps' EA. *See* Jan. 6, 2021 Hr'g Tr. 6:9-25. The parties

---

[5] Because the Court had not yet granted Enbridge's motion to intervene at the time of these teleconferences, Enbridge did not participate in either hearing.

filed the stipulated list and associated documents on January 20, 2021. *See* ECF No. 32. Although the parties have separately filed exhibits with their legal memoranda, for the sake of clarity, the Court shall refer to the "Joint Exhibit" number corresponding to the parties' stipulated list and exhibits filed at ECF No. 32.

Plaintiffs requested an expedited consideration of their preliminary injunction. *See* Pls.' Mot. In light of the parties' joint proposed briefing schedule and efforts to compile the pertinent portions of the administrative record, the parties agreed and the Court finds that the parties will not be prejudiced by the Court's decision on the preliminary injunction outside the 21 days set forth in Local Civil Rule 65.1(d). *See* Jan. 6, 2021 Hr'g Tr. 3:18–4:14. In addition, the Court finds that a hearing will not aid in the Court's disposition of Plaintiffs' motion.

## II.   LEGAL STANDARD

### A.  Preliminary Injunction

Preliminary injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)); *see also Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) ("[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." (internal quotation marks omitted)).

Plaintiffs seeking preliminary injunctive relief "must establish (1) that [they are] likely to succeed on the merits, (2) that [they are] likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in [their] favor, and [4] that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (quoting *Sherley*, 644 F.3d at 392) (internal quotation marks omitted). When seeking such relief, "the

movant has the burden to show that all four factors, taken together, weigh in favor of the injunction." *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009)) (internal quotation marks omitted).

In this jurisdiction, "[t]he four factors have typically been evaluated on a sliding scale": if the "movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Id.* at 1291–92 (internal quotation marks omitted). It is unclear whether the sliding-scale approach to assessing the four preliminary injunction factors survives the Supreme Court's decision in *Winter*. *See Save Jobs USA v. U.S. Dep't of Homeland Sec.*, 105 F. Supp. 3d 108, 112 (D.D.C. 2015). Several judges on the D.C. Circuit have "read *Winter* at least to suggest if not to hold 'that a likelihood of success is an independent, free-standing requirement for a preliminary injunction.'" *Sherley*, 644 F.3d at 393 (internal citation omitted). However, the D.C. Circuit has yet to hold definitively that *Winter* has displaced the sliding-scale analysis. *See id.*; *see also Save Jobs USA*, 105 F. Supp. 3d at 112. In light of this ambiguity, the Court shall consider each of the preliminary injunction factors and shall only evaluate the proper weight to accord the likelihood of success on the merits if the Court finds that its relative weight would affect the outcome.

### B.  Administrative Procedure Act

Plaintiffs bring their NEPA and CWA claims under the general review provision of the APA. Compl. ¶¶ 183–217; *see Karst Envtl. Educ. & Prot., Inc. v. Envtl. Prot. Agency*, 475 F.3d 1291, 1295 (D.C. Cir. 2007) ("[B]ecause NEPA creates no private right of action, challenges to agency compliance with the statute must be brought pursuant to the Administrative Procedure Act[.]"). Under the APA, the Court may set aside an agency action that is "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C.

§ 706(2). An agency action is arbitrary and capricious if, for example, the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citations and internal quotations omitted).

This standard of review is deferential to the agency, and the Court is not entitled to substitute its judgment for that of the agency. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). Nevertheless, "courts are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *Nat'l Labor Relations Bd. v. Brown*, 380 U.S. 278, 291 (1965).

### III.   DISCUSSION

#### A.  Likelihood of Success on the Merits

The Court must first consider whether Plaintiffs have demonstrated a substantial likelihood of succeeding on the merits of their claims. "[T]o determine whether plaintiffs have demonstrated a likelihood of success . . . it will ordinarily be enough that the plaintiff[s] ha[ve] raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation." *Monument Realty LLC v. Wash. Metro. Area Transit Auth.*, 540 F. Supp. 2d 66, 76 (D.D.C. 2008) (quotation omitted). Plaintiffs' likelihood of success on the merits, of course, is tied to the specific claims asserted; accordingly, the Court will focus directly on Plaintiffs' NEPA and CWA claims under the APA's standard of review.

Plaintiffs seek to enjoin the Corps' Section 404 Permit, contending that the Corps failed to assess adequately the risk of oil spills and alternative routes and construction methods under NEPA and the CWA. These failures, Plaintiffs argue, undermine the Corps' finding of no significant environmental impact underlying the Corps' decision not to produce an EIS. For the reasons set forth below, the Court concludes that Plaintiffs have not demonstrated a likelihood of success on the merits of their claims that the Corps failed to comply with NEPA or the CWA in concluding that an EIS was not warranted.

### 1. Challenges to the Corps' Consideration of Oil Spills

Plaintiffs first argue that they are likely to prevail on the merits of their claim that the Corps violated NEPA and the CWA by failing to analyze the "risks of and potential harms associated with oil spills from the Project." Pls.' Mot. at 15. Plaintiffs contend that the Corps' EA discusses only *construction* impacts of its permitting decision but fails to analyze the risks and harms of an oil spill. By failing to address this issue, Plaintiffs argue, the Corps' finding of no "significant" environmental impact underlying its decision not to conduct an EIS is flawed. *Id.* at 15–17. Plaintiffs also argue that this omission undermines the Corps' findings under the CWA that there is no practicable alternative to the Project with less impact on the aquatic ecosystem. *Id.* at 17–18.

In response, the Corps and Enbridge argue that the Corps *did* take a "hard look" at the issue of oil spills in its Section 404 and Section 408 EAs and considered the issue in its review of materials from state regulatory proceedings, including the State EIS.[6] *See* Corps' Opp'n at

---

[6] Enbridge argues that the Corps was not required *at all* to consider the environmental consequences of potential oil spills in its NEPA analysis considering a Section 404 permit because "[w]hether spills occur depend entirely on the operation of the pipeline, which is well beyond the Corps' regulatory jurisdiction." Enbridge's Opp'n at 25. The Corps appears to have taken this position in its responses to public comments. *See, e.g.*, Joint Ex. 3, First Public Notice

16–19; Enbridge's Opp'n at 22. Both the Corps and Enbridge contend that the Corps' analysis of potential oil spills in the EAs satisfies its obligations under NEPA and the CWA.

For the reasons set forth below, the Court finds that the Corps adequately considered the effects of a potential oil spill to discharge its duties under NEPA and the CWA. Accordingly, Plaintiffs have not demonstrated a likelihood of success on the merits of their claims that the Corps' oil spill analysis was deficient under either statute.

a.   <u>NEPA</u>

Plaintiffs first challenge the sufficiency of the Corps' consideration under NEPA of the risks and effects of a potential oil spill. Plaintiffs argue that the Corps' "refusal to examine" the "risk of and potential harms associated with oil spills" undermines its conclusion that its action would have no "significant" environmental impacts requiring the Corps to complete an EIS. Pls.' Mot. at 14. Enbridge and the Corps respond that the Corps took a "hard look" at the issue of potential oil spills and, based on the Corps' consideration of the issue, its finding of no significant environmental impact was reasonable—and so, therefore, was its finding that an EIS was not required. *See* Corps' Opp'n at 16–19; Enbridge's Opp'n at 22–25.

The Court first notes that its "role in reviewing [the Corps'] decision not to prepare an EIS is a limited one, designed primarily to ensure that no arguably significant consequences have been ignored." *Nat'l Parks Conserv. Ass'n v. Semonite*, 916 F.3d 1075, 1082 (D.C. Cir. 2019)

---

Comments and Responses at 2 ("Generally, oil pipeline projects are not 'major federal actions' for [the Corps] because [the Corps] has limited jurisdiction over activities associated with pipeline construction."); *id.* at 3 (noting that the Corps' jurisdiction was "limited to the construction-related impacts to aquatic resources" and referring to the State EIS for consideration of the "environmental consequences of oil spills of varying types."). Because the Corps' position in its briefing appears to be that it *did* consider the risk of oil spills, *see* Corps' Opp'n at 12, the Court shall not decide whether the Corps must categorically consider effects of oil spills in its NEPA review of a Section 404 application for construction of an oil pipeline.

(quoting *Myersville Citizens for a Rural Comm., Inc. v. FERC*, 783 F.3d 1301, 1322 (D.C. Cir. 2015) (internal quotation marks omitted)). "An agency decision that an EIS is not required may be overturned 'only if it was arbitrary, capricious or an abuse of discretion.'" *Grand Canyon Trust*, 290 F.3d at 340 (quoting *Sierra Club v. U.S. Dep't of Transp.*, 753 F.2d 120, 126 (D.C. Cir. 1985). Judicial review of an agency's finding of "no significant impact" is not, however, "merely perfunctory as the court must ensure that the agency took a 'hard look' at the environmental consequences of its decision." *Peterson*, 717 F.2d at 1413 (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)). Courts reviewing an agency's finding of "no significant impact" must consider whether the agency:

> (1) has accurately identified the relevant environmental concern, (2) has taken a hard look at the problem in preparing its [FONSI or Environmental Assessment], (3) is able to make a convincing case for its finding of no significant impact, and (4) has shown that even if there is an impact of true significance, an EIS is unnecessary because changes or safeguards in the project sufficiently reduce the impact to a minimum.

*Sierra Club v. Van Antwerp*, 661 F.3d 1147, 1154 (D.C. Cir. 2011) (quoting *TOMAC v. Norton*, 433 F.3d 852, 861 (D.C. Cir. 2006)). "In so doing, courts in this circuit apply a rule of reason to an agency's NEPA analysis and decline to flyspeck the agency's findings in search of any deficiency no matter how minor." *Standing Rock*, 255 F. Supp. 3d at 122 (internal citation and quotation marks omitted). The Court finds that Plaintiffs are not likely to succeed in demonstrating that the Corps failed to take a "hard look" at the issue, or that reaching its conclusion of "no significant impact" was arbitrary and capricious.

Although the Corps' Section 404 EA addresses the risk of oil spills, it does so only to compare the risk of oil spills associated with potential alternatives to the construction of a new pipeline. *See* Joint Ex. 2, EA-SOF at 19 ("Trains . . . are more likely to result in small to medium

spills when compared to spills from pipelines, typically resulting from human error. While pipelines generally have fewer but larger spills, the number of incidents from train spills is higher which results in a higher percentage of the overall volume being spilled when compared to pipelines); *id.* at 20 (same conclusion for trucks); *id.* at 23 ("Continued operation of the existing Line 3 poses a far greater risk of an accidental release and resulting environmental damage than the applicant's proposed alternative."); *id.* at 25, 26 (finding that an alternative combining use of Existing Line 3 with rail or truck transport would "result in a higher number of incidents involving oil spills"). The Corps' analysis in the Section 404 EA does not specifically discuss the risks or impacts of *this* Project.

The Section 408 EA (Appendix E of the Corps' EA-SOF) *does*, however, consider the risks and effects of a potential oil spill related to the Project. First, the Section 408 EA cites a study related to "potential pinhole" leaks and notes that "overall, the study concluded that pipelines monitored with supervisory control and data acquisition systems, in conjunction with computational pipeline monitoring or model-based leak detection systems, greatly lower the potential for long undetected releases." Joint Ex. 2, EA-SOF, App'x E at 10. Next, the Section 408 EA reviews the "modeling of hypothetical worst-case discharge spill scenarios . . conducted to provide insight into the behavior of different types of oils in the environments that are typical of Minnesota to help in the consideration of potential contingency planning requirements and to evaluate the range of potential impacts of an accidental release" conducted for the State EIS. *Id.* The Section 408 EA notes that the Corps examined the pertinent chapter of the State EIS and "Assessment of Accidental Releases: Technical Report." *Id.* at 10, 12. The Section 408 EA then discusses the effects of an accidental release of oil on the aquatic environment—examining impacts on fish, amphibians, birds and mammals, and wild rice—as well as the human

environment, and considers potential challenges in responding to spills. *Id.* at 13. It further

examines spill prevention, detection, and response measures, including with respect to "remote

locations, aquatic environments, and winter conditions." *Id.* at 15. Based on this review, the

Corps concluded that "the spill prevention and leak detection measures described in the Section

408 EA 'will reduce the risk of a spill resulting in environmental and human impacts.'" Corps'

Opp'n at 16 (quoting Joint Ex. 2, EA-SOF, App'x E at 17). In sum, the Section 408 EA

addresses the effects of a potential oil release, and finds that preventative and mitigative

measures would reduce the risk of a spill leading to significant harm. The Court finds that this

review sufficiently demonstrates that the Corps accurately identified and took a "hard look" at

the risk and effects of oil spills and considered those risks against the measures in place to

prevent, detect, and respond to spills. Although Plaintiffs may disagree with the Corps' ultimate

conclusion, "their disagreement does not mean the Corps failed to consider the issue altogether."

*Citizens for a Rural Cmty. v. F.E.R.C.*, 783 F.3d 1301, 1325 (D.C. Cir. 2015) (internal citations

and quotation marks omitted).

In their Reply, Plaintiffs acknowledge that the Section 408 EA discusses oil spills, but

argue that the Corps' "narrow [and] conclusory" findings in that document "do not adequately

analyze the effects of oil spills." Pls.' Reply at 2-4.[7] Plaintiffs offer three principal challenges to

Defendants' reliance on the Section 408 EA, which the Court shall address in turn.

First, Plaintiffs argue that the discussion of oil spills in the Section 408 EA is insufficient

because the Section 408 authorization pertains only to a single site: the Lost River Flood Control

Project. Pls.' Reply at 6–7. At least one other court has confronted the question of whether an oil

---

[7] Plaintiffs state that they did not receive a copy of the Section 408 EA until January 11, 2021
and therefore did not address it in their opening brief. *See* Pls.' Reply at 6 n.6.

spill analysis contained in a Section 408 EA analyzing a "limited portion" of a project can support a broader Section 404 permit. *See Atchafalaya Basinkeeper v. U.S. Army Corps of Engineers*, 310 F. Supp. 3d 707, 723 (M.D. La.), *rev'd on other grounds*, 894 F.3d 692 (5th Cir. 2018). In that case, the court concluded that because the spill model upon which the Corps relied in its Section 408 EA "covered the entire pipeline" and not just the particular crossing requiring a Section 408 authorization, it was not improper for the Corps to rely on the Section 408 EA in reaching its no "significant" impact determination in its Section 404 EA. *Id.* at 723–24.  Here, the worst-case discharge model upon which the Corps relied in its Section 408 EA assessed "eight representative sites across northern and central Minnesota" and "was carefully and deliberately selected to address a broad spectrum of terrain, land-cover types, watercourses, waterbodies, wetlands, associated freshwater and riparian habitat types, vegetation, environmentally-sensitive areas, and human land uses . . . to consider the range of consequences that may be possible should there by an accidental release of crude oil along the proposed route[.]" Joint Ex. 2, EA-SOF, App'x E at 10. Similarly, the mitigative measures discussed in the Section 408 EA address areas spanning the pipeline, including "rural, sparsely populated areas." *Id.* at 16. The Corps' consideration of the spill model and preventive measures, therefore, shows that its review was not limited to the single site at issue in the Section 408 EA. *See Atchafalaya Basinkeeper*, 310 F. Supp. at 723 ("While the Section 408 EA applied the spill model results to the specific federal easements and projects to determine the risks and impacts at those locations, the [underlying] model itself clearly covered the entire pipeline.").

Plaintiffs next argue that the Corps' analysis of oil spills relies "uncritically" on the State EIS, and so does not satisfy the Corps' duty to complete a "critical, independent verification" of a state's environmental analysis. Pls.' Reply at 4. Although Plaintiffs note that NEPA regulations

permit cooperation between state and federal agencies, they argue that the record lacks evidence of "formal cooperation" such as "joint planning, joint studies, joint public hearings, or a joint EA" with respect to any oil spill modeling or analysis. *Id.* at 5; *see* 40 C.F.R. § 1506.2(a) ("Federal agencies are authorized to cooperate with State, Tribal, and local agencies that are responsible for preparing environmental documents, including those prepared pursuant to section 102(2)(D) of NEPA."). The Corps contends that it "did not adopt the State EIS, nor did it attempt to delegate to the state or abdicate its obligation to conduct an independent review. The Corps did, however, utilize the information from the state proceedings so as not to duplicate additional review requirements." Corps' Opp'n at 12. The Corps argues that it was proper for them to rely on environmental documents prepared by other agencies, as well as submissions by Enbridge. *See id.* at 13 n.8.

Upon review of relevant caselaw, the Court agrees that the Corps was not required to duplicate studies or analyses already completed by the state (or even the permit applicant itself) to consider the risks of oil spills in its own EA. *See, e.g.*, *Atchafalaya Basinkeeper v. U.S. Army Corps of Engineers*, 2020 WL 1450750, at *12 (M.D. La. Mar. 25, 2020) ("[T]he Corps' regulations do not require the Corps to . . . gather its own information upon which to base an EA") (quoting *Friends of the Earth v. Hintz*, 800 F.2d 822, 834 (9th Cir. 1986)); *Stop the Pipeline v. White*, 233 F. Supp. 2d 957, 967-68 (S.D. Ohio 2002) ("An agency may fulfill its obligations under NEPA to conduct an independent evaluation of environmental impacts by reviewing and relying on information, data, and conclusions supplied by other federal *or state* agencies." (emphasis added)); *cf. Hoosier Env. Council v. U.S. Army Corps of Engineers*, 722 F.3d 1053, 1061 (7th Cir. 2013) ("If another agency has conducted a responsible analysis, the Corps can rely on it in making its own decisions."); *Town of Superior v. U.S. Fish & Wildlife*

*Serv.*, 913 F. Supp. 2d 1087, 1127 (D. Colo. 2012) ("[F]ederal agencies may rely on analyses conducted by state and local governments instead of devoting resources to replicating them."). Accordingly, the Court finds that it was appropriate for the Corps to evaluate and incorporate the State EIS into its findings, without needing to "reinvent the wheel."

And third, Plaintiffs argue that the Corps' discussion of the oil spill analysis "fails to grapple with the effects of an oil spill on the aquatic environment" and "falls far short in its treatment of harm to the human environment and environmental justice." Pls.' Reply at 7–8. Specifically, Plaintiffs argue that the Corps failed to address the "Tribes' unique vulnerability to oil spills, and thereby failed to comply with NEPA's mandate to take a hard look at the Project's environmental consequences." *Id.* at 9. The Section 408 EA does, however, discuss the effects of an oil spill on aquatic life, birds, mammals, and wild rice. *See* Joint Ex. 2, EA-SOF, App'x E at 13. And the Section 404 EA indicates that the Corps undertook "robust coordination with Tribes to ensure mitigative measures would be taken to reduce any adverse effects to tribal resources." Joint Ex. 2, EA-SOF at 127.

Before moving on to Plaintiffs' CWA claims, the Court shall address the parties' arguments regarding the import of the D.C. Circuit's decision in *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, --- F.3d ---, 2021 WL 244862 (D.C. Cir. Jan. 26, 2021), which was issued after Plaintiffs' motion had been fully briefed. Each party filed a supplemental notice on the docket regarding the D.C. Circuit's decision. Plaintiffs argue that the Circuit's decision clarifies that the Corps must consider the "potential consequences" of an oil leak in its NEPA analysis of an oil pipeline. *See* Pls.' Suppl. Auth. at 1. The Corps argues that the D.C. Circuit's decision "does not add anything to support Plaintiffs' case" because "[t]o the extent it was required, the Corps analyzed potential impacts of oil spills and leaks." Corps' Resp. to Pls.'

Suppl Auth. at 1–2. Enbridge largely echoes the Corps' argument. *See* Enbridge's Resp. to Pls.' Suppl. at 1. The Court agrees with the Corps and Enbridge that the *Standing Rock* decision does not alter the Court's conclusion that Plaintiffs has not shown a likelihood of success on the merits of their claim that the Corps' NEPA analysis was inadequate. The D.C. Circuit in *Standing Rock* considered whether the district court correctly concluded on summary judgment that the effects of the Corps granting an easement for construction of an oil pipeline were likely to be "highly controversial," requiring the Corps to prepare an EIS.  2021 WL 244862, at *4. The decision was not based on claims, as here, that the Corps failed *at all* to consider the effects of an oil spill. *See* Pls.' Mot. at 14. Accordingly, the Circuit's decision does not change the Court's conclusion based on the current record that the Corps did sufficiently address oil spills.

> b.  <u>CWA</u>

Plaintiffs also argue that Defendants violated the CWA by failing to analyze the risks and potential harms associated with oil spills. Pls.' Mot. at 17. Plaintiffs contend that by failing to consider the potential harms associated with an oil spill, the Corps could not have properly determined that there are no practicable, less environmentally harmful alternatives to the Project, or that the Project is in the public interest. *Id*. The Corps argues that the CWA does not require the Corps to evaluate the potential environmental effects of alternatives deemed not practicable. Corps' Opp'n at 19-20 ("Once an alternative is deemed not to be practicable no further analysis is required under [40 C.F.R. 230.10(a).").  The Court agrees with the Corps that the CWA regulations do not require the Corps to evaluate the environmental consequences of alternatives deemed "not practicable." Doing so would require the Corps to expend additional resources examining effects of alternatives already discarded. *See Town of Norfolk v. U.S. Army Corps of Engineers*, 968 F.2d 1438, 1454 (1st Cir. 1992) (concluding that the Corps did not need to weigh

the adverse impacts of alternatives sites in its public interest review because doing so "asks the Corps to duplicate the 'practicable alternatives' analysis"). In any event, the Corps in this case did compare the risk of oil spills of potential alternatives, and concluded that those alternatives presented a greater risk of a potential spill than a new pipeline. *See infra* Part III(2)(a).

As to the public interest review, the Corps argues that such review is the final step in its CWA process, and "is only undertaken for the project that will be permitted . . and is only performed after every alternative has been disqualified." Corps' Opp'n at 5, 19–20. Here, the Court finds that Plaintiffs are unlikely to succeed on their claim that the Corps failed to address the potential for oil spills of Replacement Line 3 in their "public interest" review under the CWA. The Corps identified the potential for oil spills as a consideration in its public interest review. Joint Ex. 2, EA-SOF at 51. And the Corps found that based on the comparative risk posed by "no-build" and other alternatives, issuing the Section 404 permit was in the public interest.

### 2.   Challenges to the Corps' Consideration of Alternatives

Plaintiffs next argue that Defendants failed to comply with NEPA and the CWA by "refusing to consider" alternatives to the route of the Project and the construction methods at certain waterbody crossings. Pls.' Mot. at 18–19. Before addressing the parties' arguments on each point, the Court shall discuss the appropriate analysis of "alternatives" required by each statute.

The regulations implementing Section 404 of the CWA provide that "no discharge or no discharge of dredged or fill material shall be permitted if there is a *practicable alternative* to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a) (emphasis added). A "practicable" alternative is one that "is available and capable of

being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." *Id.* § 230.10(a)(2) (emphasis added). Where, as here, the activity associated with a discharge is not water dependent, *see* Joint Ex. 2, EA-SOF at 17, the CWA regulations create a rebuttable presumption that there are practicable and environmentally preferable alternatives to discharging dredged and fill material into wetlands. 40 C.F.R. § 230.10(a)(3).

NEPA also requires agencies to consider alternatives to a proposed action, even if the agency finds no significant impact based upon an EA. 40 C.F.R. § 1508.9(b) (requiring an environmental assessment to include brief discussions of "alternatives as required by section 102(2)(E)," and "of the environmental impacts of the proposed action and alternatives"). To comply with NEPA, an EA must include a "brief discussion of reasonable alternatives to the proposed action." *Standing Rock*, 255 F. Supp. 3d at 134 (internal citations and quotation marks omitted). An EA's consideration of "reasonable alternatives" need not be "as rigorous as the consideration of alternatives in an EIS." *Id.* (internal citations and quotation marks omitted). An alternative is "reasonable" if it is "objectively feasible as well as 'reasonable in light of [the agency's] objectives.'" *Myersville*, 783 F.3d at 1323 (quoting *Theodore Roosevelt Conserv. P'ship*, 661 F.3d at 72). "NEPA requires only that the Corps consider alternatives relevant to the applicant's goals and the Corps is not to define what those goals should be." *City of Shoreacres*, 420 F.3d at 450 (citing *Citizens Against Burlington*, *Inc. v. Busey*, 938 F.2d 190, 198 (D.C. Cir.), *cert. denied* 502 U.S. 994 (1991))*.* The agency "bears the responsibility for deciding which alternatives to consider" and need only follow a 'rule of reason'," which governs "both *which* alternatives the agency must discuss, and the *extent* to which it must discuss them." *Citizens Against Burlington*, 938 F.2d at 195 (internal citations omitted). An agency's "specification of

the range of reasonable alternatives is entitled to deference." *Myersville*, 783 F.3d at 1323
(internal citations omitted).

   For the reasons set forth below, the Court finds that Plaintiffs have not established that
they are likely to succeed on the merits of the claims that the Corps' analysis of route and
construction alternatives under the CWA or NEPA was arbitrary and capricious.

a. <u>Route Alternatives</u>

   Plaintiffs first argue that the Corps' analysis of alternatives is deficient because the Corps
limited "the range of alternatives . . . to the route corridor designated by the MPUC."  Pls.' Mot.
at 17. Plaintiffs argue that the Corps' failure to consider pipeline routes other than the route
identified by the MPUC violated the CWA and NEPA because the Corps must "independently
evaluate the information presented to it, not . . . blindly eliminate options based on a state
agency's decision." Pls.' Mot. at 19–20. Under the CWA specifically, Plaintiffs contend that the
Corps was required to "presume" that a "different pipeline route or other alternative" that "does
not affect an aquatic site" could be selected.  *Id.* (citing *Del. Riverkeeper Network v. Sec'y of
Penn. Dep't of Env. Prot.*, 870 F.3d 171, 180 (3d Cir. 2017)).

   The Corps and Enbridge argue that the Corps' consideration of alternatives satisfied its
obligations under both statutes. *See* Corps' Opp'n at 25–31; Enbridge's Opp'n at 29–31.
Namely, the Corps considered "no action" alternatives (continued use of Existing Line 3),
alternatives involving transportation of oil by rail or truck, and combinations involving Existing
Line 3 and other methods of transportation. Joint Ex. 2, EA-SOF at 18–21. The Corps considered
in reasonable detail each of these alternatives—including the most obvious alternative, the
continued use of the same route occupied by Existing Line 3—and rejected each as impracticable
in light of the Project's purpose. *See id.* In its discussion of continued use of Existing Line 3's

route, for example, the Corps noted that construction would require a wider workspace and more time with open trenches, risking greater environmental harms than construction of a new route. *Id.* at 24. The Corps further noted that Existing Line 3 crosses the Chippewa National Forest and easements through the Leech Lake and Fond du Lac Reservations, which are set to expire in 2029. *Id.* The Corps concluded that building the new pipeline along the same route would not be practicable because, among other reasons, the Leech Lake Band opposes extending the easement. *Id*; *see also* Joint Ex. 18, Transcript of MPUC Deliberations 14:24-15:8.

The question, then, is whether the Corps was required to consider alternative routes to place a new pipeline (other than the route of the existing line). Plaintiffs suggest that the Corps ignored proposed "less-environmentally damaging" corridors. Pls.' Reply at 14. Plaintiffs cite, for example, their own comments during the 2019 notice and comment period proposing two alternative routes. *Id.* The Corps responds that its analysis of alternatives was appropriately constrained by the route permitted under state law—the route designated by the responsible state agency, the MPUC.  *See* Corps' Opp'n at 29.

The Court finds that the Corps' discussion of alternatives was reasonably limited to the route corridor approved by the MPUC and the "no action" alternatives discussed. Even in the case cited by Plaintiffs applying the CWA alternatives analysis, the court stated the Corps was required to "presume" that a "different pipeline route *or other alternative*" that "does not affect an aquatic site" could be selected. *Del. Riverkeeper*, 870 F.3d at 180 (emphasis added). The Corps here considered several "other alternatives" that would not require Enbridge to undertake the dredging activities requiring a Section 404 permit. Plaintiffs, therefore, are not likely to succeed on their claim that the Corps' CWA alternatives analysis was unreasonable by failing to consider obvious alternatives.

Plaintiffs are also unlikely to succeed on the merits of their claim that the Corps' analysis of alternatives under NEPA was deficient. Where, as here, a federal agency is "not the sponsor of a project," its "consideration of alternatives may accord substantial weight to the preferences of the applicant and/or sponsor in the siting . . . of the project." *City of Grapevine, Tex. v. Dep't of Transp.*, 17 F.3d 1502, 1506 (D.C. Cir. 1994) (internal citation and quotation marks omitted). For example, in *Friends of Capital Crescent Trail v. Fed. Transit Admin.*, 877 F.3d 1051 (D.C. Cir. 2017), the court concluded that the federal agency's discussion of alternatives was sufficient under NEPA even though it addressed only two alternatives: a no build option and Maryland's preferred light rail line. *Id.* at 1063. The court observed that *the state* had "initially considered numerous alternatives," and "eliminated from further consideration" alternatives not considered reasonable. *Id.* After the state's elimination of alternatives, the federal agency's role was "narrowed": "[i]ts ultimate decision was to decide whether or not to fund the preferred alternative." *Id.*

The Corps faced a similar decision here: whether or not to permit the Project based on the route that had been proposed by Enbridge, subject to extensive scrutiny, and ultimately selected by the state agency. The Corps was not required to "reinvent the wheel." *See Hoosier Environmental*, 722 F.3d at 1061. Based on the state's elimination of other proposed routes for a new pipeline, the Corps' "specification of the range of reasonable alternatives" was not arbitrary or capricious. *Myersville*, 783 F.3d at 1323; *see also Envtl. Prot. Info Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1016 (9th Cir. 2006) ("[A]n agency's obligation to consider alternatives under an EA is a lesser one than under an EIS.") (internal quotation marks omitted).

b.   Alternative Construction Methods

Plaintiffs also contest the adequacy of Corps' consideration of alternative construction

methods under NEPA and the CWA. In their public comments on this issue, Plaintiffs noted that

"the choice of construction method at each location can have extremely disparate adverse

impacts to the environment in general and water quality specifically." Pls.' Mot at 21 (citing

Joint Ex. 7; Joint Ex. 8). Plaintiffs specifically suggested that use of a "Horizontal Directional

Drill (HDD)" method (as opposed to "wet and dry crossing methods") at all crossing locations

would be a "less environmentally-damaging alternative." Joint Ex. 7, Comments on Application

No. 2014-01071-TJH at 55. Plaintiffs contend that the "vast majority" of the 227 water crossings

will consist of "dry crossings," which they argue is a "a more impactful construction method" in

which the water is diverted using damming techniques while the trench is excavated." Pls.' Mot.

at 9 (citing Joint Ex. 2, EA-SOF at 29, tbl. 2). According to Plaintiffs, this "dry crossing" method

risks harm to the stability of the waterways' banks, potential aquatic fatalities, and the release of

sediment into the water. *Id.* (citing Triplett  Decl. ¶¶ 19–26). Plaintiffs argue that the Corps failed

to evaluate the practicability of the HDD method at each crossing, or explain how impacts at

each crossing location may vary based on the method selected. *Id.* at 21.

The Corps responds that the Section 404 EA contains a "detailed review of the proposed

construction methods," noting that 21 streams would be crossed by "Horizontal Directional Drill

(HDD) or bore method, and 11 will be crossed via a trench method." Corps' Opp'n at 32. The

EA also explains that the Corps reviewed the Environmental Protection Plan submitted by

Enbridge (*see* Joint Exhibit 12), which "compares the constructability advantages and

disadvantages associated with each type of crossing method." Corps' Opp'n at 32. In addition,

the record indicates that the Corps coordinated with state agencies and Enbridge to "review

proposed pipeline construction methods at waterbody and wetland crossings." Joint Ex. 3, First Public Notice Comments and Responses at 5. After so doing, the Corps concluded that "for site specific reasons" the HDD method "might pose too high of risk for frac-outs (release of drilling mud) potentially affecting the waterbody or biota." *Id.* The Corps also reasoned that "the HDD method is not practicable at every waterbody crossing because of site specific concerns, availability of HDD equipment, and costs." *Id.* Based on this record, the Court finds that the Corps took the requisite "hard look" at alternative construction methods, including the method offered by Plaintiffs, and provided adequate analysis to support its rationale for using distinct construction methods at different sites.

### B.  Irreparable Harm

The Court next considers whether Plaintiffs have demonstrated "irreparable harm" in the absence of an injunction. To constitute "irreparable harm," the injury alleged must be "both certain and great, actual and not theoretical, beyond remediation, and of such imminence that there is a clear and present need for equitable relief." *Mexichem Specialty Resins, Inc. v. E.P.A.*, 787 F.3d 544, 555 (D.C. Cir. 2015) (internal citations and quotation marks omitted). And "[p]laintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (internal citations omitted). "[P]ossibility of irreparable harm" is not enough. *Id.* "[P]roving 'irreparable' injury is a considerable burden, requiring proof that the movant's injury is '*certain, great and actual*—not theoretical—and *imminent*, creating a clear and present need for extraordinary equitable relief to prevent harm.'" *Power Mobility Coal. v. Leavitt,* 404 F. Supp. 2d 190, 204 (D.D.C. 2005) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).

In this case, Plaintiffs discuss two types of "irreparable harm" that they claim will occur in the absence of an injunction.[8] First, Plaintiffs claim that the environment will be irreparably injured because the construction of Line 3 involves clearing tress and vegetation for the pipeline's right of way, and will result in the permanent loss of 9.97 acres of wetlands and the conversion of approximately 230 acres to "emergent" wetland. Pls.' Mot. at 22–23. Second, Plaintiffs argue that a procedural violation of NEPA constitutes irreparable harm because it is "combined with a showing of environmental or aesthetic injury." *Id.* at 23.

Plaintiffs primarily contend that the activities authorized by the Corps will "inflict irreparable harm" on the environment, citing the EA's conclusion that the Project will result in the permanent loss of 9.97 acres of wetlands, and the conversion of 81 acres of scrub-shrub wetland and 148 acres of forested wetland to emergent wetland. Pls.' Mot. at 22–23 (citing Joint Ex. 2, EA-SOF at 21, 36).  These alterations, according to Plaintiffs will result in the loss of the wetlands' original vegetation, the "impaired" ability of the wetlands to mitigate flood risk, an increased risk of oil spills, and ongoing harm to wildlife species." *Id.* at 23 (citing Triplett Decl. ¶¶ 7–10). This loss or conversion, according to Plaintiffs, will also "alter the wetlands' aesthetic appearance." *Id.* at 23.

---

[8] The Corps argues that Plaintiffs' timing in seeking a preliminary injunction undermines their claims of "irreparable harm." Corps' Opp'n at 34. The Corps contends that "Plaintiffs waited over a month after the Corps Permit was granted before filing their complaint and motion for a preliminary injunction on December 24, 2020" and "took little action to promptly effect service on Federal Defendant." *Id.* at 34–35. In reply, Plaintiffs argue that they could not file suit until after they had obtained the Corps' underlying decision documents through a FOIA request, the response to which Plaintiffs received on December 8, 2020. Pls.' Reply at 19–20. The Court "finds no unjustified delay in the timing" of Plaintiffs' motion, and therefore will not weigh that factor in its consideration of Plaintiffs' allegations of irreparable harm. *Atchafalaya Basinkeeper*, 310 F. Supp. 3d at 721.

Plaintiffs also submit declarations detailing how construction activities have already harmed and will continue to harm the environment and Plaintiffs' members. *See, e.g.*, Joint Ex. 24, Decl. of Jamie Arsenault ¶ 7 ("The imminent destruction and permanent alteration of [wetlands] will damage habitats and interfere with the White Earth Band's culturally important subsistence activities."); Joint Ex. 25, Decl. of Michaa Aubid ¶ 7 ("If Enbridge is allowed to go ahead with construction, these waterbodies on which [the Ojibwe and Amishinaabe] rely for sustenance will be forever damaged or lost."); Joint Ex. 26, Decl. of Jami Gaither ¶ 9 ("Destruction of those wetlands will impair my aesthetic and spiritual interests, and it will make it more difficult for me to see and appreciate wildlife."); Joint Ex. 27, Decl. of Winona LaDuke ¶ 16 ("Construction and operation of the Line 3 Project, as permitted by [the Corps] will imminently and permanently damage the freshwater resources that are essential to sustain my and my fellow tribal members' treaty reserve foods of wild rice, fish, and maple syrup."); Joint Ex. 28, Decl. of Samuel Strong ¶ 12 ("The workers are destroying cultural natural resources areas that are integral to our people's survival and to our way of life[.]").

The Court is sensitive to the concerns raised by Plaintiffs' members. But the record before the Court indicates that most of the environmental effects stemming from the construction of Line 3 will not be "permanent or irreversible, as the preliminary injunction standard requires." *Sierra Club v. U.S. Army Corps of Engineers*, 990 F. Supp. 2d 9, 39 (D.D.C. 2013). Both the EA and Enbridge's Environmental Protection Plan detail extensive mitigation plans and post-construction monitoring requirements. *See, e.g.*, Joint Ex. 12, Enbridge Environmental Protection Plan § 1; Joint Ex. 2, EA-SOF at 35 (noting that Enbridge will "restore the stream banks that had been disturbed by construction to as near as possible to pre-construction conditions utilizing civil survey data collected pre-Project"); *id.* ("Site specific restoration plans, completed in

consultation with the appropriate agencies, as well as post construction monitoring would reduce the potential for any long-term effects at waterbody crossing sites and to aquatic organisms at the crossing sites."); *id.* at 36 (indicating that the path cleared of trees and vegetation for the pipeline right-of-way "would be allowed to revegetate after construction and would be monitored to ensure the wetland restoration is progressing towards forested wetlands"); *id.* at 37 ("The majority of impacts associated with the Project would be temporary, lasting only during the installation of the pipeline, duration of the temporary access roads, and until initial restoration after the pipeline is installed or access roads are removed."). And, as Enbridge and the Corps note, the Corps' permit includes conditions related to wetlands restoration, monitoring, and mitigation, and requires compliance with Enbridge's Environmental Protection Plan, and the Avoidance, Mitigation, Implementation Plan for Construction (prepared in consultation with the Minnesota State Historic Preservation Office and consulting tribes). *See* Corps' Opp'n at 9, 10; Enbridge's Opp'n at 12; Joint Ex. 1, Permit at 3–6. These conditions suggest that most of the construction's disruption to the environment will be temporary, undermining a finding of harm that is "beyond remediation" to sustain preliminary injunctive relief. *Mexichem,* 787 F.3d at 555.

It is undisputed, however, that the construction of Line 3 will result in the "permanent loss" of 9.97 acres of wetlands, as well as the conversion of approximately 230 acres to "emergent wetland" in the Red Lake Watershed. Plaintiffs argue that these losses, together with evidence that Red Lake Band and White Earth Band members "regularly use" the Red Lake Watershed demonstrate "permanent harm." Pls.' Mot. at 19. The Corps and Enbridge correctly note, however, that Plaintiffs do not "tie their harm allegations to the specific wetlands that are to be permanently filled." Corps' Opp'n at 36; *see also* Enbridge's Opp'n at 34. For example, Plaintiffs do not offer evidence showing that the specific acres that will be "permanently altered"

are used by their members. The Court concludes, therefore, that Plaintiffs have not established the type of "certain and great," "beyond remediation," and "imminent" harm required to satisfy their high burden. *Mexichem*, 787 F.3d at 555; *Power Mobility Coal*, 404 F. Supp. 2d at 204.

Plaintiffs also argue that a NEPA violation coupled with an environmental or aesthetic injury supports a finding of irreparable harm. Although Plaintiffs are correct that "an *established* NEPA violation might rise to the level of irreparable harm when coupled with sufficient evidence of environmental injury," Plaintiffs have not established a likelihood of success relating to their NEPA claims. *See supra* Part III(A). "Surely after missing the mark with respect to the prerequisite, Plaintiffs cannot expect that the alleged but unproven procedural violation will carry the day on the issue of irreparable harm." *Sierra Club*, 990 F. Supp. 2d at 41.

### C. Balance of Harms and Public Interest

The final two factors the Court must consider when deciding whether to grant a preliminary injunction are the balance of harms and the public interest. *Sierra Club*, 990 F. Supp. 2d at 41. "Although allowing challenged conduct to persist certainly may be harmful to a plaintiff and the public, harm can also flow from enjoining an activity, and the public may benefit most from permitting it to continue." *Id.* When "balanc[ing] the competing claims of injury," the Court must "consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24.

Plaintiffs argue that the balance of harms weighs in favor of granting an injunction, citing the "irreparable harm to the environment and irreversible injury to Plaintiffs' members," presented in their argument of "irreparable harm." Pls.' Mot at 25.  In Plaintiffs' view, the Corps "has no stake in the Project" and any financial harm suffered by Enbridge from a "limited delay" would be "self-inflicted" (because Enbridge has already begun construction, despite pending

legal challenges) and therefore "cannot tip the balance of equities."  Pls.' Mot. at 25; Pls.' Reply at 21-22. In addition, Plaintiffs argue that the public has an interest in preserving the environment, which outweighs financial harms that Enbridge may incur.  *See* Pls.' Reply at 22–23.

Enbridge argues that a preliminary injunction is not in the public interest because it would prolong the operation of Existing Line 3, which Enbridge is required to decommission, and which is "deteriorating at an accelerating rate, and its continued operation poses a far greater risk of accidental release and resulting environmental damage than the Replacement Project." Enbridge's Opp'n at 36 (citing Joint Ex. 2, EA-SOF at 23). Enbridge notes that the continued use of Existing Line 3 during a delay caused by an injunction would require Enbridge to undertake intrusive integrity digs, including at sites in the Chippewa National Forest and on the Leech Lake and Fond du Lac Reservation. Joint Ex. 2, EA-SOF at 22; Joint Ex. 32, Simonson Decl. ¶ 71. Enbridge also identifies economic harms that would flow from an injunction, estimating  that the cost of a six-month delay would be $332 million. Joint Ex. 32, Simonson Decl. ¶ 75. Enbridge also cites its directs employment of 5,222 workers, who would be without wages during a period of delay, as well as the Project's reliance on 1,600 suppliers and creation of 2,800 "indirect jobs." Enbridge's Opp'n at 39–40; *see also* Joint Ex. 35, Decl. of Nancy Norr ¶ 11 ("[T]he Project would create over 4,000 construction jobs, 1,600 local supplier and service spin-off jobs and another 2,800 indirect jobs in the hospitality sector.").

Although Plaintiffs correctly note that economic harm does not alone suffice to show "irreparable injury," *see* Pls.' Mot. at 25 (citing *Wisc. Gas Co. v. Fed. Reg. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985)), the Court may nonetheless consider the economic effects of an injunction in its balancing of harms and public interest review. In *Sierra Club v. U.S. Army*

*Corps of Engineers*, for example, the court considered "additional construction costs" of $262 million associated with a delay in construction of a pipeline and the "major resources" the company had already committed to the pipeline project, including "intensive efforts to comply with the myriad state and federal environmental regulations that the pipeline project implicates." *Id.* at 42-43. In that case, the court reasoned that "[t]he evidence of time and effort that Enbridge has already put in to the project lends credence to Enbridge's argument that it will suffer harm if the pipeline is indefinitely delayed." *Id.* at 43. As did the court in *Sierra Club*, the Court finds compelling Enbridge's argument that an injunction would cause financial losses to the company and the workers directly and indirectly associated with the Project. *Id.*

Plaintiffs also argue that an injunction is in the public interest because the public has an interest in "having governmental agencies abide by the federal laws that govern their existence and operations."  Pls.' Reply at 22 (internal citations and quotation marks omitted).  But because the Court has already found that Plaintiffs have not established a likelihood of success on the merits of their NEPA and the CWA claims, the public interest in the Corps' compliance with its statutory duties "must be weighted accordingly." *Sierra Club*, 990 F. Supp. 2d at 43; *see also Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1326 (D.C. Cir. 1998) ("The final preliminary injunction factor, the public interest, also offers [plaintiff] no support because it is inextricably linked with the merits of the case. If, as we have held, [plaintiff] is not likely to establish [a likelihood of success in the merits], then public interest considerations weigh against an injunction."); *ViroPharma, Inc. v. Hamburg*, 898 F. Supp. 2d 1, 29–30 (D.D.C. 2012) (where plaintiff was unlikely to establish that agency action did not comply with the law, the public interest factor weighed against granting an injunction).

Because the Corps is a government entity and party to the suit, the harm to the Corps and the public interest "are one and the same, because the government's interest *is* the public interest." *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016). The Corps argues that its decision to grant Enbridge the Section 404 permit is based on its conclusion that the Project is in the public interest. Corps' Opp'n at 37. The Corps notes, for example, the public safety and environmental benefits of replacing Line 3, as compared to the continued use of Existing Line 3. *See id.* at 37–38. It also reiterates that the Project's route avoids a national forest and two Reservations. *Id.* at 40. In sum, the Corps contends that Plaintiffs ignore significant benefits of the Project and fail to establish that "the permanent loss of less than ten acres of wetland outweighs the benefit of reducing spill risk along the current pipeline route and throughout the region." *Id.* at 41.

Overall, the Court finds the balance of harms and public interest considerations to be a close call. Plaintiffs offer numerous examples of potential environmental harms stemming from the Project's construction. But the Corps presents persuasive evidence that delaying construction—and in doing so, continuing to rely on Existing Line 3 which Enbridge is required to decommission pursuant to its Consent Decree—also causes ongoing environmental harm and safety risks. And, as noted above, the Court cannot ignore the potential financial losses and harmful economic effects on the local community if construction on the Project were to be delayed. Taking into account all these considerations, the Court finds that Plaintiffs have not definitely tipped the scale in their favor.

## IV.    CONCLUSION

For the foregoing reasons, the Court concludes that Plaintiffs have failed to satisfy their burden of demonstrating that they are entitled to preliminary injunctive relief. Accordingly, based on the current record, the Court shall DENY Plaintiffs' Motion for a Preliminary Injunction. An appropriate Order accompanies this Memorandum Opinion.

_____/s/_____

COLLEEN KOLLAR-KOTELLY
United States District Judge
