# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **FRIENDS OF THE HEADWATERS,** | |
| **Plaintiff,** | |
| **v.** | |
| **UNITED STATES ARMY CORPS OF ENGINEERS, et al.,** | **Case No.** 1:20-cv-03817-CKK |
| **Defendants,** | |
| **ENBRIDGE ENERGY LP,** | |
| **Defendant-intervenor.** | |

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiff Friends of the Headwaters respectfully moves for summary judgment in its favor. In support of this motion, Plaintiff submits the attached memorandum of points of authorities. Also attached is a proposed order.

Dated: March 26, 2021

Respectfully submitted,

*/s/ Scott Strand*
Scott Strand
*[Admitted Pro Hac Vice]*
Environmental Law and Policy Center

60 S. 6th St., Suite 2800
Minneapolis, MN 55402
T: (612)-386-6409
sstrand@elpc.org


*/s/Howard A. Learner*
Howard A. Learner
IL Bar # 3127346; DC Bar ID: IL0027
Environmental Law & Policy Center
35 East Wacker Drive, Suite 1600
Chicago, IL 60601
T: (312) 673-6500
F: (312) 795-3730
hlearner@elpc.org

*/s/John Petoskey*
John Petoskey
*[Admitted Pro Hac Vice]*
Environmental Law & Policy Center
35 East Wacker Drive, Suite 1600
Chicago, IL 60601
T: (312) 673-6500
F: (312) 795-3730
jpetoskey@elpc.org

*Attorneys for Plaintiff Friends of the Headwaters*

2

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **FRIENDS OF THE HEADWATERS,** | |
| **Plaintiff,** | |
| **v.** | |
| **UNITED STATES ARMY CORPS OF ENGINEERS, et al.,** | **Case No.** 1:20-cv-03817-CKK |
| **Defendants,** | |
| **ENBRIDGE ENERGY LP,** | |
| **Defendant-intervenor.** | |

**MEMORANDUM OF POINT AND AUTHORITIES IN SUPPORT OF PLAINTIFF**

**FRIENDS OF THE HEADWATERS MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................... 1

STATEMENT OF FACTS .............................................................................................. 2

STANDING .................................................................................................................... 4

ARGUMENT .................................................................................................................. 4

    I.    THE CORPS' CONCLUSION THAT IT NEED NOT CONSIDER EITHER A
STATUS QUO ALTERNATIVE OR LESS ENVIRONMENTALLY RISKY PIPELINE
ROUTE ALTERNATIVES CANNOT BE RECONCILED WITH THE LEDPA RULE..... 6

    II.    THE CORPS' REFUSAL TO EVALUATE WHETHER THE LINE 3 PROJECT AS
A WHOLE WOULD HAVE "SIGNIFICANT ADVERSE EFFECTS" ON THE
ENVIRONMENT VIOLATES THE REQUIREMENTS OF THE 404(b)(1) GUIDELINES.
.................................................................................................................................... 9

    III.    THE CORPS' "PUBLIC INTEREST REVIEW" OF THIS PROJECT IGNORES
THE CRITICAL ISSUES AND DOES NOT MEET THE REQUIREMENTS OF THE
CORPS' OWN RULES. ................................................................................................ 11

CONCLUSION............................................................................................................. 15

## Cases

*Alliance to Save the Mattaponi v. U.S. Army Corps of Eng'rs,* 808 F.Supp.2d 121, 130 (D.D.C. 2009) ...................................................................................................................... 8

*In re Enbridge Energy,* 930 N.W.2d 12 (Minn. Ct. App. 2019) .................................... 13

*In the Matter of the Draft 401 Certification for the Line 3 Replacement Project*, OAH 60-2200-36909, ¶ 5, 3, AR010535 (Oct. 26, 2020) ................................................................. 5

*In the Matter of the Application of Enbridge Energy, Limited Partnership, for a Certificate of Need and a Routing Permit for the Proposed Line 3 Replacement Project in Minnesota from the North Dakota Border to the Wisconsin Border*, A20-1071, (Minn. Ct. App. 2021) .......... 14

*Friends of the Earth v. Laidlaw,* 528 U.S. 167, 191 (2000) ........................................... 4

*Hunt v. Washington State Apple Adver. Comm'n,* 432 U.S. 333, 343 (1977) ................. 4

*Red Lake Band of Chippewa Indians v. U.S. Army Corps of Eng'rs,* 2021 WL 430054 (D.D.C. Feb. 7, 2021). ...................................................................................................... 4

## Regulations

5 U.S.C. § 701-706 ........................................................................................................... 1

33 C.F.R. § 320.4 ................................................................................. 2, 5, 11, 12, 13

33 U.S.C. § 403 ................................................................................................................. 1

33 U.S.C. § 1251 ............................................................................................................. 11

33 U.S.C. § 1341 ........................................................................................................ 3, 14

33 U.S.C. § 1344 .......................................................................................................... 1, 4

40 C.F.R. § 230.10 ............................................................................................ 5, 6, 9, 10

42 U.S.C. § 4321 ............................................................................................................... 1

42 U.S.C. § 7521 ............................................................................................................. 11

Minn. Stat. § 116D.04 ...................................................................................................... 2

## Other Authorities

*After extensive review, Minnesota Commerce Department releases expert analysis and recommendation on the certificate of need for Enbridge's proposed Line 3 oil pipeline project*, Dep't of Commerce – Div. of Energy Res., Sep. 11, 2017, AR151894-97 .............................. 13

EPA, Endangerment and Cause or Contribute to Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act, 74 Fed. Reg. 66,496, 66,506 (Dec. 15, 2009) ............................ 11

IEA, *Net Zero by 2050:  A Roadmap for the Global Energy Sector* (May 2021), https://www.iea.org/reports/net-zero-by-2050 ............................................................... 5

Section 401 Water Quality Certification, Minnesota Pollution Control Agency, 4, AR006208 (Nov. 12, 2020) .................................................................................................................. 5

USACE Public Notice and Comment Responses, App. A., AR000478 ........................................ 3

## INTRODUCTION

This lawsuit seeks judicial review under the Administrative Procedure Act (APA), 5 U.S.C. § 701-706, of Defendant U.S. Army Corps of Engineers' ("USACE" or "the Corps") decision to grant permits under section 10 of the Rivers and Harbors Act, 33 U.S.C. § 403 and section 404 of the Clean Water Act (CWA), 33 U.S.C. § 1344 to allow Defendant-Intervenor Enbridge Energy ("Enbridge") to construct and operate its proposed Line 3 crude oil pipeline.

Plaintiffs' motions for summary judgment are now before the court. Plaintiff Friends of the Headwaters ("Friends") contends that the Corps permits are unlawful for two principal reasons: (1) because the Corps did not conduct an adequate environmental review, including its decision to not proceed with an environmental impact statement (EIS), as required by the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq*., and (2) because the Corps did not fully and fairly assess: (a) whether there are less environmentally damaging practicable alternatives to the Line 3 project and its discharges into jurisdictional waters; (b) whether the project might have "significant adverse effects" on the environment, and (c) whether this crude oil pipeline project is in the public interest, all requirements for all Corps section 404 permits.

This brief will largely focus on the Clean Water Act issues, while the other plaintiffs in this consolidated case[1] will focus on the NEPA claims.

---

[1] The other plaintiffs are the Red Lake Band of Chippewa Indians, the White Earth Band of Ojibwe, Honor the Earth, and the Sierra Club ("the Red Lake plaintiffs").

## STATEMENT OF FACTS[2]

The proposed Line 3 crude oil pipeline is that latest component of Enbridge's ongoing efforts to expand the capacity of its "Mainline" system of pipelines, all of which run from the Canadian tar sands region in northern Alberta, across Minnesota, to oil refineries or storage locations in the U.S. and eastern Canada or to refineries and export terminals on the Gulf Coast. The Line 3 pipeline would add at least 760,000 barrels per day (bpd) of heavy tar sands oil capacity to Enbridge's Mainline system.

The Line 3 pipeline will cross over 200 waterways, and over 800 protected wetlands in Minnesota alone, triggering the need to secure permits from defendant USACE.  Under USACE and Environmental Protection Agency (EPA) regulations, individual Corps permits may only be granted if the applicant can establish that: (1) there are no less environmentally damaging practicable alternatives ("LEDPA"); (2) the project will not have "significant adverse effects on the environment; and (3) the project is in the public interest.[3]

Enbridge applied for its Corps permits on September 30, 2015, but asked that the Corps not provide public notice at that time.  Decision Document § 1.5 at 9, AR00356. The Corps did not initiate an environmental review process under NEPA, nor did it agree to a joint environmental review process with the relevant Minnesota state agencies.  The Corps did not begin any analysis of LEDPA, significant impacts, or public interest either.  Instead, the Corps decided to wait until all *state* permitting processes were completed, and then determine how it would proceed.

---

[2] The brief filed by the Red Lake plaintiffs contains a more detailed statement, covering a broader range of issues.
[3] 40 C.F.R. § 230.10(a); 33 C.F.R. § 320.4(a).

The Minnesota Public Utilities Commission (PUC) completed an "environmental impact statement," not under NEPA but under the state environmental policy act, Minn. Stat. § 116D.04, and then granted a certificate of need (CN) and a routing permit (RP) endorsing Enbridge's preferred route with minor modifications.[4]  The Minnesota Pollution Control Agency (MPCA) granted a certification under section 401 of the Clean Water Act, 33 U.S.C. § 1341, that Enbridge's chosen river, stream, and wetland crossing methods would not violate state water quality standards. The MPCA did not evaluate route alternatives, spill risks, or climate risks, considering the PUC routing determination to be binding and spill risks and climate risks as beyond its jurisdiction.[5]

Within a few days after the MPCA section 401 certification, on November 23, 2020, defendant USACE issued its permits for the project.   The USACE "decision document" determined that, under the Clean Water Act and its interpretation of the rules:

(1) The Corps had no authority to consider less environmentally damaging route alternatives, because Enbridge had previously been able to secure a routing permit from the Minnesota PUC;[6]

(2) The Corps had no authority to consider whether the risks of a spill at any of the water crossings within its jurisdiction would pose a significant adverse impact on the environment;[7]

---

[4] The PUC's original EIS adequacy finding, and original CN and RP were granted in 2018, vacated by the state court of appeals in 2019, and then regranted in 2020.  Those decisions are all currently pending again at the Minnesota Court of Appeals.  That court's decision on the PUC ruling will come down at some point during the briefing process in this case.

[5] The MPCA's section 401 certification decision is also currently pending at the Minnesota Court of Appeals.  That case has been briefed, and is scheduled to be argued on June 10, 2021.  Under Minnesota law, a decision must come down within 90 days of the oral argument.

[6] USACE Public Notice and Comment Responses, App. A., AR000478.

[7] *Id.*

(3) Corps could lawfully defer to Enbridge and Minnesota state agencies to decide whether the

project is in the public interest.[8]

Upon issuance of the Corps permits, Enbridge almost immediately began construction of

the new pipeline, and, according to Enbridge, it is about half completed.  It has not gone into

operation.  This Court declined the motion of the Red Lake plaintiffs for a preliminary injunction,[9]

and now the case is before the Court for decision on the merits.

## STANDING

Plaintiff Friends of the Headwaters is a membership-based nonprofit organization

dedicated to addressing the threat of new crude oil pipelines in central Minnesota.  Many of its

members live, work, and play near the proposed Line 3 route, and their economic, recreational,

and aesthetic interests are all currently being injured by Line 3 construction. Those interests will

be further impaired if the line goes into operation.[10]  That is more than enough to establish standing

for plaintiff Friends' members under *Friends of the Earth v. Laidlaw,* 528 U.S. 167, 191 (2000)

and Friends' associational standing under *Hunt v. Washington State Apple Adver. Comm'n,* 432

U.S. 333, 343 (1977).

## ARGUMENT

Under section 404 of the Clean Water Act, 33 U.S.C. § 1344, no one may discharge "dredge

or fill" material into waters of the United States, including wetlands, without a "404 permit" from

the U.S. Army Corps of Engineers.  To secure a 404 permit, an applicant must establish:

---

[8] *Id.* at AR00477.
[9] *Red Lake Band of Chippewa Indians v. U.S. Army Corps of Eng'rs,* 2021 WL 430054 (D.D.C. Feb. 7, 2021).
[10] *See* Declarations of Lowell Schellack, Elizabeth Baker Knutilla, Maurice Spangler, Douglas Rasch, and Richard Smith, attached as Exhibit A to plaintiff FOH's complaint.

(1) That there is no "less environmentally damaging practicable alternative" (LEDPA);

(2) That the project's effects, individually and cumulatively, will have no significant adverse effects on the environment ("significant impacts"); and

(3) That the project is in the public interest.[11]

Common sense and the plain meaning of the rules governing Corps permits would tell you that a new crude oil pipeline, set to carry 760,000 barrels of heavy "tar sands" oil a day through some of the most important and fragile freshwater resources in the country,[12] would have considerable difficulty meeting those 404 requirements. To do so at a time when domestic demand for refined petroleum products is declining and indeed must reach zero in less than 25 years to meet climate goals,[13] would seem virtually impossible.

Yet, in this case, the Corps had little difficulty making those findings. First, the Corps simply assumed a continuing need to transport additional oil, and so did not consider a genuine "no action" alternative. The Corps then compounded that error by refusing to consider different pipeline route alternatives which would pose a much smaller environmental risk. Second, the

---

[11] The LEDPA and "significant adverse effects" requirements are part of the "404(b)(1) Guidelines," 40 C.F.R. § 230.10, adopted by the EPA but binding on the Corps. The "public interest" requirement is part of the Corps' own rules. 33 C.F.R. § 320.4. Unlike the parallel "procedural" requirements of NEPA, the rules governing alternatives, adverse environmental effects, and the public interest are substantive and the Corps may not lawfully issue permits if there are less environmentally damaging alternatives, if the permitted project will cause significant degradation, or if the project is not in the public interest.

[12] *In the Matter of the Draft 401 Certification for the Line 3 Replacement Project*, OAH 60-2200-36909, ¶ 5, 3, AR010535 (Oct. 26, 2020); Section 401 Water Quality Certification, Minnesota Pollution Control Agency, 4, AR006208 (Nov. 12, 2020)

[13] The International Energy Agency (IEA) recently issued a report outlining the steps necessary to meet 2050 net-zero carbon goals. Among its conclusions are that exploitation of new oil and gas fields must stop this year, and sales of fossil-fuel-driven cars must stop by 2035.. IEA, *Net Zero by 2050: A Roadmap for the Global Energy Sector* (May 2021), https://www.iea.org/reports/net-zero-by-2050

Corps avoided a "significant adverse effects" finding by refusing to consider, for example, spill risks or climate risks of the Line 3 project as a whole, and instead limited its role to the choice of construction methods at particular water crossings.   Third, the Corps simply abdicated its responsibility to assess whether the project is in the public interest by deferring entirely to Enbridge's application materials and the Minnesota utility regulator's conclusions that the project was justified under state law as sufficient to prove that the project would be in the "public interest." Those decisions are each based on a misinterpretation of the applicable law.

I.   **THE CORPS' CONCLUSION THAT IT NEED NOT CONSIDER EITHER A STATUS QUO ALTERNATIVE OR LESS ENVIRONMENTALLY RISKY PIPELINE ROUTE ALTERNATIVES CANNOT BE RECONCILED WITH THE LEDPA RULE.**

Under the "Section 404(b)(1) Guidelines" governing Corps permits for projects that include the discharge of dredged or fill materials," the so-called "less environmentally damaging practicable alternative" or LEDPA rule sets a very high bar:

> No discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have a less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences.

40 C.F.R. § 230.10(a).   In order to be "practicable," an alternative must be available, achieve the overall project purpose (as defined by the Corps), and be feasible when considering cost, logistics, and existing technology.   Decision Document § 5.2 at 18, AR000365.

The LEDPA rule lists two alternatives that likely will be available for consideration in all cases:  first, activities that do not involve additional discharges at all, and second, moving potential discharges to "other locations" that are less risky.  40 C.F.R. § 230.10(a)(1)(i)-(ii).  For virtually any oil or gas pipeline project, then, there will always be two potential alternatives to consider: (1)

a status quo "no-build" alternative; and (2) alternative pipeline routes, i.e. siting the pipeline and any discharges into jurisdictional waters that may be involved away from significant aquatic resources that might otherwise be threatened.

In this case, the Corps considered neither of those alternatives.

First, the Corps simply took for granted Enbridge's assertion that expanding the capacity of its Mainline pipeline system to carry heavy tar sands oil was needed to "ensure continued reliable crude transportation to the refining industry in [the Midwest]" and "to meet current and forecasted demand." Decision Document §§ 3.0-3.4 at 16-17, AR000363-64.[14]  Consequently, the alternatives the Corps labelled "no action" all involved transporting *more* oil between the same locations by different means, such as rail or truck.[15]  The Corps did not consider the normal "no build" alternative of leaving the status quo as it is, with no additional oil transport capacity, and that, by itself, renders its alternatives analysis legally insufficient.  The analysis of the "no build" alternative is the only way to test the genuineness and value of the claimed purpose, and to determine whether it exceeds the costs of the adverse environmental impacts.

Of course, no one is arguing that the Corps must ignore Enbridge's proffered purpose and need statement.  But neither the rules nor any of the case law suggests that a project proponent's statement of purpose and need is binding.  That would make little sense.  It is in a project

---

[14] Meeting "current and forecasted demand" is the project purpose the Corps adopted.  Decision Document § 3.4, AR000364.  The Corps also adopted without question Enbridge's assertion that the Line 3 project would serve a safety goal, because, in exchange for getting permission to build a new pipeline, Enbridge would agree to retire an older pipeline carrying light crude on a different route.  Of course, that safety purpose, to the extent it is legitimate at all, could be met by retiring the old pipeline without building a new one, an alternative the Corps did not consider.
[15] The existing Line 3 has no capacity to carry heavy oil or "dilbit," and so, whether it stays in service or is retired before its easement over tribal lands expires in 2029 is immaterial.  The existing Line 3 is not an alternative to expand Enbridge's capacity to transport heavy oil.

proponent's interest to define "purpose and need" in a way that excludes alternatives that would be less financially attractive, even if they better protect rivers, streams, and wetlands. But here, the Corps simply accepts the project proponent's claim uncritically. Despite the obvious controversy, there is no independent Corps analysis of consumer demand for refined products, or even refinery demand for crude oil feedstocks,[16] and therefore no legally sufficient basis for concluding that any "no action" alternative that does not expand heavy oil transport capacity can be summarily rejected.

Second, the Corps flatly refused to consider alternative pipeline routes that the Minnesota PUC had not already approved, on the grounds that only PUC-approved routes could be "practicable."[17] By that same logic, of course, if there were no PUC routing approval, then presumably the Corps *would* have been obligated to evaluate routing options that would not put as many quality aquatic resources at risk.

State agency opposition to an alternative does not render that alternative impracticable. *Alliance to Save the Mattaponi v. U.S. Army Corps of Eng'rs,* 808 F.Supp.2d 121, 130 (D.D.C. 2009) (dismissing Virginia opposition to groundwater withdrawals as basis for rejecting alternative to reservoir project). Making state agency views on an alternative dispositive simply cannot be reconciled with the Corps' independent responsibilities. In effect, that rewrites the LEDPA rule— essentially adding a provision that the Corps need not consider routing or siting alternatives if some other agency, applying different law, has already approved one possible alternative.

---

[16] Nor is there evidence of such demand in the Minnesota PUC record. That was the conclusion of the state department of commerce's division of energy resources, and is what the state court of appeals may well conclude before briefing in this case is concluded.
[17] No one contends that the Minnesota PUC made any attempt to apply any of the federal law governing Corps permits to its own decisionmaking.

Moreover, such a rewriting of the rule creates a powerful incentive for a project proponent to time its permit applications so that its most favorable forum makes its routing or siting-related decisions first.  The timing of applications in effect becomes outcome-determinative, a result that neither Congress nor any of the agencies could have intended.[18]

Nothing in the rules supports the Corps' assertion that it can ignore "off-site" alternatives. To the contrary, 40 C.F.R. § 230.10(a) (1)(ii) expressly contemplates moving a project and its potential discharges to "other locations" to be a likely practicable alternative. Indeed, when it comes to "special aquatic sites" like the higher-functioning wetlands at risk in this case, (Decision Document § 6.5.2 at 37-38 AR00384-85) the rule says practicable alternatives that would avoid those resources are "presumed to be available" unless "clearly demonstrated otherwise."  40 C.F.R. § 230.10(a)(3) .   The Corps reading turns that presumption on its head.  Instead of presuming that a less damaging route is available, as the plain language of the rule indicates, the Corps presumes— indeed irrefutably presumes—that any alternative route that has not been previously approved by a state utility regulator is *not* available, even if it would better preserve the water resources the Corps is obligated to protect.  The truncated alternative analysis in this case simply cannot be reconciled with the plain language of the LEDPA rule.

## II.   THE CORPS' REFUSAL TO EVALUATE WHETHER THE LINE 3 PROJECT AS A WHOLE WOULD HAVE "SIGNIFICANT ADVERSE EFFECTS" ON THE ENVIRONMENT VIOLATES THE REQUIREMENTS OF THE 404(b)(1) GUIDELINES.

The "404(b)(1) Guidelines" provide that "no discharge of dredged or fill material shall be permitted which will cause or contribute to significant degradation of the waters of the United

---

[18] As this Court previously noted, the Corps can lawfully draw on data gathered by other agencies or by the applicant, but nothing gives the Corps authority to substitute state agency decisions under state law for the federal findings the federal law requires.

States."  40 C.F.R. § 230.10(c).  "Significant degradation" occurs when a project's effects, "considered individually or collectively," would have "significant adverse effects" on "human health or welfare," on "aquatic life and other wildlife dependent on aquatic ecosystems," on "aquatic ecosystem diversity, productivity, and stability," or on "recreational, aesthetic, and economic values." *Id.,* § 230.10(c)(1)-(4) .

No one disputes that Line 3 cannot be constructed without the discharge of dredged or fill material, and therefore without Corps permits.  And no one disputes that an oil spill, particularly in those locations where the line will cross protected rivers, streams, or wetlands, could have devastating consequences for all of the factors listed in section 230.10(c) above.

Yet, the Corps' position is that any risks from *operation* of the pipeline, as opposed to its initial *construction*, are outside the bounds of its jurisdiction or analysis.[19]  The Corps' view is that the agency's only role is to look at specific water and wetland crossings along the route in isolation, and assure through permit conditions that the companies follow best management practices to reduce immediate direct adverse impacts from trenching through or tunneling under waterways and wetlands and installing pipe.

Of course, trenching through or tunneling under waterways and wetlands and installing pipe also creates a previously nonexistent risk that there will be a future oil spill at that location that might cause catastrophic adverse effects on the environment.  The Corps does not deny that,

---

[19] In the earlier preliminary injunction proceedings, it appears the Corps reversed field and claimed that it *did* consider operational risks like spills from the Line 3 project.  What it actually did was say that, for one of the over 200 river and stream crossings along the route—the Lost River crossing--one could use the state environmental impact statement, and attempt to extrapolate from there what might happen if there was a spill at Lost River.  Lost River Equivalency Memo (Oct. 8, 2020), AR010603-06.  That is not by any stretch of the imagination an assessment of the spill risks posed by the Line 3 project at its 1000+ water and wetland crossing locations where the Corps has undisputed jurisdiction.

of course, but their interpretation of "cause or contribute to" in the rule only includes "direct, intentional, and immediate" causation.

"Cause or contribute to" is, however, a term of art that appears throughout environmental law, and it is never defined as narrowly as the Corps wants to define it in this case. When the EPA, for example, made its finding that greenhouse gas emissions "cause, or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare" under section 202(a)(1) of the Clean Air Act, 42 U.S.C. § 7521(a)(1), the EPA rejected the argument that "cause" had to mean "sole" or even "major" cause, and emphasized that the addition of the phrase "contribute to" meant the threshold had to be lower than that. EPA, Endangerment and Cause or Contribute to Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act, 74 Fed. Reg. 66,496, 66,506 (Dec. 15, 2009). Any other interpretation, according to the EPA, would be inconsistent with the precautionary and preventive focus of laws like the Clean Air Act and the Clean Water Act, which call upon agencies to assess both the likelihood and potential severity of future risks like oil spills, and not limit their role solely to addressing virtually certain, present harms. 33 U.S.C. § 1251(a)(1)-(2) (delineating precautionary goals of the Clean Water Act). The Corps' overly narrow interpretation of "cause or contribute to" not only does violence to the plain language, but it also hamstrings their ability to address the most significant potential consequences to water resources from the permits they issue.

### III. THE CORPS' "PUBLIC INTEREST REVIEW" OF THIS PROJECT IGNORES THE CRITICAL ISSUES AND DOES NOT MEET THE REQUIREMENTS OF THE CORPS' OWN RULES.

The Corps' rules require that it conduct a broad "public interest review" before issuing any permit. 33 C.F.R. § 320.4(a) . Permits may not be granted if they "would be contrary to the public interest." *Id.* Section 320.4(a)(1) requires that:

The decision whether to issue a permit will be based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity *and its intended use* on the public interest.  Evaluation of the probable impact which the proposed activity may have on the public interest requires a careful weighing of all those factors which become relevant in each particular case . . . That decision should reflect the national concern for both protection and utilization of important resources . . .

33 C.F.R. § 320.4(a)(1)(emphasis added).

Section 320.4(a)(2) further provides that, for every Corps permit application, the following general criteria must be considered:

(i)  The relative extent of the public and private need for the proposed structure or work;

(ii)  Where there are unresolved conflicts as to resource use, the practicability of using reasonable alternative locations and methods to accomplish the objective of the proposed structure or work; and

(iii)  The extent and permanence of the beneficial and/or detrimental effects which the proposed structure or work is likely to have on the public and private uses to which the area is suited.

33 C.F.R. § 320.4(a)(2).

Section 320.4 further requires the Corps, when considering whether to grant a permit, to try to prevent the "direct and indirect loss and damage" of fish and wildlife resources, § 320.4(c) , to avoid adverse effects on water quality, § 320.4(d) , to preserve historic, cultural, scenic, and recreational values,  § 320.4(e), to consider private property rights, § 320.4 (g), to avoid

12

degradation of floodplains, § 320.4 (l), and to evaluate whether there is a genuine "need for the project from the perspective of the overall public interest." § 320.4 (q).

The "public interest review" in the Corps' Decision Document for this project is taken virtually verbatim from Enbridge's application materials and the "environmental impact statement," which also relies on Enbridge's application materials, prepared under state law (not NEPA) by the Minnesota PUC.[20]   At no point does the Corps even acknowledge the contrary evidence in the record.   And the Corps simply ignores the critical questions on a number of key issues, including but not limited to the following:

*Economics* (DD § 7.3 at 49, AR 000396) and *Energy Needs* (DD 7.18 at 58, AR00405): The Corps notes that, as with *any* project, construction workers will be paid, that they will spend money, and they will pay taxes. That is the full extent of the Corps' analysis of economics.   There is no discussion of likely out-of-pocket costs for consumers who will ultimately pay for the pipeline's construction and operation, or any other costs. On energy needs, the Corps defers entirely to the Minnesota PUC.   But there is *no* acknowledgment in the Corps' decision that the Minnesota Department of Commerce Division of Energy Resources (DOC-DER), the state agency responsible for analyzing whether there is sufficient demand to justify large energy facilities like oil pipelines, found that there was *no* evidence of demand sufficient to justify this project.[21]

---

[20] The PUC's EIS has already been rejected once by the state court of appeals, *In re Enbridge Energy,* 930 N.W.2d 12 (Minn. Ct. App. 2019) for its failure to assess potential spill impacts on Lake Superior, and its "revised" EIS is on appeal again, with a decision likely in the next couple of weeks.

[21] *After extensive review, Minnesota Commerce Department releases expert analysis and recommendation on the certificate of need for Enbridge's proposed Line 3 oil pipeline project*, Dep't of Commerce – Div. of Energy Res., Sep. 11, 2017, AR151894-97 ("After extensive review, Minnesota Commerce Department releases expert analysis and recommendation on the certificate of need for Enbridge's proposed Line 3 oil pipeline project.  Oil market analysis indicates that Enbridge has not established a need for the proposed project; the pipeline would

Indeed, DOC-DER appealed from the PUC's certificate of need on precisely those grounds and they are quite likely to prevail in the next couple of weeks.[22]  If that occurs, the Corps will have no colorable basis for concluding that the benefits of this project outweigh its risks.

*Climate change* (DD § 7.5 at 51):  There is a single paragraph saying that, since the Corps does not have direct regulatory authority over air emissions, the climate change implications of a new pipeline carrying primarily "tar sands" oil are "negligible to minor" for their purposes.  *Id.* That of course essentially reads "general environmental concerns," over which the Corps almost never has direct regulatory authority, out of the rule.

*Wetlands* (DD § 7.6 at 52):  The Corps concedes that there will likely be adverse impacts on wetlands that will appear post-construction, but makes no attempt to estimate them, and concludes that Enbridge's obligation to avoid or minimize those impacts can be ignored since Enbridge agrees to buy wetland credits to compensate for those losses at some later date.[23]  The Corps' own compensatory mitigation rule flatly prohibits the Corps from jumping past avoidance and minimization to mitigation measures like buying wetland credits, yet the Corps ignores that prohibition when doing its public interest review.

These are not situations where experts disagree about the facts, and the Corps has to make its best scientific judgment.  These are legal conclusions that, when conducting its required "public

---

primarily benefit areas outside Minnesota; and serious environmental and socioeconomic risks and effects outweigh limited benefits.")

[22] See *In the Matter of the Application of Enbridge Energy, Limited Partnership, for a Certificate of Need and a Routing Permit for the Proposed Line 3 Replacement Project in Minnesota from the North Dakota Border to the Wisconsin Border*, A20-1071, (Minn. Ct. App. 2021) (pending)

[23] This was also a fatal flaw in the Minnesota Pollution Control Agency's certification under section 401 of the Clean Water Act, 33 U.S.C. § 1341, that the Line 3 project would not violate state water quality standards protecting wetlands.  That decision is currently on appeal to the Minnesota court of appeals, with oral argument set for June 10, 2021.

interest review," the Corps need not conduct any independent evaluation of economic or energy need justifications, even for a huge, risky project like this, that the Corps can ignore climate change impacts from operations, and that the Corps can simply defer consideration of likely wetland impacts until some unspecified future date.  Those positions cannot be reconciled with the plain language of the rule, and they must be overturned.

No one suggests that the Corps cannot draw on work done by other agencies, or by permit applicants, but that does not give the Corps a blank check to abdicate its responsibility under the rules to independently determine whether a project serves the public interest, and to deny a permit application when it does not.  On remand, the Corps should be directed to do its own analysis of the economic justifications for this pipeline project, its potential climate implications, and its total wetland impacts before deciding whether to grant any permits for this project.


## CONCLUSION

For the reasons stated above, and in co-plaintiffs' memorandum, plaintiff Friends of the Headwaters respectfully requests that this Court vacate defendant Corps' decisions not to prepare an environmental impact statement under NEPA, and vacate the Corps' permits granted for the Line 3 project.

*/s/ Scott Strand*
Scott Strand
*[Admitted Pro Hac Vice]*
Environmental Law and Policy Center
60 S. 6th St., Suite 2800
Minneapolis, MN 55402
T: (612)-386-6409
sstrand@elpc.org

/s/Howard A. Learner
Howard A. Learner
IL Bar # 3127346; DC Bar ID: IL0027
Environmental Law & Policy Center
35 East Wacker Drive, Suite 1600
Chicago, IL 60601
T: (312) 673-6500
F: (312) 795-3730
hlearner@elpc.org

/s/John Petoskey
John Petoskey
[Admitted Pro Hac Vice]
Environmental Law & Policy Center
35 East Wacker Drive, Suite 1600
Chicago, IL 60601
T: (312) 673-6500
F: (312) 795-3730
jpetoskey@elpc.org

Attorneys for Plaintiff Friends of the
Headwaters

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FRIENDS OF THE HEADWATERS, | |
| Plaintiff, | |
| v. | |
| UNITED STATES ARMY CORPS OF ENGINEERS, et al., | Case No. 1:20-cv-03817-CKK |
| Defendants, | [PROPOSED] ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT |
| ENBRIDGE ENERGY LP, | |
| Defendant-intervenor. | |

## [PROPOSED] ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on cross motions for summary judgment. Plaintiffs have moved this Court for an order granting them summary judgment, vacating the U.S. Army Corps of Engineers ("Corps") permits challenged in this lawsuit as violative of the Administrative Procedures Act,  and remanding this matter to On remand, the Plaintiffs request that the Court order the Corps to prepare an environmental impact statement for the Line 3 project prior to considering any new permits. Defendant has also submitted a cross motion for summary

1

judgment requesting the Court uphold its permits, and its environmental assessment and finding of no significant impact for the Line 3 project.

Both motions have been fully briefed with memoranda of law in support and opposition, including detailed statements of pertinent facts in the administrative record.

The Court has considered the arguments of the parties, the relevant law, and the undisputed facts and concludes that Plaintiff Friends of the Headwaters is entitled to judgment as a matter of law.

THEREFORE, it is this ____ day of _____, 2021, ORDERED that Plaintiffs' motions for summary judgment is GRANTED;

IT IS FURTHER ORDERED that Defendant Corps' cross motion for summary judgment is DENIED.

_____

Colleen Kollar-Kotelly
United States District Judge