UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| RED LAKE BAND OF CHIPPEWA INDIANS, WHITE EARTH BAND OF OJIBWE, HONOR THE EARTH, and SIERRA CLUB,<br><br>        Plaintiffs,<br><br>   v.<br><br>UNITED STATES ARMY CORPS OF ENGINEERS,<br><br>        Defendant,<br><br>ENBRIDGE ENERGY, LP<br><br>        Defendant-Intervenor. | Case No. 1:20-cv-03817-CKK |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................... iii

INTRODUCTION ........................................................................................... 1

STATEMENT OF FACTS AND PROCEDURAL HISTORY ........................... 2

STANDING ..................................................................................................... 5

STANDARD OF REVIEW .............................................................................. 7

ARGUMENT ................................................................................................... 8

I.     THE CORPS VIOLATED NEPA BY FAILING TO TAKE A HARD LOOK AT THE PROJECT'S CONSEQUENCES. ............................................................... 8

     A.     The Corps Did Not Fully Account for the Project's Contributions to Climate Change. ...................................................................................... 8

     B.     The Corps Did Not Fully Account for Environmental Justice Considerations. ..................................................................................... 11

     C.     The Corps Did Not Fully Account for the Project's Effects on the Tribes' Rights to Hunt, Fish, and Gather Natural Resources. ............................. 14

     D.     The Corps Did Not Fully Account for Potentially Significant Impacts to Wetlands, Waterbodies, and Animal Species. ....................................... 16

     E.     The Corps Did Not Conduct an Adequate Analysis of Alternatives. ................... 17

II.     THE CORPS VIOLATED NEPA BY FAILING TO PREPARE AN EIS. ..................... 19

     A.     Highly Controversial Aspects of the Project Make Its Impact Significant. ........... 20

     B.     The Uncertain Effects of the Project Render Its Impacts Significant. .................. 22

     C.     The Project's Material Risk of Grave or Catastrophic Harms Render its Impact Significant. ............................................................................... 23

III.     THE CORPS ARBITRARILY AND CAPRICIOUSLY DETERMINED THAT THE PROJECT WILL NOT BE INJURIOUS TO THE PUBLIC INTEREST. .............. 24

     A.     The Corps Arbitrarily and Capriciously Ignored Reasonably Foreseeable Impacts of the Project's Construction and Operation. ............................. 24

     B.     The Corps Arbitrarily and Capriciously Considered the Benefits of the Project's Operation While Overlooking its Detriments. ......................... 28

     C.     The Corps Arbitrarily and Capriciously Ignored Evidence that There Is No Public Need for the Project. .................................................................. 29

CONCLUSION ............................................................................................... 30

# TABLE OF AUTHORITIES

*\* Authorities upon which we chiefly rely are marked with an asterisk.*

## CASES

Page number(s)

*Allen v. Nat'l Insts. of Health*,
  974 F. Supp. 2d 18 (D. Mass. 2013) .............................................................12

*Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*,
  No. 18-23-SDD-EWD, 2020 WL 1450750 (M.D. La. Mar. 25, 2020) ................24–25, 26

*Border Power Plant Working Grp. v. Dep't of Energy*,
  260 F. Supp. 2d 997 (S.D. Cal. 2003) .............................................................11

*Burlington Truck Lines v. United States*,
  371 U.S. 156 (1962) ....................................................................................8

*Calvert Cliffs' Coordinating Comm. v. Atomic Energy Comm'n*,
  449 F.2d 1109 (D.C. Cir. 1971) .....................................................................10

*Citizens Against Burlington, Inc. v. Busey*,
  938 F.2d 190 (D.C. Cir. 1991) .......................................................................17

*Columbia Riverkeeper v. U.S. Army Corps of Eng'rs*,
  2020 WL 6874871 (W.D. Wash. Nov. 23, 2020) .......................................10, 28

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
  508 F.3d 508 (9th Cir. 2007) ..........................................................................9

*Ethyl Corp. v. EPA*,
  541 F.2d 1 (D.C. Cir. 1976) ............................................................................8

*Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric.*,
  681 F.2d 1172 (9th Cir. 1982) .......................................................................20

*Fox Bay Partners v. U.S. Army Corps of Eng'rs*,
  831 F. Supp. 605 (N.D. Ill. 1993) ...................................................................25

*Friends of the Capital Crescent Trail v. Fed. Transit Admin.*,
  877 F.3d 1051 (D.C. Cir. 2017) ................................................................18, 19

*Friends of the Earth, Inc. v. U.S. Army Corps of Eng'rs*,
  109 F. Supp. 2d 30 (D.D.C. 2000) .................................................................20

*Fund for Animals v. Norton*,
  294 F. Supp. 2d 92 (D.D.C. 2003) .................................................................16

*Gov't of Province of Manitoba v. Norton*,
    398 F. Supp. 2d 41 (D.D.C. 2005) ................................................................23

*Hoosier Env't Council v. U.S. Army Corps of Eng'rs*,
    722 F.3d 1053 (7th Cir. 2013) .......................................................................19

*Hough v. Marsh*,
    557 F. Supp. 74 (D. Mass. 1982) ...................................................................28

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977) .....................................................................................5, 6

*In re Enbridge Energy, Ltd. P'ship*,
    930 N.W.2d 12 (Minn. Ct. App. 2019) ..........................................................21

*Indigenous Env't Network v. U.S. Dep't of State*,
    347 F. Supp. 3d 561 (D. Mont. 2018) ...........................................................11

*Indigenous Env't Network v. U.S. Dep't of State*,
    317 F. Supp. 3d 1118 (D. Mont. 2018) ..........................................................18

*Marsh v. Oregon Nat. Res. Council*,
    490 U.S. 360 (1989) ......................................................................................18

*Mid States Coal. for Progress v. Surface Transp. Bd.*,
    345 F.3d 520 (8th Cir. 2003) .........................................................................10

*Minnesota v. Mille Lacs Band of Chippewa Indians*,
    526 U.S. 172 (1999) ......................................................................................14

*Motor Vehicles Mfrs. Ass'n v. State Farm Mutual Auto Ins. Co.*,
    463 U.S. 29 (1983) ......................................................................................7, 8

*Nat. Res. Def. Council v. U.S. Army Corps of Eng'rs*,
    No. 09-CV-588, 2010 WL 1416681 (N.D. Ohio Mar. 31, 2010) ....................24

*Nat'l Parks Conservation Ass'n v. Semonite*,
    311 F. Supp. 3d 350 (D.D.C. 2018) ...............................................................29

*Nat'l Parks Conservation Ass'n v. United States*,
    177 F. Supp. 3d 1 (D.D.C. 2016) ...................................................................20

*Ocean Advocates v. U.S. Army Corps of Eng'rs*,
    402 F.3d 846 (9th Cir. 2005) .........................................................................22

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*,
  547 U.S. 47 (2006) ...........................................................................................5

*Sierra Club v. Antwerp*,
  661 F.3d 1147 (D.C. Cir. 2011) .......................................................................8

*Sierra Club v. FERC*,
  827 F.3d 36 (D.C. Cir. 2016) ...........................................................................7

* *Sierra Club v. FERC*,
  867 F.3d 1357 (D.C. Cir. 2017) .......................................................9, 10, 11, 18

*Sierra Club v. Peterson*,
  717 F.2d 1409 (D.C. Cir. 1983) ................................................................19–20

* *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  255 F. Supp. 3d 101 (D.D.C. 2017) ...........................................8, 11, 12, 14, 15

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  301 F. Supp. 3d 50 (D.D.C. 2018) ....................................................................5

* *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  985 F.3d 1032 (D.C. Cir. 2021) .................................................19, 20, 21, 22, 23

*TOMAC, Taxpayers of Mich. Against Casinos v. Norton*,
  433 F.3d 852 (D.C. Cir. 2006) .........................................................................8

*United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*,
  517 U.S. 544 (1996) ........................................................................................6

*United States v. Adair*,
  723 F.2d 1394 (9th Cir. 1983) ........................................................................14

*United States v. Washington*,
  506 F. Supp. 187 (W.D. Wash. 1980) .............................................................14

*United States v. Washington*,
  853 F.3d 946 (9th Cir. 2017) ..........................................................................14

*United Techs. Corp. v. Dep't of Def.*,
  601 F.3d 557 (D.C. Cir. 2010) .........................................................................8

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
  454 U.S. 464 (1982) ........................................................................................6

*White Tanks Concerned Citizens, Inc. v. Strock*,
    563 F. 3d 1033 (9th Cir. 2009) .................................................................9–10, 15

*WildEarth Guardians v. Jewell*,
    738 F.3d 298 (D.C. Cir. 2013) .............................................................................6

## STATUTES

5 U.S.C. § 551 ...............................................................................................................1

5 U.S.C. § 706(2)(A)......................................................................................................7

33 U.S.C. § 408 .............................................................................................................1

33 U.S.C. § 1344 ...........................................................................................................1

42 U.S.C. §§ 4321–35 ...................................................................................................1

## REGULATIONS

33 C.F.R. § 320.4(a)......................................................................................24, 25, 26

40 C.F.R. § 1506.2 ......................................................................................................18

40 C.F.R. § 1502.16 (2019) .......................................................................................10

## OTHER AUTHORITIES

CEQ, *Environmental Justice: Guidance Under the National Environmental Policy Act*
    (Dec. 10, 1997) .......................................................................................................12

Exec. Order No. 12,898, Federal Actions to Address Environmental Justice in Minority
    Populations and Low-Income Populations, 59 Fed. Reg. 7629 (Feb. 11, 1994) ...............11

Purple Line Final Environmental Impact Statement and Draft 4(f) Evaluation (2013),
    https://www.purplelinemd.com/component/jdownloads/send/23-volume-1/104-
    chapter-1-purpose-and-need .................................................................................19

## INTRODUCTION

The U.S. Army Corps of Engineers ("Corps") must review any project it approves under Section 404 of the Clean Water Act ("CWA"), 33 U.S.C. § 1344, and Section 14 of the Rivers and Harbors Act ("Section 408"), 33 U.S.C. § 408, to avoid unreasonable threats to waterways and wetlands. As part of that review, the Corps is obligated under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–35, to assess the project's reasonably foreseeable direct, indirect, and cumulative effects and to prepare an Environmental Impact Statement ("EIS") if those effects could be significant. In all its actions, the Corps must honor the promises that the federal government has made—and often broken—to Tribal Nations by seriously considering a project's effects on Native American tribes and their resources.

The Corps failed to fulfill these obligations in approving an application by Enbridge Energy, LP ("Enbridge") to construct a new pipeline (the "Project") which will transport 760,000 barrels of crude oil per day, including carbon-intensive tar sands oil, for 338-miles across 227 waterbodies and 885 wetlands; dredge and fill over 1,000 acres of wetlands; and scar hundreds of miles of pristine lands and habitat in territory critical to local tribes. Instead of fully analyzing the Project's impacts, the Corps shirked its responsibilities. It ignored the Project's greenhouse gas emissions; overlooked harm to the Red Lake Band of Chippewa Indians and White Earth Band of Ojibwe (collectively, "Tribes"); and refused to consider reasonable alternatives that would cause less harm to the Tribes and threaten fewer pristine waterways and wetlands. It failed to prepare an EIS. And it inappropriately skewed its public interest assessment by emphasizing the Project's alleged benefits and ignoring its clear costs.

In short, the Corps' analysis was contrary to NEPA, the CWA, and the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, which prohibits agency decisionmaking that is unlawful, arbitrary, or capricious. Accordingly, the Corps' decision must be vacated.

1

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

With the Corps' approval, Enbridge currently is constructing its 338-mile crude oil pipeline—together with associated facilities, including thirty-seven above-ground valves, four new and four expanded pump stations, transmission lines, and approximately 288 access roads—through the lands and waters of northern Minnesota.  AR000352 [JA ___]; AR097750 [JA __]. Although the Corps characterizes this Project as the "replacement" of an existing pipeline with only minimal effects, the Project differs from the existing pipeline in at least two important respects.  Despite acknowledging these differences, the Corps alternately downplayed and overlooked the impacts they will have, determined that the Project will have no significant environmental impacts, and declined to prepare an EIS.  However, the record shows that the Project threatens serious harm to people and the environment.

*First*, the Project will follow a different, longer route than the existing pipeline, passing within ten miles of the Red Lake Reservation and within three miles of the White Earth Reservation, though territory in which tribal citizens long have engaged in subsistence fishing, hunting, and gathering.  The Tribes are tied to the natural resources in this place.  *See* Aubid Decl. ¶ 3, ECF No. 2-10 at 1 ("The Ojibwe and Anishinaabe people have lived in [northern Minnesota] since 1730, and since then, they have hunted, fished, and gathered both on and off their reservations."); LaDuke Decl. ¶ 7, ECF No. 2-12 at 3 ("I am a traditional harvester of wild rice, medicinal plants, maple syrup, fish and other animals, and I live from this land. Indakiingimin.  This is the land to which I belong."); Strong Decl. ¶ 10, ECF No. 2-13 at 3–4 ("Our people have different harvesting and gathering sites scattered throughout the lands surrounding the Red Lake Reservation.  We live sustainably by utilizing different sites at different times.  We have found a balance that works for us and the natural environment.  The loss of any one site—as a result of an oil spill, tree removal, or any other disruption—would be

2

very damaging.  It would disrupt the balance that we have maintained over many years, and it would threaten our ability to live off the land.").  The Corps acknowledged both that the Tribes engage in cultural and subsistence practices in and around the Project's path and that they have rights to continue these practices.  AR000400 [JA___].

The record demonstrates that the Project will damage natural resources and wildlife habitat, including in culturally significant areas.  According to the Corps, Enbridge will remove native vegetation along the Project's entire route, so that at least a 10-foot-wide swath remains largely free of vegetation and an additional 20-foot-wide swath remains clear of trees.  AR000383 [JA___].  Enbridge also will destroy 9.97 acres of wetlands and permanently convert more than 230 additional acres of scrub-shrub and forested wetlands to emergent-type wetlands, reducing their capacity to perform critical functions and altering their value as habitat.  *See* Triplett Decl. ¶¶ 7–10, ECF No. 2-14 at 3–5.  The Corps admits that the destruction, degradation, and fragmentation of habitat could harm native plants and wildlife, potentially resulting in population declines and extirpation.  AR000383 [JA___].  This damage will be especially severe in the "large undisturbed" areas along the Project's route.  *Id*.

*Second*, the Project will substitute a new 36-inch diameter pipeline for the existing 34-inch pipeline, immediately increasing capacity to approximately 760,000 barrels per day ("bpd").  AR097740 [JA___].  With this increased capacity, the Project will carry heavy diluted bitumen, *see* AR000368 [JA___], an especially dirty fuel, AR097753–57 [JA___], in addition to lighter crude oil.[1]  As the U.S. Department of State has acknowledged, when diluted bitumen spills into a waterbody, it poses "more difficult cleanup scenarios" than other types of crude oil.  *See*

_____

[1] Unlike light crude, bitumen naturally occurs as a viscous mass with the consistency of peanut butter.  AR097754 [JA___].  Before it can flow through pipelines, bitumen must be diluted with lighter chemicals, resulting in diluted bitumen or "dilbit."  *Id*.

AR097755 [JA___] (quoting Keystone XL FSEIS at 3.13-10 (2014)).  For instance, in 2010, Enbridge spilled approximately 840,000 gallons of diluted bitumen—that is, more than ninety tanker trucks' worth—near Marshall, Michigan.  AR097757 [JA___].  Once the spill reached the Kalamazoo River, the bitumen sank, coating wildlife and the river bottom, while the diluting chemicals rose to the water's surface and evaporated, emitting toxic fumes that sent hundreds of people to the hospital.  AR097758 [JA___].  Not only is diluted bitumen more damaging to the aquatic environment, but it also generates almost triple the climate pollution as conventional oil. AR097770 [JA___].

Throughout Enbridge's permit application process, Plaintiffs submitted extensive comments, complete with citations to reputable scientific sources and expert reports, highlighting the Project's many potential harms.  In addition, Plaintiffs repeatedly called on the Corps to prepare an EIS analyzing these harms.  *See, e.g.*, AR097739 [JA___]; AR033893 [JA___]. Despite substantial evidence that the Project will have significant environmental impacts, the Corps opted to prepare two environmental assessments ("EA")—one concerning Enbridge's application to discharge dredge and fill materials into 1,050.71 acres of waters of the United States under CWA Section 404 ("404 EA"), which included the Corps' rationale for issuing the 404 permits, and the other authorizing work at the Lost River crossing under Section 408 ("408 EA")—rather than a more thorough EIS.

The Corps issued permits for the Project on November 23, 2020 without making its EAs available to the public.  After filing a request under the Freedom of Information Act, Sierra Club was able to obtain the 404 EA, including some appendices but not the 408 EA, on December 8, 2020.  *See* Hayes Decl. ¶ 8, ECF No. 2-15 at 2–3.  The Corps gave no indication that a second EA existed before it released a second batch of records, including its 408 EA, to Sierra Club on

January 11, 2021, nineteen days after Plaintiffs filed their complaint and motion for preliminary injunction.  *See* Hayes Suppl. Decl. ¶ 4, ECF No. 33-1 at 2.  And, despite receiving additional time to compile its administrative record in this case, the Corps filed two sets of records *after* this Court's May 5, 2021 deadline for filing the certified Administrative Record.  The Corps notified Plaintiffs on May 24, 2021—after the deadline set by the Court for responding to issues regarding the contents of the record and two days before Plaintiffs' deadline to file the motion for summary judgment—that it had found fifteen additional documents that it provided to Plaintiffs but has yet to add to the certified index.[2]

## STANDING

Plaintiffs have standing to bring this challenge.  The Red Lake and White Earth Bands are federally recognized tribes that are directly injured by a project that threatens lands and resources subject to treaties entered into by the Tribes and the United States Government.  *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 301 F. Supp. 3d 50, 60–61 (D.D.C. 2018) (finding that a tribe had standing to bring a NEPA claim based on tribal members' past use of areas affected by construction and operation of a pipeline, as well as the injuries they feared from the pipeline's presence on those lands).[3]  Plaintiffs also have standing to sue on behalf of their members and citizens.  The interests Plaintiffs seek to protect are germane to their purpose*;* neither the claims asserted nor the relief requested requires the participation of individual members in the lawsuit; and Plaintiffs' members and citizens would have standing to sue in their own right.  *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

---

[2] Plaintiffs reserve the right to address in subsequent filings any new issues or arguments that arise from review of these 15 additional documents, which were provided without sufficient time for Plaintiffs to review and incorporate into their Motion for Summary Judgment.

[3] "[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006).

In particular, Plaintiffs bring this challenge to prevent the ill-considered destruction of northern Minnesota's natural resources, the protection of which is an interest germane to each Plaintiff's purpose.  The Tribes have relied on the natural resources in this area for hundreds of years.  *See, e.g.*, Aubid Decl. ¶ 3, ECF No. 2-10 at 1; Strong Decl ¶ 6–7, ECF No. 2-13 at 1–2 (explaining that the Red Lake Band settled in northern Minnesota "[t]housands of years ago, [because] our leaders had prophesies that told us to migrate to a place where food grows on the water," and "[w]e believe that the prophesies brought us here to protect us and provide us with food forever").  Plaintiffs Honor the Earth and Sierra Club exist to support tribal citizens and protect natural resources.  *See* LaDuke Decl. ¶ 4, ECF No. 2-12 at 2; Hayes Decl. ¶ 2, ECF No. 2-15 at 1.

Although the participation of individual members or citizens in this lawsuit is not necessary, *see United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996) (citing *Hunt*, 432 U.S. at 343), Plaintiffs' members and citizens have standing to sue in their own right.  Their members have suffered an actual or threatened injury; that injury is traceable to the Corps' action; and the injury is likely to be redressed by a favorable judicial ruling.  *See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982); *see, e.g.*, *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305–06 (D.C. Cir. 2013) (finding that an agency's failure to prepare an adequate EIS caused injury).

Plaintiffs' members unquestionably have suffered injuries, because the Corps failed to adequately review the Project's impacts and did not prepare an EIS, and the Corps' approval of the Project threatens their use and enjoyment of northern Minnesota's natural resources.  *See, e.g.*, Aubid Decl. ¶ 10, ECF No. 2-10 at 4 ("I . . . worry greatly that both oil spills from the pipeline and Enbridge's discharge of fill material into nearby waterbodies will destroy our ability

to grow wild rice and fish in the area.  Losing access to these important economic and cultural resources would be traumatic and would damage my ability to make a living."); Gaither Decl. ¶ 7, ECF No. 2-11 at 4 ("I am very concerned that the pipeline will jeopardize my ability to live sustainably and enjoy nature."); LaDuke Decl. ¶ 19, ECF No. 2-12 at 7 ("I am afraid for my children and grandchildren, and I particularly fear that the gifts from the Creator are being put into extreme danger and risk by this pipeline.").  The injuries suffered by Plaintiffs' members and citizens are traceable to the Corps' action, and they will be redressed by a favorable judicial decision.  *See Sierra Club v. FERC*, 827 F.3d 36, 43–44 (D.C. Cir. 2016); *see, e.g.*, Gaither Decl. ¶ 14, ECF No. 2-11at 6 ("If the Corps were to take a close, careful look at the consequences of pipeline construction and operation, I would feel more confident that government decision-makers were on the right track."); Strong Decl. ¶ 14, ECF No. 2-13 at 6 ("I would feel much more comfortable with the pipeline if I felt confident that the decision-makers in charge had considered the risk of an oil spill and taken appropriate steps to protect the land, the water, and the people who depend upon them.").

## STANDARD OF REVIEW

Under the Administrative Procedure Act ("APA"), a reviewing court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Agency action is arbitrary and capricious if, for example, "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicles Mfrs. Ass'n v. State Farm Mutual Auto Ins. Co.*, 463 U.S. 29, 43 (1983).  Therefore, a reviewing court may uphold agency action *only if* the agency "examine[d] the relevant data and articulate[d] a

satisfactory explanation for its action including a 'rational connection between the facts found

and the choice made.'" *Id.* (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168

(1962)).  Courts must not "rubber-stamp" agency decisions, *Ethyl Corp. v. EPA*, 541 F.2d 1, 34

(D.C. Cir. 1976), or "defer to the agency's conclusory or unsupported suppositions." *Standing

Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 121–22 (D.D.C. 2017)

(quoting *United Techs. Corp. v. Dep't of Def.*, 601 F.3d 557, 562 (D.C. Cir. 2010)).

## ARGUMENT

**I.     THE CORPS VIOLATED NEPA BY FAILING TO TAKE A HARD LOOK AT THE PROJECT'S CONSEQUENCES.**

In reviewing an agency's EA and decision not to prepare an EIS, courts must "ensure

'that no arguably significant consequences have been ignored.'" *Standing Rock Sioux Tribe*, 255

F. Supp. 3d at 122 (quoting *TOMAC, Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d

852, 860 (D.C. Cir. 2006)).  To determine whether the agency's EA is inadequate, triggering the

need for more thorough review, a court must consider whether the agency failed to take a "hard

look" at the relevant environmental concerns.  *Standing Rock Sioux Tribe*, 255 F. Supp. 3d at 122

(quoting *Sierra Club v. Antwerp*, 661 F.3d 1147, 1154 (D.C. Cir. 2011)).  Here, as described

more fully below, the Corps' analysis fails.  The Corps failed to take a hard look at the Project's

contributions to climate change, environmental justice considerations, the Tribes' rights to

continue using natural resources, the Project's impacts to species and habitats, and the full range

of reasonable alternatives.  Both its EA and conclusion that the Project would have no significant

impact, therefore, do not meet NEPA's requirements and must be vacated.

### A.     The Corps Did Not Fully Account for the Project's Contributions to Climate Change.

The Corps had notice that this Project would exacerbate the climate crisis.  *See*

AR097773 [JA __] (explaining the causal connection between the Project and greenhouse gas

emissions associated with 760,000 bpd of heavy and light crude oil); AR097775 [JA___]

(reporting a conclusion by a Minnesota Administrative Law Judge ("ALJ") that the Project's

life-cycle greenhouse gas emissions will be equivalent to 193 million tons of carbon dioxide,

totaling $287 billion in social costs).  Nonetheless, the Corps closed its eyes both to the

greenhouse gas emissions associated with the Project's construction and to the "emissions that

the [Project] will make possible" through its operation, *see Sierra Club v. FERC*, 867 F.3d 1357,

1371 (D.C. Cir. 2017), acknowledging only that the authorized destruction of wetlands *could*

contribute to climate change.  *See* AR000398 [JA___].[4]  In the absence of any meaningful

analysis of construction- and operation-related emissions, the Corps could not "engage in

'informed decision making' with respect to the greenhouse-gas effects of this [P]roject."  *See*

*Sierra Club*, 867 F.3d at 1374.  Therefore, the Corps' approval of the Project violated NEPA.

Although the Corps admitted that construction-related emissions are "associated with the

Corps' federal action," *see* AR000398 [JA___], it did not quantify or meaningfully consider

those emissions.  Instead, the Corps asserted that it has no authority to regulate emissions from

the combustion of fossil fuels and stated that those emissions are subject to regulation by other

federal agencies.  *Id*.  Contrary to the Corps' suggestion, however, its authority to regulate the

combustion of fossil fuels is immaterial to its obligations under NEPA.  *See, e.g.*, *White Tanks*

---

[4] Even with respect to this impermissibly narrow range of climate-polluting activities, the Corps
did not quantify or consider the significance of greenhouse gas emissions, beyond its bald
assertion that any harm would be *de minimis*.  AR000398 [JA___].  This assertion
misunderstands both the Corps' responsibilities under NEPA and the nature of climate change
itself.  "[T]he fact that 'climate change is largely a global phenomenon that includes actions that
are outside of [an] agency's control does not release the agency from the duty of assessing the
effects of *its* actions on global warming within the context of other actions that also affect global
warming." *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 508 F.3d 508,
550 (9th Cir. 2007).  To the contrary, "[t]he impact of greenhouse gas emissions on climate
change is precisely the kind of cumulative impacts analysis that NEPA requires agencies to
conduct." *Id.*

*Concerned Citizens, Inc. v. Strock*, 563 F. 3d 1033, 1039–40 (9th Cir. 2009) (explaining the difference between the Corps' regulatory jurisdiction and the scope of analysis required under NEPA).  And "the existence of permit requirements overseen by another federal agency or state permitting authority cannot substitute for a proper NEPA analysis." *Sierra Club*, 867 F.3d at 1371 (citing *Calvert Cliffs' Coordinating Comm. v. Atomic Energy Comm'n*, 449 F.2d 1109, 1122–23 (D.C. Cir. 1971)).  Courts consistently have required the Corps and other agencies either to quantify and consider the emissions traceable to their activities or explain in detail why they cannot do so. *See id.* at 1375.  Because the Corps did neither here, its analysis cannot stand.

In addition to impermissibly dismissing greenhouse gas emissions associated with the Project's construction, the Corps failed to disclose and analyze emissions that will result from the achievement of the Project's basic purpose: the "[t]ransportation of crude oil" destined for combustion.  *See* AR000364 [JA___].  This failure, too, violates NEPA, which requires agencies to "consider not only the direct effects, but also the *indirect* environmental effects" of the projects they approve.  *See Sierra Club*, 867 F.3d at 1371 (quoting 40 C.F.R. § 1502.16 (2019)).  With respect to approval of a pipeline, indirect effects include, *at a minimum*, "the amount of . . . carbon emissions that the pipeline will make possible."  *Id.*; *cf. Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 548–49 (8th Cir. 2003) (finding that the Surface Transportation Board had a responsibility under NEPA to consider effects on air quality that would result from increased availability of coal before approving a proposal to construct and upgrade a rail line that would improve options for coal transport); *Columbia Riverkeeper v. U.S. Army Corps of Eng'rs*, 2020 WL 6874871, at *4 (W.D. Wash. Nov. 23, 2020) (concluding that the Corps' review under NEPA of a fracked gas-to-methanol refinery was arbitrary and capricious because the Corps failed to consider the "reasonably foreseeable indirect cumulative

10

effects of the Project's greenhouse gas emissions," which included "increased fracking (and attendant emissions)"); *Border Power Plant Working Grp. v. Dep't of Energy*, 260 F. Supp. 2d 997, 1028–29 (S.D. Cal. 2003) (concluding that the U.S. Department of Energy violated NEPA by "fail[ing] to disclose and analyze" the significance of carbon dioxide emissions from gas turbines before permitting a transmission line that would transport power from those turbines). Thus, a federal court recently enjoined construction and operation of a pipeline in part because the U.S. Department of State did not adequately evaluate greenhouse gas emissions associated with that pipeline before authorizing it to cross into the United States. *See Indigenous Env't Network v. U.S. Dep't of State*, 347 F. Supp. 3d 561, 577–79 (D. Mont. 2018).

The Corps cannot remedy its failure to take a hard look at the Project's contribution to climate change merely by observing in a single sentence that "[a]n analysis of greenhouse gas emissions was conducted by the Minnesota Department of State and included in the State EIS." *See* AR000398 [JA___]. *First*, as explained above, the fact that a state agency will oversee some aspects of a project "cannot substitute for a proper NEPA analysis." *Sierra Club*, 867 F.3d at 1375. *Second*, even in situations in which a federal agency seeks to rely on information presented in its *own* prior NEPA reviews, courts require the agency to reproduce that information and present some reasoned analysis indicating that it would reach the same conclusions in the present review. *See Indigenous Env't Network*, 347 F. Supp. 3d at 578–79. The Corps need not reinvent the wheel, but it must at least identify the particular conclusions from the State EIS on which it intends to rely and explain why it believes those conclusions are valid. The Corps failed to do so here.

## B.     The Corps Did Not Fully Account for Environmental Justice Considerations.

Under NEPA, the Corps must conduct an environmental justice analysis "to determine whether a project will have a disproportionately adverse effect on minority and low income

populations." *Standing Rock Sioux Tribe*, 255 F. Supp. 3d at 140 (quoting *Allen v. Nat'l Insts. of Health*, 974 F. Supp. 2d 18, 47 (D. Mass. 2013)); *see also* Exec. Order No. 12,898, Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations, 59 Fed. Reg. 7629, 7629 (Feb. 11, 1994) (directing agencies to "identify[] and address[], as appropriate, disproportionately high and adverse human health or environmental effects of [their] programs, policies, and activities on minority populations and low-income populations"). The Council on Environmental Quality ("CEQ") has published guidance to assist the Corps and other agencies "in ensuring that environmental justice concerns 'are effectively identified and addressed.'" *Standing Rock Sioux Tribe*, 255 F. Supp. 3d at 136 (quoting CEQ, *Environmental Justice: Guidance Under the National Environmental Policy Act* 1 (Dec. 10, 1997)). Especially relevant here, CEQ expressly advises that "the impacts [to] . . . Indian tribes may be different from impacts on the general population due to a community's distinct cultural practices . . . such as subsistence fish, vegetation, or wildlife consumption." CEQ, *Environmental Justice: Guidance Under the National Environmental Policy Act*, at 14.

To satisfy its responsibility to consider environmental justice under NEPA, the Corps must offer more than "a bare-bones conclusion" that its action will not result in disproportionate harm. *Standing Rock Sioux Tribe*, 255 F. Supp. 3d at 140. The Corps fails that test here. The Corps provided minimal explanation to support its determination that the Project's *construction* was unlikely to reduce the "overall availability" of subsistence resources, *see* AR000401 [JA___], and it baldly asserted that an oil spill at a single location along the Project's route would not raise environmental justice concerns, *see* AR000473–74 [JA___–__]. These bare-bones conclusions fall short of any meaningful analysis indicating whether and to what extent the Project would interfere with the Tribes' "subsistence fish, vegetation, [and] wildlife

consumption." *See* CEQ, *Environmental Justice: Guidance Under the National Environmental Policy Act*, at 14.

The Corps had notice that the Tribes and their members rely on subsistence fishing, hunting, and gathering. *See, e.g.*, AR098645 [JA___] (reporting the ALJ's finding that "Anishinaabe tribes depend on traditional land use activities and related natural resources that exist in the Project Area, such as wild rice gathering locations, hunting and fishing habitats, [and] hunting trails"); AR151769 [JA__] ("Having large, unbroken areas for hunting activities is vital to traditional lifestyles."). Nonetheless, even though the Corps acknowledged that oil spills "commonly" result in "acute toxicity" to fish, *see* AR002551 [JA___], it failed to consider how an oil spill-triggered fish kill would affect tribal citizens who engage in subsistence fishing at multiple locations along the Project's route. Similarly, the Corps rejected a request to mitigate the destruction of stands of fruit- and nut-bearing trees and shrubs, *see* AR000467 [JA___], without addressing how the loss of those stands would affect tribal citizens' ability to harvest fruits and nuts for subsistence purposes. And the Corps conceded that the Project will destroy habitat and displace wildlife, potentially resulting in the extirpation of species, *see* AR000383 [JA___], but it did not explain how that destruction, displacement, and extirpation would affect tribal citizens who rely on subsistence hunting.

The Corps' lack of detailed analysis is significant—and fatal—because the Anishinaabe depend for their survival on the presence of *specific* resources at *specific* locations. *See, e.g.*, AR151570 [JA___] ("[T]he pipeline would run adjacent to the largest berry patches in the region. . . . The Anishinaabe have traveled to and camped next to these berry patches for hundreds of years. We depend on these berries for nourishment . . . ."); AR151567 [JA___] ("The Anishinaabe have a rich and long-standing spiritual connection to the land. . . . The land

13

is used for hunting, fishing, and gathering.  . . .  It's where we harvest our plants with medicinal and spiritual uses.  The people and the land cannot be separated.").  Thus, even if—as the Corps optimistically assumes—wildlife merely "shift habitat and movement locations as a result of the Project," *see* AR000384 [JA___], that shift could negatively affect tribal citizens who, for a variety of reasons, may be unable to adapt their longstanding subsistence practices accordingly. For the same reason, off-site mitigation is unlikely to prevent harm to tribal citizens.  The Corps' analysis is inadequate because it is "silent . . . on the distinct cultural practices . . . and the social and economic factors that might amplify [the Tribes'] experience of the [Project's] environmental effects."  *See Standing Rock Sioux Tribe*, 255 F. Supp. 3d at 140.

### C.   The Corps Did Not Fully Account for the Project's Effects on the Tribes' Rights to Hunt, Fish, and Gather Natural Resources.

Not only did the Corps fail to grapple with the Tribes' longstanding subsistence uses of natural resources, as explained above, but it also failed to take a hard look at the Project's effects on the Tribes' rights to continue those uses.  That failure violates NEPA.  *See Standing Rock Sioux Tribe*, 255 F. Supp. 3d at 133–34 (concluding that the Corps failed to fulfill its obligations under NEPA when it permitted an oil pipeline without first analyzing the effects of a potential oil spill on a tribe's hunting and fishing rights).

The Corps acknowledged that the Project will cross lands and waters in which the Tribes, together with their members, exercise rights to hunt, fish, and gather natural resources. AR000400 [JA___]; s*ee also Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 201–03 (1999) (holding that tribes retain treaty rights, including off-reservation usufructuary rights, absent a clear and express abrogation of those rights)*.*  Tribal rights to hunt, fish, and gather necessarily include the preservation of habitat and resources sufficient to support the exercise of those rights.  *See United States v. Adair*, 723 F.2d 1394, 1410–11, 1414–15 (9th Cir.

1983); *see also United States v. Washington*, 853 F.3d 946, 965 (9th Cir. 2017) ("[T]he Tribes'

right of access to their usual and accustomed fishing places would be worthless without

harvestable fish."); *United States v. Washington*, 506 F. Supp. 187, 203 (W.D. Wash. 1980)

("The most fundamental prerequisite to exercising the right to take fish is the existence of fish to

be taken.").  The Corps had ample notice that the Project could interfere with the Tribes' abilities

to exercise their rights.  *See* AR148168 [JA __] ("[I]t is the individual tribal members'

usufructuary rights to gather food and earn a modest living that are essential to our lives and

important for the success of future generations' ability to maintain our culture and traditions.");

AR033885 [JA___] ("Much of Line 3 . . . will affect wildlife habitat in ceded territories where

tribes have federally adjudicated reserved hunting, fishing, and gathering rights."); AR151676

[JA___] (explaining that the Project will "endanger[] primary areas of hunting, fishing, wild rice

harvest, medicinal plant harvest, and organically certified wild rice crops"); AR101141 [JA___]

(noting that the Project "has the significant potential to cause . . . degradation of traditional

fishing areas").

     Nonetheless, the Corps impermissibly sidestepped its responsibility to consider the

Project's effects on those rights.  *See, e.g.*, AR000471 [JA___] (reporting that Plaintiff Red Lake

Band expressed concern that the Project "would adversely impact their treaty rights" and

indicating that the Corps responded by asserting that it "cannot control the entire pipeline

construction or operation").  As explained above, the Corps cannot evade its responsibility to

consider the consequences of its action under NEPA simply because those consequences occur

outside its regulatory jurisdiction.  *See White Tanks Concerned Citizens, Inc.*, 563 F.3d at 1039–

40 (distinguishing the Corps' regulatory jurisdiction from the scope of analysis required under

NEPA).  Because it failed to pay appropriate attention to the Project's effects on the Tribes'

hunting, fishing, and gathering rights, the Corps' analysis was inadequate.  *See Standing Rock Sioux Tribe*, 255 F. Supp. 3d at 134.

> **D.      The Corps Did Not Fully Account for Potentially Significant Impacts to Wetlands, Waterbodies, and Animal Species.**

The Corps also did not address potentially significant ecological impacts.  It impermissibly failed to examine the Project's local environmental effects on biodiversity and particular animal species.  *See Fund for Animals v. Norton*, 294 F. Supp. 2d 92, 111 (D.D.C. 2003) (concluding that a "failure to even consider taking the steps necessary to gather relevant information result[ed] in an incomplete [NEPA] analysis").

The Corps admits that the "changing composition of vegetation" that will occur as a result of Enbridge's conversion of more than 230 acres of forested and scrub-shrub wetlands to emergent wetlands "could affect resident wildlife unable to adapt to changing conditions" and "result in displacement of wildlife that rely on those wetland types."  AR000383 [JA___].  These potential impacts "could be magnified by the permanent loss of trees and shrubs, habitat fragmentation, and changes in vegetation cover in large tracts of forest habitats within the pipeline right-of-way," resulting in a "decrease in total habitat area, amount of interior habitat, biodiversity (richness), and connectivity."  *Id.*  Nevertheless, the EAs are silent on the significance of the risk of such ecological harms and the full extent of those impacts.  Though the Corps suggests that habitat loss, wildlife displacement, and changes in animal migration patterns "would be most pronounced in large, undisturbed areas," the Corps neglects to identify the particular areas that would be most affected or assess how the ecological characteristics of those areas would be degraded.  *See id.*

The Corps also did not discharge its obligation to evaluate the Project's impact on localized animal species.  *See Fund for Animals v. Norton*, 281 F. Supp. 2d at 233–34 (setting

aside a NEPA analysis for failure to adequately assess the impact of a proposed action on a local population of a species). The Corps' EA admits that the Project may result in impacts on localized populations of animal species, *see* AR000401 [JA___] ("Some individuals and localized populations may be affected. . ."); *see also* AR000383 [JA___] (conversion of more than 230 acres of wetlands "could affect resident wildlife unable to adapt to changing conditions"), and "could" result in permanent decreases "in total habitat area, amount of interior habitat, biodiversity (richness), and connectivity," but nowhere does the Corps discuss what species might be affected, where, and how. This omission warrants setting aside the Corps' EA and requiring it to complete an analysis that is consistent with NEPA's requirements.

### E.   The Corps Did Not Conduct an Adequate Analysis of Alternatives.

The Corps did not adequately consider alternatives in its NEPA analysis, but instead arbitrarily eliminated certain reasonable routing alternatives from its review. While NEPA does not obligate a federal agency to consider all possible alternatives, it does require an agency to consider a reasonable range of feasible alternatives that meet the project need, where that need is not unreasonably narrow. *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195–96 (D.C. Cir. 1991). Here, the Corps considered only some no-build alternatives—*i.e.*, using rail and other methods for crude transport—and building the new Line 3 pipeline in the corridor occupied by the existing pipeline. AR000366–73 [JA___–__].[5] The Corps did not consider any alternative routes, based solely on the fact that the state Public Utility Commission ("PUC") granted Enbridge routing permits for the company's preferred route. AR000368 [JA___]. This,

---

[5] As is discussed in more detail in the brief by Plaintiff Friends of the Headwaters, the Corps, in fact, failed to undertake a true no-action alternatives analysis, which should have involved evaluating the true status quo, *i.e.*, continuing to use the existing Line 3 at its existing capacity until its permission to operate expired and not increasing the volume of oil shipped by either rail or truck.

however, is not an appropriate basis for failing to consider a reasonable range of alternatives under NEPA.

The Corps need not redo from scratch analysis that a state or federal agency has conducted, but neither can it blindly rely on another agency's work or oversight as a "substitute for a proper NEPA analysis." *See Sierra Club*, 867 F.3d at 137.  NEPA requires "that agencies take a 'hard look' at the environmental effects of their planned action, even after a proposal has received initial approval." *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 373–74 (1989). Thus, in *Indigenous Environmental Network v. U.S. Department of State*, even after a Nebraska agency reviewed and selected a particular pipeline route, the federal agency was required to review that same route under NEPA.  *See* 317 F. Supp. 3d 1118, 1123 (D. Mont. 2018).

While state and federal agency coordination is permitted—and indeed encouraged, *see* 40 C.F.R. § 1506.2—the Corps may not abdicate its responsibility over a critical portion of the NEPA analysis under any circumstances.  The Corps' own regulations make clear that the Corps can adopt portions of state environmental review documents where there is cooperation that "shall include, to the fullest extent practicable, joint environmental impact statements."  *See id.* Here, however, there were no joint impact statements, no joint planning processes, and no joint studies.  Indeed, the record demonstrates that there was little to no coordinated review process between the Minnesota PUC and the Corps that would justify the Corps' refusal to evaluate routing alternatives rejected by the PUC.  And the Corps has offered no reason whatsoever why it failed to follow its own regulations.

This lack of coordination or joint analysis stands in sharp contrast to the cases where federal agencies have worked in tandem with the state.  For example, in *Friends of the Capital Crescent Trail v. Federal Transit Administration*, the D.C. Circuit found a Final Environmental

Impact Statement ("FEIS") prepared by the Federal Transit Administration ("FTA") to be lawful,

even though the agency considered only the no-build alternative and the state's preferred

alternative. 877 F.3d 1051 (D.C. Cir. 2017). In contrast to the Corps' conduct here, however,

FTA considered a broader range of alternatives earlier in its review process. *See id.* at 1063–64.

Although FTA's FEIS discussed only two alternatives, the agency's Draft Environmental Impact

Statement compared eight alternatives, *id.* at 1063, and FTA had been involved in joint studies

and planning dating back a decade before the FEIS prepared *jointly* by the state and federal

agencies was published, *see* Purple Line Final Environmental Impact Statement and Draft 4(f)

Evaluation, at 1-6 tbl.1-1 (2013), https://www.purplelinemd.com/component/jdownloads/send/

23-volume-1/104-chapter-1-purpose-and-need. Similarly, in *Hoosier Environmental Council v.*

*U.S. Army Corps of Engineers*, the Corps reviewed the draft EIS conducted by the Federal

Highway Administration—another federal agency operating under NEPA—and concurred with

the Administration's alternatives analysis prior to the selection of the final route. 722 F.3d 1053,

1060 (7th Cir. 2013). By contrast, there is no evidence here that the Corps did anything more

than wait passively by as the PUC made its routing determination—a role that does not justify its

wholesale reliance on the PUC's rejection of other routes for the project.

## II.    THE CORPS VIOLATED NEPA BY FAILING TO PREPARE AN EIS.

Not only was the Corps' conclusion that the Project would not cause significant impacts

irrational, but the Corps' decision that no EIS was warranted for a nearly 350-mile oil pipeline

also must be set aside, for at least three reasons: *First*, the Project is highly controversial.

*Second*, the Project's impacts remain uncertain. And *third*, the Project carries a material risk of

"grave" or "catastrophic" harm. *See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,

985 F.3d 1032, 1043–44, 1049–50 (D.C. Cir. 2021) ("[U]ncertain and controversial" pipeline

impacts present "precisely the circumstances in which Congress intended to require an EIS."

(citation and quotation marks omitted)); *see also Sierra Club v. Peterson*, 717 F.2d 1409, 1415
(D.C. Cir. 1983) ("If *any* 'significant' environmental impacts might result from the proposed
agency action then an EIS must be prepared *before* the action is taken."); *Friends of the Earth,
Inc. v. U.S. Army Corps of Eng'rs*, 109 F. Supp. 2d 30, 42–43 (D.D.C. 2000).  Therefore, the
Corps' 'finding of no significant impact' is untenable, arbitrary, and capricious, in violation of
NEPA and the APA.

### A.     Highly Controversial Aspects of the Project Make Its Impact Significant.

The Project is highly controversial and requires an EIS because a "substantial dispute
exists as to [its] size, nature, [and] effect."  *See Nat'l Parks Conservation Ass'n v. United States*,
177 F. Supp. 3d 1, 33 (D.D.C. 2016) (citation omitted).  As discussed above, the Corps did not
fully analyze the project's effects on climate change, environmental justice, tribal rights to use
natural resources, or habitats and species, and it failed to evaluate a reasonable range of
alternatives.  *Supra* Section I.  A controversy warranting the preparation of an EIS therefore
exists, because the data and information the Corps has about Line 3 are insufficient to allow it to
establish the intensity of the impact or the "efficacy of the mitigation measures designed to offset
that unquantified impact."  *See Nat'l Parks Conservation Ass'n*, 177 F. Supp. 3d at 33.

The existence of a controversy is further demonstrated by substantial unaddressed
criticism in the record, pertaining to the shortcomings identified above, from Tribes, experts, and
specialized organizations.  *See Standing Rock Sioux Tribe*, 985 F.3d at 1046 ("The Tribes'
criticisms . . . present[ed] an unresolved controversy requiring the Corps to prepare an EIS.");
*Friends of the Earth*, 109 F. Supp. 2d at 43 (finding that a project was "genuinely and extremely
controversial" where the Corps' evaluation was disputed, warranting an EIS); *Found. for N. Am.
Wild Sheep v. U.S. Dep't of Agric.*, 681 F.2d 1172, 1182 (9th Cir. 1982) (finding that criticism
from "knowledgeable individuals" demonstrated the existence of "precisely the type of

'controversial' action for which an EIS must be prepared"). Criticism levied by "organizations with on-point expertise," such as Tribes and environmental groups, "rises to more than mere passion." *Standing Rock Sioux Tribe*, 985 F.3d at 1043 (citation omitted). Further, as the D.C. Circuit explained in *Standing Rock*, unresolved criticisms from Tribes trigger an EIS because "[Tribes] are sovereign nations with at least some stewardship responsibility over the precise natural resources implicated by the Corps' analysis," and thus "of at least equivalent status" to "highly specialized governmental agencies and organizations." *Id.* at 1043–44. That the Corps failed to materially address and resolve several "serious objections to its analysis" raised by the Tribes and other experts demonstrates sufficient controversy to require preparation of an EIS. *See id.* at 1043.

In addition, the Corps failed to acknowledge and rebut substantial scientific criticisms of the evidence it relied on. *See id.* at 1044–49 (unresolved criticisms by Tribes of Corps' oil spill risk methodology showed pipeline project was highly controversial and necessitated preparation of an EIS). For example, the Corps was well aware that the state-prepared oil spills analysis upon which it relied had been struck down by the Minnesota Court of Appeals for failure to consider how an oil spill might impact Lake Superior and the Lake Superior Watershed, which the project crosses many times. *See In re Enbridge Energy, Ltd. P'ship*, 930 N.W.2d 12, 27–28 (Minn. Ct. App. 2019). The Tribes and other specialized organizations raised this very criticism before the Corps, but the Corps did not address, let alone resolve this objection. AR097765–68 [JA___–__]. The Corps' analysis of oil spills also failed to acknowledge that, upon remand, the state PUC included in its modified oil spill risk analysis just one additional site—a segment of the St. Louis River, thirty-two miles away from Lake Superior. *See* Minn. PUC, Final EIS-Revised, at 10-57–10-58 (Dec. 9, 2019), AR56840 [JA___], https://mn.gov/eera/web/project-

21

file/11251/.  This critical failure by the state was again challenged before the Minnesota Court of Appeals well before the Corps issued its EAs, meaning the Corps had ample opportunity to address this deficiency.  Instead, the Corps said nothing, thus failing to resolve the controversy and justify the failure to prepare an EIS.

>   **B.**     **The Uncertain Effects of the Project Render Its Impacts Significant.**

Preparation of an EIS is required not only as a result of the Corps' refusal to resolve the controversies created by its failure to consider critical impacts and answer critiques of its analysis, but also because those same failures create sufficient uncertainty that the Corps was unable to resolve in the EAs.  *See Fund for Animals*, 281 F. Supp. at 209, 233–34 ("[U]ncertainty as to . . . impact" is "'a basis for a finding that there will be a significant impact' and setting aside a FONSI." (citation omitted)); *see also Standing Rock Sioux Tribe*, 985 F.3d at 1043 ("Congress created the EIS process to provide robust information in situations where, following an environmental assessment, the scope of a project's impacts remains both uncertain and controversial." (citation omitted)); *see also Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 865 (9th Cir. 2005) (holding that the presence of "one of [the significance] factors may be sufficient to require preparation of an EIS in appropriate circumstances").  "[A]n EIS is perhaps especially warranted where an agency explanation confronts but fails to resolve serious outside criticism, leaving a project's effects uncertain." *Standing Rock Sioux Tribe*, 985 F.3d at 1043.

The Corps does not know how Line 3 will affect climate, tribes, tribal resources, or local species, because it refused to consider these impacts.  It failed to resolve "serious objections" from Tribes, experts, and highly specialized organizations to the oil spill risk analysis on which it relied.  *See id.*  The Corps' FONSI, therefore, is baseless and its decision not to prepare an EIS cannot stand.

**C.**    **The Project's Material Risk of Grave or Catastrophic Harms Render its Impact Significant.**

The D.C. Circuit has made clear that "[a] finding of no significant impact is appropriate only if a grave harm's probability is so low as to be remote and speculative, or if the combination of probability and harm is sufficiently minimal." *Standing Rock Sioux Tribe*, 985 F.3d at 1049–50 (citation and quotation marks omitted); *id.* ("[A]lthough the risk of a pipeline leak may be low, [if] that risk is sufficient that a person of ordinary prudence would take it into account in reaching a decision to approve the pipeline's placement, [then] its potential consequences are . . . properly considered." (citation and quotation marks omitted)).  There are numerous potentially catastrophic impacts from Line 3 that the Corps ignored or failed to properly evaluate that warrant completion of an EIS.

This court has found that "even a low risk of [an event occurring] may be offset by the possibility of catastrophic consequences should [such an event] occur." *Gov't of Province of Manitoba v. Norton*, 398 F. Supp. 2d 41, 65 (D.D.C. 2005); *see also Standing Rock Sioux Tribe*, 985 F.3d at 1049–50 (finding that "any material prospect of catastrophic failure" would plainly pass the threshold of significance).  Here, there is no question that eroding the Tribes' abilities to conduct critical subsistence and spiritual practices and further harming communities that already have borne generations of trauma would have tragic consequences.  So too would even a small spill of tar sands oil into waterways that are of substantial importance to the Tribes and part of some of the most critical watersheds in the country.  *See, e.g.*, *Gov't of Province of Manitoba*, 398 F. Supp. 2d at 65.  The nontrivial risk of permanent degradation of the exceptional natural and cultural resources crossed by the Project is, in short, "significant" under NEPA and requires the completion of an EIS.  *See Standing Rock Sioux Tribe*, 985 F.3d at 1049–50.

III.   **THE CORPS ARBITRARILY AND CAPRICIOUSLY DETERMINED THAT THE PROJECT WILL NOT BE INJURIOUS TO THE PUBLIC INTEREST.**

Before issuing a permit under section 404 of the CWA or section 408 of the Rivers and Harbors Act, the Corps must determine that the proposed activity will not be injurious to the public interest. 33 C.F.R. § 320.4(a). Here, however, the Corps failed to follow its own regulations in assessing whether the Project is consistent with the public interest. The Corps failed to consider all the probable impacts of the project and its intended use on the public interest. *See id.* § 320.4(a)(1). The Corps also improperly considered only the benefits of the Project's operations while ignoring its detriments, including potential effects to historic, cultural, scenic, and recreational values, both tribal and non-tribal. *See id.* ("The benefits which reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments."). Moreover, the Corps did not consider "[t]he relative extent of the public and private need for the proposed structure or work," *see id.* § 320.4(a)(2), and it ignored the fact that there is insufficient record evidence demonstrating a need for the Project.

A.   **The Corps Arbitrarily and Capriciously Ignored Reasonably Foreseeable Impacts of the Project's Construction and Operation.**

The plain language of the Corps' regulations directs it to consider the impacts of the proposed activity *and* the impacts of the project's *intended use* when conducting the public interest review. *See id.* § 320.4(a); *see also Nat. Res. Def. Council v. U.S. Army Corps of Eng'rs*, No. 09-CV-588, 2010 WL 1416681, at *6 (N.D. Ohio Mar. 31, 2010) ("[I]n appropriate circumstances, the Corps may include some discussion of an overall project in order to make the required determination that the permit 'is not contrary to public interest.'" (quoting 33 C.F.R. § 320.4(a)(1))). Thus, where the proposed activity is dredging and filling to construct an oil pipeline, the Corps' public interest review must consider not only the pipeline's construction, but also its *operation*. *See Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, No. 18-23-SDD-

24

EWD, 2020 WL 1450750, at *12–13 (M.D. La. Mar. 25, 2020) (assessing whether the Corps adequately considered the risk of oil spills from a pipeline's operation in its public interest review); *cf. Fox Bay Partners v. U.S. Army Corps of Eng'rs*, 831 F. Supp. 605, 608–10 (N.D. Ill. 1993) (concluding that where the proposed activity was filling wetlands to construct piers, boat docks, and boat ramps for the development of a commercial marina, the Corps appropriately considered impacts from the marina's operation, including increased boat traffic, in its public interest review). Despite this clear command, the Corps here failed to consider important impacts from the Project's construction and largely ignored potential impacts from the Project's operations.

The Corps bases its refusal to consider the full range of Project impacts in its public interest determination, in significant part, on its mistaken conclusion that it need only consider the effects of activities that it can regulate. The Corps' rationale here is similar to the one it used to justify its illegally narrow NEPA review, and that rationale fails for the same reason: it is wrong. For example, while the Corps conceded that "[g]reenhouse gas emissions associated with the Corps' federal action may also occur from the combustion of fossil fuels associated with the operation of construction equipment," it refused to consider greenhouse gas emissions from Project construction and their effects because it "has no authority to regulate emissions that result from the combustion of fossil fuels." AR000398 [JA___]. The Corps' stance is in direct contravention of the plain language of its own regulations, which require it to consider the reasonably foreseeable impacts of the proposed activity. 33 C.F.R. § 320.4(a). The regulation does not limit the Corps' considerations to the impacts that it can regulate. The Corps' authority to regulate greenhouse gas emissions, therefore, is of no matter and its failure to consider the emissions that will likely occur from construction is arbitrary and capricious.

25

In addition, among the reasonably foreseeable impacts of the operation of an oil pipeline is the risk of an oil spill.  *See Atchafalaya Basinkeeper*, 2020 WL 1450750, at *12–13. However, the Corps arbitrarily and capriciously ignored the risk of oil spills when determining whether the Project is in the public interest under Section 404.[6]  The Corps' failure to consider the risk of oil spills infects its public interest review, as the risk threatens many of the relevant factors—wetlands, cultural values, recreational values, fish and wildlife, water quality, food production, and the needs and welfare of the people.  Public comments on Enbridge's permit application explained that a spill would "pose a serious risk to wetlands and waterways along the project route," AR099409 [JA___], "potentially impact or entirely obliterate the cultural and economic value of the wild rice lakes along the proposed pipeline," AR097684 [JA___], and "harm Ojibwe cultural and property interests, a variety of shipping, commercial, recreational, and tourism interests, and sensitive aquatic environments," AR097932–33 [JA___].  Yet, the Corps did not consider the impact of a spill on any of these factors.  As such, the Corps did not conduct "a careful weighing" of the factors, 33 C.F.R. § 320.4(a)(1), and its balancing of the Project's benefits and detriments is incomplete.

The Corps' discussion of hazardous materials in the 404 EA does not satisfy its duty to consider the risk of tar sands oil spills in its public interest review.  In the 404 EA, the Corps' only discussion of crude oil spills in its public interest review refers to Section 10.0 of Enbridge's Environmental Protection Plan ("EPP"), AR000398 [JA___], which only addresses "impacts resulting from spills of fuels, petroleum products, or other regulated substances *as a*

---

[6] In the Corps' opposition to Plaintiffs' motion for a preliminary injunction, it conceded that the Court must review its consideration of oil spills in its public interest review because "once [the Corps] exercised its discretion to consider it, then it became subject to arbitrary and capricious review under the APA."  ECF No. 29 at 25.

*result of construction*." AR007650 [JA___] (emphasis added).  The Court has recognized that the

EPP does not cover minimizing the impacts of a spill from the Project's *operation.  See* Mem.

Op., ECF No. 40 at 20 ("Although the Corps' Section 404 EA addresses the risk of oil spills, it

does so only to compare the risk of oil spills associated with potential alternatives to the

*construction* of a new pipeline." (emphasis added)).  Nor should it—the purpose of the EPP is

limited to evaluating construction impacts, AR007591.  Thus, the Corps' discussion of releases

of hazardous materials does not satisfy its duty to consider the impacts of the proposed activity's

"intended use."  33 C.F.R § 320.4(a)(1).

In addition, the Corps' cursory discussion of oil spills in the 408 EA does not satisfy its

duty under its regulations to carefully weigh all the factors relevant to a public interest

determination.  The 408 EA is limited by the scope of Enbridge's 408 application, which covers

only a single location at Lost River.  The 408 EA does not address the impact of an oil spill on

wetlands, the Tribes' cultural values and ability to produce food, the Tribes' needs and welfare,

or Lake Superior.

The Corps' failure to consider increased greenhouse gas emissions from the Project's

operation also renders its public interest review arbitrary and capricious.  Tar sands oil

production generates almost triple the global warming pollution as conventional oil production,

due to the massive amounts of energy needed to extract, upgrade, and refine the oil.  AR097770

[JA___].  The Corps' approval of the Project is intended to facilitate, and thereby increase, tar

sands oil production, along with increased greenhouse gas emissions associated with that

production.  These emissions will drive increases in global temperatures, precipitation, regional

drought, wildfires, ocean acidification, and sea-level rise.  These climate impacts are serious, and

without them, the Corps' balancing of the Project's benefits and detriments is inaccurate.

**B.     The Corps Arbitrarily and Capriciously Considered the Benefits of the Project's Operation While Overlooking its Detriments.**

In its public interest review, the Corps may not consider the benefits of the operation of a proposed activity without also considering its detriments. *See Columbia Riverkeeper*, 2020 WL 6874871, at *7 ("[The Corps] arbitrarily and capriciously relied on benefits of the Project in worldwide reduction of greenhouse gases without conducting an assessment of the detriments worldwide."); *see also Hough v. Marsh*, 557 F. Supp. 74, 86 (D. Mass. 1982) (determining that the Corps' public interest review was arbitrary and capricious because it "mention[ed] the positive anticipated impact of the proposal on jobs and municipal taxes," but it "sidestepped any consideration of adverse economic effects"). Yet here, the Corps considered multiple purported benefits of the Project's operation while overlooking almost all of its detriments.

In its singular focus on the project's operational benefits, Corps noted that "[t]his Project will . . . benefit the communities (from continuing to employ local residents), *services provided not related to the Project, and others in the U.S. who would use the products of crude oil*." AR000395 [JA___] (emphasis added). The Corps also stated that "[t]he Project would improve overall safety to the public and environment by providing a safe and efficient means of transporting crude oil," "[t]he Project would support United States consumers' energy demands," and "[t]he Project would help to ensure the continued delivery of North American crude oil to refineries in Minnesota, other Midwestern states, Eastern Canada, and the Gulf Coast." AR000405 [JA___]. When considering the Project's detriments, the Corps considered only those from construction. *See* AR000397–98 [JA___–__]. The Corps thereby arbitrarily ignored detriments from the Project's intended use, including the risk of oil spills and increased greenhouse gas emissions. The Corps' public interest determination cannot be so lopsided and must be set aside for failure to evenly weigh all of the project's benefits and detriments.

28

**C.     The Corps Arbitrarily and Capriciously Ignored Evidence that There Is No Public Need for the Project.**

In its public interest review, the Corps must "independently weigh[]" the relevant factors. *Nat'l Parks Conservation Ass'n v. Semonite*, 311 F. Supp. 3d 350, 377 (D.D.C. 2018), *rev'd on other grounds,* 925 F.3d 500 (2019).  But here, the Corps failed to make an independent assessment of the public need for the Project, and it ignored evidence that, in fact, there is no public need.  The Corps accepted Enbridge's assertion that the public need for the project "is driven by domestic and global demand" for crude oil, AR000394 [JA___], without addressing ample evidence in the record that "it is unreasonable to forecast that demand for crude oil will increase in the U.S., the Midwest, the five-state area, or Minnesota," AR097782 [JA___].  In particular, the record contains evidence that the adoption of electric vehicles, along with efforts by the United States and Canada to reduce greenhouse gas emissions, will *reduce* future demand for petroleum.  AR097781 [JA___].  Further, the record indicates that "production from all existing and approved but not yet completed tar sands projects will peak around 2022–23" and then decline thereafter.  *Id.*  The Corps entirely failed to address this evidence, let alone independently weigh it against Enbridge's assertions.

Likewise, the Corps uncritically accepted Enbridge's contention that public need for the Project stems from "the need to replace the existing [L]ine 3 which continues to develop anomalies that require maintenance," AR000394 [JA___], without any analysis of the risk of spills from the existing pipeline or the relative impacts of maintaining the existing pipeline versus building a new pipeline.  It also ignored alternatives to the Project that satisfy this need but have fewer impacts on the aquatic ecosystem.  *See* AR097783 [JA___] (explaining that the in-trench replacement alternative "would not require the creation of a new right-of-way for any significant portion of the project, thus eliminating" many of the Project's impacts).  As such, the

Corps' public interest review does not reflect a careful and independent weighing of the public need for the Project.

## CONCLUSION

For the foregoing reasons, Plaintiffs Red Lake Band of Chippewa Indians, White Earth Band of Ojibwe, Honor the Earth, and Sierra Club respectfully request that this Court grant their motion for summary judgment and vacate the challenged agency action.

DATED: May 26, 2021

*s/ Moneen Nasmith\_\_\_*
Moneen Nasmith
*[Admitted Pro Hac Vice]*
Alexis Andiman
*[Admitted Pro Hac Vice]*
Mekela Panditharatne
*[Admitted Pro Hac Vice]*
Kara Goad
*[Application for Admission Pro Hac Vice
    Forthcoming]*
Earthjustice
48 Wall Street, 15th Floor
New York, NY 10005
(212) 845-7376
mnasmith@earthjustice.org
aandiman@earthjustice.org
mpanditharatne@earthjustice.org
kgoad@earthjustice.org

*s/ Seth Johnson\_\_\_*
Seth L. Johnson, D.C. Bar No. 1001654
Earthjustice
1001 G St. NW, Ste. 1000
Washington, D.C. 20001
(202) 667-4500
sjohnson@earthjustice.org

*Attorneys for Plaintiffs*