# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| RED LAKE BAND OF CHIPPEWA INDIANS, *et al.,* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 1:20-cv-03817 (CKK) |
| | ) | |
| UNITED STATES ARMY CORPS OF ENGINEERS, | ) | |
| | ) | |
| Federal Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ENBRIDGE ENERGY, LIMITED PARTNERSHIP, | ) | |
| Defendant-Intervenor. | ) | |

| | | |
|---|---|---|
| FRIENDS OF THE HEADWATERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 1:21-cv-00189 (CKK) |
| | ) | |
| UNITED STATES ARMY CORPS OF ENGINEERS, COL. KARL JANSEN, District Engineer, St. Paul District, | ) | |
| | ) | |
| Federal Defendants, | ) | |
| and | ) | |
| | ) | |
| ENBRIDGE ENERGY, LIMITED PARTNERSHIP, | ) | |
| Defendant-Intervenor. | ) | |

**MEMORANDUM IN SUPPORT OF FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Statutory and Regulatory Framework ................................................................. 2

    I.     National Environmental Policy Act................................................ 2

    II.    Clean Water Act ........................................................................... 3

    III.   Rivers and Harbors Act ................................................................ 4

Factual Background .......................................................................................... 5

    I.     Enbridge Line 3 Replacement Project .......................................... 5

    II.    State review of Replacement Line 3 .............................................. 7

    III.   The Corps' review of Enbridge's application for a CWA permit and RHA authorizations ............................................................ 9

    IV.   Procedural background ................................................................11

Standard of Review .........................................................................................12

Argument .......................................................................................................13

    I.     The Corps satisfied NEPA's requirements by taking a hard look at the impacts of issuing the Permit and Permission and considering a reasonable range of alternatives ..............................................................13

          A.    The Corps properly considered air quality impacts, greenhouse gas emissions, and climate change ..............................................14

          B.    The Corps properly considered environmental justice............................21

          C.    The Corps reasonably considered impacts to Tribal rights to hunt, fish, and gather natural resources.........................................25

          D.    The Corps reasonably considered impacts to biodiversity and animal species...............................................................27

          E.    The Corps considered a reasonable range of alternatives .......................30

    II.    The Corps properly determined that no EIS was necessary ...............................35

    III.   The Corps reasonably determined that the CWA 404 Permit should issue .........40

          A.    The Corps conducted a reasonable alternatives analysis ........................41

              1.    The Corps properly evaluated two no-action alternatives.............42

B.      The Corps properly declined to consider oil spills as part of its
        "significant degradation" analysis under 40 C.F.R. § 230.10(c) ..............46

C.      The Corps' public interest analysis was not arbitrary or capricious .........46

        1.      FOH did not identify any flaws in the public interest analysis .....47

                a.      Economics .......................................................................48

                b.      Energy Needs ..................................................................49

                c.      Climate Change ...............................................................50

                d.      Wetlands Impacts and Mitigation ....................................51

        2.      The Red Lake Plaintiffs also have not identified flaws in the
                public interest analysis .............................................................52

                a.      Greenhouse Gas Emissions ..............................................52

                b.      The risk of oil spills ........................................................55

Conclusion ........................................................................................................57

# TABLE OF AUTHORITIES

**Cases**

*Alliance to Save the Mattaponi v. Army Corps,*
808 F.Supp.2d 121 (D.D.C. 2009) ...................................................................52

*Am. Paper Inst., Inc., v. Am. Elec. Power Serv. Corp.,*
461 U.S. 402 (1983).........................................................................................14

*Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs,*
894 F.3d 692 (5th Cir. 2018) ...........................................................................28

*Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs,*
524 F.3d 938 (9th Cir. 2008) ...........................................................................56

*Citizens Against Burlington, Inc. v. Busey,*
938 F.2d 190 (D.C. Cir. 1991) ..................................................................21, 36

*City of Grapevine, Tex. v. Dep't of Transp.,*
17 F.3d 1502 (D.C. Cir. 1994) .........................................................................36

*Cmtys. Against Runway Expansion, Inc. v. FAA,*
355 F.3d 678 (D.C. Cir. 2004) .........................................................................26

*Coeur Alaska, Inc. v. Se. Council,*
577 U.S. 261 (2009).........................................................................................55

*Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs,*
941 F.3d 1288 (11th Cir. 2019) .......................................................................20

*Del. Riverkeeper Network v. FERC,*
753 F.3d 1034 (D.C. Cir. 2014) .......................................................................16

*\*Dep't of Transp. v. Pub. Citizen,*
541 U.S. 752 (2004)........................................................... 16, 19, 30, 34, 41

*EarthReports, Inc. v. FERC,*
828 F.3d 949 (D.C. Cir. 2017) .........................................................................22

*\*Friends of Cap. Crescent Trail v. FTA,*
877 F.3d 1051 (D.C. Cir. 2017) .............................................. 18, 21, 40

*Friends of Cap. Crescent v. U.S. Army Corps of Eng'rs,*
453 F. Supp. 3d 804 (D. Md. 2020) ................................................................40

*Fund for Animals v. Norton,*
281 F. Supp. 2d 209 (D.D.C. 2003) ................................................................35

*Fund for Animals v. Norton,*
294 F. Supp. 2d 92 (D.D.C. 2003) ..................................................................35

*Greater Yellowstone Coal. v. Flowers,*
359 F.3d 1257 (10th Cir. 2004) .......................................................................52

iii

*Hapner v. Tidwell,*
  621 F.3d 1239 (9th Cir. 2010) .................................................................22

*Hillsdale Env't Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs,*
  702 F.3d 1156 (10th Cir. 2012) ...............................................................41

*Hoosier Envtl. Council v. U.S. Army Corps of Eng'rs,*
  722 F.3d 1053 (7th Cir. 2013) ...........................................................39, 63

*Hough v. Marsh,*
  557 F. Supp.  (D. Mass 1982) ..................................................................66

*\*In re Applications of Enbridge Energy,*
  930 N.W.2d 12 (Minn. Ct. App. 2019) ..........................................9, 44, 45

*La. Wildlife Fed'n v. York,*
  761 F.2d 1044 (5th Cir. 1985) .................................................................50

*Marsh v. Or. Nat. Res. Council,*
  490 U.S. 360 (1989) .................................................................................43

*Metro. Edison Co. v. People Against Nuclear Energy,*
  460 U.S. 766 (1983) ...........................................................................23, 24

*Mich. Gambling Opp'n (MichGO) v. Norton,*
  477 F. Supp. 2d 1 (D.D.C. 2007) ............................................................42

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ...................................................................................15

*\*Myersville Citizens for a Rural Cmty, Inc. v. FERC,*
  783 F.3d 1301 (D.C. Cir. 2015) ...........................................16, 32, 36, 40

*Nat. Parks Conservation v. U.S. Forest Service,*
  177 F. Supp. 3d 1 (D.D.C. 2016) ............................................................45

*Nat'l Parks Conservation Ass'n v. Semonite,*
  916 F.3d 1075 (D.C. Cir. 2019) ..............................................................41

*Nat'l Wildlife Fed. v. Appalachian Reg'l Comm'n,*
  677 F.2d 883 (D.C. Cir. 1981) ................................................................21

*Oceana, Inc. v. Ross,*
  454 F. Supp. 3d 62 (D.D.C. 2020) ..........................................................29

*Robertson v. Methow Valley Citizens Council,*
  490 U.S. 332 (1989) ..................................................................................3

*Selkirk Conservation All. v. Fosgren,*
  336 F.3d 944 (9th Cir. 2003) ...................................................................20

*Sierra Club v. Dep't of Energy,*
  867 F.3d 189 (D.C. Cir. 2017) ................................................................21

*Sierra Club v. FERC*,
   827 F.3d 36 (D.C. Cir. 2016) ..................................................................22

*Sierra Club v. FERC*,
   827 F.3d 59 (D.C. Cir. 2016) ..................................................................22

*Sierra Club v. FERC*,
   867 F.3d 1357 (D.C. Cir. 2017) ...............................................22, 23, 26, 29

*Sierra Club v. U.S. Army Corps of Eng'rs*,
   803 F.3d 31 (D.C. Cir. 2015) ....................................................24, 32, 36

*Sierra Club v. U.S. Army Corps of Eng'rs*,
   No. 20-2195, 2021 WL 1921128 (1st Cir. May 13, 2021) .......................44

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
   205 F. Supp. 3d 4 (D.D.C. 2016) ............................................................24

*Town of Cave Creek v. FAA*,
   325 F.3d 320 (D.C. Cir. 2003) ................................................................43

*Town of Norfolk v. U.S. Army Corps of Eng'rs*,
   968 F.2d 1438 (1st Cir. 1992) .................................................................56

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
   136 S. Ct. 1807 (2016) .............................................................................4

*U.S. Postal Serv. v. Gregory*,
   534 U.S. 1 (2001) ............................................................................14, 24

*United States v. Pa. Indus. Chem. Corp.*,
   411 U.S. 655 (1973) ..................................................................................6

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
   435 U.S. 519 (1978) ..........................................................................15, 47

*WildEarth Guardians v. Zinke*,
   368 F. Supp. 3d 41 (D.D.C. 2019) ..........................................................46

**Statutes**

5 U.S.C. § 706 ...............................................................................................2, 12

16 U.S.C. § 1536 ...............................................................................................29

33 U.S.C. § 403 ...........................................................................................1, 5, 9

33 U.S.C. § 408 ..................................................................................1, 5, 11, 52

33 U.S.C. § 1311(a) .............................................................................................3

33 U.S.C. § 1344 ...............................................................................................11

42 U.S.C. § 4332 ............................................................................................2, 3

v

49 U.S.C. § 10901 ..............................................................................................21

Minn. Stat. § 216G.02 ...............................................................................34, 44

**Regulations**

33 C.F.R. Part 320 .............................................................................................47

33 C.F.R. part 325 ..................................................................................3, 31, 34

33 C.F.R. § 230.1 ..............................................................................................11

33 C.F.R. § 320.1(a)(5) ................................................................................47, 54

33 C.F.R. § 320.2(e) ............................................................................................5

33 C.F.R. § 320.4 .........................................................................................*passim*

33 C.F.R. § 322.1 ................................................................................................5

33 C.F.R. § 323.2(d)(2)(ii) ................................................................................24

33 C.F.R. § 325.2(a)(2) .......................................................................................4

33 C.F.R. § 328.3 ..............................................................................................16

33 C.F.R. § 332.2 ..............................................................................................24

33 C.F.R. § 332.3(a)(1) .....................................................................................50

40 C.F.R. Part 1500 (2018) .................................................................................3

40 C.F.R. § 230 ...................................................................................................4

40 C.F.R. § 230.6(b) .........................................................................................45

40 C.F.R. § 230.10 ..................................................2, 4, 41, 42, 43, 44, 45, 46

40 C.F.R. § 1501.4 ..............................................................................................3

40 C.F.R. § 1506.2 ............................................................................................34

40 C.F.R. § 1508.1(g)(2) ...................................................................................17

40 C.F.R. § 1508.13 ............................................................................................3

40 C.F.R. § 1508.27 ....................................................................................37, 39

**Other Authorities**

45 Fed. Reg. 85 (Dec. 24, 1980) ......................................................................49

51 Fed. Reg. 15618 (Apr. 25, 1986) ..................................................................3

The Enbridge Line 3 Replacement Project (Replacement Line 3) is a Minnesota-approved private project undertaken to satisfy court-ordered consent decree requirements by replacing aging infrastructure with a modern pipeline with corrosion resistant technology and other safety improvements. Approximately 90 percent of Replacement Line 3's route will be co-located with other pipelines, utilities, roads, railroads, or highways. And the pipeline has been routed to avoid the Chippewa National Forest and the Leech Lake Band's Reservation, both of which are traversed by Existing Line 3. Replacement Line 3 has been the subject of an extensive state administrative process and state litigation over, among other things, oil spill risk, route alignment, and future demand. This month, the Minnesota Court of Appeals upheld the state's certificate of need for Replacement Line 3, examination of potential environmental impacts, and route selection.

Following a five year public process and comprehensive project examination, in 2020, the U.S. Army Corps of Engineers (Corps) issued Enbridge Energy Limited Partnership a Section 404 permit to allow for the discharge of fill material into jurisdictional waters of the United States during the construction of portions of Replacement Line 3, along with a Rivers and Harbors Act (RHA), 33 U.S.C. § 403, authorization for crossings of RHA Section 10 waters (Permit), and RHA permission, 33 U.S.C. § 408, to alter a federal project, the Lost River Flood Control Project (Permission). The Corps found that the large majority of wetland impacts from the construction of Replacement Line 3 will be temporary and mitigation will be performed to compensate for the small amount of loss of aquatic resource function.

Plaintiffs challenge the Corps' review and approval process as arbitrary and capricious under the APA, 5 U.S.C. § 706. The Corps met its NEPA obligations, 42 U.S.C. § 4332, by preparing Environmental Assessments (EA), which included consideration of the impacts from

1

the Corps' authorizations, including to wetlands, the climate, low-income and minority populations, Tribal rights to hunt, fish, and gather, and all of the issues to which Plaintiffs draw special attention. A comprehensive Environmental Impact Statement (EIS) was prepared by Minnesota state authorities; the Corps considered this report as it made its decisions. The Corps also considered a reasonable range of alternatives, before incorporating important protections for wetlands, wild rice, and cultural resources as enforceable conditions of the Permit and Permission. The Corps also met its CWA obligations by performing an alternatives analysis under that statute's implementing regulations at 40 C.F.R. § 230.10, ultimately determining that none were practicable and therefore a potential bar to issuing the challenged permit. The Corps then performed the balancing test and considered the factors and policies specified in implementing regulation 33 C.F.R. § 320.4, and explained the record bases for its determination that issuing the challenged Permit would not be contrary to the public interest. Applying the APA's deferential standard of review, the Court should reject Plaintiffs' arguments and enter summary judgment in favor of Federal Defendants.

**Statutory and Regulatory Framework**

I.     **National Environmental Policy Act**

NEPA focuses governmental and public attention on potential environmental effects from any proposed "major Federal actions." *See* 42 U.S.C. § 4332(2)(C). But NEPA does not mandate particular results; it prescribes a process to ensure that federal decision-makers consider, and that the public is informed about, potential environmental consequences. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). To meet NEPA's purposes, agencies prepare an EIS for any "major [f]ederal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). If the significance of any potential

2

effect is not readily apparent, agencies may prepare an EA—a much more concise document—to determine whether an EIS is necessary.  40 C.F.R. §§ 1501.4, 1508.9;[1] 33 C.F.R. part 325, App. B., para. 7.  If, based upon an EA, an agency issues a finding of no significant impact, no EIS is required.  40 C.F.R. § 1508.13; 33 C.F.R. part 325, App. B., para. 7.

## II.    Clean Water Act

The Clean Water Act prohibits the discharge of pollutants (including dredged spoil, rock, and sand) into the waters of the United States (including wetlands) from any point source.  33 U.S.C. § 1311(a).  Section 404 of the Act, *id*. § 1344, authorizes the Corps to issue permits for the discharge of dredged or fill material when certain conditions are met.  *Id.* §§ 1311(a); 1344. Section 404 Permits are issued by the Corps through a public notice and comment process pursuant to regulations promulgated by the Corps and the Environmental Protection Agency (EPA). 33 C.F.R. Parts 320-332; 40 C.F.R. Parts 230-232.  Section 404 Permits are enforced by both agencies, consistent with an inter-agency Memorandum of Understanding.  *See e.g., U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1812 (2016).

When a Section 404 Permit application is complete, the Corps first issues a public notice providing "sufficient information to give a clear understanding of the nature and magnitude of the activity to generate meaningful comment," including "information which may assist interested parties in evaluating the likely impact of the proposed activity . . . on factors affecting the public interest."  33 C.F.R. §§ 325.2(a)(2), 325.3(a), (a)(13).  Supplemental notice only issues "if *in [the Corps'] view* there is a change in the application data that would affect the

---

[1] The Council on Environmental Quality promulgated regulations implementing NEPA in 1978, 43 Fed. Reg. 55978 (Nov. 29, 1978), and a minor substantive amendment to those regulations in 1986, *see* 51 Fed. Reg. 15618 (Apr. 25, 1986).  More recently, the Council published a new rule, effective September 14, 2020, further revising the 1978 regulations.  The claims in this case arise under the 1978 regulations, as amended in 1986.  All citations to the Council's regulations in this brief refer to those regulations as codified at 40 C.F.R. Part 1500 (2018).

public's review of the proposal." *Id.* § 325.2(a)(2) (emphasis added). In this case, notice was given on December 20, 2018, with a 30 day public comment period. The comment period was subsequently extended until February 21, 2019. AR_34911, 33867, 103353, 103686.

The Corps next evaluates various alternatives (*e.g.,* petroleum transportation via rail or tanker truck) to determine first whether any of them is practicable as that term is defined in 40 C.F.R. § 230.10(a) and second whether any practicable alternative would have a lesser impact on the aquatic ecosystem. 40 C.F.R. § 230.10. If so, the permit application must be denied. *Id.* § 230.10(a). In addition, the Corps evaluates the application pursuant to procedural guidelines set forth in 40 C.F.R. § 230 that implement CWA § 404(b)(1) and are known as "404(b)(1) Guidelines."

Finally, the Corps conducts a "public interest review" to evaluate the probable impacts of the proposed activity, balancing its reasonably foreseeable benefits and detriments to determine "whether to authorize [the] proposal" and "the conditions under which it will be allowed to occur." 33 C.F.R. § 320.4(a)(1). That "decision should reflect the national concern for both protection and utilization of important resources . . . [and] a permit will be granted unless the [Corps] determines that [the activity] would be contrary to the public interest." *Id.* Under the CWA, the public interest analysis is only undertaken for the proposed activity that will be permitted (not for any alternatives). It also is the very last step in the 404 permitting process, and is only performed after every alternative has been disqualified because it is not practicable or would not have a lesser impact on the aquatic environment than the proposed activity for which the permit is sought.

III.     **Rivers and Harbors Act**

4

The RHA had its genesis over a century ago, when Congress passed a series of laws designed to preserve and protect the Nation's navigable waterways, all of which were subsequently re-enacted in one package known as the Rivers and Harbors Act. *United States v. Pa. Indus. Chem. Corp.,* 411 U.S. 655, 663 (1973). Section 10 of the RHA, 33 U.S.C. § 403, prohibits structures and activities that obstruct navigable waters unless they are expressly authorized by the Department of the Army through individual permits that are granted only after case-by-case evaluations, or through authorizations to proceed under nationwide permits that authorize activities that fall within specified parameters. *See* 33 C.F.R. §§ 322.1, 320.2(b), (d), (e). Section 14 of the RHA, 33 U.S.C. § 408, also known as (and referred to herein as) Section 408, provides that actions that impair the usefulness of federal works that, among other things, preserve or improve waters of the United States require prior permission from the Department of the Army. *Id.* § 408(a). Such permission is granted through documents that allow the temporary occupation of such projects, instead of permits. 33 C.F.R. § 320.2(e).

## Factual Background

### I.   Enbridge Line 3 Replacement Project.

Starting in September 2015, Enbridge Energy Limited Partnership sought Corps' authorizations to allow temporary and permanent impacts to waters of the United States by construction activities related to the Enbridge Line 3 Replacement Project. AR_351; AR_356.[2] Existing Line 3 was completed in 1968 and was designed to transport light, medium, and heavy crude oil at an operating capacity of 760,000 barrels per day. AR_355; AR_372. Existing Line

---

[2] This document, Enbridge Line 3 Replacement Project, Dep't of the Army EA and Statement of Findings (Section 404 EA), contains the Section 404 EA and is also the record of decision for the Permit. AR_347-475. Citations to AR_xxxx are to the Bates numbering on the Corps' administrative record. For simplicity, we have replaced excessive digits with an underscore (for example, AR00000347 is cited as AR_347).

3 has a "large number of identified pipe defects and anomalies." AR_363. It is currently operating at a reduced capacity due to pipeline integrity issues and risk of a spill. AR_355. Maintaining Existing Line 3 requires an "extensive dig and repair program," which impacts federally-recognized Tribes' reservation lands, the Chippewa National Forest, landowners, the waters of the United States, and the environment. AR_363; AR_369-70.

Replacement Line 3 is designed, in part, to "improve public safety and protection of the environment" by decommissioning Existing Line 3 in accordance with Enbridge's 2017 Consent Decree with EPA and the United States Coast Guard, which requires Enbridge to replace Line 3 as expeditiously as possible, provided all necessary approvals and permits are received. AR_363; Mem. in Supp. of the Unopposed Mot. of the United States for Entry of the Consent Decree, 11-12, *United States v. Enbridge Energy Ltd. P'ship*, Case No. 16-cv-914 (W.D. Mich.), ECF No. 9 (Jan. 19, 2017) (Consent Decree Mem.). *See also* Consent Decree ¶ 22a ("Enbridge shall seek all approvals necessary for the replacement of Original US Line 3, and provide approval authorities with complete and adequate information needed to support such approvals, as expeditiously as practicable").[3] Enbridge plans to replace the 282 miles of 34-inch diameter pipeline that currently runs from the Red River valve in North Dakota to the Minnesota/Wisconsin border with approximately 330 miles of 36-inch diameter pipeline. AR_351; AR_372. Replacement Line 3 will be constructed "using modern pipeline design, manufacturing, coating, and installation techniques, as well as wider, thicker pipe." AR_368.

Existing Line 3 traverses the Chippewa National Forest and the Leech Lake and Fond du Lac Bands of Chippewa Indians' Reservations. AR_369, 371. Replacement Line 3 avoids the

---

[3] Following the Marshall oil spill in south-central Michigan, the United States obtained a Consent Decree requiring Enbridge to work to replace Existing Line 3 expeditiously. Consent Decree Mem., 12.

Chippewa National Forest and Leech Lake Reservation. *Id.* Even with the deviation around the Chippewa National Forest and Leech Lake Reservation, approximately 90 percent of the total project route will be co-located with other pipelines, utilities, roads, railroads, or highways. AR_355. Construction of the pipeline will be conducted in accordance with Enbridge's Environmental Protection Plan, which outlines site-specific environmental procedures and mitigation measures. AR_369; AR_7583-8684.

## II.     State review of Replacement Line 3.

The state of Minnesota has undertaken an extensive review of Replacement Line 3. AR_356-59. The Minnesota Public Utilities Commission held numerous proceedings evaluating Enbridge's application for a certificate of need for the pipeline project and selecting the route. *See* AR_356-59 (summarizing the history of environmental review and permit applications for the project including the Commission's process); AR_357 (the Commission held 16 public hearings in eight different counties to receive comments on the certificate of need and route permit applications); *see also* AR_7127-36, AR_12101, AR_64741-71 (Plaintiffs' extensive participation in state proceedings). An issue considered by the Commission was the risk of accidental oil release. *See* AR_12098-12127. Based in part on an evidentiary hearing held by an administrative law judge from the Minnesota Office of Administrative Hearings, the Commission concluded the "evidence in the record is clear that the Project will significantly reduce the risk of an accidental oil release." AR_12109. A substantial evidentiary record was also developed regarding the proposed pipeline route. *See, e.g.,* AR146430-68; *In re Enbridge Energy, Limited Partnership*, No. A20-1071(L), slip op. at 10-14 (Minn. Ct. App. June 14, 2021).

7

The State of Minnesota Department of Commerce also prepared a state EIS regarding Enbridge's applications for a certificate of need and routing permit. AR_56840. The state EIS examined topics such as oil spill risk, greenhouse gas emissions, project alternatives, and environmental justice. AR_56840 (state EIS, §§ 4, 5, 10, 11). In June 2019, the Minnesota Court of Appeals issued an order finding the state EIS sufficiently identified project alternatives, utilized an appropriate methodology to analyze potential impacts from oil spills, and considered potential impacts on the climate and the relative impacts of alternative routes. *In re Applications of Enbridge Energy*, 930 N.W.2d 12, 36 (Minn. Ct. App. 2019). But the court remanded for further consideration of potential impacts to the Lake Superior watershed. *Id*. at 28.

After additional environmental analysis was completed, the Commission reissued the certificate of need, concluding that "the consequences to society of granting the modified certificate of need are more favorable than the consequences of denial." AR_12112. The Commission found that "Existing Line 3 is deteriorating at an alarming rate, increasing the public safety and environmental risks to Minnesota and requiring constant and disruptive maintenance impacting hundreds of thousands of acres of land." *Id*. The Commission also found it significant that the Leech Lake Band urged the Commission "to grant the certificate of need and remove the risks to its reservation lands posed by Existing Line 3." *Id*. Then, the Commission's updated decisions regarding the certificate of need and the pipeline route were again challenged in state court. On June 14, 2021, the Minnesota Court of Appeals affirmed the Commission, finding that substantial evidence supports the certificate of need, the state EIS adequately addressed the concerns regarding impacts to the Lake Superior watershed, and the route for Replacement Line 3 respects "tribal sovereignty, while minimizing environmental impacts." *In re Enbridge Energy*, slip op. at 4.

III.     **The Corps' review of Enbridge's application for a CWA permit and RHA
         authorizations.**

The Corps' role with respect to the Replacement Line 3 project is highly circumscribed.
The Corps does not regulate the siting of pipelines, operation of pipelines, or transport of oil, nor
does it choose the route for the replacement pipeline. The Corps is implicated because some
portions of this project involve activities that would impact waters of the United States, a
waterway's navigable capacity, or certain public works, thus requiring authorizations from the
Corps under Sections 10 and 14 of the Rivers and Harbors Act of 1899 and Section 404 of the
CWA. 33 U.S.C. §§ 403, 408 & 1344. The Corps gave public notice in December 2018 and
January 2019 that Enbridge had applied for a Section 404 permit, Section 10 authorization, and
Section 408 permission. AR_358. Specifically, Enbridge requested a Section 404 permit to
permanently fill 9.97 acres of waters of the United States and temporarily fill 1,050.71 acres of
waters of the United States. AR_351. Enbridge also requested authorization under Section 10 of
the RHA to install underground crossings at the Red River of the North, the Red Lake River, and
the Mississippi River using horizontal directional drilling. AR_403. Finally, Enbridge requested
permission under Section 14 of the RHA to alter a federal project, the Lost River Flood Control
Project. AR_380. Less than 1 percent of the overall work in waters of the United States would
occur in association with non-linear aspects of the project, including expanding three pump
stations at the Donaldson, Plummer, and Clearbrook facilities and installing new pump stations
at two inlets, Swatara, and North Gowan North. AR_360. Overall, 24 percent of Replacement
Line 3 involves activities in waters of the United States requiring a Corps CWA Section 404
permit. *Id*.

In response to public comments regarding the permit application, the Corps requested
additional information from Enbridge in October 2019. AR_358. Specifically, the Corps

instructed Enbridge to address public concern and questions regarding wetland and impact characterization, construction methods, impact minimization, post-construction monitoring, and compensatory mitigation. *Id*. Enbridge responded in December 2019, identifying changes that would reduce temporary and permanent wetland impacts. *Id*. The Corps issued another public notice seeking comment on these revisions on February 4, 2020. AR_359. Additionally, the Corps engaged in consultation with Tribal Nations, such as the Fond du Lac, Grand Portage, Bois Forte, Leech Lake and White Earth Bands of the Minnesota Chippewa Tribe; and the Red Lake Nation/Red Lake Band of Chippewa Indians. AR_400; AR_1026-1032. These consultations took place over a five year period, and involved the creation of a cultural resources survey, elder interviews, and the identification of resources to be avoided. AR_456-72. To protect cultural resources, the Corps coordinated an Avoidance, Mitigation, and Implementation Plan for Construction (Avoidance Plan) with the Minnesota State Historic Preservation Office and consulting Tribes. AR_454. The Avoidance Plan includes provisions pertaining to Tribal and archeological monitors, unanticipated discoveries, and "protection of historic properties and sensitive resources of cultural importance to the Tribes." *Id*.

On November 23, 2020, the Corps finalized its Section 404 EA, which reviewed and considered the environmental impacts of issuing the Permit. After reviewing its findings, considering alternatives, and addressing public comments, the Corps concluded that issuing the Permit would not have significant impacts on the quality of the human environment. AR_475. Additionally, based on its analysis of the alternatives, the Corps concluded that there was no practicable alternative that would have a lesser impact on the aquatic ecosystem. 40 C.F.R. § 230.10; AR_374-75. The Corps also considered the projected human and environmental impacts, and conducted the separate alternatives analyses and public interest analysis required by

the implementing regulations for CWA Section 404, 33 U.S.C. § 1344, including 33 C.F.R.230.1 and 33 C.F.R. 320.4. AR_374-407.   Because Replacement Line 3 will cross the Lost River Flood Control Project, the Corps also prepared the Section 408 EA for Enbridge's request to modify a federal project, 33 U.S.C. § 408.  The Section 404 EA discusses this document, *id*. at 109, 126-127, and it is attached as Appendix E to the Section 404 EA. AR_456; AR_473-74; AR_2536-2556.   In the Section 408 EA, the Corps detailed its conclusion that the issuance of the Permission also would not have significant impacts on the quality of the human environment. AR_2555.

On November 23, the Corps issued the Permit, which authorizes Enbridge to temporarily discharge dredged and fill material into 1,050.71 acres of waters of the United States, including wetlands and waterbodies, and permanently discharge fill material into 9.97 acres of waters of the United States for construction activities.   AR_339-346.  The Permit also authorizes installation of underground crossings under Section 10 of the RHA. AR_341.  The Permit imposes a total of 23 special conditions that Enbridge must fulfill, including compliance with wetlands restoration, monitoring, and mitigation, the Environmental Protection Plan, and the Avoidance Plan. AR_341-44; AR_6622-45; AR_6646-67; AR_7103-26.  The Permit also incorporated the terms and conditions of the water quality certifications issued by the Minnesota Pollution Control Agency and Fond du Lac Reservation.  AR_342; AR_500-51.  On the same day, the Corps also issued the Permission under Section 408 of the RHA to alter the Lost River Flood Control Project.  AR_334-38.

## IV.   Procedural background.

Plaintiffs Red Lake Band of Chippewa Indians, the White Earth Band of Ojibwe, Honor the Earth, and the Sierra Club, (collectively, Red Lake Band Plaintiffs), filed suit on December

24, 2020 alleging that the Corps issued the Permit and Permission in violation of NEPA, the CWA, the RHA, and the APA. Compl. ¶¶ 183–217, ECF No. 1, No. 1:20 cv-03817. At the same time, they also filed a motion for preliminary injunction, requesting that the Court enjoin the Corps to withdraw the Permit. ECF No. 2, No. 1:20 cv-03817. On January 21, 2021, Plaintiff Friends of the Headwaters filed its action challenging the Permit and Permission. ECF No. 1, No. 1:21 cv-00189. Plaintiffs seek declaratory and injunctive relief. Compl. ¶¶ 183–217, ECF No. 1, No. 1:20 cv-03817; First Am. Compl. ¶ 2, ECF No. 13, No. 1:21 cv-00189. Enbridge Energy intervened in both cases. ECF No. 19, No. 1:20 cv-03817; ECF No. 6, No. 1:21 cv-00189. Following briefing, the Court denied Red Lake Band Plaintiffs' motion for a preliminary injunction. ECF No. 39, No. 1:20 cv-03817. And the Court subsequently consolidated the cases for all purposes. ECF No. 47, No. 1:20 cv-03817; ECF No. 20, No. 1:21 cv-00189. Plaintiffs filed their motions for summary judgment on May 26, 2021. ECF Nos. 52, 53. Federal Defendants file this cross-motion and response to address Plaintiffs' motions and complaints. Federal Defendants request that summary judgment be entered in their favor on all of Plaintiffs' causes of action.

## Standard of Review

The APA directs the Court to uphold an agency's decision unless it is deemed to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Although the inquiry must be thorough, the standard of review is narrow and highly deferential, an agency's decisions are entitled to a "presumption of regularity," and the Court cannot substitute its judgment for that of the agency decision maker. *U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001). The Court need not find that an agency decision "is the only reasonable one, or even that it is the result [the court] would have reached." *Am. Paper Inst.,*

*Inc., v. Am. Elec. Power Serv. Corp.*, 461 U.S. 402, 422 (1983).  The Court must determine

whether the agency: (1) relied on factors which Congress had not intended it to consider; (2)

entirely failed to consider an important aspect of the problem; (3) offered an explanation for its

decision that runs counter to the evidence before the agency; or (4) offered an explanation so

implausible that it could not be ascribed to a difference in view or the product of agency

expertise.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S.

29, 43 (1983).

**Argument**

I.    **The Corps satisfied NEPA's requirements by taking a hard look at the impacts of
      issuing the Permit and Permission and considering a reasonable range of
      alternatives.**

Red Lake Band Plaintiffs' challenge the sufficiency of the Corps' NEPA analysis.

ECF No. 53-1 at 8-23.[4]  The Corps prepared extensive EAs and took a hard look at the impacts

of issuing the Permit and Permission.  The Corps considered public comments, engaged in Tribal

consultation, examined the state's environmental analysis, and all of the information in the

extensive record.  The Corps then articulated the basis for its conclusions, and made a "fully

informed and well-considered decision."  *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def.*

*Council, Inc.*, 435 U.S. 519, 558 (1978).  This satisfies the requirements of NEPA.  NEPA is

governed by a "rule of reason, which ensures that agencies determine whether and to what

extent" to evaluate environmental impacts "based on the usefulness of any new potential

information to the decisionmaking process."  *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767

(2004) (internal quotation and citation omitted).  When reviewing an agency's NEPA

compliance, courts ask whether the agency has "adequately considered and disclosed the

_____

[4] Plaintiff Friends of the Headwaters (FOH) does not include NEPA arguments in its brief.  *See*
ECF No. 52 at 1.

environmental impacts of its action." *Del. Riverkeeper Network v. FERC*, 753 F.3d 1034, 1313 (D.C. Cir. 2014). If this Court determines that the Corps has taken a "hard look" at the relevant potential impacts of its action, this Court's review is complete. *See Myersville Citizens for a Rural Cmty, Inc. v. FERC*, 783 F.3d 1301, 1322 (D.C. Cir. 2015).

### A.      The Corps properly considered air quality impacts, greenhouse gas emissions, and climate change.

The Corps took a hard look at air quality impacts, greenhouse gas emissions, and climate change related to the Permit and Permission. Although Red Lake Band Plaintiffs contend that the Corps should have completed its own broader analysis of impacts, ECF No. 53-1 at 8-11, the Corps' analysis is reasonable and not arbitrary and capricious under precedent from the D.C. Circuit.

The Section 404 EA evaluated air quality impacts, greenhouse gas emissions, and climate change, AR_397-98, and specifically referenced the State EIS's evaluation of greenhouse gas emissions from the Line 3 project, AR_398. Contrary to Plaintiffs' claim that the Corps "closed its eyes" to such impacts, the Corps analyzed air quality impacts that may occur as a result of the construction activities in waters of the United States. ECF No. 53-1 at 9. The Corps explained that the pipeline would be constructed in separate sections to reduce the concentration of emissions. AR_397. The Corps noted that dust impacts to air quality would be minimized by wetting soils during dry conditions and by completing the majority of construction during winter conditions. *Id*. The Corps also considered measures developed by Enbridge to suppress dust on the construction right-of-way and access roads. *Id*.

Noting that greenhouse gas emissions contribute to climate change, the Section 404 EA also examined the potential impact of proposed construction activities within and adjacent to the waters of the United States. AR_398; AR_479. The Corps concluded that the proposed

activities which had a reasonably close causal relationship with the permitted activity "likely would result in a negligible release of greenhouse gases into the atmosphere when compared to global greenhouse gas emissions." AR_398. The agency's analysis showed that there "are no anticipated direct changes to hydrology that could potentially trigger changes in temperature, precipitation, evaporation rates and other climate variables." AR_479. Nor did the Corps anticipate that there would be any indirect impacts such as sediment loading that would reduce the functions of the wetland basins resulting in impacts to climate change. *Id*. The Corps explained the connection between aquatic resources and greenhouse gases, noting that the resources can either be sources or sinks of greenhouse gases. AR_398. Because "some aquatic resources sequester carbon dioxide whereas others release methane," the impacts authorized by the Corps can result in either "an increase or decrease in atmospheric greenhouse gas." *Id*. The Corps concluded that these impacts were minimal and would be mitigated through compensatory mitigation. *Id*.; *see also* AR_354-55; AR_369; AR_407-9; AR_7583-8684 (detailing the mitigation plans). The Corps also noted that emissions associated with the Permit issuance may result from the fossil fuels used to operate construction equipment. AR_398. The Corps further considered that tree removal from the construction work areas between Clearbrook and Carlton County would result in the release of greenhouse gas emissions. AR_98735.

Ultimately, the Corps concluded that air quality impacts, greenhouse gas emissions, and climate change impacts related to the Permitted activities would be negligible to minor. AR_397-98; AR_479. After analyzing emissions from construction equipment, vehicles, and construction-related activities in the Section 408 EA, the Corps reached a similar conclusion finding that emissions related to the alteration of the flood control project would "result in localized minor, short-term (2 days) and temporary impacts." AR_2544. The Corps'

conclusions are consistent with the findings in the state EIS. AR_56840 (state EIS, § 5.2.7.3, construction impacts and estimated construction emissions).

Plaintiffs' arguments (ECF No. 53-1 at 8-11) do not establish that the Corps' consideration of air quality impacts, greenhouse gas emissions, and climate change was arbitrary and capricious. Plaintiffs have not identified any information on localized impacts associated with construction activities within or adjacent to the waters of the United States that the Corps failed to consider. *See Friends of Cap. Crescent Trail v. FTA*, 877 F.3d 1051, 1067 (D.C. Cir. 2017) (agencies' analysis was adequate because plaintiffs "have not identified a critical flaw or glaring hole that would inhibit NEPA's information-promoting and accountability goals"). In support of this position, Plaintiffs cite only their own public comments in favor of a far broader review of emissions related to alleged increased levels of tar sands production in Alberta, Canada and the social cost of carbon. ECF No. 53-1 at 8-9 (citing AR_97773; AR_97775). But Plaintiffs have not shown that the Corps' agency actions here approved, or otherwise authorized, tar sands production in Alberta, Canada, nor could they as the Corps' CWA and RHA authority is limited to the United States. 33 C.F.R. §§ 328.3, 329.4.

The Supreme Court has held that "a 'but for' causal relationship is insufficient to make an agency responsible for a particular effect under NEPA." *Pub. Citizen*, 541 U.S. at 767. Instead, NEPA requires agencies to consider effects that have a "reasonably close causal relationship" with the agency action, and that are "useful[]" to consider in the agency's "decision-making process." *Id*. The Court previously recognized that "[e]ffects 'do not include those effects that the agency has no ability to prevent due to its limited statutory authority or would occur regardless of the proposed action.'" ECF No. 40 at 4 (quoting 40 C.F.R. § 1508.1(g)(2)).

That the Corps did not need to provide additional independent analysis of indirect greenhouse gas emissions attributable to Replacement Line 3 as a whole is reinforced by the rule of reason that this Court must apply. The Corps' NEPA responsibility depends on the nature of the Corps' action and the Corps' authority. Here, the scope of the Corps' involvement was limited. The "major Federal action" is the Permit for Enbridge's construction activities in waters of the United States and the Permission for the alteration of the Lost River Flood Control Project. AR_351; AR_2539-2540. The EAs properly focused on the potential effects of the activities permitted by the agency, *see, e.g.*, AR_360-361 (Permit scope of analysis); AR_479 (responding to comments that it should broaden its greenhouse gas emissions analysis); AR_2542 (focus of analysis for Permission), and its judgment about what was a "reasonably close causal relationship" was not arbitrary and capricious under the circumstances.

Plaintiffs fail to acknowledge that defining the scope of a NEPA document "is a delicate choice and one that should be entrusted to the expertise of the deciding agency." *Selkirk Conservation All. v. Fosgren*, 336 F.3d 944, 962 (9th Cir. 2003). When evaluating the impacts of issuing the Permit and Permission, it was "sensible" for the Corps to consider "the reaches of its own jurisdiction," *Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs*, 941 F.3d 1288, 1295 (11th Cir. 2019), and focus its analysis there, particularly because the State had already analyzed the entire project. Nevertheless, to the extent that the Court concludes a broader analysis of greenhouse gas emissions was necessary, the administrative record demonstrates that the Corps met this obligation. The Corps reviewed and referenced the extensive analysis of climate conditions, greenhouse gas emissions, operations impacts, loss of trees (which are carbon sinks), the social cost of carbon, upstream and downstream effects, and measures to minimize greenhouse gas emissions included in the state EIS. AR_398; AR_56840 (state EIS, § 5.2.7.3);

17

AR151471-72 (explaining that the state EIS and state decisions on the certificate of need and route permit will be used to inform aspects of the Corps' review). As the Court previously concluded, "the Corps was not required to duplicate studies or analyses already completed by the state . . . ." ECF No. 40 at 24. Hence, the Corps' analysis of air quality impacts, greenhouse gas emissions, and climate change satisfied NEPA.

Plaintiffs' argument that the Corps should have provided a quantitative analysis of possible environmental impacts is unavailing. ECF No. 53-1 at 9. The D.C. Circuit has held that the quantification of greenhouse gas emissions is not always required simply because those emissions are an indirect effect of an agency action. *Sierra Club v. Dep't of Energy*, 867 F.3d 189, 202 (D.C. Cir. 2017) (agency adequately considered potential emissions even though it did not disclose amount of greenhouse gases that would be emitted in its NEPA document); *see also Friends of Cap. Crescent Trail,* 877 F.3d at 1065 (finding that quantification of indirect effects was not necessary). Under D.C. Circuit precedent, a "rule of reason guides every aspect" of an agency's NEPA approach, *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 201 (D.C. Cir. 1991), including agency decisions "setting limits to the scope" of environmental review. *Nat'l Wildlife Fed. v. Appalachian Reg'l Comm'n*, 677 F.2d 883, 889 (D.C. Cir. 1981). Given the mostly temporary and minor nature of the impacts of the agency action, the qualitative analysis conducted by the Corps here was sufficient. Requiring the Corps to attempt to quantify these impacts, which it concluded were "negligible to minor" would add little (if any) value to the agency's decision-making process. Plaintiffs have not shown the Corps' conclusions to be arbitrary, capricious, or contrary to NEPA's rule of reason. *See Sierra Club*, 867 F.3d at 202; *Hapner v. Tidwell*, 621 F.3d 1239, 1245 (9th Cir. 2010) (agency adequately considered global

warming impacts even though they were not discussed in the EA, but only "addressed comments regarding climate change in its . . . notice of final decision").

Plaintiffs' reliance on *Sierra Club v. FERC*, ECF No. 53-1 at 9-10 (867 F.3d 1357, 1374 (D.C. Cir. 2017)), does not establish that the Corps' action was arbitrary and capricious. *Sierra Club* concerned whether, and to what extent, FERC was required to analyze downstream greenhouse emissions resulting from the burning of natural gas transported on natural gas pipelines. *Id*. Plaintiffs miss a critical legal distinction from this decision: the scope of FERC's regulatory authority is different than the Corps' authority. Natural gas pipelines cannot be constructed or operated without authorization by FERC. 15 U.S.C. § 717f.[5] FERC has the legal authority to deny the authorization needed for construction and operation of natural gas pipelines based on downstream environmental effects, so as the legally relevant cause of these effects, FERC was required to quantify these effects or explain why it could not. *Sierra Club*, 867 F.3d at 1373-74. But FERC provided no explanation. *Id*. at 1374. The court stressed that it did not create a new rule requiring quantification of greenhouse gas emissions in every case, but agencies must provide "a satisfactory explanation" when analyzing indirect effects. *Id*. The Corps' analysis of air quality impacts, greenhouse gas emissions, and climate change met the "satisfactory explanation" obligation.

Plaintiffs' belief that the Corps' NEPA analysis was required to consider greenhouse emissions from the pipeline's operation and transportation of oil (ECF No. 53-1 at 8-11)

---

[5] Oil pipelines can be constructed and operated without authorization by the Corps if they do not involve discharges of fill into waters of the U.S. (CWA Section 404), cross or obstruct such waters (RHA Section 408), or impact federal projects (RHA Section 10). A better comparison to the Corps' scope of authority can be seen in three D.C. Circuit cases finding that FERC was not the legally relevant cause of effects from anticipated liquefied natural gas exports because its authority was to license terminal upgrades, not to approve or regulate exports. *See EarthReports, Inc. v. FERC*, 828 F.3d 949, 956 (D.C. Cir. 2017); *Sierra Club v. FERC*, 827 F.3d 36, 47 (D.C. Cir. 2016); *Sierra Club v. FERC*, 827 F.3d 59, 68-69 (D.C. Cir. 2016).

misreads the requirements of NEPA. NEPA did not require the Corps to consider the effects from such activities because they do not have a "reasonably close causal relationship" with the permitted activity and permission.

NEPA's purpose is to inform the agency's decision-making; studying the possible effects of private activities that are beyond the agency's decision-making authority would not be useful in considering the decision to be made because the agency simply lacks the power to act on that information in taking the agency action. *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 767-68 (1983). "[W]here an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant 'cause' of the effect." *Id*. at 770.

Plaintiffs believe the Corps should have conducted a more expansive NEPA analysis. *See, e.g.*, ECF No. 53-1 at 9-10. But this is not in keeping with D.C. Circuit precedent which has recognized the limits of the Corps' authority in the context of oil pipelines and rejected the argument that a whole-pipeline NEPA analysis was needed. *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 46-48 (D.C. Cir. 2015) (the Corps' NEPA obligations "extended only to the segments under the Corps's asserted Clean Water Act jurisdiction"). A similar conclusion was reached in *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, where the court explained that it could <u>not</u> conclude "that a federal agency with limited jurisdiction over specific activities related to a pipeline is required to consider <u>all</u> the effects of the <u>entire</u> pipeline to be the indirectly or directly foreseeable effects of the narrower permitted activity." 205 F. Supp. 3d 4, 31 (D.D.C. 2016). While Plaintiffs disagree with the Corps' conclusions, this does not state a NEPA claim. The Court should not substitute Plaintiffs' views for the reasoned judgment of the Corps. *Gregory*, 534 U.S. at 7.

The other authority cited by Plaintiffs likewise fails to demonstrate that the examination of greenhouse gas emissions conducted by the Corps failed to satisfy its NEPA obligations or was arbitrary and capricious. *White Tanks Concerned Citizens, Inc. v. Strock* reinforces that a focus on the environmental effects triggered from the filling of waters of the United States was reasonable in this case. ECF No. 53-1 at 9-10 (citing 563 F.3d 1033, 1039–40 (9th Cir. 2009)). Plaintiffs' cite to *Center for Biological Diversity v. National Highway Traffic Safety Administration* can also be dismissed. ECF No. 53-1 at 9, n.4 (citing 538 F.3d 1172 (9th Cir. 2008)). There, NHTSA's regulations are the proximate cause of tailpipe emissions because the agency has the authority to set specific fuel economy standards for light trucks. *Id.* at 1217-18. Likewise, in *Mid States Coalition for Progress v. Surface Transp. Board*, as the exclusive licensing authority for the construction and operation of rail lines under 49 U.S.C. § 10901, the agency's authority was far more comprehensive than the Corps' authority under the CWA or RHA. ECF No. 53-1 at 10 (citing 345 F.3d 520, 533 (8th Cir. 2003)).

### B. The Corps properly considered environmental justice.

Plaintiffs' claim that the Corps did not fully account for environmental justice considerations is also unsupported. ECF No. 53-1 at 11-14. The Corps reasonably assessed the impacts of the Permit and Permission on minority and low-income populations and concluded that the impact would not be disproportionately high or adverse. AR_473-74. Executive Order 12898 requires that specified federal agencies identify and address, as appropriate, disproportionately higher and adverse human or environmental health effects on minorities and low-income populations. 59 Fed. Reg. 7629 (Feb. 11, 1994). Because the Corps has discretion to include an environmental justice analysis in its NEPA evaluation, its analysis is reviewed under the arbitrary and capricious standard. *Cmtys. Against Runway Expansion, Inc. v. FAA*, 355

21

F.3d 678, 689 (D.C. Cir. 2004).  The analysis "must be 'reasonable and adequately explained,'
but the agency's 'choice among reasonable analytical methodologies is entitled to deference.'"
*Sierra Club*, 867 F.3d at 1368 (quoting *Cmtys. Against Runway Expansion, Inc.*, 355 F.3d at
689).  "As always with NEPA, an agency is not required to select the course of action that best
serves environmental justice, only to take a 'hard look' at environmental justice issues." *Id*.
(citation omitted).

   The Corps did not ignore environmental justice concerns or offer a "bare-bones
conclusion that its action will not result in disproportionate harm." ECF No. 53-1 at 12 (internal
quotation marks and citation omitted).  Rather, the Corps used the EPA's EJSCREEN tool, as
well as the environmental justice information provided in the state EIS, to assess demographic
data and identify minority and low-income populations within Replacement Line 3's corridor.
AR_472-73; AR_56840 (state EIS, § 11).  Minority or low-income populations were determined
to be present in an area when the percentage of minority group or low-income population
exceeded 50 percent of the county population.  AR_472-73.  Plaintiffs do not dispute the
methodology used by the Corps to make its assessment.  Replacement Line 3 crosses through
"13 counties and a total of 128 census tracts, which are predominantly rural." AR_473.  And the
Section 404 EA includes a detailed breakdown of the demographic data in these counties,
explaining that the project would cross ten tracts with minority populations.  *Id*. It also identifies
the six tracts that contain Native American populations that exceed the county level by more than
10 percent. *Id*.  The EA also describes the pipeline's location in relation to the Tribes'
reservations and lands on which Tribes exercise their treaty rights to access Tribal resources.
*See, e.g., id*.; AR_369; AR_371.  The Corps explained that Replacement Line 3 does not cross
any tracts with low-income populations.  AR_473.  The Corps also noted that the crossing at

Lost River, authorized by the Permission, is not located in a tract with a higher minority population. *Id*.

The Corps' Section 404 EA reflects the agency's consideration of environmental justice issues, setting forth the Corps' public involvement efforts, as well as Tribal coordination and consultation as an "integral part of planning," so that the agency could "ensure that concerns of all people are considered in the decision-making process." AR_472; *see also* AR_358-59. The Corps' review also included "coordination with Tribes to ensure mitigative measures would be taken to reduce any adverse effects to Tribal resources." AR_474; AR_456-472. And the Corps reviewed comments from the Minnesota Pollution Control Agency pertaining to environmental justice. AR_99212-19. Then, the Corps considered whether the impacts from the agency action would be disproportionately high and adverse on minority or low-income populations. AR_473-74. The Corps made this determination based upon the duration, intensity, and extent of the impacts. *Id*. In sum, the Corps found that most of the impacts would be short-term, construction-related, and located primarily along the pipeline. AR_473. Longer-term impacts would be limited to maintenance of a permanent pipeline right-of-way and the presence of pump stations. *Id*. Thus, the Corps' conclusion that the issuance of the Permit and Permission would not have a disproportionately high or adverse impact on minority or low-income populations is well-reasoned and supported in the record. AR_473-74.

Plaintiffs raise objections to the Corps' considered environmental justice analysis. ECF No. 53-1 at 13-14. However, the Corps examined each of these issues. Beyond the "Environmental Justice" section, the Section 404 and 408 EAs include further descriptions of potential effects on Tribal subsistence fishing, hunting, and gathering (AR_400-01), oil spill risks (AR_2548-54), habitat, and wildlife (AR_380-84; AR_2546-47). *See also infra* pp. 25-30.

While Plaintiffs are correct that the Corps rejected a request to include a condition in the Permit regarding fruit- and nut-bearing trees (ECF No. 53-1 at 13), it did so because such a condition is outside of its regulatory authority, though the recommendation could be made to Enbridge. AR_467. Plaintiffs have not shown that such trees are in jurisdictional waters of the United States or that their destruction is a regulated activity. 33 C.F.R. § 323.2(d)(2)(ii). And Plaintiffs cannot identify a source of authority that allows the Corps to require and enforce this type of mitigation. The Corps only has authority under the CWA to require compensatory mitigation for aquatic impacts. 33 C.F.R. §§ 332.2., 332.3; *Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, 894 F.3d 692, 701 (5th Cir. 2018) ("the Corps' responsibility under the CWA is to ensure the protection of aquatic functions and services, which does not include the protection of tree species as such").

Citing *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, Plaintiffs assert that the Corp's analysis here was similarly "bare bones." ECF No. 53-1 at 12-13. The *Standing Rock* environmental justice analysis involved a much more limited area (a 0.5 mile buffer around a crossing with a focus on two census tracts in which horizontal directional drilling boreholes would be drilled), which excluded a Native American reservation by just 80 yards. 255 F. Supp. 3d at 137. Plaintiffs fail to show that the methodologies used here to identify and evaluate impacts was unreasonable. The Corps' analysis of census tract information in this matter involved 128 census tracts, and an examination of the record shows that the Corps fully assessed and disclosed the potential effects on minorities and low-income populations. AR_473 (describing the applied methodologies). This fulfilled the requirements of NEPA and the Corps' determination should be upheld. *Sierra Club*, 867 F.3d at 1368-69 (upholding FERC's determination that the preferred route of several natural gas pipelines would not have a

disproportionate impact on environmental justice communities, when 83.7 percent of the pipelines' length would cross through, or within one mile of, tracts with such communities).[6]

### C. The Corps reasonably considered impacts to Tribal rights to hunt, fish, and gather natural resources.

Plaintiffs claim that the Corps violated NEPA by failing to consider Tribal rights to hunt, fish, and gather natural resources. ECF No. 53-1 at 14-16. But the record shows that the Corps engaged in adequate Tribal consultation and "appropriately and reasonably examined" potential impacts. *Pub. Citizen*, 541 U.S. at 770.

As Plaintiffs point out, the Corps recognized that the pipeline covers territory in which tribes retain rights to hunt, fish, gather, and take subsistence resources. ECF No. 53-1 at 14 (citing AR_400). Accordingly, the Corps consulted with the Fond du Lac, Grand Portage, Bois Forte, Leech Lake and White Earth Bands of the Minnesota Chippewa Tribe; and the Red Lake Nation/Red Lake Band of Chippewa Indians, along with other Native American Tribes, to understand how the Permit and Permission might affect those rights. AR_400; AR_456-472 (detailing tribal consultation taking place over a five year period, correspondence, information provided to Tribes, meetings, field visits, and coordination with state and Tribal historic preservation officers). A Tribal cultural resources survey was conducted, including those areas outside of the Corps' control and responsibility, which allowed Tribal members "to walk the entire proposed corridor and to connect, or reconnect, with the land and resources." AR_401. Led by the Fond du Lac Band, Tribal elder interviews were conducted in an attempt to identify information concerning the use of natural resources along the project corridor. *Id.*; AR_461;

---

[6] Minnesota Interfaith Power & Light and Youth N' Power's proposed amicus brief on impacts to urban communities of color (ECF No. 55-1) is largely based on extra-record evidence that the Court should disregard. *See Oceana, Inc. v. Ross*, 454 F. Supp. 3d 62, 68 (D.D.C. 2020) (internal quotation marks omitted).

AR_1027-28.  Historical maps were used to identify the trails that the project would traverse, so that they could be given extra investigation by Tribal survey crews.  AR_401.  This process identified resources as significant to Tribes, and those resources have been adequately avoided by alignment shifts, alternative routes, or minimized through protective measures.  *Id.*; *see*, *e.g.*, AR_6-7 (Permit conditions 10-14, 17, 18, 20, 22); AR_457 (discussing route alternative to avoid wild rice that was coordinated with the White Earth Band); AR_5954 (summarizing pipeline reroutes to avoid crossing lands within the boundaries of Eastern Wild Rice Watershed, impacts to Rice Lake, crossing the Sandy River, and two wildlife management areas); AR146987-89.  The Avoidance Plan, coordinated with the Minnesota State Historic Preservation Office and consulting tribes, also requires Tribal monitoring at all potential historic trail locations.  AR_464.

Plaintiffs cite concerns regarding usufructuary rights to gather food, and as well as concerns about hunting, fishing, wild rice, and medicinal plants.  ECF No. 53-1 at 15.  But the Corps did not ignore these topics.  For example, the Corps considered recommendations from the Tribes regarding natural resources.  AR_461-70.  In doing so, the Corps addressed Tribal concerns that invasive species may affect the harvesting and gathering of medicinal plants and berries and explained the measures that would be taken to reduce the potential for invasive species.  AR_467-68; AR_7770-8136 (invasive and noxious species plan); *see also* AR_8 (Permit Condition 22 makes these measures an enforceable condition of the Permit).  The Corps also considered a comment contending that contaminated water would disrupt Tribes' traditional lifeways and explained the minimization measures to ensure that water quality is not impacted.  AR_468-69; AR_500-51 (water quality certifications); *see also* AR_6 (Permit Condition 2 makes these measures an enforceable condition of the Permit).  The Corps also noted Tribal concerns regarding the removal of forest cover and the potential effects on habitat and wildlife.

AR_469.  The Corps explained that compensatory mitigation is required for the conversion of forested and scrub-shrub wetlands.  *Id*.; AR_7645 (Enbridge's voluntary restoration measures to allow natural reforestation and seeding); AR_6622-45 (compensatory wetland mitigation plan); *see also* AR_7 (Permit Conditions 13 and 20), AR_354; AR_390; AR_414.  The Corps also reviewed the risk of a spill from the pipeline on wild rice, the human environment, fish, birds, semi-aquatic mammals, and other species.  AR_2548-54; AR_56840 (state EIS, §§ 10.2, 10.3, 10.4); AR151473-564 (Potential Effects of the Line 3 Replacement Project on Wild Rice-Revised); AR157913-158176 (Assessment of Accidental Releases: Technical Report); AR162240-42 (state analysis of an alternative to avoid the wild rice lake identified by White Earth Band).

The Corps' review and consultation with the Tribes supports its conclusion that impacts from the agency actions are not likely to significantly reduce the overall availability of resources that are typically part of the tribes' subsistence activities.  AR_401; *see also id*. (acknowledging that there may be some effects to local species' populations during construction, but overall they are expected to remain available).  Plaintiffs again contend that the Corps focused too narrowly on effects related to the Corps' regulatory jurisdiction, ECF No. 53-1 at 15, but Plaintiffs have not shown that a more expansive NEPA analysis is required.  *Sierra Club*, 803 F.3d at 46-48.  While Plaintiffs do not agree with the Corps' conclusions regarding potential impacts to Tribal hunting, fishing, and gathering rights, this does not mean that the Corps failed to take a hard look or that it was in any way arbitrary or capricious.  *Myersville*, 783 F.3d at 1325 (finding that an EA was adequate because it clearly addressed the challenged issue).

      **D.**      **The Corps reasonably considered impacts to biodiversity and animal species.**

Plaintiffs contend that the Corps failed to examine effects on biodiversity and animal species. ECF No. 53-1 at 16-17. But a review of the administrative record supports the Corps' conclusion (AR_384; AR_2546) that effects to biodiversity and wildlife are anticipated but would be minor. The Corps' analysis met NEPA's requirements.

The Corps acknowledged that wetlands along the pipeline corridor provide benefits to wildlife habitat, and it discussed the impacts that may occur to wildlife as a result of the discharge of dredged and fill material. AR_382-84; AR_435. But it explained that the "majority of the impacts [to wetlands] would be temporary and those functions and benefits would return after construction and restoration." AR_435; *see also* AR_2546. The Corps also discussed the connections between functioning floodplains and effects to wildlife habitat, and disclosed that temporary impacts to floodplains would occur during the duration of trenching, pipe installation, backfilling, and initial restoration. AR_403. But the Corps noted that such areas would be restored "to as near as possible to pre-construction conditions." *Id.*

Plaintiffs argue that the Corps did not identify particular areas that would be most affected or assess them adequately. ECF No. 53-1 at 16. To be sure, the Corps explained that "[f]ollowing existing infrastructure for the majority of the Project would limit the amount of new corridor which would reduce habitat fragmentation." AR_395; *see also* AR_383. But the agency also looked at potential impacts to habitat and wildlife in the area that would be impacted in a greater way— the portions of the pipeline in jurisdictional waters that would not be co-located with other pipelines, utilities, or road. AR_383. The Corps also disclosed that there would be a small conversion (less than 1% to 5%) of wooded wetlands in certain watersheds, which would affect wildlife habitat. AR_435; *see also* AR_383 (recognizing that impacts to wildlife would be longer in duration for wooded wetlands). But while habitat will be impacted,

the loss would still be small within each watershed. AR_435.  The Corps factored this in when it examined potential impacts to terrestrial wildlife and birds and explained that "population level effects are not expected to be detectable given the surrounding landscape and other suitable habitat in close proximity."  AR_384.  The Corps also took into account the minimization measures that Enbridge plans to undertake, such as creating buffer zones for sensitive wildlife species and habitat and undertaking winter construction at six water crossings to prevent impacts to sites of high and moderate biodiversity and that are near a wildlife management area. AR_388-92; AR_394-96.  And the Corps considered recommendations made during Tribal consultation regarding wildlife and responded to comments regarding minimizing impacts to wildlife.  AR_464; AR_468-69; AR_487; AR_489.

Plaintiffs further contend that the Corps did not evaluate impacts to localized animal species.  ECF No. 53-1 at 16-17.  But the Corps ensured the agency's action was in compliance with the ESA, 16 U.S.C. § 1536, by preparing a Biological Assessment and consulting with the U.S. Fish and Wildlife Service.  AR_380-381; AR_63090-63092; AR_95575-97459.  The Corps' EAs identified the ESA-pertinent species[7] that are present in portions of the corridor and the corresponding critical habitats and discussed the potential impacts.  AR_380-81; AR_402; AR_2547.  The Section 408 EA also explained that "[w]ildlife in the area would be typical of northwestern Minnesota and would include deer, small mammals, and birds."  AR_2546. Plaintiffs do not specify any local animal populations that the Corps failed to analyze, nor do they point to any public comments that suggested particular areas or types of wildlife that would be most affected by the proposed agency action.  This is not sufficient to establish a deficiency in

---

[7] These include the Whooping crane, Rufa red knot, Rusty patched bumble bee, Gray wolf, Canada lynx, Northern long-eared bat, Piping plover, Dakota skipper, and Poweshiek skipperling.

the Corps' NEPA analysis.  *Pub. Citizen*, 541 U.S. at 764 (parties must alert the agency to their "position and contentions," in order to allow the agency to give the issue meaningful consideration during the NEPA process).

Plaintiffs rely on *Fund for Animals v. Norton* in support of their argument.  ECF No. 53-1 at 16-17 (281 F. Supp. 2d 209, 233-34 (D.D.C. 2003)).  There, the state government planned to kill hundreds of mute swans, and the court concluded that the NEPA analysis failed to consider the impacts to swans at the local level, rather than impacts to the statewide swan population.  281 F. Supp. 2d at 232-34.  In this case, Plaintiffs simply have not identified any animal species that the Corps failed to study, nor any localized impacts that the agency ignored.[8]  Here, the Corps took the requisite hard look at impacts to biodiversity and animal species before determining that such impacts were not significant.  Its determinations were not arbitrary and capricious.

### E.   The Corps considered a reasonable range of alternatives.

Plaintiffs also renew their argument that the Corps did not conduct an adequate NEPA analysis of alternatives.  ECF No. 53-1 at 17-19.  The Corps, however, met NEPA's requirements by preparing a detailed alternatives analysis and considering a reasonable range of alternatives.  AR_365-73; 33 C.F.R. part 325, App. B., para. 7.  Plaintiffs contend that the Corps should have considered alternative pipeline routes.  ECF No. 53-1 at 17-18.  But the Corps did not err in relying on the route corridor established by the Minnesota Public Utilities Commission,

---

[8] *Fund for Animals v. Norton*, 294 F. Supp. 2d 92, 111 (D.D.C. 2003), does not help Plaintiffs either.  *See* ECF No. 53-1 at 16.  In that case, the administrative record was "ripe" with studies showing that winter use of trails had led to "major changes in bison migration patterns."  294 F. Supp. 2d at 110.  Thus, in the court's view, the agency erred by failing to undertake trail and road closures to gather additional data for its NEPA analysis.  *Id.* at 111.  Plaintiffs have not identified anything in the record that shows the Corps needs to gather additional information about a specific animal species.

the state government unit with authority over oil and gas pipeline route decisions, Minn. Stat. ch. 216G.

The alternatives analysis required for EAs is less rigorous than that for EISs. *Standing Rock*, 255 F. Supp. 3d at 134. An EA must include a "brief discussion of reasonable alternatives to the proposed action." *Id*. As the Court previously explained, the Corps "bears the responsibility for deciding which alternatives to consider and need only follow a rule of reason, which governs both *which* alternatives the agency must discuss, and the *extent* to which it must discuss them." ECF No. 40 at 28 (citing *Citizens Against Burlington*, 938 F.2d at 196) (internal quotation marks omitted). "Where, as here, a federal agency is 'not the sponsor of a project,' its 'consideration of alternatives may accord substantial weight to the preferences of the applicant and/or sponsor in the siting . . . of the project.'" *Id*. at 31 (quoting *City of Grapevine, Tex. v. Dep't of Transp.*, 17 F.3d 1502, 1506 (D.C. Cir. 1994)). And the Corps' specification of the range of reasonable alternatives is entitled to deference. *Myersville*, 783 F.3d at 1323.

Contrary to Plaintiffs' claim, the Corps did not "blindly rely on another agency's work or oversight." ECF No. 53-1 at 18. The EA prepared for the Permit includes a detailed analysis of alternatives. For example, the Corps considered "no action" alternatives that would not require a Section 404 permit. AR_365-368. The Corps concluded that transporting crude oil by either rail or truck would result in the need for increased infrastructure, such as 14 miles of new rail line, 7,200 new tank rail cars, or 12,000 new tanker trunks. AR_366-367. And the Corps found that other effects would occur, including increased logistical issues regarding rail space, the addition of a substantial amount of tanker truck traffic, increased costs, and potential delays due to extreme weather conditions. *Id*. Using trains or trucks for oil transportation also results in a higher percentage of overall volume of crude oil spillage when compared to pipelines. *Id*.

31

The Corps also analyzed the applicant's preferred alternative, Replacement Line 3. Because Enbridge intends to use a wider, thicker pipe with a greater yield strength for the replacement, it would "resist fatigue growth of cracks from pressure cycling." AR_368. The Corps concluded that adopting the preferred alternative would increase the safety and reliability of the pipeline. *Id.* (considering the pipeline's design, manufacturing, coating and installation techniques combined with the wider, thicker pipe). Replacement Line 3 would also reduce the number of integrity digs in jurisdictional waters needed to maintain the pipeline. *Id.* The Section 404 EA also discussed the project's route, costs, and potential wetland impacts. AR_368-369. And the Corps described the environmental procedures and mitigation measures that would be implemented during construction of this alternative, noting that additional details are provided in Enbridge's Environmental Protection Plan. AR_369. The Corps further considered an alternative that would use a pipe with a smaller diameter. AR_372. The Corps concluded that a 34-inch diameter pipeline would pose engineering and logistical constraints and increase costs because it is not standard industry size. *Id.* In comparison, the agency noted that Replacement Line 3's proposed 36-inch diameter pipeline would result in "significant energy savings" and similar impacts to waters of the United States. *Id.*

The Corps did not limit its analysis to considering only the new route for the pipeline. Instead, the Corps examined several alternatives involving Existing Line 3 and its current route. AR_369-73. The Corps described the potential impacts of maintaining Existing Line 3, installing a new pipeline in the existing trench, and supplementing Existing Line 3 with oil transported by either rail or truck. *Id.* But each of these alternatives had significant drawbacks. For example, an extensive dig and repair program would be required to address corrosion, stress corrosion cracking, and long seam cracking on Existing Line 3. *Id.* at AR_363; AR_369. "In

Minnesota, maintaining existing Line 3 would require approximately 6,250 integrity digs over the next 15 years." AR_369. The integrity digs would also affect two Native American reservations and the Chippewa National Forest. *Id*. (estimating that 484 digs would be required in these areas for the same timeframe). And, as part of the extensive state review, the Minnesota Public Utilities Commission concluded that the "continued operation of the existing Line 3 poses a far greater risk of accidental release and resulting environmental damage" than Replacement Line 3. AR_370.

Replacing Line 3 in the same trench would result in a 16-month interruption of service, greater environmental impacts at wetland and waterbody crossings, and extended construction periods. AR_370-71. It would also require an easement extension to allow the pipeline to continue to cross the Leech Lake Band's Reservation and a portion of the Chippewa National Forest co-managed by the Band. AR_371. But the Leech Lake Band has consistently opposed granting the required easement. *Id*. Supplementing Existing Line 3 with oil transported by either rail or truck would require continued maintenance on the pipeline, while also increasing costs, logistical issues, safety concerns, and possible impacts to waters of the United States. AR_372-73. The Section 408 EA also contains an analysis of Enbridge's preferred alternative of installing pipeline at the Lost River crossing and a no action alternative. AR_2540-42. Hence, the administrative record demonstrates, that consistent with NEPA, the Corps considered a reasonable range of alternatives.

Plaintiffs contend that the Corps should have considered alternative pipeline routes. ECF No. 53-1 at 17-18. As the Corps explained in its EA, the route approved by the state Commission "is the corridor within which Enbridge is legally obligated to construct the Project under Minnesota law." AR_356; AR_5954-58; Minn. Stat. § 216G.02, subd. 2. Plaintiffs

complain that there was no coordinated review process between the Corps and the state and that the Corps waited "passively" until the Commission rejected other routes. ECF No. 53-1 at 18-19. But they fail to show that a joint review process was required or that the Corps abdicated its duty under the CWA or RHA. *See Hoosier Envtl. Council v. U.S. Army Corps of Eng'rs*, 722 F.3d 1053, 1061 (7th Cir. 2013) (although the Corps had an independent responsibility to enforce the CWA, it is permitted to rely on another agency's analysis relating to the central functions of that agency in making the Corps' own decision). And there is no indication that the Corps failed to follow its regulations. ECF No. 53-1 at 18. Neither the Corps' regulations, 33 C.F.R. part 325, App. B, nor 40 C.F.R. § 1506.2 mandate the preparation of joint environmental analyses.

The state of Minnesota engaged in a lengthy and through analysis of numerous alternatives before selecting the route for Replacement Line 3. AR_356-58; AR_56840 (state EIS, § 4). The Commission's route selection has now been affirmed. *In re Enbridge Energy*, slip op. at 4 (the Commission "reasonably selected a route for the replacement pipeline based upon respect for tribal sovereignty, while minimizing environmental impacts"). The Corps did not err in relying on the state agency "with more expertise than the Corps in transit matters [that] had already undertaken years of work identifying the best options" for this project. *Friends of Cap. Crescent v. U.S. Army Corps of Eng'rs*, 453 F. Supp. 3d 804, 817 (D. Md. 2020) (no need for the Corps to "reinvent the wheel") (internal quotation marks omitted). "Requiring more detail on rejected alternatives would elevate form over function." *Friends of Cap. Crescent*, 877 F.3d at 1064.

As the Court previously held, "[b]ased on the state's elimination of other proposed routes for a new pipeline, the Corps' 'specification of the range of reasonable alternatives' was not arbitrary or capricious.'" ECF No. 40 at 31 (quoting *Myersville*, 783 F.3d at 1323). The Corps

explained how the proposed route was developed and NEPA does not require an endless examination of alternatives, particularly given the Corps' lack of authority over the pipeline route and the extensive state administrative process. *See Hillsdale Env't Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1169 (10th Cir. 2012) ("There is no magic number of alternatives the Corps must consider for its analysis to be acceptable, but the agency must draw the line somewhere . . . ."). The Corps met NEPA's requirements here.

## II.    The Corps properly determined that no EIS was necessary.

Red Lake Band Plaintiffs allege that the Corps erroneously found that the issuance of the Permit and Permission do not have significant environmental impacts. ECF No. 53-1 at 19-23. According to Plaintiffs, the Corps should have prepared an EIS rather than EAs. *Id.* But the Corps' determination that an EIS is not necessary is neither arbitrary nor capricious.

"An agency's decision not to prepare an EIS can be set aside only upon a showing that it was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Pub. Citizen*, 541 U.S. at 763. As the Court previously recognized, "its 'role in reviewing [the Corps'] decision not to prepare an EIS is a limited one, designed primarily to ensure that no arguably significant consequences have been ignored.'" ECF No. 40 at 19 (quoting *Nat'l Parks Conservation Ass'n v. Semonite*, 916 F.3d 1075, 1082 (D.C. Cir. 2019)). Like other NEPA-related decisions, an agency decision not to prepare an EIS is "afforded a considerable degree of deference." *Mich. Gambling Opp'n (MichGO) v. Norton*, 477 F. Supp. 2d 1, 9 (D.D.C. 2007), *aff'd on other grounds sub nom.*, *Mich. Gambling Opp'n v. Kempthorne*, 525 F.3d 23 (D.C. Cir. 2008).

The Corps' Section 404 and Section 408 EAs detailed the affected environment and disclosed the relevant environment's current state. AR_349-53; AR_355-56; AR_2539-42.

Then the EAs evaluated the proposed actions' potential impacts.  AR_374-444; AR_2543-55.  In preparing the EAs, the Corps coordinated with federal and state agencies and analyzed the public comments submitted regarding the project.  *See, e.g.*, AR_356-59; AR_380; AR_400; AR_476-99.  The record also shows that Tribal consultation occurred and that a Tribal cultural resources survey was undertaken.  AR_456-472.  In concluding that the issuance of the Permit would not have significant impacts on the quality of the human environment, the Corps considered, for example, the fact approximately 90 percent of the project route would be co-located with other pipelines, utilities, roads, railroads, or highways.  AR_355.  The Corps also found that the vast majority of the impacts to wetlands would only be temporary.  AR_399 (1,049.58 acres would be temporarily impacted in comparison to 9.97 acres permanently impacted).  The Corps also determined that the unavoidable impacts to wetlands would be cumulatively small and offset by appropriate mitigation.  AR_354-55.  Based on the avoidance, minimization, and compensation measures undertaken by Enbridge, the Corps concluded that the overall impacts to wetlands would be minor.  *Id.*[9]  In reaching its conclusion regarding the Permission, the Corps noted that the Lost River crossing "has been highly disturbed from past activities, including the installation of seven pipelines as well as implementation of the federal project when the channel was snagged, cleared, enlarged, and straightened, and eight-foot-tall banks were built."  AR_2548. The Corps also concluded that the proposed installation at Lost River would cause mostly minor, short-term, and temporary impacts.  *See* AR_2544-47.  Because the Corps' decisions require technical expertise, they must be accorded an especially high level of deference.  *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377 (1989).

---

[9] *See also* AR_377-79; AR_382; AR_384; AR_386-87; AR_392-393; AR_396; AR_398; AR_400-02; AR_404-06; AR_469; AR_473 (describing other impacts that the Corps concluded will be minor, temporary, or negligible).

Red Lake Band Plaintiffs focus on two "intensity" factors within the definition of significance. ECF No. 53-1 at 20-23. NEPA regulations require agencies to consider both context and intensity in determining whether a project's effects are significant enough to require a full EIS. 40 C.F.R. § 1508.27. Intensity "refers to the severity of impact," and the regulation identifies several factors that agencies should consider in assessing intensity. *Id*. § 1508.27(b).

Plaintiffs' arguments do not demonstrate arbitrary or capricious decision-making. First, they argue that "highly controversial aspects of the Project make its impact significant." ECF No. 53-1 at 20; 40 C.F.R. § 1508.27(b)(4) (asking agencies to consider "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial"). But highly controversial refers to "a substantial dispute" about "the size, nature, or effect of the *major federal action*." *Town of Cave Creek v. FAA*, 325 F.3d 320, 331 (D.C. Cir. 2003) (emphasis added). Plaintiffs do not provide any evidence of a dispute regarding jurisdictional waters, the Permit, or the Permission in the administrative record. They focus on environmental effects outside of the Corps' NEPA scope of analysis, ECF No. 53-1 at 20, but this is insufficient to show a scientific controversy and does not demonstrate that the Corps decision was arbitrary or capricious. *Sierra Club v. U.S. Army Corps of Eng'rs*, No. 20-2195, 2021 WL 1921128, at *8 (1st Cir. May 13, 2021) (plaintiffs could not rely on their unsuccessful argument that effects along an entire lineal project needed to be considered to show controversy).

Plaintiffs cite only one new example in support of their argument, claiming that the state-prepared oil spill analysis, which the Corps partially relied upon, was "struck down by the Minnesota Court of Appeals." ECF No. 53-1 at 21. This overstates *In re Enbridge Energy, Limited Partnership*, 930 N.W.2d 12. To the contrary, the court upheld the sufficiency of the oil spill analysis methodology (modelling the potential spread of oil at seven sites along the

37

preferred route and alternative routes). *Id*. at 28; *see also id*. at 36 (the state EIS "utilized an appropriate methodology to analyze potential impacts from oil spills"). The court found the decision not to model spill impacts on the Lake Superior watershed to be inadequate. *Id*. Consistent with the court's order, a revised EIS was prepared, which specifically addressed the risk of oil spills to the Lake Superior watershed. Following an opportunity for public comment and two public meetings, the Minnesota Public Utilities Commission approved the revised EIS on May 1, 2020. And the Corps considered it as part of its NEPA analysis. *See, e.g.,* AR_358-59 (Corps' discussion of court's finding and the subsequent state analysis completed); AR_62413 (portion of analysis regarding the Lake Superior watershed). The Commission's approval of the revised EIS and spill modelling on the Lake Superior watershed has now been affirmed. *In re Enbridge Energy*, slip op. at 20-24 ("we are satisfied that the revised FEIS addresses the issue, raised in scoping and in public comments, of the impact of an oil spill in the Lake Superior watershed"); *id*. at 23 (explaining that even if an oil spill reached Lake Superior, "impacts to the lake and its aquatic resources likely would be localized and limited").

Plaintiffs' remaining claims also fail to show a scientific controversy requiring an EIS. Plaintiffs summarily assert that the Corps failed to respond and resolve objections raised by the Tribe and other experts. ECF No. 53-1 at 20-21. But the Corps considered and responded to criticisms made by Plaintiffs and comments contending that an EIS should be prepared. AR_476-99. Plaintiffs have not established that the Corps was required to complete an EIS. *Nat. Parks Conservation v. U.S. Forest Service*, 177 F. Supp. 3d 1, 34 (D.D.C. 2016) (an EIS was not warranted because the plaintiff failed to identify "any scientific criticism of the methods or data" relied upon by the agency; instead, the "disagreement concerns the conclusions that should be drawn from those methods and data").

Further, Plaintiffs do not identify any comments or record evidence from other federal agencies suggesting that the Corps' significance analysis was flawed. *See WildEarth Guardians v. Zinke,* 368 F. Supp. 3d 41, 82 (D.D.C. 2019) (noting lack of opposition from other federal agencies with "special expertise" weighs "heavily" in evaluating the controversy factor). And although Plaintiffs attempt to compare this case to *Standing Rock Tribe v. U.S. Army Corps of Eng'rs*, ECF No. 53-1 at 20-21, Plaintiffs' lack of specificity regarding any scientific controversy makes the cases distinguishable. *See, e.g.*, 985 F.3d 1032, 1044-46 (D.C. Cir. 2021) (agency decision was controversial, in part, because the Corps failed to successfully resolve in its EA the plaintiffs' criticisms of the efficacy of the leak detection technology).

Second, Plaintiffs argue that there are "uncertain effects" that make an EIS necessary. ECF No. 53-1 at 22. But the Corps did not act arbitrarily in concluding that the effects from the Permit and Permission are not highly uncertain and did not involve unique or unknown risks. 40 C.F.R. § 1508.27(b)(5) (asking agencies to consider "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks"); *WildEarth Guardians*, 368 F. Supp. 3d at 82–83 ("this factor is implicated when an action involves new science, or when an action's impact on a species is unknown"). Plaintiffs have not shown that the effects of temporarily discharging dredge or fill material in waters of the United States is uncertain. And the Corps reasonably set out the impacts in each of the areas Plaintiffs now claim are uncertain—namely, to the climate, Tribes, Tribal resources, and local species *See, e.g.*, AR_397-98, AR_2544 (climate); AR_400-01, AR_456-473 (Tribes and Tribal resources); AR_380-84, AR_395, AR_435, AR_2546-47 (wildlife); *supra* pp. 14-30. The Corps also responded to the comments contending that an EIS should be prepared. AR_477-78, AR_483

(explaining the scope of the Corps' NEPA analysis). Thus, Plaintiffs have not established uncertainty under § 1502.27(b)(5).

Third, Plaintiffs allege that an EIS is needed because there is a "material risk of grave or catastrophic harms." ECF No. 53-1 at 23. This argument is not based on the factors set forth in § 1502.27(b). Instead, Plaintiffs attempt to create this standard based on *Standing Rock Tribe*. *Id*. (citing 985 F.3d at 1049-50). But the D.C. Circuit discussed this issue in conjunction with § 1508.27(b)(4) and its analysis of whether the effects are likely to be "highly controversial." 985 F.3d at 1049-50. In any event, the two cases are different. In *Standing Rock Tribe*, the D.C. Circuit concluded that there were "several serious scientific disputes" regarding the leak detection system effectiveness, the assessment of the operator's safety record, the worst case discharge calculation, and spill response in winter conditions that made the effects of the Corps' decision "highly controversial." *Id*. at 1044-50. Plaintiffs have not identified a comparable scientific dispute.

Here, Plaintiffs do not contend that the Corps failed to identify the relevant environmental concerns, nor could they do so. The Permit, Permission, EAs, Tribal cultural resources survey, Avoidance Plan, Biological Assessment, Enbridge's Environmental Protection Plan, state EIS, and the additional documents, analyses, and public comments considered by the Corps show that the agency reached an informed and well-considered decision regarding the Permit and the Permission. *Vt. Yankee Nuclear Power Corp.*, 435 U.S. at 558. Thus, Plaintiffs cannot show that an EIS is required. Accordingly, Federal Defendants are entitled to summary judgment on Plaintiffs' NEPA claims (Compl. ¶¶ 183-203, ECF No. 1, No. 1:20 cv-03817; First Am. Compl. ¶¶ 104-57, ECF No. 13, No. 1:21 cv-00189).

## III.   The Corps reasonably determined that the CWA 404 Permit should issue.

The CWA Section 404 Permit also should be upheld because Plaintiffs in these consolidated cases failed to establish that the Corps' findings pursuant to the implementing regulations for Section 404 were arbitrary or capricious.  The arguments asserted by the plaintiffs in *Friends of the Headwaters* ("FOH") and the plaintiffs in *Red Lake Band of Chippewa Indians* ("Red Lake Plaintiffs") are based on a series of misunderstandings regarding the Section 404 permitting process, its governing regulations and the administrative record for the permit at issue.  Instead, the Corps conducted analyses pursuant to those regulations and explained its record bases for reasonably finding that the challenged Permit should issue.

A.    **The Corps conducted a reasonable alternatives analysis.**

As described *supra*, an early stage of the Section 404 permitting process includes the analysis of alternatives to the proposed discharge to determine if any are "practicable" as that term is defined in 40 C.F.R. § 230.10(a)(2).  Those alternatives normally include at least one "no action" alternative that does not involve the discharge of fill into waters of the United States, although there is no statutory or regulatory requirement that the Corps consider more than one such alternative.  *Id.* § 230.10(a)(1).  If an alternative is found to be practicable, then it is evaluated to determine whether it would have a less adverse impact on the aquatic ecosystem than the proposed discharge.[10]  If a practicable alternative would have a lesser impact on the aquatic ecosystem, and it also does not pose significant environmental consequences of its own,

---

[10]  It bears emphasizing that the CWA Section 404 alternatives analysis is narrowly focused on impacts to the aquatic ecosystem—as opposed to the greater environment or human health or welfare.  40 C.F.R. § 230.10(a) (scope of alternatives analysis); *see id.* § 230.3(b) (definitions) ("The term[] . . . *aquatic ecosystem* mean[s] waters of the United States . . . that serve as habitat for interrelated and interacting communities and populations of plants and animals.") (emphasis added).

then the Corps must deny the CWA Section 404 permit application before it. *Id*. § 230.10(a); 45 Fed. Reg. 85,336, 85,340/1 (Dec. 24, 1980).[11]

### 1.       The Corps properly evaluated two No-Action alternatives.

FOH raises a series of objections to the Corps' analysis of alternatives to the proposed project, particularly "no action" alternatives. These objections cannot be sustained because they are based on misunderstandings of the record and governing regulations.

Contrary to the plain language of the 404 EA and the underlying record, FOH alleges that the Corps failed to consider any *bona fide* "no action" alternative at all. ECF No. 52 at 6-8. This argument fails because the Corps evaluated *two* "no action" alternatives: transporting the same petroleum that the new line would carry via rail and by truck. AR_366-68. These alternatives follow different routes than the existing or proposed pipelines and do not involve any discharge of fill into waters of the United States. Based on a lengthy, detailed analysis, the Corps reasonably concluded that they are not practicable due to cost, logistic issues and safety concerns. *Id*.

Because replacing the dangerously deteriorated existing Line 3 is a primary purpose for the project, and is required by a federal consent decree, the Corps did not evaluate the potential "no action" alternative of simply allowing the old line to continue operating. *See* AR_364 ("Overall Project Purpose . . . To replace an existing crude oil pipeline to increase safety of transporting crude oil . . . "). As discussed *supra*, a 2017 Consent Decree requires Enbridge to seek the necessary permits and approvals to replace the 1960s-era Line 3, remove it from service once the replacement line is constructed, and complete final clean-out and decommissioning within 15 months thereafter. *United States v. Enbridge Energy Ltd Partnership,* Case No. 16-cv-

---

[11] For ease of reference, slash marks ("/") are used to indicate the column in the Federal Register page at which the cited material may be found.

914 (W.D. Mich.), ECF No. 14, ¶ 22; *see also* AR_352.  Disregarding these facts and analyzing

the old line as an alternative would have made little sense for the Corps.  ECF No. 52 at 7 &

n.14.  The courts have long recognized that, when identifying and evaluating alternatives under

40 C.F.R. § 230.10, "not only is it permissible for the Corps to consider the applicant's objective;

the Corps has a duty to [do so] . . . .  Indeed, it would be bizarre if the Corps were to ignore the

purpose for which the applicant seeks a permit and to substitute a purpose it deems more

suitable."  *La. Wildlife Fed'n v. York,* 761 F.2d 1044, 1048 (5th Cir. 1985).

      FOH's argument that the Corps also should have evaluated shutting down the old line

without constructing a replacement is similarly flawed.  ECF No. 52 at 7 n.14.  To be practicable,

an alternative must be available and capable of being done "in light of overall project purposes."

40 C.F.R. § 230.10(a)(2).  Shutting down the old line is not practicable because it contravenes

the purpose of replacing the existing line.  The Corps also does not have the authority to shut

down existing facilities under CWA Section 404—it can only approve or deny permit

applications—and Enbridge is not required to shut down the old line if it is denied a permit to

discharge fill material in furtherance of constructing a replacement.  40 C.F.R. 230.10(a); *see* 45

Fed. Reg. at 85,339/3 - 340/1.

      FOH also misunderstands the record and 40 C.F.R. §§ 230.10(a)(2) and (a)(3) when it

argues that the Corps erred by failing to evaluate the practicability of hypothetical "off site"

alternatives like pipeline routes that were not approved by the Minnesota Public Utility

Commission.  ECF No. 52, 8-9.  First, as explained *supra*, the record establishes that the Corps

*did* address two "off site" alternatives that followed different routes than the proposed

replacement line: transportation by rail or truck.  Second, contrary to FOH's arguments at page 9

of their brief, Section 230.10(a)(3) does not create alternatives by presumption.  Instead, where a

proposed activity would discharge fill into a special aquatic site and an alternative has been shown to be practicable, Section 230.10(a)(3) creates a rebuttable presumption that the alternative has a less adverse impact on the aquatic ecosystem than the proposed discharge. Third, Section 230.10(a)(2) defines practicable alternatives as those that are "available and capable of being done." 40 C.F.R. § 230.10(a)(3). In Minnesota, pipelines cannot lawfully be installed except in areas approved by the Public Utility Commission.[12]  AR_356; AR_5955; Minn. Stat. § 216G.02, subd. 2; *In re Enbridge Energy*, slip op. at 53. Therefore, even if Plaintiffs could identify an alternative route that is not approved—which they did not in their brief or in public comments at the federal stage[13]—it would not be practicable and the Corps would not be required to conduct a futile analysis of it. Fourth, the 404 process incorporates a rule of proportionality. *See Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1271 (10th Cir. 2004) ("The CWA guidelines instruct the Corps to 'recognize the different levels of effort that should be associated with varying degrees of impact and require or prepare commensurate documentation. The level of documentation should reflect the significance and complexity of the discharge activity.' 40 C.F.R. § 230.6(b). . . . 'Although all requirements in § 230.10 must be met, the compliance evaluation procedures will vary to reflect the seriousness of the potential for adverse impacts *on the aquatic ecosystems posed by specific dredged or fill material discharge*

---

[12] Unlike the *Alliance to Save the Mattaponi v. Army Corps* case cited by FOH where the Commonwealth of Virginia opposed an alternative, 808 F.Supp.2d 121, 130 (D.D.C. 2009), unapproved Minnesota pipeline routes are *per se* unavailable.

[13] The Corps notes that the Minnesota PUC rejected an alternative route that FOH proposed during the State process which "resulted in a pipeline that is approximately 100 miles longer [and] still could not entirely avoid the groundwater vulnerabilities associated with karst that the Commission identified as a critical concern" (AR_65321), while approximately tripling the acres of populated areas within 1,31 feet of the centerline and increasing impacts on archaeological resources and federal lands (AR_65323 & Tables U-11, U-14). The Corps also notes that this FOH-proposed alternative used 36-inch diameter pipe. AR_98615.

*activities.*' *Id.* § 230.10)' ") (emphasis added).  Therefore, in this case where the overwhelming

majority of the impacts to waters of the United States are temporary and will be restored, the

Corps was not required to take extraordinary measures like hypothesizing entire alternative

pipeline routes that could not be deemed practicable as a matter of law.

 In addition, FOH is mistaken when it argues that the proposed activity expands the

capacity of Line 3 to 760,000 barrels per day and heavy oil, thereby invalidating the "no action"

analysis.  ECF No. 52, at 7.  As the Corps explained in Section 1.5 of the 404 EA:

> The crude oil transported in Line 3 has varied over its many years of operation
> based on type of crude produced, shipper demand, and system operations.  . . .
> Enbridge used Line 3 to transport medium and heavy crudes . . . . . It was designed
> to transport all grades of crude oil, and the type of crude oil transported upon
> replacement would be based on shipper demand as it is currently and was in the
> past.
> The historic annual average operating capacity of Line 3 was approximately
> 760,000 barrels per day. Enbridge voluntarily reduced the operating pressure and
> capacity on Line 3 to 390,000 barrels per day due to pipeline integrity issues . . .
> Full implementation of the Line 3 Pipeline Replacement Project would restore the
> line to its historic annual average throughput capacity of approximately 760,000
> barrels per day, assuming the pipeline will transport of [sic] both heavy and light
> crudes.

AR_355.

 Moreover, the Corps *did* perform an independent assessment of the need for the proposed

project, although it was not required to do so.  Contrary to FOH's arguments at pages 7-8 of its

opening brief, 33 C.F.R. § 320.4(q) instructs that, "When private enterprise makes application

for a permit, it will generally be assumed that appropriate economic evaluations have been

completed, the proposal is economically viable, and is needed in the market place."  While the

Corps in its discretion may choose to make an independent assessment of any of those factors,

that is not required.  Nonetheless, the Corps evaluated the Minnesota Public Utility

Commission's certificate of need and the submissions underlying it—which were recently

upheld by the Minnesota Supreme Court—and fulsomely explained its independent conclusion that the project is needed. AR_363-64; AR_405.

**B.    The Corps properly declined to consider oil spills as part of its "significant degradation" analysis under 40 C.F.R. § 230.10(c).**

Plaintiffs' argument at pages 9-11 that the Corps should have based its significant degradation analysis on the risk of future oil spills is inapposite, and is based on a misreading of 40 C.F.R. § 230.10(c). Section 230.10(c) provides that "no *discharge of dredged or fill material* shall be permitted which will cause or contribute to significant degradation of the waters of the United States. Findings of significant degradation *related to the proposed discharge* shall be based upon appropriate factual determinations . . . ." 40 C.F.R. § 230.10(c) (emphasis added). By its plain language, the significant degradation inquiry is made with respect to the particular discharges of dredged or fill material for which a permit is needed—*i.e.,* the discharges of dredged or fill material that must occur during pipeline construction. Unintended releases during future operation of the replacement line therefore fall outside the scope of the Section 230.10(c) significant degradation analysis. The Corps' significant degradation analysis therefore properly focused on the discharge of fill material, and should be upheld.

**C.    The Corps' public interest analysis was not arbitrary or capricious.**

Plaintiffs' arguments regarding the Corps' public interest analysis similarly lack merit. This analysis is governed by the 33 C.F.R. § 320.4, which requires the Corps to even-handedly weigh the benefits and detriments of a proposed activity:[14]

> The decision whether to issue a permit will be based on an evaluation of the probable impacts . . . of the proposed activity and its intended use on the public interest. . . . The benefits which reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments. The

---

[14] Contrary to FOH's allegation in footnote 11 of their opening brief, 33 C.F.R. § 320.4 and the other "General Regulatory Policies" in 33 C.F.R. Part 320 are procedural, not substantive, regulations that govern the process by which permit applications are evaluated.

> decision whether to authorize a proposal, and if so, the conditions under which it
> will be allowed to occur, are therefore determined by the outcome of this general
> balancing process.

33 C.F.R. § 320.4(a)(1). In this case, the discharge of dredge or fill material into waters of the

United States and other structures or work in navigable waters of the United States is the

proposed activity, and the intended use of the activity is to facilitate construction of portions of

the pipeline in waters of the United States. 33 C.F.R. § 320.1(b)(2), (5).

The Corps conducts this general balancing test by weighing various enumerated factors

according to their "importance and relevance to the particular proposal," some or most of which

may not be relevant to a particular application. 33 C.F.R. § 320.4(a)(3); *see, e.g., Coeur Alaska,*

*Inc. v. Se. Council*, 577 U.S. 261, 285 (2009) (noting that the Corps "has significant expertise in

making this [public interest] determination"); *Town of Norfolk v. U.S. Army Corps of Eng'rs*, 968

F.2d 1438, 1454 (1st Cir. 1992) ("Under the 'public interest' review, the Corps conducts a

general balancing of a number of economic and environmental factors and its ultimate

determinations are entitled to substantial deference."); *Bering Strait Citizens for Responsible*

*Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 948-49 (9th Cir. 2008). In doing so, the

Corps must give "full consideration and appropriate weight" to all comments and information

from federal, state, and local agencies, and other experts on matters within their expertise. 33

C.F.R. § 320.4(a)(3); *see Red Lake Band of Chippewa Indians v. U.S. Army Corps of Eng'rs*,

Case No. 20-cv-3817 (CKK), 2021, at WL 430054 *12 (D.D.C. Feb. 7, 2021).

### 1.     FOH did not identify any flaws in the public interest analysis.

FOH does not identify any deficiencies in the Corps' public interest analysis that render it

arbitrary or capricious. Many of FOH's arguments fail to acknowledge that the Corps was

required to weigh the benefits as well as its detriments of the proposed activity when evaluating

whether granting the permit was contrary to the public interest. *See* 33 C.F.R. § 320.4(a)(1), (p). Replacement Line 3 confers substantial benefits by facilitating the replacement of the rapidly-deteriorating 1960s-era Line 3 pipeline—*e.g.,* eliminating the ever-increasing risk of a catastrophic release and more than 6,500 intrusive integrity digs and repairs over the next 15 years—thereby placing a heavy thumb on the public interest scale. *See* 404 EA, Sec. 3.1 5.5.2; *see also Red Lake Band*, 2021 WL 430054 at **3-4; *In re Enbridge Energy*, slip op. at 6-7 & nn.2-3. FOH's arguments ignore these benefits and therefore are unavailing, as the public interest analysis weighs all benefits and detriments. For the same reason, FOH is mistaken to the extent it argues that any single detriment *per se* would prevent the Corps from approving Enbridge's application.

FOH's objections to the Corps' assessment of four specific public interest factors—economics, energy needs, climate change and wetlands—are also unavailing. These arguments all are based on misreadings of the controlling regulations and administrative record, and FOH did not substantiate any of its allegations that contradictory information was disregarded. ECF No. 52 at 13-15.

### a.    Economics

FOH's economics argument is unavailing, because the Corps complied with the governing regulation, 33 C.F.R. § 320.4(q), by both: (1) applying the rebuttable presumption that for this private industry project "appropriate economic evaluations have been completed, the proposal is economically viable, and is needed in the market place"; and (2) performing an optional inquiry into local economic benefits, including "employment, tax revenues, community cohesion, community services, and property values." AR_397; *see also* AR_363-64. The Corps was neither required to perform the additional analyses that FOH mentions in passing at page 13

of its Brief, nor was it provided with the information needed to do so in public comments from FOH or others.

### b.      Energy Needs

FOH's argument that the Corps failed to adequately assess the energy industry's need for the proposed activity is similarly unavailing. ECF No. 52, 13-14 & n.22. The governing regulatory provision provides only that, "Energy conservation and development are major national objectives. District engineers will give high priority to the processing of permit actions involving energy projects." 33 C.F.R. § 320.4(n). The Corps nonetheless reviewed the information provided to the Minnesota Public Utility Commission and reached its own conclusions that the activity would provide numerous, significant energy-related benefits which are explained in Sections 3.1 and 7.18 of the 404 EA. AR_363-64; AR_405; AR_151471 (Corps comments to Minnesota Public Utility Commission on the adequacy of state FEIS: "The state FEIS and decisions on state permits, including the PUC's decisions on the requests for a certificate of need and route permit, will be used to inform aspects of our federal review listed above particularly the public interest review"). Contrary to FOH's arguments, the Minnesota Public Utility Commission, not the environmental resources department of the State Department of Commerce, is charged with determining whether there is sufficient need for the pipeline based on demand and other factors. *In re Enbridge Energy,* slip op. at 5, 24-26. Moreover, the Minnesota Court of Appeals recently found that substantial evidence supported the Public Utility Commission's determination to issue a certificate of need for the project based on demand and other factors, despite the environmental resources department's initial objections.[15] *Id.* at 7-8, 10-14, 25-53.

---

[15] The Corps also notes that the challenged actions stand or fall on the record before the Agency when it issued them on November 23, 2020. Neither the Corps nor Plaintiffs can challenge those

c.      **Climate Change**

FOH also fails to show that the Corps' climate change analysis was deficient.  The controlling public interest regulation, 33 C.F.R. § 320.4(a), provides that the Corps should weigh the benefits and detriments "of the proposed activity and its intended use."  There is no dispute that the proposed activity is construction of the replacement Line, and its intended use is limited to transporting petroleum.

First, with respect to impacts on waters of the United States within its CWA section 404 permitting authority, the Corps determined that changes in carbon dioxide sequestration would be *de minimis*.  As expressly authorized by 33 C.F.R. § 320.4(r)(iii), the Corps addressed those impacts through compensatory wetland mitigation for purposes of the public interest analysis. Next, with respect to greenhouse gas emissions arising from pipeline construction and operation, the Corps considered the Minnesota Department of State's analysis.  AR_398; *see* AR_151471. The Corps did not require compensatory wetland mitigation for these detriments, and instead weighed them against benefits of the proposed activity as instructed in 33 C.F.R. §§ 320.4(a)(1) and (p).  AR_398; 33 C.F.R. § 332.3(a)(1).  Finally, "upstream" and "downstream" oil extraction, refining and consumption (including tar sands that may or may not be transported by the replacement pipeline) fall outside the intended use of the proposed activity and therefore are outside the scope of the Section 320.4 public interest analysis.  While the Corps carefully reviewed the State's analysis of climate change impacts in its EIS, which included greenhouse gas emissions from upstream oil production and downstream oil refining and consumption, the Corps properly declined to weigh associated benefits and detriments in the public interest

---

actions based on materials that post-date the record, including those discussed in FOH footnote 13.

analysis. Consequently the Corps' climate change analysis under 33 C.F.R. § 320.4 was not deficient and should be upheld.

**d.      Wetlands Impacts and Mitigation**

FOH's conclusory, two-sentence objection to the Corps' wetlands analysis lacks merit because it is based on misreadings of the controlling regulations and numerous portions of the Corps' 404 EA. ECF No. 52 at 14. In those two sentences, FOH alleges that the Corps did not explore measures to minimize or avoid wetlands impacts, did not evaluate post-construction impacts to wetlands, and erroneously allowed Enbridge to offset wetland impacts with purchased mitigation credits for purposes of the public interest analysis. All of these unsupported allegations are erroneous.

First, the Corps analyzed numerous measures that Enbridge proposed to avoid and minimize wetland impacts, including those itemized and detailed in Sections 1.3 of the 404 EA ("Proposed Avoidance and Minimization Measures"), 5.5, 6.3.1, 6.3.2, 6.3.5, 6.4.2, 6.8 ("Actions to Minimize Adverse Effects"), 7.2, 7.6, 8, 9.1, 9.3, 9.5, and 10 (Special Conditions 4-16). AR_363-64, 368-73, 376-77, 378-79, 381-82, 388-92, 395-96, 398-99, 407-10, 414-43, 444-46. Special Conditions 4-16 were added to the Permit as a result. Second, the Corps identified the affected wetlands, and quantified and analyzed the temporary and permanent post-construction impacts on them, in Sections 1.2, 5.5.1, 6.2, 6.4.3, 6.5.2, 7.6, 8, and 9 of the 404 EA. AR_351-53, 368-69, 375-76, 382-84, 384-86, 99, 398-99, 407-42. Section 9.3 maps and analyzes these impacts in particularly granular detail. AR_414-34. Third, as expressly authorized in 33 C.F.R. § 320.4(r)(1)(iii), the Corps allowed Enbridge to offset those temporary and permanent wetland impacts that could not be avoided by purchasing wetland mitigation credits for purposes of the public interest analysis. *See* AR_354-55, 388. Purchasing those mitigation credits is a permit

51

requirement, and Special Conditions 20 and 21 barred Enbridge from beginning construction before the company provided written assurance that the purchase had been initiated and posted a performance bond of almost $30 million "to ensure a high level of confidence that the restoration of wetlands and waters to pre-constructions conditions would be successfully completed." AR_399; *see* AR_6063 (proof of purchase). FOH therefore has not identified any insufficiencies in the Corps' wetlands analysis.

### 2. The Red Lake Plaintiffs also have not identified flaws in the public interest analysis.

Likewise, the Red Lake Plaintiffs have not identified any deficiencies in the Corps' public interest analysis.[16]

#### a. Greenhouse Gas Emissions.

The Red Lake Plaintiffs argue that the Corps failed to adequately consider greenhouse gas emissions from the construction of the pipeline. ECF No. 53-1 at 31. In support, the Red Lake Plaintiffs cite to the Corps' statement that it "has no authority to regulate emissions that result from the combustion of fossil fuels." AR_398. The same section of the EA from which the Red Lake Plaintiffs quote, however, shows that the quotation relates only to the emission of GHGs from construction equipment and does not reflect a refusal by the Corps to consider GHG emissions at

---

[16] The Red Lake Plaintiffs also conflate and misstate the standards for the Corps' public interest analysis under Sections 404 and 408 and the Corps' regulations. The standard for Section 404 permits to discharge fill is established in 33 C.F.R. § 320.4, which provides that "a permit will be granted unless the district engineer determines that it would be contrary to the public interest." In contrast, the standard for Section 408 approvals to occupy or use federal civil works projects is established in 33 U.S.C. § 408, which requires the Corps to determine whether a proposed occupation or use of an Army Civil Works project is "injurious to the public interest" or will "impair the usefulness of such work." The only standard pertinent to the Red Lake Plaintiffs' brief is the Section 404 standard, since they do not otherwise discuss the Corps' Section 408 public-interest analysis regarding Replacement Line 3's proposed occupation of a civil works project (which only occurs at one location). The Red Lake Plaintiffs' attempt to frame their Section 404 arguments in terms of the Section 408 standard therefore should be disregarded.

all.  To the contrary, as discussed *supra* at 48-49, the Corps *did* consider the impact of GHGs related to the construction of the pipeline, independently reviewed the analysis conducted by the State, and weighed those impacts (as well as impacts of pipeline operation discussed in the State analysis) against "national goals of energy independence, national security, and economic development." *Id.* The Red Lake Plaintiffs point to nothing demonstrating that this consideration was inadequate.

GHG emissions from the operation of the pipeline itself were analyzed as part of the state proceedings.  *See* AR_398 ("An analysis of greenhouse gas emissions was conducted by the Minnesota Department of State and included in the State EIS"); *see also* AR_056840, Chapter 5 at 5-454 – 5-481 (analysis of the permanent air quality effects resulting from facility operations for the Applicant's proposed project and each of the CN Alternatives); AR_12113 (Minnesota Public Utility Commission Order finding that "The Commission recognized that most of the emissions attributed to the Project would result from ultimate consumption of the oil, not the construction or operation of the Project" and requiring modifications to the certificate of need to mitigate emissions from operations).  As discussed above, the Corps reviewed the state's conclusions but properly declined to weigh the benefits and detriments as part of its public interest analysis.  *See supra* at 50.[17]

---

[17] Even if the Corps were required to independently analyze GHG emissions from pipeline operations, it would have been appropriate for the Corps to rely on the State's work.  Indeed, the controlling regulation, 33 C.F.R. § 320.4(a)(3), requires the Corps to give "full consideration and appropriate weight . . . to all comments, including those of federal, state, and local agencies, and other experts on matters within their expertise."  Corps regulations further provide that the permit review process should complement other regulatory programs, rather than supplant or duplicate them. 33 C.F.R. § 320.1(a)(5).  *See Hoosier Env't Council v. U.S. Army Corps of Eng'rs*, 722 F.3d 1053, 1062-63 (7th Cir. 2013) (noting the common sense limitations of the scope of the public interest review analysis and finding it reasonable for the Corps to limit its review of the factors within its competence, such as effects on wetlands, and rely on other agencies' analysis of the relative benefits and costs of a proposed project).

The Red Lake Plaintiffs do not dispute, or even address, any of the State's conclusions about GHG emissions, nor do they point to anything in the record suggesting that pipeline operations – that is, moving petroleum products from one end of the pipeline to the other – are a significant source of GHG emissions. Instead, the Red Lake Plaintiffs argue that that Corps made a policy decision to "facilitate" increased production of tar sands oil, and, therefore, should have considered the "increased greenhouse gas emission associated with that production." ECF No. 53-1 at 27.

The Corps issued permits related to the construction of a new, state-of-the-art pipeline to replace the aging existing Line 3. Both Existing Line 3 and Replacement Line 3 are designed to transport light, medium, and heavy crude oil. *See supra* at 5, 45. The Corps does not have regulatory authority over what type of oil is transported in Replacement Line 3, and it likewise has not been charged with making general policy decisions related to the extraction or ultimate consumption of oil that may someday be carried in the pipeline.

Additionally, the relation between the operation of the pipeline and global GHG emissions was considered as part of the State proceedings. For example, the Minnesota Public Utility Commission considered

> the significant lifecycle-greenhouse-gas emissions from the Project and the cost to society arising from those emissions. However, the Commission found that most of those emissions would not result directly from the Project but rather from ultimate consumption of the oil transported by the Project. The Commission recognized the potential impacts of global climate change, but after carefully reviewing the record concluded that denying the certificate of need would not significantly reduce the demand for crude oil and would therefore not significantly reduce climate change impacts. Instead, the record demonstrated that the most likely consequence of denial would be increased transport of crude oil via more dangerous means such as truck, rail, and Existing Line 3.

AR_12102. Thus, even assuming the Corps was required to conduct a broader analysis of the effects of GHG emissions from the extraction or use of oil to be carried in Replacement Line 3,

the Red Lake Plaintiffs have not shown that such an analysis would have or should have altered the Corps' public interest analysis.

### b.      The risk of oil spills.

In their Motion for Preliminary Injunction, the Red Lake Plaintiffs argued that the Corps failed to consider the risk of oils spills from the operation of Replacement Line 3 at all in its public interest analysis. The Court rejected this argument in its order denying the Red Lake Plaintiffs' motion, finding that the Corps considered the risk of oil spills related to alternatives to Replacement Line 3 in its 404 EA, and it considered the risk of oil spills from the operation of Replacement Line 3 in its 408 EA. *In re Enbridge Energy*, slip op. at 20-21.[18]

In their brief, the Red Lake Plaintiffs argue that the Corps erred by failing to consider as part of its public interest analysis "wetlands, cultural values, recreational values, fish and wildlife, water quality, food production, and the needs and welfare of the people." (ECF NO. 53-1 at 26). However, as the Court already found in its order denying the Red Lake Plaintiffs' motion, the "404 EA indicates that the Corps undertook 'robust coordination with Tribes to ensure mitigative measures would be taken to reduce any adverse effects to tribal resources[,]'" *In re Enbridge Energy*, slip op. at 25 (quoting AR_474), and the 408 EA, among other things, "discusses the effects of an accidental release of oil on the aquatic environment—examining impacts on fish, amphibians, birds and mammals, and wild rice—as well as the human environment . . . ." (*id.* at 21-22) (internal quotation omitted).

Furthermore, through comprehensive and robust regulatory proceedings, the State of Minnesota determined that the risk of oil spills from Replacement Line 3 was substantially less

---

[18] For a more complete discussion of the Corps' consideration of the risk of oil spills as part of its public interest analysis see Federal Defendants' Response in Opposition to Plaintiffs' Motion for a Preliminary Injunction, ECF No. 29 at 21-25.

than from any of the other alternatives considered, including keeping the existing, aging pipeline in place. The Corps independently analyzed the state EIS and the decisions of the Minnesota Public Utilities Commission and supporting documents as part of its review under the CWA and RHA. AR_481, 483; *see also* ECF No. 29 at 24. The Red Lake Plaintiffs do not dispute the Corps' conclusion that the risk of oil spills from Replacement Line 3 is less than from other alternatives.

The Red Lake Plaintiffs argue—as they did in the preliminary injunction briefing—that the Corps' reliance on the 408 EA is insufficient because it only pertains to one site: the Lost River Flood Control Project. (ECF No. 53-1 at 27). Therefore, the Red Lake Plaintiffs assert, "[t]he 408 EA does not address the impact of an oil spill on wetlands, the Tribes' cultural values and ability to produce food the Tribes' needs and welfare or Lake Superior."

However, among the things the Corps considered in its 408 EA was a modeling of hypothetical worst-case scenarios of oil spills at eight sites that were intended to be representative of the entire pipeline. Therefore, as the Court noted in its PI Order, "[t]he Corps' consideration of the spill model and preventive measures, therefore, shows that its review was not limited to the single site at issue in the Section 408 EA." *In re Enbridge Energy,* slip op. at 23. Further, the Red Lake Plaintiffs have failed to demonstrate how additional consideration of any of the specific things about which they complain would have changed the Corps' public interest analysis.[19] Thus, contrary to the Red Lake Plaintiffs' assertions, the Corps *did* consider the risk of oil spills as part

---

[19] In one place in their brief, the Red Lake Plaintiffs refer to the risk of a tar sands oil spill, asserting that "[t]he Corps' discussion of hazardous materials in the 404 EA does not satisfy its duty to consider the risk of tar sands oil spills in its public interest review." ECF No. 53-1, at 32. To the extent the Red Lake Plaintiffs are arguing that the Corps should have considered the risk of tar sands oil spills specifically as opposed to oil spills generally, they have not shown how or why this would have made a difference to the Corps' public interest analysis.

of its public interest analysis. The Red Lake Plaintiffs therefore failed to demonstrate that this analysis was arbitrary and capricious, and it should be upheld.[20]

## Conclusion

For the reasons set forth above, Federal Defendants respectfully ask that the Court deny Plaintiffs' motions for summary judgment and grant the Federal Defendants' cross-motion for summary judgment.

Respectfully submitted this 23rd day of June, 2021.

JEAN E. WILLIAMS
Acting Assistant Attorney General
Environment and Natural Resources Division


/s/ Sara E. Costello
SARA E. COSTELLO (KS Bar No. 20898)
MATTHEW MARINELLI
AMANDA STONER
Trial Attorneys
Natural Resources Section
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7611
Washington, DC 20044-7611
202-305-0484 (Costello)
sara.costello2@usdoj.gov

/s/ Heather E. Gange
HEATHER E. GANGE (DC Bar 452615)
Senior Counsel
MARK L. WALTERS
Trial Attorney
Environmental Defense Section
Environment and Natural Resources Division

---

[20] The Red Lake Plaintiffs also argue that the Corps considered the benefits of the operation of Replacement Line 3, but not the detriments. This is inaccurate. In fact, with only one exception— energy needs—the Corps analysis focused on the benefits of construction, not post-construction operation. AR394-407. Thus, the cases on which the Red Lake Plaintiffs rely—*Columbia Riverkeeper*, No. 19-6071 RJB, 2020 WL 6874871 (W.D. Wash. Nov. 23, 2020) and *Hough v. Marsh*, 557 F. Supp. 86 (D. Mass 1982)—are inapposite.

U.S. Department of Justice
Post Office Box 7611
Washington, DC 20044-7611
202-532-3157 (Gange)
202-616-9190 (Walters)
Heather.Gange@usdoj.gov
Mark.Walters@usdoj.gov

*Attorneys for Federal Defendants*

OF COUNSEL:
MELANIE CASNER
Assistant Counsel
Office of Chief Counsel
U.S. Army Corps of Engineers