**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| RED LAKE BAND OF CHIPPEWA INDIANS, *et al*., | |
| Plaintiffs, | |
| v. | Civil Action No. 1:20 cv-03817 (CKK) |
| UNITED STATES ARMY CORPS OF ENGINEERS, | |
| Defendant, | |
| ENBRIDGE ENERGY, LIMITED PARTNERSHIP, | |
| Defendant-Intervenor. | |
| FRIENDS OF THE HEADWATERS, | |
| Plaintiff, | |
| v. | Civil Action No. 1:21 cv-00189 (CKK) |
| UNITED STATES ARMY CORPS OF ENGINEERS, *et al*., | |
| Defendants, | |
| ENBRIDGE ENERGY, LIMITED PARTNERSHIP, | |
| Defendant-Intervenor. | |

**INTERVENOR-DEFENDANT ENBRIDGE ENERGY, LIMITED PARTNERSHIP'S
MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT
AND IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT**

George P. Sibley, III (D.C. Bar No. 1011939)
Deidre G. Duncan (D.C. Bar No. 461548)
Karma B. Brown (D.C. Bar No. 479774)
Brian Levey (D.C. Bar No. 1035683)
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, N.W.
Washington, DC 20037-1701
(202) 955-1500
gsibley@huntonAK.com
dduncan@huntonAK.com
kbbrown@huntonAK.com
blevey@huntonAK.com

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

STATEMENT OF FACTS ....................................................................................................3

    I.      The Line 3 Replacement ....................................................................................3

    II.     Regulatory Review and Approval of the Project ....................................................5

         A.     State Authorizations and Litigation .................................................................5

         B.     The Challenged Corps Authorizations.......................................................10

STANDARD OF REVIEW ...............................................................................................13

ARGUMENT .......................................................................................................................13

    I.      The Corps was not obligated under NEPA or the CWA to evaluate the effects of GHG emissions from downstream uses of products shipped through the pipeline..........................................................................................................14

         A.     The Corps was not required under NEPA to evaluate GHG emissions from downstream uses of crude oil....................................................................14

         B.     The Corps was not required to evaluate GHG emissions from downstream uses as part of its "public interest" analysis..............................................21

    II.     The Corps carefully evaluated the Project's potential effects on Tribes' subsistence resources and usufructuary rights. ......................................................22

    III.    The Corps properly concluded that the Project was not "highly controversial."...26

CONCLUSION....................................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Paper Institute, Inc., v. American Electric Power Service Corp.*,
    461 U.S. 402 (1983)..................................................................................................13

*In re Application of Enbridge Energy, Limited Partnership*,
    930 N.W.2d 12 (2019) ...........................................................................................6, 7

*In re Application of Enbridge Energy, Limited Partnership*,
    No. A20-1071(L), 2021 WL 2407855 (Minn. Ct. App.) ..................................2, 8, 28

*In re Application of Enbridge Energy, Limited Partnership*,
    No. PL-9/CN-14-916, 2020 WL 7261318 (Minn. P.U.C.)........................................7

*Center for Biolological Diversity v. U.S. Army Corps of Engineers*,
    941 F.3d 1288 (11th Cir. 2019) ....................................................................20, 21, 22

*City of Shoreacres v. Waterworth*,
    420 F.3d 440 (5th Cir. 2005) ..................................................................................18

*Department of Transportation v. Public Citizen*,
    541 U.S. 752 (2004)...........................................................................................18, 19

*Doe v. U.S. Citizenship & Immigration Services.*,
    410 F. Supp. 3d 86 (D.D.C. 2019) .........................................................................13

*Fund for Animals v. Frizzell*,
    530 F.2d 982 (D.C. Cir. 1975).................................................................................27

*Hillsdale Environmental Loss Prevention, Inc. v. U.S. Army Corps of Engineers*,
    702 F.3d 1156 (10th Cir. 2012) ..............................................................................28

*Indiana Forest Alliance v. U.S. Forest Service*,
    325 F.3d 851 (7th Cir. 2003) ............................................................................27, 30

*Indigenous Environmental Network v. U.S. Department of State*,
    347 F. Supp. 3d 561 (D. Mont. 2018).....................................................................17

*Kelly v. United States*,
    34 F. Supp. 2d 8 (D.D.C. 1998)..............................................................................13

*Marsh v. Oregon Natural Resource Council*,
    490 U.S. 360 (1989).................................................................................................30

*Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.*,
463 U.S. 29 (1983)............................................................................................13

*North Carolina v. FAA*,
957 F.2d 1125 (4th Cir. 1992) ....................................................................27, 28

*National Committee for the New River v. FERC*,
373 F.3d 1323 (D.C. Cir. 2004)......................................................................30

*National Parks Conservation Association v. United States*,
177 F. Supp. 3d 1 (D.D.C. 2016)....................................................................27

*National Parks Conservation Association v. Semonite*,
916 F.3d 1075 (D.C. Cir. 2019)...................................................................27, 30

*Ohio Valley Environmental Coalition v. U.S. Army Corps of Engineers*,
No. 2:12–6689, 2014 WL 41024 (S.D. W. Va. Aug. 18, 2014) ...........................21

*Ohio Valley Environmental Coalition v. Aracoma Coal Co.*,
556 F.3d 177 (4th Cir. 2009) ..........................................................................15

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989)........................................................................................14

*Sierra Club v. Bostick*,
787 F.3d 1043 (10th Cir. 2015) .................................................................15, 20

*Sierra Club v. FERC*,
827 F.3d 36 (D.C. Cir. 2016)......................................................................18, 19

*Sierra Club v. FERC*,
867 F.3d 1357 (D.C. Cir. 2017)..............................................................16, 17, 20

*Sierra Club v. U.S. Army Corps of Engineers*,
803 F.3d 31 (D.C. Cir. 2015)......................................................................15, 20

*Standing Rock Sioux Tribe v. U.S. Army Corps. Of Engineers*,
985 F.3d 1032, 1046 (D.C. Cir. 2021)..........................................................27, 28

*Town of Cave Creek v. FAA*,
325 F.3d 320 (D.C. Cir. 2003)..........................................................................27

*Town of Marshfield v. FAA*,
552 F.3d 1 (1st Cir. 2008)................................................................................28

*United States v. Adair*,
723 F.2d 1394 (9th Cir. 1983) ........................................................................24

*United States v. Washington*,
    853 F.3d 946 (9th Cir. 2017) ..............................................................24

*Wetlands Action Network v. U.S. Army Corps of Engineers*,
    222 F.3d 1105 (9th Cir. 2000) ............................................................15

*Winnebago Tribe of Nebraska v. Ray*,
    621 F.2d 269, 272-73 (8th Cir. 1980) .................................................18

**Statutes**

5 U.S.C. § 706(2)(A) ..................................................................................13

33 U.S.C. § 408 .........................................................................................10

33 U.S.C. § 1341, Clean Water Act section 401 .......................................8

Minn. Stat. 216B.243 .................................................................................5

Minn. Stat. 216G.02 ..................................................................................5

**Federal Regulatory Authorities**

33 C.F.R. § 320.4(a) ............................................................................14, 21

33 C.F.R. § 325, App. B .................................................................*passim*

40 C.F.R. § 1506.2 .............................................................................3, 4, 17

40 C.F.R. § 1508.18 ...................................................................................14

40 C.F.R. § 1508.27(b)(1)–(10) ................................................................26

53 Fed. Reg. 3,120, 3,121 (Feb. 3, 1988) ................................................15

85 Fed. Reg. 43,304 (July 16, 2020) ........................................................26

**Other Authorities**

EPA, Promising Practices for EJ Methodologies in NEPA Reviews, at 38 (Mar.
    2016), *available at* https://www.epa.gov/environmentaljustice/ej-iwg-
    promising-practices-ej-methodologies-nepa-reviews .............................22

## INTRODUCTION

Enbridge[1] must replace Line 3, an aging oil pipeline that traverses almost 1,100 miles from Edmonton, Alberta to Superior, Wisconsin.  Originally built in the 1960s, Line 3 has deteriorated to the point where Enbridge must reduce the flow of oil by half and step up environmentally intrusive inspection and maintenance to ensure safe operation of the pipeline. For the past six years, State, federal, and Tribal regulators have been studying Enbridge's proposed "Line 3 Replacement," which will replace the aging Line 3 with stronger, modern pipe and significantly improve safety and operational efficiency.

Plaintiffs here challenge federal permits needed to construct the Minnesota portion of the Line 3 Replacement (the "Project")—a permit from the U.S. Army Corps of Engineers ("Corps") issued under Section 404 of the Clean Water Act (CWA) and Section 10 of the Rivers and Harbors Act (RHA) and an authorization issued under RHA Section 14 to alter the Lost River flood control project (the "Permit").

While the Permit is necessary to allow certain construction activities, Minnesota regulators had primary responsibility for authorizing the Project and evaluating its overall environmental effects.  The Minnesota Public Utilities Commission (the "Commission") evaluated the need for the Project to replace Line 3 and meet demand, directed the preparation of a comprehensive environmental impact statement (EIS) to understand the Project's potential environmental effects, and selected the Project's route through the State after evaluating multiple alternatives.  The Minnesota Department of Natural Resources and the Minnesota Pollution Control Agency (MPCA) coordinated on impacts to aquatic resources, analyzing the Project's effects on streams and wetlands, and concluding that the Project as proposed would not cause a

---

[1] "Enbridge" refers to Defendant-Intervenor Enbridge Energy, Limited Partnership.

1

violation of State water quality standards.  The comprehensive evaluations by the State agencies reflect years of study and substantial consultation with public stakeholders, including affected Tribes.

The Corps' analysis was necessarily narrower, but it was no less deep.  The CWA and RHA direct the Corps to evaluate impacts to waters of the United States (WOTUS), not to serve as a super regulator of oil pipeline projects.  So the Corps focused chiefly on the Project's effects on streams and wetlands.  As part of its own years-long review, the Corps relied upon the State agencies' extensive work and appropriately built upon it for its own analysis before issuing the Permit.

The Plaintiffs here have challenged the Project at every turn.  They challenged both the Commission's and the MPCA's actions, first administratively and then in the Minnesota Court of Appeals.  These State challenges have almost run their course.  On June 14, 2021, the Minnesota Court of Appeals rejected Plaintiffs' challenge to the Commission's certificate of need, route permit, and EIS.  *In re Application of Enbridge Energy, Limited Partnership*, No. A20-1071(L), 2021 WL 2407855 (Minn. Ct. App.) ("*Enbridge*").  Only their challenge to the MPCA's water quality certification remains pending, and a decision is due in September.

Plaintiffs now turn their attention to the Permit.  But the contentions they make here are mostly recycled versions of the same arguments the Minnesota Court of Appeals rejected.   They fault the Corps for relying on the State's evaluation of the potential effects of oil spills, which the Minnesota court upheld.  *Enbridge*, 2021 WL 2407855 at *8.  They say the Corps should have done more to evaluate the Project's greenhouse gas (GHG) emissions and its effects on environmental justice communities and Tribes, but the Minnesota Court of Appeals rejected similar arguments.  *Id.* at *7-9.  They say the Corps should have considered routes beyond those

2

the Commission considered.  But the court rejected that argument as well, finding the

Commission's evaluation of alternatives reasonable and supported by substantial evidence.  *Id.* at

*10-11.  Ultimately, Plaintiffs simply disagree with the Commission's basic conclusion that the

Project is necessary and would serve the public interest.  But that issue, too, was litigated and

resolved in the State proceedings.  *Id.* at 19-21.

Now, Plaintiffs ask this Court to direct the Corps to redo the State's substantial work.

But the Corps regulations do not require that type of duplication.  In fact, they command the

Corps to avoid it.  *See* 33 C.F.R. § 325, App. B; 40 C.F.R. § 1506.2.

The Court should deny Plaintiffs' motions for summary judgment and grant the Enbridge

and Corps cross-motions.

## STATEMENT OF FACTS

**I.      The Line 3 Replacement**

Enbridge's Line 3 is a crude oil pipeline that runs 1,097 miles from Edmonton, Alberta to

Superior, Wisconsin.  AR000355.  It is an integral part of Enbridge's Mainline System.

AR152383.  Built in the 1960s, Line 3 historically has transported up to 760,000 barrels per day.

AR000355; AR144846.  But it is old and has deteriorated.  AR152395.

Enbridge concluded in 2013 that Line 3 needed to be replaced.  Although Enbridge could

manage integrity threats through inspection and repair (known as "integrity digs"), those

integrity digs are environmentally intrusive and disturb local landowners.  AR000363.  In recent

years, to lower the risk of failure, Enbridge reduced the volume of oil it pumps through the

pipeline by half, but this reduced capacity diminishes operational efficiency.  *Id.*  A new pipeline

would be safer, would reduce the need for intrusive inspection, and would restore the capacity Line 3 used to deliver.[2]  AR000363–64.

So Enbridge began work to design and secure regulatory approval.  The Line 3 Replacement will replace the existing 34-inch diameter Line 3 pipeline and will upgrade associated equipment and facilities.  AR000368.  The new pipeline will be wider (36 inches in diameter) and thicker (35% greater yield strength) and will be built using modern pipeline design, manufacturing, materials, coating, and installation techniques.  *Id.*  The wider diameter pipe will allow Enbridge to move the same volume of oil more efficiently.  AR000364.  And the stronger and more modern pipe would allow Enbridge to do so more safely.  AR000363.  When finished, the Line 3 Replacement will restore Line 3's average annual capacity to 760,000 barrels of crude oil per day, ensuring that Enbridge can continue to transport crude oil safely from Canada to users in Minnesota and Wisconsin.  AR000363–364.

The U.S. portion of the Line 3 Replacement has been undertaken in phases.  The segments in Wisconsin and North Dakota have been approved and are now complete.  The final phase, and the one at issue here, is the replacement of approximately 282 miles of the existing pipeline with approximately 340 miles of new pipeline and associated facilities in Minnesota (the "Project").  AR000351.  Like the original Line 3, the Project runs from the North Dakota/Minnesota border down to the Minnesota/Wisconsin border, crossing portions of multiple counties and the Fond du Lac Band of Lake Superior Chippewa reservation.  *Id.*

---

[2] In part to address the integrity issues with the existing Line 3, Enbridge and the federal government entered into a Consent Decree in 2017 obligating Enbridge to limit the operating pressure of existing Line 3 and to retire and decommission the pipeline as expeditiously as practicable following the receipt of required permits and approvals for the Line 3 Replacement. AR152394. Existing Line 3 will continue to operate, with incremental barrels transported via less safe alternatives like rail, until the Project is constructed and commissioned for service.

Approximately 90 percent of that route is co-located with other Enbridge pipelines, third-party pipelines or utilities, roads, railroads or highways.  AR000355.

## II.     Regulatory review and approval of the Project

The Project required extensive regulatory review by multiple governmental authorities. In 2014, Enbridge started that process.  It worked with federal, State, Tribal, and local authorities to design the Project to minimize impacts to the environment, and in November 2020, after years of careful study by State and federal regulators, secured the approvals needed to start work. AR000347–475.

### A.     State authorizations and litigation

#### 1.     Certificate of Need and Route Permit

The Commission is responsible for certifying the need for oil pipelines in Minnesota and selecting their routes.  Minn. Stat. 216B.243 (certificate of need authority) and Minn. Stat. 216G.02 (route selection authority).  In April 2015, Enbridge submitted applications with the Commission for the Certificate of Need and Route Permit.  AR012098.  The Commission then began its work and directed the Minnesota Department of Commerce, Energy Environmental Review and Analysis (DOC-EERA) to develop a comprehensive EIS.  *Id.*

The State agencies' initial steps included extensive public outreach to gather information to help inform their analysis of alternative pipeline routes and the human and environmental impacts of each potential route.  AR144839.  In August 2015, staff from the Commission and DOC-EERA conducted 15 public information meetings in 10 different counties along Enbridge's proposed route.  *Id.*  The agencies took comment on route alternatives from July through September 2015, and in February 2016, the Commission granted contested case proceedings to address those questions.  *Id.*

Plaintiffs participated in those proceedings, consisting of sixteen public hearings in eight cities and two weeks of evidentiary hearings.  AR000357.  In April 2018, the Administrative Law Judge (ALJ) issued a report that included over 1,400 findings of fact and conclusions of law.  AR144856.  The ALJ recommended a route and a series of proposed conditions.  *Id.*

In parallel, DOC-EERA solicited public comment and analyzed the Project to prepare an EIS.  AR000356; AR148203.  It prepared a draft EIS and put it out for public comment on May 15, 2017.  *Id.*  In June 2017, the agency held 22 public information meetings in 22 counties to discuss the draft.  AR144839.  During that process, the agency considered thirty possible route combinations.  AR144847-80.  It analyzed reasonably foreseeable impacts; mitigation; potential oil spill impacts; various safety, efficiency, reliability, and environmental benefits of the Project. *Id.*  DOC-EERA finalized its EIS on February 12, 2018, and on May 1, 2018, and after extensive review, the Commission found the EIS adequate.  AR150010; AR012099.

Over the next several months, the Commission evaluated the alternatives identified in the EIS and the findings in the April 2018 ALJ report to identify the best route for the project. AR144847–AR144880.  The Commission held oral argument in June 2018, AR144844, and in October 2018, the Commission issued its approved route, which captured numerous modifications to Enbridge's originally proposed route to minimize potential effects of the Project on cultural and environmental resources.

The Plaintiffs in this case challenged the EIS in the Minnesota Court of Appeals, raising a number of issues that are similar to the claims raised in this case.  On June 3, 2019, the Minnesota court rejected nearly all of Plaintiffs' arguments.  *See In re Application of Enbridge Energy, Limited Partnership,* 930 N.W.2d 12 (2019).  It concluded that the EIS sufficiently identified alternatives, used an appropriate methodology to analyze potential oil spill impacts,

and adequately analyzed potential impacts on historic and cultural resources and the relative

impacts of alternative routes.  *Id.* at 36.  The court, however, remanded the matter to the agency

to more fully evaluate the potential impact of an oil spill on the Lake Superior watershed.  *Id.*

Minnesota DOC-EERA did so.  It further analyzed potential oil spill impacts within the

Lake Superior watershed and prepared a revised EIS that concluded that even an unmitigated

release of oil was unlikely to reach Lake Superior in any measurable amount within the 24-hour

worst-case model.  AR012102-03.  After another round of public notice and comment, the

Commission issued an Order on May 1, 2020 finding the revised EIS adequate and approving the

Certificate of Need and Route Permit for the Project.  AR012098.  With that order, the

designated route the Commission approved is the only route Enbridge can use to construct the

Project under Minnesota law.  *Id.*

In August 2020, Plaintiffs again sought review, challenging the Commission's analysis of

the potential environmental effects of an oil spill and various aspects of its findings and

conclusions, including the approved route.  Plaintiffs waited three months before filing a motion

for a stay, which the Commission denied in December 2020.  *See In re Application of Enbridge*

*Energy, Limited Partnership*, No. PL-9/CN-14-916, 2020 WL 7261318 (Minn. P.U.C.).  In its

order, among other things, the Commission found that the steps it had taken to identify and avoid

historic tribal resources and the conditions that it and the MPCA placed on construction would

mitigate any harm to the environment or historic tribal resources.  Most significantly, the

Commission found that delaying construction would enhance, not reduce, the risk of harm to the

environment:

> There is substantial evidence in the record regarding the rapidly deteriorating
> condition of [Line 3], which increases the chances of an accidental oil spill on that
> pipeline, chances that will be greatly reduced with the construction of the state-of-
> the-art Project. … Delaying construction would prolong the period during which

7

> oil would be transported through [Line 3], by truck, or by rail—all of which carry
> substantially more risks than transportation through a new pipeline.

*Id.* at *5 (internal quotation marks omitted).

As they do here, the Red Lake Band and the White Earth Band emphasized the potential

harm to their lands associated with construction, but the Commission acknowledged the broader

picture.  For example:

> The Leech Lake Band of Ojibwe, whose Reservation contains 46 miles of
> Existing Line 3, has continuously represented to the Commission that the current
> situation with that pipeline is untenable and Existing Line 3 must be replaced as
> soon as possible. The Commission finds that prolonged operation of Existing Line
> 3 has the potential to inflict irreparable harm on the Leech Lake Band of Ojibwe
> and the public through continued environmental impacts from that pipeline.

*Id*.  Plaintiffs sought reconsideration of the Commission's order denying the stay, which was

denied, and Plaintiffs then filed a Motion for Stay Pending Appeal in the Minnesota Court of

Appeals.  *Id.*  That motion, too, was denied.

On June 14, 2021, the Court of Appeals affirmed the Commission's decisions on the

Certificate of Need, the Route Permit, and the sufficiency of the State EIS, recognizing the

Commission balanced a "vigorous public debate," against the "backdrop of a deteriorating

existing pipeline and a federal consent decree directing Enbridge to replace existing Line 3, if it

could obtain state authority to do so."  *Enbridge*, 2021 WL 2407855 at *1-2.  The Court of

Appeals held that the Commission addressed its earlier concern regarding the need to consider

the impact of an oil spill on the Lake Superior Watershed; that substantial evidence supported its

decision to issue a certificate of need; and that the Commission "reasonably selected a route for

the replacement pipeline based upon respect for tribal sovereignty, while minimizing

environmental impacts."  *Id. at* *2.

## 2.   CWA Section 401 water quality certification

CWA Section 401 requires applicants for a federal permit anticipated to result in discharges to navigable waters to obtain certification from relevant State and Tribal agencies that the discharge will comply with applicable state water quality standards.  33 U.S.C. § 1341. Enbridge needed to secure two Section 401 certifications for the Project areas in Minnesota— one from the State of Minnesota, and one from the Fond du Lac Band of Lake Superior Chippewa, through whose reservation the Project passes.[3]

Enbridge requested Section 401 certification from the MPCA in October 2018 and submitted a revised request on November 15, 2019.  AR000358.  After receiving public comment on a draft certification, the MPCA granted a contested case hearing before an ALJ to consider several factual contentions raised by the Plaintiffs.  AR010533-34.  The ALJ rejected each of Plaintiffs' contentions in a written recommendation issued on October 16, 2020, which the MPCA adopted.  AR0010533-545; AR000514.

On November 12, 2020, the MPCA issued its Section 401 certification for the Project. AR00510-527.  The MPCA determined that there is reasonable assurance that the Project will not violate applicable water quality standards, provided that Enbridge complies with the conditions imposed by MPCA to avoid, minimize, and mitigate Project impacts.  AR000514.

On November 30, 2020, Plaintiffs challenged the MPCA's Section 401 certification in the Minnesota Court of Appeals.  That litigation is pending.

Enbridge also applied for a Section 401 Certification from the Fond du Lac Band of Lake Superior Chippewa, which issued a certification with conditions on April 15, 2019.  AR000501- 507.  That certification has not been challenged.

---

[3] North Dakota also provided a certification for a 0.5-mile segment of pipeline in North Dakota between the Red River valve and the Minnesota border.  AR000508-509.

### B.     The challenged Corps authorizations

The Commission-approved route for the Project avoids environmental and cultural

resources as much as possible.  But, like nearly all linear projects, portions of the Project

unavoidably cross some wetlands and streams and thus require a permit from the Corps to

authorize the discharge of dredged or fill material into WOTUS under Section 404 of the CWA

and crossings of navigable-in-fact waters under Section 10 of the RHA.  AR000351-52.  The

Project also crosses the Corps' Lost River Flood Control Project and thus required authorization

from the Corps under Section 14 of the RHA (33 U.S.C. § 408 ("Section 408")).  AR010902.

In 2015, Enbridge applied to the Corps' St. Paul District for an individual permit.  That

application was later withdrawn, and Enbridge submitted a new permit application on September

21, 2018.  AR000492.  The permit application was based on a preliminary jurisdictional

determination, which means that all waters and wetlands were assumed to be jurisdictional

features for purposes of the Section 404 permit and mitigation requirements.  After two years of

consideration and deliberation, extensive coordination with State, Tribal, and federal agencies,

and two public comment periods, the Corps issued the Permit on November 23, 2020.

AR000347–AR000359.  The Permit authorizes the temporary discharge of dredged or fill

material into approximately 1,049.58 acres of wetlands, permanent discharge of dredged or fill

material into approximately 9.97 acres of wetlands, and the crossing of 227 waterbodies.

AR000351–52.  The Permit also authorizes the crossing of three RHA Section 10 waters and

grants permission to alter the Lost River Flood Control Project.  AR000402.  It includes

numerous conditions—including conditions imposed by MPCA and the Fond du Lac Band

through CWA Section 401—to minimize and mitigate impacts to streams and wetlands.  For

example, Enbridge must minimize all in-stream work activities to the extent practicable on an

area and time duration basis and can conduct in-stream trenching only during specified time

periods.  AR000341-344, 510-551.  Among other things, these timing restrictions require winter

construction through some wetlands, prohibit certain activities in wetlands during certain

seasons, prohibit work in wild-rice areas in spring months, and restrict work within certain

waterbodies to protect sensitive species and critical habitat.  *Id.*

The Corps documented its extensive analysis in an Environmental Analysis and

Statement of Findings (EA-SOF), pursuant to the National Environmental Policy Act (NEPA),

the CWA, and the RHA.  AR000347–475.  The EA-SOF summarizes the Corps' extensive

evaluation of the effects of the Project's discharges to streams and wetlands and why the Project

would not be contrary to the public interest.  *Id.*  And it includes as an appendix its

environmental assessment for the Section 408 authorization to cross the Lost River flood control

project.  AR002536-56.  Throughout the EA-SOF, the Corps references the State's substantial

evaluation of the Project's environmental effects through the State EIS.  The Corps noted the

State's comprehensive evaluation of the effect of potential GHG emissions, both from Project

construction and from downstream uses of crude oil.  AR000398.  The Corps reviewed the

State's evaluation of environmental justice and concluded, based on the State's analysis and its

own review, that the Project would not disproportionately affect minority populations or Tribal

resources.  AR000473-74.  And the Corps also referenced the State's evaluation of potential oil

spills, which assessed worst-case scenarios and accidental releases at eight representative sites

across northern and central Minnesota.  AR002548–50.  The Corps looked at the sites the State

studied to identify the most similar circumstances for purposes of analyzing the Lost River

crossing.  *Id.*  The Corps then provided a detailed discussion on the potential effects of an

accidental release on the aquatic environment and on the human environment, concluding that

the effects of a potential crude oil release on the aquatic and human environments would be no greater than the effects of continuing to operate the existing Line 3.  AR002550–53.

The Corps also explained its consideration of alternatives to the Project.  It compared the proposal with no-action alternatives, such as the use of trucks or rail to move oil, and alternatives involving the continued use of Line 3, the replacement of Line 3 in the existing trench, and combinations thereof.  Based on this analysis, the Corps concluded that the proposed Project was the least environmentally damaging practicable alternative (LEDPA), under the Corps' 404(b)(1) Guidelines.  AR000365–74.  The Corps did not consider alternative routes for building the new pipeline, because that is the Commission's job, not the Corps'.  The only route for building a new pipeline was the one the Commission approved.  And the Corps explained that it had conducted extensive discussions with Enbridge and State agencies to identify the least environmentally damaging method for crossing jurisdictional waters.

The Corps also documented its extensive consultation with Tribal Nations to evaluate the potential for the Project to affect historic and cultural resources.  AR000456–72.  The Corps and Tribal representatives conducted a comprehensive Tribal Cultural Resources Survey, involving field visits, consultation meetings, and interviews with Tribal elders.  AR000457-60.  A cultural resource management training was held at Fond du Lac tribal college with at least six Tribes participating.  AR000459.  After this extensive process, which included input and participation by dozens of tribes and the Minnesota State Historic Preservation Officer, the Corps determined that the Project "would not adversely affect historic properties."  AR000400, AR000466.  And to ensure the Project would not inadvertently affect historic and cultural resources, the Corps required Enbridge to comply with the Avoidance, Mitigation, and Implementation Plan (AR000554-632) to protect resources identified by the Tribes.  AR000401.  This plan ensures

that Tribal monitors, under the direction of the Fond du Lac Tribe, are onsite during construction and have authority to stop work to allow for the evaluation of a site.  AR000470.

## STANDARD OF REVIEW

The Administrative Procedure Act (APA) directs courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  "'The scope of review under the arbitrary and capricious standard is narrow and a court is not to substitute its judgment for that of the agency.'"  *Kelly v. United States*, 34 F. Supp. 2d 8, 12 (D.D.C. 1998) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  To uphold agency action, the court need not find that the decision "is the only reasonable one, or even that it is the result [the court] would have reached."  *Am. Paper Inst., Inc., v. Am. Elec. Power Serv. Corp.*, 461 U.S. 402, 422 (1983).  The agency's action should be set aside only if the agency failed to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made" or "fail[ed] to consider an important aspect of the problem or offer an explanation for its decision that runs counter to the evidence before it."  *Doe v. U.S. Citizenship & Immigr. Servs.*, 410 F. Supp. 3d 86, 95 (D.D.C. 2019) (internal quotations and citations omitted).

## ARGUMENT

The Court should grant Enbridge's and the Corps' cross-motions for summary judgment and should deny Plaintiffs' motions.  In support, Enbridge adopts the arguments advanced by the Corps in its brief.  In further support, Enbridge submits this brief to amplify three points:  (1) the Corps is not obligated under NEPA or the CWA to evaluate the effects of GHG emissions from "downstream" uses of products shipped through the pipeline; (2) the Corps thoroughly evaluated

the effects of the action on environmental justice communities and the Tribes; and (3) the Corps

correctly concluded that its analysis was not "highly controversial."

I.  **The Corps was not obligated under NEPA or the CWA to evaluate the effects of GHG emissions from downstream uses of products shipped through the pipeline.**

Under NEPA, the Corps need only consider effects proximately caused by the authorized

discharge of dredged or fill material into WOTUS, and need not consider effects it has no power

to regulate.  Similarly, under its CWA regulations, the Corps must consider only the effects of

the proposed activity and its intended use.  33 C.F.R. § 320.4(a).

The RLB Plaintiffs say the Corps failed to meet its obligations under NEPA and the

CWA by failing to consider the effect of GHG emissions—in particular emissions associated

with the use of oil transported through the pipeline.  The effect of GHG emissions caused by

downstream crude oil users is beyond the Corps' regulatory purview.  In any event, the

allegation is factually incorrect—the Corps noted in its public interest discussion that the State

had conducted a comprehensive evaluation of potential GHG emissions, both from Project

construction and from downstream uses.

A.  **The Corps was not required under NEPA to evaluate GHG emissions from downstream uses of crude oil.**

NEPA requires federal agencies to take a "hard look" at the environmental consequences

of proposed federal actions before taking them.  *Robertson v. Methow Valley Citizens Council*,

490 U.S. 332, 350-51 (1989).  The proper scope of an agency's analysis under NEPA is therefore

determined by the extent of the "federal" action in question.  Council on Environmental Quality

(CEQ) regulations define "major federal action" to include "actions with effects that may be

major and which are potentially *subject to Federal control and responsibility*."  40 C.F.R.

§ 1508.18 (emphasis added).  And under the Corps' NEPA regulations, the focus of the NEPA

review for a Section 404 permit is the activity subject to the Corps' regulatory authority—i.e.,

14

the discharge of fill material for which federal authorization is sought.  33 C.F.R. § 325 App. B.

As explained in the preamble to the Corps rules:

> NEPA requires Federal agencies to consider the direct and indirect consequences of Federal actions, not State or private actions.  When the Federal action is the issuance of a 404 permit, then the activity which would be authorized by the permit is the subject of the NEPA document.  The Corps authorizes the discharge of dredged or fill material in 404 permits.  Therefore, *the activity the Corps studies in its NEPA document is the discharge of dredged or fill material*.

53 Fed. Reg. 3,120, 3,121 (Feb. 3, 1988) (emphasis added).  So even though Corps permits may

be necessary for the construction of a larger project, the scope of the Corps' action for NEPA

purposes does not include effects of the project from activities outside the Corps' control.[4]

In the specific context of linear infrastructure projects, these regulations appropriately

prevent the "small federal handle"[5] of a Corps permit from transforming State projects into

federal projects.  *See Sierra Club v. Bostick*, 787 F.3d 1043 (10th Cir. 2015) (holding that the

Corps was not required to prepare a NEPA analysis of the entire pipeline when verifying

nationwide permits for a 485-mile oil pipeline crossing over 2,000 waterways); *Sierra Club v.*

*U.S. Army Corps of Eng'rs*, 803 F.3d 31 (D.C. Cir. 2015) ("*Flanagan South*") (holding that the

various federal easements and approvals, including nationwide permit verifications, along the

length of a 593-mile oil pipeline did not trigger NEPA analysis for the entirety of the pipeline).

---

[4] *See, e.g., Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 195 (4th Cir. 2009) ("[T]he fact that the Corps' § 404 permit is central to the … valley-filling process [as part of a coal mine] does not itself give the Corps 'control and responsibility' over the entire fill"); *Wetlands Action Network v. U.S. Army Corps of Eng'rs*, 222 F.3d 1105, 1116-17 (9th Cir. 2000), *abrogated on other grounds by Wilderness Soc. v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011) (Corps' NEPA review of CWA permit need not include effects of larger project).

[5] *See* Cong. Research Serv., *Oil and Natural Gas Pipelines: Role of the U.S. Army Corps of Engineers*, at 6, n.14 (June 2017) ("For a project such as an oil pipeline, in which only discrete segments are federalized, the Corps is described as having a 'small federal handle' based on the analogue that the pipeline is the pan and the federal role is limited to a small handle.").

Here, the Corps appropriately defined the scope of its actions as limited to the activities in and near WOTUS.  *See* 33 C.F.R. Pt. 325, App. B § 7.b.  The Corps concluded that the scope of its NEPA analysis "includes the regulated activities in [WOTUS] associated with linear crossings as well as uplands adjacent to, and in some cases between, waterbodies where the Corps has sufficient control and responsibility to expand its analysis."  AR000360.   The Corps specifically explained that this analysis did not "extend to the entire pipeline construction, or operation, because the Corps does not have sufficient control and responsibility over the entire project to warrant an expanded analysis."  AR000361.  And as to GHG emissions, the Corps observed, shortly before referencing the comprehensive evaluation of GHG emissions in the State EIS, that it "has no authority to regulate emissions that result from the combustion of fossil fuels."  AR000398.

The RLB Plaintiffs say the Corps improperly constrained its NEPA review, because it did not independently consider the environmental effects of GHG emissions from Project construction, along with those that might occur when third parties use the oil transported through the pipeline or products refined from it.  But this contention is flawed, both factually and legally.

As the RLB Plaintiffs concede (at 11), the Corps correctly noted that the State comprehensively evaluated the effects of GHG emissions related to the Project.  *See* AR000398.  That comprehensive analysis evaluated not only "direct effects" caused by emissions from construction but also effects associated with the downstream uses of the oil transported through the pipeline.  AR152985-3020.  It estimates quantities of GHG emissions in tons per year, both for the Project and alternatives, along with the "social cost" of those emissions.  AR153019.

The RLB Plaintiffs do not critique this analysis but instead argue (at 11) the Corps should have said more when it referenced the State's work.  Citing *Sierra Club v. FERC*, 867 F.3d 1357

16

(D.C. Cir. 2017) ("*Sabal Trail*"), the RLB Plaintiffs say "the fact that a state agency will oversee some aspects of a project 'cannot substitute for a proper NEPA analysis.'" But *Sabal Trail* did not involve a situation where, as here, the State has already completed its evaluation of the effects of potential GHG emissions. Instead, the Federal Energy Regulatory Commission (FERC) there argued that it need not consider GHG emissions caused by the use of natural gas transported through a proposed pipeline, because those emissions would be thoroughly assessed at a later stage by the State of Florida when it evaluated applications for Clean Air Act permits for the receiving power plants. 867 F.3d at 1374.

Similarly inapplicable is *Indigenous Environmental Network*, which the RLB Plaintiffs say (at 11) stands for the proposition that a federal agency can rely on State analyses only after presenting "some reasoned analysis indicating that it would reach the same conclusions in the present review." (citing *Indigenous Envtl. Network v. U.S. Dep't of State*, 347 F. Supp. 3d 561, 577–79 (D. Mont. 2018)). *Indigenous Environmental Network* involved a significantly different situation than the one presented here. There, the federal agency prepared a supplemental EIS that purported to address cumulative effects of GHG emissions from the Keystone XL pipeline and other reasonably foreseeable projects, but did not evaluate emissions from a nearby planned Alberta Clipper pipeline.[6] The federal agency acknowledged this deficiency, but argued that the error was harmless, because it had considered the combined effects of the two projects in the EIS for the Alberta Clipper project. But that separate analysis was not a part of the agency's record, so the court remanded the matter for the agency to cure the defect. Here, by contrast, the State's

---

[6] Both the Keystone XL pipeline and the Alberta Clipper pipeline required a Presidential Permit, which federalized each project and led to the requirement for a federal EIS. No such Presidential Permit was required for the Line 3 Replacement.

EIS is complete and is part of the Corps' record.  And the Corps appropriately referenced that work.  *See* 33 C.F.R. pt. 325, App. B §7.b.; 40 C.F.R. § 1506.2(b) (2020).

As to "downstream" GHG emissions, the Corps did not need to do even that much.  The Corps unquestionably lacks authority to regulate GHG emissions.  Corps regulations and policy specifically limit the Corps' regulatory oversight to areas within the Corps' statutory jurisdiction.  *See* 33 C.F.R. Part 325, App. B § 7.b.  No statute authorizes the Corps to regulate air emissions from oil refineries and other industrial users that may use crude oil, merely because that oil was transported through a pipeline that required a Corps permit for construction.  The Corps' lack of regulatory jurisdiction over the activities producing those effects puts them beyond the ambit of the Corps' NEPA review.  *See* infra at 21-22.

NEPA likewise does not require federal agencies to evaluate environmental effects they lack jurisdiction to prevent.  In general, NEPA requires federal agencies to consider only those environmental effects proximately caused by the actions subject to its jurisdiction and control.  *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752 (2004).  A mere "but for" causal relationship between an agency action and an effect is not a sufficient basis to attribute that effect to the agency action under NEPA.  *See, e.g., Sierra Club v. FERC*, 827 F.3d 36, 40-41 (D.C. Cir. 2016) ("*Freeport*") (holding that NEPA review for license for liquefied natural gas terminal did require analysis of GHG emissions from combustion of gas transferred through terminal).  Instead, there must be "a 'reasonably close causal relationship' between the environmental effect and the alleged cause," analogous to the concept of proximate cause in the tort context.  *Pub. Citizen*, 541 U.S. at 767; *see also Winnebago Tribe of Neb. v. Ray*, 621 F.2d 269, 272-73 (8th Cir. 1980) (a simple "but for" causal relationship in which an effect would not occur without the activity is not a sufficient basis to attribute an effect to the agency's action under NEPA).  In other words,

an "agency need not consider" effects that it "has no ability to prevent." *Pub. Citizen*, 541 U.S.
at 770; *see also Freeport*, 827 F.3d at 47; *cf. City of Shoreacres v. Waterworth*, 420 F.3d 440,
452 (5th Cir. 2005) ("[I]t is doubtful that an environmental effect may be considered as
proximately caused by the action of a particular federal regulator if that effect is directly caused
by the action of another government entity over which the regulator has no control.").

    *Public Citizen* is instructive.  There, the Supreme Court rejected a NEPA challenge to
Federal Motor Carrier Safety Administration ("FMCSA") regulations that established safety and
inspection requirements for Mexican trucks and buses operating in the United States.  The
issuance of those regulations allowed the President to lift a congressionally imposed moratorium
on the entry of Mexican trucks into the United States.  That, said the petitioners in that case,
made the regulations a "but for" cause of increased truck traffic from Mexico, requiring FMCSA
to consider the environmental impacts of those trucks and buses under NEPA.  But the Supreme
Court deemed that causal connection too attenuated.  541 U.S. at 768.  The President's lifting of
the moratorium was the "legally relevant" cause of any increased truck traffic, not the issuance
of the FMSCA regulations.  *Id.* at 769.  And, because FMCSA had no authority to prevent cross-
border truck movements, requiring the agency to evaluate the environmental effects of increased
truck traffic "would have no effect on FMCSA's decisionmaking—FMCSA simply lacks the
power to act on whatever information might be contained in the [NEPA review]."  *Id.* at 768.

    Lower courts applying *Public Citizen* in the context of Section 404 permitting have
consistently recognized the limited scope of the Corps' NEPA review.  For example, in
*Flanagan South*, the D.C. Circuit upheld a Corps' nationwide permit (NWP) verification (*i.e.*,
CWA Section 404 general permit authorization) for discharges of dredged and fill material for
crossings of WOTUS associated with construction of the Flanagan South pipeline, a nearly 600-

mile oil pipeline running from Illinois to Oklahoma.  803 F.3d at 39-40.  The court rejected

arguments that NEPA required the Corps to evaluate the effects of construction and operation of

the entire pipeline, including, for instance, effects associated with construction over lengthy

portions that crossed private land.  *Id.*  And in *Bostick*,, the Tenth Circuit similarly declined to

require the Corps to consider the overall impacts of the Gulf Coast pipeline, such as the risk of

oil spills along the entire pipeline, finding that the Corps lacked "sufficient 'control and

responsibility'" over the entire pipeline project.  787 F.3d at 1054.

 In accord with this consistent authority, the Corps here reasonably concluded that its

action, the authorization of the discharge of dredged or fill material, would not proximately cause

the GHG emissions associated with the use of oil that would flow through Line 3's replacement.

 The RLB Plaintiffs ignore this precedent and instead say (at 10) that NEPA broadly

requires the Corps "to quantify and consider the emissions traceable to their activities or explain

in detail why [it] cannot do so."  (citing *Sabal Trail*).  But *Sabal Trail* stops well short of

endorsing such a sweeping proposition.  The court in *Sabal Trail* specifically emphasized the

broad scope of FERC's authority when authorizing an interstate natural gas pipeline under the

Natural Gas Act (NGA).  *See* 867 F.3d at 1373.  Unlike the Corps, which narrowly focuses on

impacts from the discharge of dredged and fill material, FERC considers a much broader array of

economic and environmental impacts when authorizing an interstate natural gas pipeline.  For the

*Sabal Trail* majority, the breadth of that review distinguished FERC's role under the NGA from

its more confined role when approving liquefied natural gas terminals.  *Sabal Trail*, 867 F.3d at

1372.  For that reason, courts have refused to read *Sabal Trail* to require the Corps to consider

"downstream" environmental effects that are beyond its regulatory control.  *See Center for Biol.*

*Diversity v. U.S. Army Corps of Eng'rs*, 941 F.3d 1288 (11th Cir. 2019) (rejecting claim that

NEPA required the Corps to evaluate effects of processing phosphate rock to be extracted at a mine that required a Section 404 permit).

**B.**    **The Corps was not required to evaluate GHG emissions from downstream uses as part of its "public interest" analysis.**

The RLB Plaintiffs further contend that the Corps should have evaluated downstream GHG emissions when evaluating whether the activity it would authorize would be contrary to the public interest. 33 C.F.R. § 320.4(a).  They say (at 25) the Corps' refusal to weigh GHG emissions "is in direct contravention of the plain language of its own regulations."  This is wrong—the Corps' regulations appropriately limit the scope of the Corps' review.

When evaluating a permit application, the Corps must consider "the probable impacts . . . of the *proposed activity* and its intended use on the public interest" and weigh those impacts against the activity's benefits. 33 C.F.R. § 320.4(a) (emphasis added).  But Corps regulations specifically direct the Corps to define the activity appropriately to prevent the agency from reaching beyond its authority. 33 C.F.R. Pt. 325, App. B § 7.b.  And section 320.4(a) authorizes the Corps to deny permits "only if the discharge itself will have an unacceptable environmental impact" and not "for any other reason."  *Ctr. for Biol. Diversity*, 941 F.3d at 1299; *see also, e.g., Ohio Valley Envtl. Coal. v. U.S. Army Corps of Eng'rs*, No. 2:12–6689, 2014 WL 41024, at *21 (S.D. W. Va. Aug. 18, 2014) ("[T]he scope of the public interest review may not exceed the scope of the Corps' authority under the CWA—it is restricted to the 'filling' of jurisdictional waters.").  "[A]n alternative, unbounded view of the public-interest review would … [make] the Corps de facto environmental-policy czar."  *Ctr. for Biol. Diversity*, 941 F.3d at 1299.

Here, the Corps reasonably defined the "proposed activity" to include the actual discharges requiring Section 404 authorization for crossings and related work in adjacent upland areas.  AR000361.  The Corps appropriately declined to deem the "activity" to be the

construction of the entire pipeline.  But even if it did, the "intended use" of the pipeline is the

transportation of crude oil, not its combustion.  Any nexus between construction-related stream

crossings and GHG emissions from downstream uses is far too attenuated to allow consideration

of those emissions under section 320.4.  *See Ctr. for Biol. Diversity*, 941 F.3d at 1299.

## II.     The Corps carefully evaluated the Project's potential effects on Tribes' subsistence resources and usufructuary rights.

As the Corps explains more fully in its brief, the Corps fully complied with its obligation

to evaluate environmental justice (EJ) as part of its NEPA analysis.  The Corps specifically

referenced the State's EJ analysis, prepared based on CEQ and EPA guidance.[7]  AR000472.  In

that analysis, which spans 28 pages in the State EIS, the State identified the portion of the

Project's total impacts that would be borne by minority or low-income communities and

included a number of mitigation measures to "reduce most impacts to EJ communities to minor

or negligible" levels.  AR154334-361.

The State carefully considered Tribal interests as part of this analysis.  The State

conducted significant outreach to include Tribes in the regulatory process.  *See, e.g.,* AR154359

(describing direct consultation with Tribes through their natural resources departments and

scoping and draft EIS public meetings held on reservations).  Through that effort, the State was

able to identify the Project's potential effects on the Tribes' use of subsistence resources.  *See*,

*e.g.*, AR154350 (discussing "walleye and trout fisheries, which are predominately used for

---

[7] "[T]he identification of a disproportionately high and adverse impact on minority and low income populations does not preclude a proposed agency action from going forward, nor does it necessarily compel a conclusion that a proposed action is environmentally unsatisfactory."  EPA, Promising Practices for EJ Methodologies in NEPA Reviews, at 38 (Mar. 2016), *available at* https://www.epa.gov/environmentaljustice/ej-iwg-promising-practices-ej-methodologies-nepa-reviews.  Instead, an agency "may wish to consider heightening its focus on meaningful public engagement regarding community preferences, considering an appropriate range of alternatives (including alternative sites), and mitigation and monitoring measures."  *Id.*

subsistence," "[t]raditional terrestrial game and waterfowl hunting grounds are habitat for a

variety of subsistence resources, including deer, elk, ducks, geese, and turkey," and "[w]ild rice,

fish, and other treaty resources are sources of income and subsistence for tribes in the area.").

The EIS details potential noise, visual, air quality, and other impacts to existing resources,

including impacts to hunting, fishing, and farming activities.  AR154353.  It acknowledges that

during construction there would be "prohibitions on hunting, fishing, and farming within the

construction work area."  But "[t]he duration of these impacts would be temporary and short

term."  *Id.*

The State analysis noted steps taken to minimize impacts on Tribes.  For example, when

comparing route alternatives, the State considered and rejected certain alternatives, in part due to

impacts on tribal subsistence resources: "[Route Alternative (RA)]-06, RA-07, and RA-08 would

cross the Fond du Lac Reservation.  Closing of the hunting ground near the construction work

area and the loss of access to hunting and gathering during construction would result in both a

cultural and economic impact on the community. Given the importance of subsistence activities,

this may represent a disproportionate adverse impact on the Fond du Lac Reservation and its

members."  AR154355.  And the State EIS acknowledges that Minnesota's Oil Pollution Act

allows the recovery of "[d]amages for loss of subsistence use of natural resources . . . by any

claimant who uses natural resources for subsistence that have been injured, destroyed, or lost,

without regard to the ownership or management of the resources."  AR154358.

In addition to the State's comprehensive analysis, upon which the Corps appropriately

relied, the Corps also independently considered impacts to the Tribes' treaty rights in Section 7.8

of the EA-SOF.  AR000400-401.  "Construction of the Project is not likely to significantly

reduce overall availability of [Treaty] resources that are typically part of subsistence activities

. . . Some individuals and localized populations may be affected during construction activities, but overall species populations are expected to remain available." AR000401. While "[a]ny impacts resulting in a loss of access to treaty resources would disproportionately impact tribal communities and members culturally and have the potential to impact tribal economies," AR154353, "[t]he Project is not anticipated to have long-term effects on [Treaty] resources as a result of installation of the pipeline and initial restoration of the ROW occurring quickly." AR000401; *see also* AR000473 ("Most of the impacts associated with the Project would be construction-related and would be considered short term and localized primarily along the pipeline. Long-term impacts associated with operation would generally be limited to maintenance of a permanent pipeline right-of-way and presence of pump stations."); Doc. No. 40 at 35 ("the record before the Court indicates that most of the environmental effects stemming from the construction of Line 3 will not be 'permanent or irreversible.'") (citations omitted).[8]

The RLB Plaintiffs cite (at 14-15) a number of cases to support the notion that "Tribal rights to hunt, fish, and gather necessarily include the preservation of habitat and resources sufficient to support the exercise of those rights." Perhaps. But the activities described in those cases are not analogous to any temporary impacts that might result from pipeline construction at issue here. *See United States v. Adair*, 723 F.2d 1394 (9th Cir. 1983) (action for a declaration of water rights where reduced flow would extinguish Tribe's fishing rights under treaty); *United*

---

[8] The RLB Plaintiffs also claim (at 13) that the Corps did not adequately address impacts to "stands of fruit- and nut-bearing trees and shrubs," that the Tribes harvest for subsistence purposes. This claim fails to recognize that the Tribal Cultural Resources Survey thoroughly considered potential impacts to these resources, *see*, *e.g.*, AR064262 ("Mitigation is recommended for stands of fruit and nut bearing trees and shrubs that are identified during the timber assessment on state forest and federal lands where harvesting is allowed. Trees and shrubs lost to construction should be replaced to allow Tribal harvests to continue into the future."), and Enbridge's implementation of the "tree-for-tree" replacement program. *See* AR103350 ("Trees removed from tribal reservation land shall be replaced on tribal reservation land or other land as directed by the tribal government.").

*States v. Wash.*, 853 F.3d 946 (9th Cir. 2017) (the construction of barrier culverts prevented salmon from performing necessary lifecycle functions significantly depleting the quantity of salmon available to the Tribes).

RLB Plaintiffs also claim (at 13) that the NEPA analysis "failed to consider how an oil spill-triggered fish kill would affect tribal citizens who engage in subsistence fishing at multiple locations along the Project's route." But "[t]he Section 408 EA discusses the effects of an oil spill on aquatic life, birds, mammals, and wild rice. . . . And the Section 404 EA indicates that the Corps undertook 'robust coordination with Tribes to ensure mitigative measures would be taken to reduce any adverse effects to tribal resources.'" Doc. 40 at 25. And the State EIS considers the potential impact of a spill on subsistence fishing (*see, e.g.,* AR154354), including with respect to the Ojibwe people (*see, e.g.,* AR154356), and includes mitigation measures to address any such release. For example, the proposed mitigation measures included in the State EIS's EJ discussion recognize that: "If a release occurs, the most important actions to reduce environmental impacts are to minimize the size and spread of the release by implementing a rapid, coordinated, and effective spill response based on an established action plan." AR154358. Chapter 10 of the State EIS evaluates potential impacts from "Accidental Crude Oil Releases," including potential impacts to fish,[9] and Section 10.5 provides information on Crude Oil Release Prevention Programs and Measures, Emergency Response Planning and Preparedness, and Initial Oil Spill Containment and Response Methods. *See* AR154290-299.

The Section 408 EA also examines spill prevention, detection, and response measures,

---

[9] *See* AR154248. *See also* AR154255 ("Direct impacts on tribal resources could occur by direct damage to archaeological and historic resources or secondary damage during clean-up activities. . . . Temporary access limitations are possible, especially during response efforts. In general, tribal resources related and/or in close proximity to surface waters have the most potential to be affected by oil releases. Surface water-related resources of particular concern are fisheries and wild rice harvest areas.").

25

including with respect to "remote locations, aquatic environments, and winter conditions." AR002553.  Upon review of the Section 408 EA, this Court stated that it "addresses the effects of a potential oil release," and the "preventative and mitigative measures would reduce the risk of a spill leading to significant harm . . . sufficiently demonstrat[ing] that the Corps accurately identified and took a 'hard look' at the risk and effects of oil spills and considered those risks against the measures in place to prevent, detect, and respond to spills."  Doc. 40 at 22.

Contrary to the RLB Plaintiffs' claims, the Corps' approach was not arbitrary or capricious.  The Corps considered the potential EJ impacts of its authorization on Tribal resources, including the extent to which the Project would interfere with the Tribes' subsistence resources and rights.  Based on this review, its extensive consultation with Tribes, and the implementation of mitigation measures, the Corps has satisfied its obligation under NEPA to take a "hard look" at potential impacts to EJ communities, including the Plaintiff Tribes.[10]

## III.   The Corps properly concluded that the Project was not "highly controversial."

In deciding whether an EIS is required—that is, whether a federal action will significantly impact the environment—the agency considers at least ten factors, including "the degree to which" an environmental impact is "highly controversial."  40 C.F.R. § 1508.27(b)(1)–(10).[11]  The Corps applied these factors here and concluded that the construction-related impacts

---

[10] Notably, other Tribes—specifically the Fond du Lac Band of Lake Superior Chippewa and Leech Lake Band of Ojibwe—support the Project.  *See* AR012112 (The Commission found it significant that the Leech Lake Band urged the Commission "to grant the certificate of need and remove the risks to its reservation lands posed by Existing Line 3."); AR094313 ("we certify that there is reasonable assurance that activities associated with the proposed project will be conducted in a manner that will not violate the Fond du Lac Band of Lake Superior Chippewa Water Quality Standards."); AR000466 (Fond du Lac concurring with Corps that "the Federal undertaking, as it is currently proposed, would not adversely affect historic properties").

[11] CEQ published new NEPA regulations on July 16, 2020, which became effective on September 14, 2020.  85 Fed. Reg. 43,304 (July 16, 2020).  The new regulations, which were not applied to the Corps' analysis, eliminate the consideration of "controversy," because the concept is "subjective and is not dispositive of effect' significance."  *Id.* at 43,322.

to WOTUS and one federal public-works project could be adequately assessed in an EA. AR000475.  The Corps noted that the Commission-approved State EIS disclosed information regarding effects of the overall Project and used that information in analyzing effects within the Corps' regulatory authority.  *Id.*

The RLB Plaintiffs argue (at 26), however, that "the Project is highly controversial and requires an EIS" because "the Corps did not fully analyze the project's effects" and left "substantial" criticisms unaddressed.  (citing *Standing Rock Sioux Tribe*, 985 F.3d 1032, 1046 (D.C. Cir. 2021)).  The RLB Plaintiffs are wrong.

"Highly controversial" is a term of art that refers to "a substantial dispute" about "the size, nature, or effect of the major federal action."  *Town of Cave Creek v. FAA*, 325 F.3d 320, 331 (D.C. Cir. 2003).  The RLB Plaintiffs (at 20) cite *Nat'l Parks Conservation Ass'n v. United States*, 177 F. Supp. 3d 1, 33 (D.D.C. 2016), where this Court concluded the proposed action was not "highly controversial" because plaintiffs failed to identify any scientific criticism of the agency's analysis.  Indeed, controversy does not refer to the "existence of opposition to a use." *Town of Cave Creek*, 325 F.3d at 331.  And this factor does not create a "heckler's veto."  *See, e.g., N.C. v. FAA*, 957 F.2d 1125, 1133–34 (4th Cir. 1992).  To be "highly controversial," more is required "besides the fact that some people may be highly agitated and be willing to go to court over the matter."  *Fund for Animals v. Frizzell*, 530 F.2d 982, 988 n.15 (D.C. Cir. 1975).[12]

---

[12] *National Parks Conservation Association v. Semonite*, where the D.C. Circuit concluded that a power line project involving towers across the James River near historic Jamestown was "highly controversial," is distinguishable.  916 F.3d 1075, 1085-86 (D.C. Cir. 2019).  In *Semonite*, the project had been met by "consistent and strenuous opposition" by "highly specialized governmental agencies and organizations." *Id.* at 1085, 1086.  Those criticisms, the D.C. Circuit found, identified flaws in the agency's methods.  *Id.* at 1083–84.  In response, the Corps directed the project proponent to revise its "photo simulations," *id.* at 1080, 1086, but then dismissed the controversy as "inherently subjective."  *Id.* at 1081.  The D.C. Circuit disagreed, finding that the agency had "failed to make a 'convincing case' that an EIS is unnecessary."  *Id.* at 1087.  Importantly, it was not the mere existence of opposition that rendered

Otherwise, mere "opposition"—"not the reasoned analysis set forth in an environmental assessment"—"would determine whether an [EIS] would have to be prepared." *N.C.*, 957 F.2d at 1133–34.  Controversy, by itself, cannot dictate whether an EIS is required.  *Town of Marshfield v. FAA,* 552 F.3d 1, 5 (1st Cir. 2008); *Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1181 (10th Cir. 2012).

The criticisms and disputes the RLB Plaintiffs identify fall well short of the "highly controversial" threshold.  To begin, complaints about the Corps' consideration of effects beyond the limited scope of its review do not qualify.  *See supra* at 14-21.  The Corps need not prepare an EIS to resolve controversies NEPA does not require it to engage.

The only specific criticism the RLB Plaintiffs say went unaddressed concerns the State-prepared oil spill analysis.  To the extent that controversy is within the Corps' purview at all, it has been resolved.  DOC-EERA revised its spill analysis, the Commission relied on it, and the Minnesota Court of Appeals affirmed it.  *Enbridge*, 2021 WL 2407855,*8-10.   The Corps was not required to duplicate that analysis.  *See* Doc. 40 at 24 ("[T]he Corps was not required to duplicate studies or analyses already completed by the state (or even the permit applicant itself) to consider the risks of oil spills in its own EA.").  Beyond that one example, the RLB Plaintiffs simply quote from *Standing Rock* and suggest that case stands for the sweeping proposition that an EIS must be required whenever a Tribe objects to the Corps' analysis.

The D.C. Circuit's holding in *Standing Rock* is not so broad.  In that case, the D.C. Circuit considered whether the Corps was required to prepare an EIS when granting the Dakota Access Pipeline (DAPL) an easement to cross Lake Oahe.  985 F.3d at 1054.  The court

---

the Corps' decision in *Semonite* "arbitrary and capricious," but rather the absence of a "well-reasoned explanation" for why the action was not "highly controversial."  *Indiana Forest Alliance v. U.S. Forest Serv.*, 325 F.3d 851, 858 (7th Cir. 2003).  Here, nothing qualifies as "highly controversial," and the Corps has provided a reasoned explanation for its FONSI.

concluded that the effects of the easement were "likely to be highly controversial" due to unresolved criticisms of the Corps' analyses of: (i) the effectiveness of DAPL's leak detection system, (ii) the operator's safety record, (iii) the effect of harsh North Dakota winters on oil spill response efforts, and (iv) worst-case discharge estimates in the oil spill analysis.

This case differs from *Standing Rock* in key respects.  <u>First</u>, and most fundamentally, no legitimate controversy remains.  State agencies addressed effects from potential leaks and spills, and cured any shortcomings.   There was no such robust State analysis in *Standing Rock.*

<u>Second</u>, the Corps easement at issue in *Standing Rock* granted the permanent occupation of federal property, and gave the Corps considerably greater power over the operation of the proposed pipeline.  By contrast, the Permit at issue here involves almost exclusively temporary construction related impacts, and the Corps' regulatory authority and jurisdiction is limited to those construction-related impacts to aquatic resources.

<u>Third</u>, the record here is replete with documentation of the extensive Tribal consultation that occurred throughout the permitting process.  *See*, *e.g*., AR000400-401, AR000456-472, AR001026.  For example, the section 408 EA "discuss[es] the effects of an oil spill on aquatic life, birds, mammals, and wild rice," and "indicates that the Corps undertook 'robust coordination with Tribes to ensure mitigative measures would be taken to reduce any adverse effects to tribal resources.'"  Doc. 40 at 25 (citing AR000474).  The Corps took seriously its obligations to consult with the Tribes, and the substantial well-documented Tribal consultation that took place here is clearly distinguishable from the issues Tribes raised in *Standing Rock*.[13]

<u>Finally</u>, unlike *Standing Rock* and *Semonite*, no criticism has been levied here by "highly

---

[13] In *Standing Rock,* the Tribes submitted a critique from an expert pipeline consultant who concluded that the EA was "seriously deficient and [could not] support the finding of no significant impact, even with the proposed mitigations."  No such critique exists here.

specialized governmental agencies." 916 F.3d at 1085–86. No federal agencies have voiced

concern regarding the Project. To the contrary, the Corps worked closely with the U.S. Fish and

Wildlife Service, Bureau of Indian Affairs, EPA, consulting Tribes, and State agencies when

analyzing proposed construction impacts to aquatic resources and to other public interest factors

within the scope of its regulatory purview, and made modifications to respond to comments

raised by the State agencies. AR000477.

Even if Plaintiffs had identified expert criticism not addressed by the Corps (which they

have not), the Corps' "evaluati[on]" of "scientific data" is entitled to an "extreme degree of

deference," *Nat'l Comm. For New River v. FERC*, 373 F.3d 1323, 1327 (D.C. Cir. 2004),

especially because it implicates "a high level of technical expertise." *Marsh v. Or. Nat. Res.

Council*, 490 U.S. 360, 377 (1989). Thus, when "specialists express conflicting views, an

agency must have discretion to rely on the reasonable opinions of its own qualified experts even

if, as an original matter, a court might find contrary views more persuasive." *Id.* at 378. Indeed,

scientific disputes are "part of the everyday existence" of agencies like the Corps, and NEPA

does not demand "scientific unanimity in order to support a FONSI." *Indiana Forest All. v. U.S.

Forest Serv.*, 325 F.3d 851, 861 (7th Cir. 2003).

The Corps rationally concluded that the effects of its action are not 'highly

controversial," and this conclusion is supported by the record. The RLB Plaintiffs' arguments to

the contrary lack merit.

## <u>CONCLUSION</u>

For the foregoing reasons and the reasons identified in the Corps' brief, the Court should

deny Plaintiffs' motions for summary judgment, and grant the Enbridge and Corps cross-

motions.

Dated: June 23, 2021                              Respectfully submitted,


                                                  /s/ George P. Sibley, III

                                                  George P. Sibley, III (D.C. Bar No. 1011939)
                                                  Deidre G. Duncan (D.C. Bar No. 461548)
                                                  Karma B. Brown (D.C. Bar No. 479774)
                                                  Brian Levey (D.C. Bar No. 1035683)
                                                  HUNTON ANDREWS KURTH LLP
                                                  2200 Pennsylvania Avenue, N.W.
                                                  Washington, DC 20037-1701
                                                  (202) 955-1500
                                                  gsibley@huntonAK.com
                                                  dduncan@huntonAK.com
                                                  kbbrown@huntonAK.com
                                                  blevey@huntonAK.com

                                                  ATTORNEYS FOR DEFENDANT-
                                                  INTERVENOR, ENBRIDGE ENERGY, LIMITED
                                                  PARTNERSHIP.