**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| RED LAKE BAND OF CHIPPEWA INDIANS, *et al.*, | |
| Plaintiffs, | |
| v. | |
| UNITED STATES ARMY CORPS OF ENGINEERS, | Civil Action No. 20-3817 (CKK) |
| Defendant, | |
| ENBRIDGE ENERGY, LIMITED PARTNERSHIP, | |
| Defendant-Intervenor. | |
| FRIENDS OF THE HEADWATERS, | |
| Plaintiff, | |
| v. | |
| UNITED STATES ARMY CORPS OF ENGINEERS, *et al.*, | Civil Action No. 21-0189 (CKK) |
| Defendants, | |
| ENBRIDGE ENERGY, LIMITED PARTNERSHIP, | |
| Defendant-Intervenor. | |

**MEMORANDUM OPINION**
(October 7, 2022)

This consolidated action arises from the United Army Corps of Engineers' (the "Corps") issuance of a permit to Intervenor-Defendant Enbridge Energy, Limited Partnership ("Enbridge"), authorizing Enbridge to discharge dredged and fill material into waters of the United States under Section 404 of the Clean Water Act and to cross waters protected by the Rivers and Harbors Act in its replacement of sections of the Line 3 oil pipeline in Minnesota.  Plaintiffs Red Lake Band of

Chippewa Indians, White Earth Band of Ojibwe, Honor the Earth, Sierra Club, and Friends of the

Headwaters (collectively, "Plaintiffs") allege that the Corps' decision to issue these permits

violated the National Environmental Policy Act, the Clean Water Act, the Rivers and Harbors Act,

and the Corps' permitting regulations.

Presently before the Court are the parties' cross-motions for summary judgment.  Upon

consideration of the pleadings,[1] the relevant legal authorities, and the administrative record,[2] the

---

[1] The Court's consideration has focused on the following:

- Memorandum of Points and Authorities in Support of Plaintiff Friends of the Headwaters' Motion for Summary Judgment ("FOH's Mot."), ECF No. 52;
- Memorandum in Support of Plaintiffs Red Lake Band of Chippewa Indians, White Earth Band of Ojibwe, Honor the Earth and Sierra Club's Motion for Summary Judgment ("RLB Pls.' Mot."), ECF No. 53-1;
- Memorandum in Support of Federal Defendants' Cross-Motion for Summary Judgment and Response in Opposition to Plaintiffs' Motions for Summary Judgment ("Fed. Defs.' Opp'n & Cross-Mot."), ECF No. 61-1;
- Intervenor Defendant Enbridge Energy, LP's Memorandum in Support of Cross-Motion for Summary Judgment and in Opposition to Plaintiffs' Motions for Summary Judgment ("Enbridge's Opp'n & Cross-Mot."), ECF No. 63-1;
- Plaintiffs' Opposition to Defendant's and Defendant-Intervenor's Cross-Motions for Summary Judgment and Reply in Support of Plaintiffs' Motion for Summary Judgment ("RLB Pls.' Reply & Opp'n"), ECF No. 65;
- Reply Brief of Plaintiff Friends of Headwaters in Support of its Motion for Summary Judgment and in Opposition to Defendants' Motions for Summary Judgment ("FOH's Reply & Opp'n"), ECF No. 67;
- Federal Defendants' Reply in Support of their Cross-Motion for Summary Judgment ("Fed. Defs.' Reply"), ECF No. 69;
- Intervenor Defendant Enbridge Energy, Limited Partnership's Reply Memorandum in Support of Cross-Motion for Summary Judgment ("Enbridge's Reply"), ECF No. 70; and
- Brief of *Amicus Curiae* Congregations Caring for Creation d/b/a Minnesota Interfaith Power & Light and Youth N' Power in Support of Plaintiffs ("*Amicus* Br."), ECF No. 72.

In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision.  *See* LCvR 7(f).

[2] In accordance with Local Civil Rule 7(n), the parties have filed a Joint Appendix containing "copies of those portions of the administrative record that are cited or otherwise relied upon" in their pleadings.  LCvR(n); *see* ECF Nos. 73, 74, 77.  Citations to the administrative record shall

Court concludes that the Corps complied with its obligations to assess the environmental consequences associated with its permits to Enbridge.  Accordingly, the Court **DENIES** Plaintiffs' Motions for Summary Judgment (ECF Nos. 52, 53) and **GRANTS** Federal Defendants' and Intervenor Defendant Enbridge's Cross Motions for Summary Judgment (ECF Nos. 61, 63)

## I.   BACKGROUND

**A.  Statutory and Regulatory Background**

   **1.  National Environmental Policy Act**

   The National Environmental Policy Act ("NEPA") requires the federal government to "identify and assess in advance the likely environmental impact of its proposed actions, including its authorization or permitting of private actions."  *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 36 (D.C. Cir. 2015) ("*Flanagan South Pipeline*") (citing *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756–57 (2004)).   "NEPA's mandate, which incorporates notice and comment procedures serves the twin purposes of ensuring that (1) agency decisions include informed and careful consideration of environmental impact, and (2) agencies inform the public of that impact and enable interested persons to participate in deciding what projects agencies should approve and under what terms."  *Id.* at 36–37 (citing *Pub. Citizen*, 541 U.S. at 768).  NEPA accomplishes these purposes by requiring agencies to take a "'hard look' at their proposed actions' environmental consequences in advance of deciding whether and how to proceed."  *Id.* at 37 (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350–51 (1989)).

   NEPA is a "purely procedural statute."  *Oglala Sioux Tribe v. U.S. Nuclear Regulatory Comm'n*, 45 F.4th 291, 299 (D.C. Cir. 2022).  It "does not mandate particular results," but prohibits

---

include the pages numbers corresponding to the Joint Appendix ("JA") and Administrative Record ("AR").

"uninformed—rather than unwise—agency action." *Robertson*, 490 U.S. at 350–51. "Agency actions with adverse environmental effects can thus be NEPA compliant where 'the agency has considered those effects and determined that competing policy values outweigh those costs.'" *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 113 (D.D.C. 2017) ("*Standing Rock 2017*") (quoting *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 191 (4th Cir. 2009)).

NEPA's "major action-forcing provision . . . is the requirement that all agencies of the Federal government prepare a detailed environmental analysis"—an Environmental Impact Statement ("EIS")—for "major Federal actions *significantly* affecting the quality of the human environment." *Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 146 (D.C. Cir. 1985) (emphasis added) (internal quotation marks omitted) (quoting 42 U.S.C. § 4332(C)). An EIS must assess the action's anticipated "direct and indirect environmental effects," and consider "alternatives that might lessen any adverse environmental impact." *Flanagan South Pipeline*, 803 F.3d at 37 (citing 42 U.S.C. § 4332(C); 40 C.F.R. § 1508.11[3]). "If *any* significant environmental impacts *might* result from the proposed agency action, then an EIS must be prepared *before* the agency action is taken." *Grand Canyon Trust v. FAA*, 290 F. 3d 339, 340 (D.C. Cir. 2002) (quoting *Sierra Club v. Peterson*, 717 F.2d 1409, 1415 (D.C. Cir. 1983)).

If it is unclear whether an action will "significantly affect[ ] the quality of the human environment," the federal agency may prepare an Environmental Assessment ("EA"). *Theodore*

---

[3] The Council on Environmental Quality ("CEQ') promulgated regulations implementing NEPA in 1978, *see* 43 Fed. Reg. 55,978 (Nov. 29, 1978), and amended those regulations in 1986, *see* 51 Fed. Reg. 15618 (Apr. 25, 1986). CEQ published a new rule, effective September 14, 2020, further revising these regulations. Because the claims at issue in this case arise under the 1978 regulations, as amended in 1986, all citations to the CEQ regulations in this Memorandum Opinion refer to those regulations as codified at 40 C.F.R. Part 1500 (2018), *available at* https://www.govinfo.gov/content/pkg/CFR-2018-title40-vol37/pdf/CFR-2018-title40-vol37-chapV.pdf.

*Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 503 (D.C. Cir. 2010) (internal citations and quotation marks omitted).  An EA is "essentially, a preliminary consideration of potential environmental effects in a concise public document, designed to provide sufficient evidence and analysis for determining whether an EIS is needed." *Flanagan South Pipeline*, 803 F.3d at 37 (internal citations and quotation marks omitted); 40 C.F.R. §§ 1501.4(c), 1508.9(a).  An EA must include "brief discussions of the need for the proposal, of alternatives[,]" and "of the environmental impacts of the proposed action and alternatives[.]"  40 C.F.R. § 1508.9(b).

To determine whether a federal action will "significantly" affect the quality of the environment, the agency must consider the "context and intensity" of the proposed action and must address both "direct" and "indirect" caused by the proposed action.  40 C.F.R. §§ 1508.8, 1508.27. Indirect effects include those "caused by the actions and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b).  An effect is "reasonably foreseeable" if a "person of ordinary prudence would take it into account in reaching a decision." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1050 (D.C. Cir. 2021) ("*Standing Rock 2021*") (quoting *City of Shoreacres v. Waterworth*, 420 F.3d 440, 453 (5th Cir. 2005)).

If the agency determines based on its EA that an EIS is *not* required, the agency must issue a "finding of no significant impact ("FONSI"), which "briefly presents the reasons why the proposed agency action will not have a significant impact on the human environment." *Pub. Citizen*, 541 U.S. at 757–58 (internal citations omitted).  "Each form of NEPA analysis— EA/FONSI or EIS—requires public notice and comment, . . . and each is subject to judicial review." *Flanagan South Pipeline*, 803 F.3d at 37–38 (citing *Pub. Citizen*, 541 U.S. at 763–64; *Grand Canyon Trust*, 290 F.3d at 340–42).

### 2. Clean Water Act

The Clean Water Act ("CWA") seeks to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" and to "increase the quality and quantity of the Nation's wetlands."  33 U.S.C. §§ 1251(a), 2317(a).  The CWA, therefore, prohibits the discharge of dredged or fill materials into navigable waters of the United States absent authorization by the Corps pursuant to Section 404, 33 U.S.C. § 1344.  Section 404 of the CWA assigns the Corps jurisdiction to issue permits authorizing the discharge of fill material into "navigable waters."  33 U.S.C. §§ 1342(a)(1), (4), 1344(a); *see Flanagan South Pipeline*, 803 F.3d at 38.  The Corps' permitting authority also extends to "wetlands adjacent to navigable waters."  *Nat'l Ass'n of Mfrs. v. Dep't of Defense*, 138 S. Ct. 617, 625 (2018) (citing *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 132 (1985)); *see also* 33 C.F.R. § 328.3(a)(4) ("For the purposes of the Clean Water Act . . . the term 'waters of the United States' means . . . adjacent wetlands.").

Before the Corps issues a Section 404 permit, it must determine that there is "no practicable alternative" to the proposed activity "which would have less adverse impact on the aquatic ecosystem."  40 C.F.R. § 230.10(a).  A practicable alternative is one which is "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes."  *Id.* § 230.10(a)(2).  If there is any practicable alternative that would have a lesser impact on the aquatic ecosystem, the Corps must deny the application permit. *Id.* § 230.10(a).  The Corps must also evaluate the "probable impacts" of the proposed activity and will grant the permit "unless the district engineer determines that [the activity] would be contrary to the public interest."  33 C.F.R. § 320.4(a)(1).

### 3. Rivers and Harbors Act

Section 10 of the Rivers and Harbors Act prohibits structures and activities that would obstruct navigable waters unless "the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army[.]" 33 U.S.C. § 403. Section 14 of the RHA— commonly referred to as "Section 408"—provides that actions impairing "work[s] built by the United States" require authorization by the Corps. 33 U.S.C. § 408; 33 C.F.R. § 320.2(e).

### B. Factual Background

Intervenor-Defendant Enbridge sought the permits challenged by Plaintiffs in this action to replace portions of its "Line 3" oil pipeline, which transports crude oil from Edmonton, Alberta to Superior, Wisconsin, traversing portions of North Dakota and Minnesota. *See* JA 29/AR 351. Originally constructed in the 1960s, "Existing Line 3" suffers from corrosion and integrity issues, including a "large number of identified pipe defects and anomalies." JA 41/AR 363. Due to safety and integrity concerns, such as "stress corrosion cracking and long-seam cracking," Enbridge reduced the capacity of Existing Line 3 from its historical average of 760,000 barrels/day to 390,000 barrels/day. *See* JA 41, 46/AR 363, 368. According to Enbridge, maintaining Existing Line 3 in that condition would require approximately 6,250 "integrity digs" over the next 15 years which would be "nearly equal" to the cost of replacing the pipeline, and would result in "year-over-year impacts" to landowners and the environment. JA 41/AR 363.

In 2017, Enbridge entered a Consent Decree with the federal government, obligating Enbridge to "seek all approvals necessary for the replacement of [Existing] Line 3" and upon receipt of those approvals, to "complete the replacement of [Existing Line 3] and take [Existing] Line 3 out of service . . . as expeditiously as practicable." *See* Consent Decree, ECF No. 14, *United*

*States v. Enbridge Energy Ltd. P'ship*, No. 16-cv-914 (W.D. Mich. May 23, 2017).[4]  To comply with its obligation to decommission Existing Line 3, Enbridge developed plans to  construct a new pipeline—"Replacement Line 3."  *See* JA 30/AR 352.

Enbridge's Replacement Line 3 will replace the existing 34-inch-diameter pipeline with a 36-inch-diameter pipeline. JA  46/AR  368.  Whereas  Existing  Line  3  was  transporting "predominantly light crude" oil, Replacement Line 3 can carry "heavy, light, and mixed service." *Id*.  Replacement Line 3 would also enable Enbridge to transport a higher capacity of crude oil than Existing Line 3 was transporting once Enbridge reduced its capacity.  JA 41–42, 46/ AR 363–64, 368 (indicating that Replacement Line 3 would "restor[e] the capacity of the pipeline to its historic operating capacity of 760,000 bpd").

At issue here is the replacement of approximately 282 miles of existing pipeline in Minnesota with 330 miles of new pipeline and associated facilities (the "Project").  JA 253/AR 2812.  Approximately 90% of the Project is "co-located with other Enbridge pipelines, third-party pipelines, roads, railroads, or highways."  JA 33/AR 355.  But the remainder of the route crosses a new corridor.  JA 33/AR 355.  Unlike the existing route, the new corridor avoids the Chippewa National Forest and the Leech Lake and Fond du Lac Bands of Chippewa Indians' Reservations. JA 47, 49/AR 369, 371.

### 1.   State Administrative Proceedings

The  Project  has  undergone  extensive  state  administrative  proceedings.  *See, e.g.*, JA 34–37/AR 356–59 (providing timeline of "Project History); JA 938–41/AR 12098–101 (summarizing  procedural  posture  of  state  proceedings).    The  Minnesota  Public  Utilities

---

[4] The Consent Decree arises from a Complaint against Enbridge in 2010 "as the result of unlawful discharges of oil from two Lakehead System pipelines." *See* Consent Decree at 1.

Commission ("MPUC") is responsible under state law for certifying the need for oil pipelines and approving the route. *See* Minn. Stat. §§ 216B.243, 216G.02. Enbridge submitted applications for a Certificate of Need and Route Permit on April 24, 2015. *See* JA 1698/AR 144837; JA 1801/AR 146430. The MPUC and the Minnesota Department of Commerce, Energy Environmental Review and Analysis ("DOC-EERA") conducted public information meetings along Enbridge's proposed routes and solicited public comments. JA 1700/AR 144839; JA 1802/AR 146431. In February 2016, the MPUC granted contested case proceedings, which were held in the fall of 2017 and included sixteen public hearings in eight cities and two weeks of evidentiary hearings. JA 1802–03/AR 146431–32. Plaintiffs in this action participated in the contested case proceedings. JA 1803/AR 146433. In April 2018, the state ALJ issued a report recommending a route and associated proposed conditions. JA 1804/AR 146433.

While the MPUC oversaw route proposals, DOC-EERA developed an Environmental Impact Statement ("State EIS") pursuant to Minnesota's Environmental Policy Act, Minn. Stat § 116D.01-.11, which mandates preparation of an EIS for Certificate of Need and Route Permit proceedings, *see In re Enbridge Energy, Ltd. P'ship*, 930 N.W.2d 12, 20 (Minn. Ct. App. 2019). DOC-EERA issued its first draft of the State EIS on May 15, 2017 for public comment. JA 34/AR 356. The agency held 22 public information meetings and "considered thirty possible route combinations." *See* Declaration of Barry Simonson ("Simonson Decl.") ¶ 25, ECF No. 28-1; *see also* JA 1708–16/AR 144847–55 (examining route alternatives). The State EIS includes sections examining alternatives to the proposed project, *see* JA 6445–6488 (State EIS Chapter 4, "Alternatives to the Proposed Project"),[5] and analyzing issues related to the accidental release of

---

[5] The State EIS was included via hyperlink as part of the Administrative Record, JA 1061/AR 56840, but were "not produced with original or revised administrative record in this proceeding, and therefore lack administrative record pagination." *See* ECF No. 73, at (vi).

crude oil, *see* JA 3451–3621/AR149745–915 (State EIS Chapter 10, "Accidental Crude Oil Releases").

DOC-EERA finalized its EIS on February 12, 2018—which was "found adequate" by the MPUC on May 1, 2018. *See* JA 939/AR 12099. MPUC held oral argument regarding the Project Route, and then issued its approved route in October 2018. *See* JA 1698–1745/AR 144837–84. According to Enbridge, the route approved by the MPUC "captured numerous modifications to Enbridge's originally proposed route to minimize potential effects of the project on cultural and environmental resources." Simonson Decl. ¶ 26.

Plaintiffs challenged the State EIS and route determination in the Minnesota Court of Appeals, contesting the adequacy of the State EIS under state law. *See In re Enbridge Energy, Ltd. P'ship*, 930 N.W.2d 12 (Minn. Ct. App. 2019). The court concluded that the MPUC correctly found that the State EIS was adequate—except that the oil spill model upon which the State EIS relied failed to address the impact of an oil spill on the Lake Superior watershed. *Id.* at 28, 36. The court, therefore, remanded to MPUC for further proceedings. *Id.* at 36. DOC-EERA prepared a revised State EIS in accordance with the court's order and issued its revised analysis for public notice and comment. *See* JA 940–41/AR 12100–01. MPUC issued an Order on May 1, 2020 finding the revised State EIS adequate, and approving the Certificate of Need and Route Permit for the Project. *See* JA 941–43/AR 12101–03.

Plaintiffs again challenged the MPUC's Order and filed for a stay on November 25, 2020. The MPUC denied the motion in December 2020. *See* Order Denying Motion for Stay Pending Appeal, *In the Matter of the Applications of Enbridge Energy*, *LP*, Docket Nos. PL-9/CN-14-916, PL-9/PPL-15-137, PL-9/C-20-801 (MPUC Dec. 9, 2020) (ECF No. 28-2). Plaintiffs then sought a stay pending appeal from the Minnesota Court of Appeals, which the court denied on February

2, 2021.  *See* Order, *In the Matter of the Application of Enbridge Energy, LP*, A20-1071, 1072,

1074, 1075, 1077 (Minn. Ct. App. Feb. 2, 2021).   In a decision dated June 14, 2021, the Minnesota

Court of Appeals upheld the revised State EIS.   *In the Matter of Enbridge Energy, Limited

Partnership*, 964 N.W.2d 173 (Minn. Ct. App. 2021).

   **2.  The Corps' Environmental Assessment and Permits**

   Because the path of the Project involves crossing 227 waterways, Enbridge was also

required to obtain a permit from the Corps to authorize the discharge of dredged or fill materials

into "waters of the United States" under Section 404 of the Clean Water Act.  The Project also

crosses the Corps' Lost River Flood Control Project, which required Enbridge to obtain an

authorization from the Corps under Section 408 of the Rivers and Harbors Act.

   Enbridge first applied for an individual CWA permit in 2015 and submitted a revised

application on September 21, 2018.  JA 34–35, 42/AR 357–58, 364.  On December 20, 2018, the

Corps issued a Public Notice for the Section 404 permit and Section 408 authorization, which was

followed by a 60-day period for comments.  JA 42–43/AR 364–65.  After this first public notice

and comment period, the Corps requested additional information from Enbridge in October 2019

regarding concerns about wetland impact, construction methods, impact minimization, post-

construction monitoring, and compensatory mitigation.   JA 36–37/AR 358–59.  Following

Enbridge's submission of additional information in December 2019, the Corps issued another

public notice seeking comment on these revisions on February 4, 2020.  JA 37, 43/AR 359, 365.

   The Corps prepared an Environmental Assessment and Statement of Findings.  JA 24–

153/AR 347–475.   Therein, the Corps indicates that Enbridge was seeking a permit for

"construction-related activities in waters of the U.S. associated with the proposed Project."  JA

29/AR 351.  The Corps summarized the "purpose" of the Project as replacing an "existing crude

oil pipeline to increase safety of transporting crude oil and to ensure continued reliable crude oil transportation[.]" JA 42/AR 364.  "A total of 227 waterbodies would [be] crossed by the Project," 95 of which are "[d]itches" (many of which are "roadside ditches") and 132 of which are "streams."  JA 30/AR 352.  Noting that it "does not regulate the siting of pipelines, nor any substance being transported within a pipeline," the Corps framed the scope of its environmental assessment as relating to "the specific activity requiring a Department of the Army permit."  *Id.* According to the Corps, such "construction activities would involve "temporary discharges of fill material into 1,049.58 acres of wetlands, 1.13 acres of streambed, and permanent discharges of fill material into 9.97 acres of wetlands."  JA 29/AR 351.  As a result, "[a]pproximately 130.21 acres of the total acres temporarily impacted would be permanently converted from a forested or scrub-shrub vegetation community to an herbaceous vegetation community."  JA 29/AR 351.

Based on its EA, the Corps concluded that issuing the Section 404 permit would not "have significant impacts on the quality of the human environment."  *Id.* at 128.  The Corps, therefore, did not produce an EIS for the Project. Appended to the Corps' Section 404 EA is an additional EA pursuant Section 408 of the RHA ("Section 408 EA")—regarding the authorization for the Project to cross the Lost River Flood Control Project.  *See* JA 232–52/AR 2536–56.

On November 23, 2020, the Corps granted Enbridge a CWA Section 404 permit, which provides:

> [Enbridge is] authorized to temporarily discharge dredged and fill material into 1,050.71 acres of waters of the U.S., including wetlands and waterbodies, and permanently discharge fill material into 9.97 acres of waters of the U.S for construction activities, as described in the November 2020 Environmental Protection Plan incorporated into this authorization, associated with the Line 3 Replacement Project.

JA 0017–24/AR 339–46; *see also* JA 0010/AR 332.  The Corps also authorized Enbridge under Section 408 of the RHA to "alter the Lost River, Minnesota Flood Control Project" through "installation of a 36-inch diameter pipeline[.]" JA 0012–16/AR 334–38.  The Corps' authorization was "contingent on the permittee's compliance with all conditions stated in the permit and its attachments." *Id.*

Construction on the Project began around December 1, 2020.  *See* Simonson Decl. ¶¶ 56–57.  As of October 4, 2021, Enbridge had completed the discharge activities authorized by the Corps.  *See* Enbridge's Notice of Suppl. Auth. at 2, ECF No. 84.[6]

## C.  Procedural Background

### 1.  *Red Lake Band of Chippewa Indians et al. v. U.S. Army Corps of Engineers*, Case No. 20-cv-3817-CKK

Plaintiffs Red Lake Band of Chippewa Indians, White Earth Band of Ojibwe, Honor the Earth, and Sierra Club (together, "Red Lake Band Plaintiffs") filed their [1] Complaint against Defendant United States Army Corps of Engineers on December 24, 2020.  Red Lake Band Plaintiffs' four-count Complaint alleges that the Corps: (1) failed to adequately consider the direct, indirect, and cumulative impacts of its permit under NEPA,  Red Lake Band Pls.' Compl. ¶¶ 183–95; (2) violated NEPA by failing to prepare an EIS, *id.* ¶¶ 196–203; (3) violated the CWA by failing to "evaluate all relevant factors" and by failing to choose the "least damaging practicable alternative," *id.* ¶¶ 204–10; and (4) conducted an inadequate public interest review, in violation of the CWA, the RHA, and the Corps' own regulations, *id.* ¶¶ 211–17.

---

[6] Completion of these activities does not render this case moot because if the Court were "to hold that [the Corps'] NEPA analysis was inadequate or their decisions otherwise arbitrary and capricious, [it] 'would have to correct the decision-making process.'"  *Flanagan South Pipeline*, 803 F.3d at 43 (quoting *Columbia Basin Land Protection Ass'n v. Schlesinger*, 643 F.2d 585, 591 n.1 (9th Cir. 1981)).  "If the NEPA analysis were legally inadequate, we could order that the [pipeline] be closed or impose restrictions on its use[.]"  *Id.*  (internal citations and quotation marks omitted).

On the same day they filed their Complaint, Red Lake Band Plaintiffs filed a [2] Motion for Preliminary Injunction, in which they sought to "enjoin [the Corps] to withdraw the permit issued on November 23, 2020 authorizing Enbridge Energy to discharge dredged and fill material into 1050.71 acres of waters of the United States for construction activities associated with the Line 3 project."  Red Lake Band Pls.' PI Mot. at 1.  Red Lake Band Plaintiffs argued that preliminary injunctive relief was appropriate based on claims that the Corps had failed to adequately address the effects of potential oil spills, alternative construction routes, and alternative construction methods in granting Enbridge necessary permits to proceed with the construction of Replacement Line 3.  Concluding that Red Lake Band Plaintiffs failed to carry their burden of demonstrating a likelihood of success on the merits and irreparable harm, the Court denied their Motion for Preliminary Injunction on February 7, 2021.  *See Red Lake Band of Chippewa Indians v. U.S. Army Corps of Eng'rs*, Civil Action No. 20-3817 (CKK), 2021 WL 430054 (D.D.C. Feb. 7, 2021).

Without opposition from Red Lake Band Plaintiffs or the Corps, Enbridge moved to intervene as a defendant on January 5, 2021.  *See* Enbridge's Mot. to Intervene, ECF No. 19; Corps' Resp., ECF No. 20; Pls.' Resp., ECF No. 22. The Court granted Enbridge's motion to intervene as of right under Federal Rule of Civil Procedure 24(a).  *See Red Lake Band of Chippewa Indians v. U.S. Army Corps of Eng'rs*, 338 F.R.D. 1 (D.D.C. 2021).

   **2.  *Friends of the Headwaters v. U.S. Army Corps of Engineers et al.*, Case No. 21-cv-189-CKK**

Separately, on January 21, 2021, Plaintiff Friends of the Headwaters ("FOH") filed its own [1] Complaint against Defendants United States Army Corps of Engineers and Col. Karl Jansen, District Engineer of the St. Paul, Minnesota District, alleging various violations of NEPA and the Clean Water Act.   FOH subsequently filed a [13] First Amended Complaint on February 16, 2021.

FOH claims that the Corps violated NEPA by failing to consider various direct, indirect, and cumulative effects of the construction of Line 3 (including the risks and effects of an oil spill and climate change, among others), failing to consider reasonable alternatives, improperly relying on the conclusions of state agencies in its environmental impact analysis, and by concluding that an EIS was not warranted. *See* FOH 1st Am. Compl. ¶¶ 121–57. FOH also alleges violations of the CWA, including that the Corps failed to consider reasonable alternatives, improperly relied on state regulatory decisions, failed to consider greenhouse gas emissions and climate change implications of Replacement Line 3, and conducted an inadequate public interest review. *Id.* ¶¶ 174–85.

Enbridge also moved to intervene as a defendant in this case—again without opposition from FOH or the Corps. *See* Enbridge's Mot. to Intervene, ECF No. 6. The Court granted Enbridge's motion to intervene as of right under Federal Rule of Civil Procedure 24(a). *See Friends of the Headwaters v. U.S. Army Corps of Eng'rs*, Civil Action No. 21-189 (CKK), 2021 WL 1061162 (D.D.C. Mar. 20, 2021).

### 3. Consolidation and Summary Judgment

On March 4, 2021, the Corps moved to consolidate both cases. *See* Corps' Mot. to Consolidate, ECF No. 41. Enbridge consented to the proposed consolidation. All Plaintiffs consented to consolidation, but objected to the Corps' proposal that they be required to file joint briefs. *See* Order at 2, ECF No. 47. The Court granted the Corps' request for consolidation of the two cases on March 22, 2021, and directed the parties to make filings only in Case No. 20-cv-3817. *Id.* The Court further directed that Plaintiffs would not be required to file joint briefs, but must "coordinate to minimize duplication of arguments," and share a specified allotment of pages. *Id.* at 3, 4. In the same order, the Court set a briefing schedule for the parties' proposed summary

judgment motions.  On May 26, 2021, Plaintiffs filed their motions for summary judgment.  *See* FOH's Mot.; RLB Pls.' Mot.  The Corps and Enbridge filed their oppositions and cross-motions to Plaintiffs' motions on June 23, 2021.  Fed. Defs.' Cross-Mot. & Opp'n; Enbridge's Cross-Mot. & Opp'n.  All four motions are ripe for the Court's consideration.

## II.    LEGAL STANDARD

The Administrative Procedure Act ("APA") governs the Court's review of Plaintiffs' NEPA, CWA, and RHA claims.  *See Indian River Cty. v. U.S. Dep't of Transp.*, 945 F.3d 515, 527 (D.C. Cir. 2019) (judicial review of NEPA claim governed by APA); *Sierra Club v. Fed. Energy Regulatory Comm'n*, 867 F.3d 1357, 1367 (D.C. Cir. 2017) ("*Southeast Market Pipelines*") ("[B]ecause NEPA does not create a private right of action, we can entertain NEPA-based challenges only under the [APA] and its deferential standard of review."); *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1278 (D.C. Cir. 2005) (challenge to CWA permit analyzed under APA).

"[W]hen a party seeks review of agency action under the APA [before a district court], the district judge sits as an appellate tribunal.  The 'entire case' on review is a question of law."  *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001).  Accordingly, "the standard set forth in [Federal Rule of Civil Procedure] 56[ ] does not apply because of the limited role of a court in reviewing the administrative record."  *Friends of Animals v. Pendley*, 523 F. Supp. 3d 39, 52 (D.D.C. 2021) (internal citation omitted).  "Summary judgment is [ ] the mechanism for deciding whether as a matter of law the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review."  *Id.* (internal citation omitted).

The APA "sets forth the full extent of judicial authority to review executive agency action for procedural correctness."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009).  A

court must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Agency action is arbitrary and capricious if, for example, the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983).

This a "narrow" standard of review, under which "a court is not to substitute its judgment for that of the agency."  *Standing Rock 2017*, 255 F. Supp. 3d at 121.  However, an agency is still required to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *State Farm*, 463 U.S. at 43 (internal quotation marks omitted).  "Moreover, an agency cannot 'fail[ ] to consider an important aspect of the problem' or 'offer[ ] an explanation for its decision that runs counter to the evidence' before it."  *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 57 (D.C. Cir. 2015) (quoting *State Farm*, 463 U.S. at 43).

## III.   DISCUSSION

### A.  NEPA Claims

Plaintiffs first argue that the Corps' environmental assessment fell short of its obligation under NEPA to take a "hard look" at the Project's consequences and that the Corps' decision not to prepare an EIS was arbitrary and capricious.  RLB Pls.' Mot. at 8–23.  Many of the NEPA deficiencies identified by Plaintiffs hinge on two overarching arguments: first, that the Corps improperly limited the scope of its NEPA review to effects connected to the construction-related activities authorized by its permits (as opposed to effects connected with the construction *and*

*operation* of the entire pipeline); and second, that the Corps improperly relied on the State EIS. The Corps and Enbridge counter that the Corps' environmental analysis was appropriately tailored to the scope of the activities authorized by the Corps; they argue that the Corps' EA sufficiently reviewed the effects associated with those activities and its decision not to prepare an EIS based on its reasonable conclusion that there were no "significant" environmental effects associated with the permitted activities.

Because disputes about the scope of the Corps' NEPA analysis and its use of the State EIS permeate Plaintiffs' arguments about the sufficiency of the Court's analysis, the Court addresses both disputes before turning to Plaintiffs' specific challenges.  Before doing so, however, the Court emphasizes that its role in "reviewing agency compliance with NEPA is . . . *limited.*"  *Southeast Market Pipelines*, 867 F.3d at 1367 (emphasis added).  The Court must "simply ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary and capricious."  *Id.* (quoting *Wildearth Guardians v. Jewell*, 738 F.3d 298, 308 (D.C. Cir. 2013)) (additional citation omitted).

### 1.  Scope of the Corps' NEPA Analysis

The parties dispute the extent to which the Corps was required to consider effects of Replacement Line 3's *operation* as opposed to its *construction*.  The EA's NEPA analysis is limited to environmental effects associated with the "specific activity requiring a Department of the Army permit," JA 38/AR 360—that is, effects related to "construction activities in waters of the United States," Fed. Defs.' Opp'n & Cross-Mot. at 17.  The Corps explicitly stated that its NEPA analysis "does *not* extend to the entire pipeline construction, *or operation*, because the Corps does not have sufficient control and responsibility over the entire project to warrant an expanded analysis."  JA 39/AR 361 (emphasis added); *see also* JA 34/AR 356 ("The Corps . . .

does not have authority over the entire pipeline. . . . [Its] review includes segments of the overall Project comprised of waters where regulated activities would occur[.]"); JA 156/AR 478 ("[The Corps'] regulatory authority and jurisdiction is limited to the construction-related impacts to aquatic resources.").  Plaintiffs argue that this limitation was arbitrary and capricious, and many of its specific challenges to the Corps' NEPA analysis hinge on the Corps' failure to consider effects associated with the *operation* of Replacement Line 3.  *See, e.g.*, RLB Pls.' Mot. at 9, 18.

NEPA requires agencies to take a "hard look" at the environmental consequences of their actions, but "the statute does not specify how an agency should determine the scope of its NEPA analysis."  *Aracoma Coal Co.*, 556 F.3d at 194.  The "selection of the scope" of an agency's NEPA analysis is a "delicate choice and one that should be entrusted to the expertise of the deciding agency."  *Selkirk Conservation All. v. Forsgren*, 336 F.3d 944, 962 (9th Cir. 2003).  The Corps' implementing regulations direct that its NEPA review must "address the impacts of the *specific activity* requiring a [Department of the Army] permit and those portions of the entire project over which the district engineer has sufficient control and responsibility to warrant Federal review." 33 C.F.R. pt. 325, App. B, § 7(b)(1) (2020) (emphasis added).

The Court is satisfied that the scope identified by the Corps was appropriate in light of the activities authorized by its permit.  The EA specifies that the scope of its NEPA analysis relates to "the specific activity requiring a Department of the Army permit," but that "other portions of the Project are included because the Corps does have sufficient control and responsibility to warrant federal review."  JA 38/AR 360.  As previously noted, the "activities" authorized by the Corps' permit include "temporary discharges of fill material into 1,049.58 acres of wetlands, 1.13 acres of streambed, and permanent discharges of fill material into 9.97 acres of wetlands."  JA 29/AR 351.  Consistent with the Corps' NEPA-implementing regulations, the Corps here considered

"[w]hether or not the regulated activity comprises 'merely a link' in a corridor type project[;]"
"[t]he extent to which the entire project will be within Corps jurisdiction;" and "[t]he extent of
cumulative Federal control and responsibility[.]"   33 C.F.R. pt. 325, App. B, § 7(b)(2)(i)–(iv).
Applying those factors, the Corps determined that "almost all regulated activities associated with
the overall project comprise separate crossings that are 'merely links' in a corridor type project.
In other words, much of the corridor project . . . does *not* involve regulated works in the waters of
the U.S"; rather, only "[a]pproximately 24% of the overall project comprises activities in waters
of the U.S."  JA 38/AR 360.  Based on these findings, the Court finds appropriate the Corps'
decision to limit its NEPA analysis to environmental effects arising from the "regulated activities
in waters of the U.S. associated with linear crossings as well as uplands adjacent to, and in some
cases between, waterbodies where the Corps has sufficient control and responsibility to expand its
analysis."  JA 38/AR 360.

The Corps found that it did not have "sufficient control and responsibility" over the entire
project to extend its NEPA review to "the entire pipeline construction, *or operation*," noting that
it "does not regulate the siting of pipelines, nor any substance being transported within a pipeline."
JA 39, 42/AR 361, 364.  This conclusion was consistent with the above-described regulations, as
well as precedent in this jurisdiction.  *See, e.g.*, *Flanagan South Pipeline*, 803 F.3d at 46–48
(concluding that the Corps' "NEPA obligations" arising out of authorized "federal action"
extended "only to the segments under the Corps['] asserted Clean Water Act jurisdiction);
*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 205 F. Supp. 3d 4, 9 (D.D.C. 2016)
("*Standing Rock 2016*") ("[T]his Court cannot conclude here that a federal agency with limited
jurisdiction over specific activities related to a pipeline is required to consider *all* the effects of the
*entire* pipeline to be the indirectly or directly foreseeable effects of the narrower permitted

activity."). The Corps did not act arbitrarily or capriciously in tailoring its NEPA analysis to address the environmental effects associated with the activities it permitted.

### 2. Reliance on State EIS

Throughout its various criticisms of the Corps' NEPA analysis, Plaintiffs also contend that the Corps improperly and "uncritically" relied on the State EIS, signaling that it failed to complete a "critical, independent verification" of the state's environmental analysis. *See, e.g.*, RLB Pls.' Reply & Opp'n at 4. Although Plaintiffs note that NEPA regulations permit cooperation between state and federal agencies, they argue that the record lacks evidence of "formal cooperation" such as "joint planning, joint studies, joint public hearings, or a joint EA" with respect to any oil spill modeling or analysis. *Id.* at 5.

The administrative record belies Plaintiffs' claim about the lack of "coordination" between the Corps and other agencies with regulatory authority over the Project. The EA notes that "the Corps and other regulatory agencies worked collaboratively to leverage expertise and information" due to "multiple agency approvals needed for this Project." JA 27/AR 349. Moreover, in response to public comments raising issues about the Corps' "obligat[ion] to coordinate permit and environmental review with the State review and such review had not happened," the Corps responded that it "coordinated numerous times with state agencies prior to the issuance of the public notice as well as during the review process after public notice. Coordination included participating in weekly agency meetings as well as participating in inter-agency review of specific plans submitted by the applicant." JA 161/AR 483; *see also id.* JA 164/AR 486 ("The Corps participated in many coordination efforts with State agencies during the entire project review.").

The Corps' regulations explicitly direct the district engineer to "whenever practicable, incorporate by reference and rely upon the reviews of other Federal and State agencies." 33 C.F.R.

pt. 325, App. B, § 7(b)(3); *see also* 40 C.F.R. § 1506.2(b) ("Agencies *shall* cooperate with State and local agencies to the fullest extent possible to reduce duplication between NEPA and State and local requirements[.]") (emphasis added).

Moreover, review of relevant caselaw supports the Corps' position that it was not required to duplicate studies or analyses already completed by the state (or even the permit applicant itself) to consider certain effects its activities associated with the Project.  *See, e.g.*, *Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, Civil Action No. 18-23-SDD-EWD, 2020 WL 1450750, at *12 (M.D. La. Mar. 25, 2020) ("[T]he Corps' regulations do not require the Corps to undertake an independent investigation or to gather its own information upon which to base an EA") (quoting *Friends of the Earth v. Hintz*, 800 F.2d 822, 834 (9th Cir. 1986)); *Stop the Pipeline v. White*, 233 F. Supp. 2d 957, 967–68 (S.D. Ohio 2002) ("An agency may fulfill its obligations under NEPA to conduct an independent evaluation of environmental impacts by reviewing and relying on information, data, and conclusions supplied by other federal *or state* agencies." (emphasis added)); *cf. Hoosier Env. Council v. U.S. Army Corps of Eng'rs*, 722 F.3d 1053, 1061 (7th Cir. 2013) ("If another agency has conducted a responsible analysis, the Corps can rely on it in making its own decisions."); *Town of Superior v. U.S. Fish & Wildlife Serv.*, 913 F. Supp. 2d 1087, 1127 (D. Colo. 2012) ("[F]ederal agencies may rely on analyses conducted by state and local governments instead of devoting resources to replicating them.").  Accordingly, the Court finds that it was appropriate for the Corps to evaluate and incorporate the State EIS into its findings, without needing to repeat the state's analysis or discussion.

### 3.  "Hard Look" at Effects of the Project

Turning to Plaintiff's specific challenges to the Corps' environmental assessment, Plaintiffs first contend that the Corps violated NEPA by failing to take a "hard look" at various aspects of the Project—including (a) its contributions to climate change; (b) environmental justice

considerations; (c) Tribal rights to continue using natural resources; (d) effects on species and habitats; and (e) reasonable alternatives.  RLB Pls.' Mot. at 8.  The Court shall examine each concern, but first presents the legal framework applicable to its analysis.

NEPA requires agencies to take a "hard look" at "every significant aspect of the environmental impact of a proposed major federal action."  *Oglala Sioux Tribe*, 45 F.4th at 300 (internal citations and quotation marks omitted).  An agency satisfies its obligation to take a "hard look" at the environmental impacts of a proposed action if its "statement contains sufficient discussion of the relevant issues and opposing viewpoints,' and the agency's decision is 'fully informed' and 'well-considered.'"  *Myersville Citizens for a Rural Cmty. v. Fed. Energy Regulatory Comm'n*, 783 F.3d 1301, 1324–25 (D.C. Cir. 2015) (internal citations omitted).  Although NEPA requires federal agencies to take a "hard look" at the consequences of their actions, it does not obligate the agency to "take one type of action or another."  *Southeast Market Pipelines*, 867 F.3d at 1367 (quoting *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 194 (D.C. Cir.), *cert. denied* 502 U.S. 994 (1991)).  Moreover, an agency is not required to "examine everything for which the [Project] could conceivably be a but-for cause."  *Id.* (citing *Pub. Citizen*, 541 U.S. at 767; *Village of Bensenville v. FAA*, 457 F.3d 52, 65 (D.C. Cir. 2006)).  The agency may limit its review to environmental effects that are "sufficiently likely to occur that a person of ordinary prudence would take it into account in reaching a decision."  *Id.* at 47 (internal citations omitted).  In other words, NEPA "requires a reasonably close causal relationship between the environmental effect and the alleged cause."  *Id.*; *see also Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 774 (1983) (explaining that the terms "environmental effect" and "environment impact" in NEPA should be read to "include a requirement of a reasonably close causal relationship between a change in the physical environment and the effect at issue").

23

Keeping these principals in mind, the Court addresses each of Plaintiffs' challenges to the sufficiency of the Corps NEPA review, finding that none of them compels the Court to conclude that the Corps' analysis was arbitrary or capricious.

       a.   <u>Climate Change</u>

Plaintiffs first argue that the Corps failed to take a "hard look" at the Project's contributions to climate change, contending that the EA lacked discussion of "greenhouse gas emissions associated with the Project's construction" *and* the "emissions that the [Project] will make possible through its operation."  RLB Pls.' Mot. at 9.

The Court begins with the latter criticism.  The Corps contends that it *did* "review[ ] and reference[ ] the extensive analysis of climate conditions, greenhouse gas emissions, operations impacts, loss of trees . . . , the social cost of carbon, upstream and downstream effects, and measures to minimize greenhouse gas emissions included in the state EIS."  Fed. Defs.' Opp'n & Cross-Mot. at 17.  The EA indicates that an "analysis of greenhouse gas emissions was conducted by the Minnesota Department of State and included in the State EIS."  JA 76/AR 398.  Plaintiffs argue that this discussion—reliant on the State EIS—is insufficient to discharge the Corps' obligation to consider "indirect" environmental effects of the Project.  *See* RLB Pls.' Mot. at 10, 11.  Plaintiffs argue that the Corps was obligated to consider in its discussion, for example, the "amount of . . . carbon emissions that the pipeline will make possible."  *Id*.  The Corps and Enbridge argue that, in light of the limited and temporary *construction* activities authorized by the Corps, it was not responsible for reviewing effects arising from the *operation* of the pipeline.  Otherwise put, Defendants argue that the Corps was not required by NEPA to consider "greenhouse gas emissions from the pipeline's operation and transportation of crude oil" because

such effects are too far attenuated from the permitted activities.  Fed. Defs.' Opp'n & Cross-Mot. at 19–20; Enbridge's Opp'n & Cross-Mot. at 16.

Defendants have the better argument.  If an agency "has no ability to prevent a certain effect due to that agency's limited statutory authority over the relevant action[,] then that action *cannot* be considered a legally relevant cause of the effect for NEPA purposes."  *Sierra Club v. Fed. Energy Regulatory Comm'n*, 827 F.3d 36, 47 (D.C. Cir. 2016) ("*Freeport Projects*") (cleaned up) (emphasis added) (quoting *Pub. Citizen*, 541 U.S. at 771).  In other words, NEPA requires review of the effects with a "reasonably close causal relationship" to the authorized federal action. Fed. Defs.' Opp'n & Cross-Mot. at 16 (citing *Pub. Citizen*, 541 U.S. at 767).  The Corps' discussion in its EA properly addressed such affects with a "reasonably close causal relationship" to the Corps-permitted construction activities.  *See* Fed. Defs.' Reply at 2.

Other courts in this jurisdiction have declined to impose on the Corps an obligation under NEPA to examine downstream emissions resulting from an entire pipeline project when the Corps' involvement was limited to permitting temporary construction activities.  In *Flanagan South Pipeline*, for example, the court determined that the Corps' NEPA obligations "extended only to the segments" of a larger pipeline project that were "under the Corps' asserted Clean Water Act jurisdiction."  803 F.3d at 46–47; *see also Ctr. for Bio Div. v. U.S. Army Corps of Eng'rs*, 941 F.3d 1288, 1296 (11th Cir. 2019) ("*Mosaic*") (Corps not required to consider "downstream" effects beyond its regulatory control).  In a more recent decision, the D.C. Circuit clarified that it has "rejected the notion that that *downstream emissions* are *always* reasonably foreseeable effects of a pipeline project."  *Del. Riverkeeper Network v. Fed. Energy Regulatory Comm'n*, 45 F.4th 104, 109 (D.C. Cir. 2022) (emphases added); *see also Birckhead v. Fed. Energy Regulatory Comm'n*, 925 F.3d 510, 519 (D.C. Cir. 2019) ("[Plaintiffs] go too far to the extent they claim emissions from

downstream gas combustion are, as a categorical matter, always a reasonably foreseeable indirect effect of a pipeline project.").   In light of the limited, construction-related activities permitted by the Corps in this case, the Court concludes that it was not arbitrary or capricious to limit its review of the Project's effects to those associated with that activity; meaning that it was not required to review effects associated with the entire pipeline—including its operation.  *See Mosaic*, 941 F.3d at 1295 ("Only the effects caused by" the "discharge into U.S. waters" is "relevant under NEPA.").

Plaintiffs rely on *Southeast Market Pipelines* for the proposition that NEPA obligated the Corps to consider the "emissions that the [Project] will make possible" through its operation.  RLB Pls.' Mot at 9.  But that decision involved a NEPA analysis conducted by FERC—which, unlike the Corps, has regulatory authority to consider and approve "applications to construct and operate interstate pipelines."  867 F.3d at 1373.  Although Plaintiffs concede that they are *not* arguing that the Corps was required to consider "the entire pipeline" to satisfy NEPA, they *do* appear to argue that the Corps was required to consider "indirect" effects outside the Corps' regulatory jurisdiction—which appear to extend to indirect effects arising from the operation of the entire pipeline.  RLB Pls.' Reply & Opp'n at 3 n.2.  It is unclear to the Court what line Plaintiffs attempt to draw between not requiring the Corps to consider the "entire pipeline," but also obligating it to consider the transportation of oil through the entire pipeline.

Plaintiffs further argue that the EA fails to sufficiently address construction-related contributions to climate change.  But the EA does address such effects, concluding that the "combustion of fossil fuels associated with the operation of construction equipment"—would "likely . . . result in negligible release of greenhouse gases into the atmosphere."  JA 76/AR 398.  The EA further describes steps taken that would mitigate some of those effects, including that construction would be "in phases" to minimize adverse air quality impacts.  Fed. Defs.' Opp'n &

Cross-Mot. at 14.   And, it analyzed potential effects of emissions on aquatic life, concluding that mitigation would minimize any potentially harmful effects.  Fed. Defs.' Opp'n & Cross-Mot. at 15 (citations omitted).  In response to public comments indicating that the Corps must "evaluate climate change impacts" including "Greenhous Gas Emission impacts," the Corps explained that it reviewed "proposed construction activities within and adjacent to waters of the US and determined that they would not be expected to affect climate."  JA 157/AR 479; *see also* JA 75–76/AR 397–98.  Plaintiffs have not identified any information "on localized impacts associated with construction activities within or adjacent to the waters of the United States that the Corps failed to consider." Fed. Defs.' Opp'n & Cross-Mot. at 16.  The Corps' discussion of the potential effects of construction-related activities on climate changes satisfied NEPA.[7]

      b.  <u>Environmental Justice Review and Consideration of Tribes' Rights to Hunt, Fish, and Gather Natural Resources</u>

Plaintiffs next argue that the Corps' EA did not "fully account" for "environmental justice" concerns because it failed to address "whether and to what extent" the construction of Replacement Line 3 would disproportionately affect Tribal communities and the natural resources upon which they rely for subsistence fishing, hunting, and gathering. *See* RLB Pls.' Mot. at 11–12.  Plaintiffs separately argue that the Corps failed to "fully account" for the Project's effects on Tribes' rights to hunt, fish, and gather natural resources. *Id.* at 14–16.  Because both arguments address questions of whether the Project disproportionately affects Tribes, the Court considers them together.

---

[7] In their Reply, Plaintiffs cite Executive Order No. 14,008, issued on January 27, 2021 for the proposition that the Corps' "permitting decisions" must "consider the effects of greenhouse gas emissions and climate change." *See* RLB Pls.' Reply & Opp'n at 9 (quoting Exec. Order No. 14,008, Tackling the Climate Crisis at Home and Abroad, 86 Fed. Reg 7619, 7626 (Jan. 27, 2021). That executive order, however, post-dates the EAs and permits at issue in this case.

The principle of environmental justice "encourages agencies to consider whether the projects they sanction will have a 'disproportionately high and adverse' impact on low-income and predominantly minority communities." *Southeast Market Pipelines*, 867 F.3d at 1368.  Executive Order 12,898 required federal agencies to include an environmental justice analysis in their NEPA reviews, and the CEQ has promulgated corresponding guidance for agencies. *See id.*  An environmental justice analysis is "measured against the arbitrary-and-capricious standard." *Id.* (citing *Cmtys. Against Runway Expansion v. FAA*, 355 F.3d 678, 689 (D.C. Cir. 2004)).  The agency's "choice among reasonable analytical methodologies is entitled to deference." *Id.* (citing *Runway Expansion*, 355 F.3d at 689).  And, as with other components of its NEPA review, an agency is not required to select the course of action that "best serves environmental justice," only to take a "hard look" at such issues. *Id.* (citing *Latin Ams. For Social & Econ. Dev. v. Fed. Hwy. Admin.*, 756 F.3d 447, 475–77 (6th Cir. 2014)).

The Court concludes that the Corps' discussion of environmental justice in the EA satisfies these standards.  The Corps found that the Project would "cross through a total of 13 Counties and a total of 128 consensus tracts, which are predominantly rural," including nine "census tracts with a meaningfully higher minority population than the surrounding county."  JA 151/AR 473.  One of those nine tracts includes a "portion of the White Earth Reservation," but the Project itself does not cross the reservation. *Id.*  Additionally, the Project "does cross the Fond du Lac Reservation and also crosses" areas "on which tribes exercise their treaty rights to access tribal resources." *Id.*  The Corps also detailed its methodology (which Plaintiffs do not challenge, RLB Pls.' Reply & Opp'n at 18) showing that minority populations were determined to be present in an area when the "percentage of minority group or low-income population exceeded 50 percent of the county population, or was 'meaningfully greater' than the general population of the county."  JA 150/AR

472.  The Corps found that none of the census tracts crossed by the Project "has a meaningfully greater proportion of the population with income less than 185 percent of the poverty level compared to the respective county level." JA 151/AR 473.  In reaching this conclusion, the Corps considered "low-income populations" as those with individuals "with income below 185 percent of the poverty level."  *Id.*   Based on these findings, the Corps concluded that effects associated with construction of Line 3 would not disproportionately affect these communities.

The Corps also coordinated and consulted with Tribes in "planning" and "mitigation," and reviewed comments from MPUC regarding environmental justice.  Fed. Defs.' Opp'n & Cross-Mot. at 23; *see* JA150/AR472.[8]  The Corps points to portions of the EA addressing the concerns raised by Tribes about natural resources.   Fed. Defs.' Opp'n & Cross-Mot. at 26; *see* JA 139–50/AR 461–72.  And the Section 408 EA discusses potential effects on Tribal subsistence fishing, hunting and gathering, including the potential effects of an oil spill on aquatic life, birds, and mammals.  JA 244–51/AR 2548–55.  Plaintiffs, however, argue that the Corps' EA ignored "the extent to which reliance on subsistence hunting, fishing, and gathering will amplify tribal citizens' experience of the Project's environmental harm."  RLB Pls.' Reply & Opp'n at 18.  Plaintiffs cite evidence on the record of the Corps' consultation with Tribes, which Plaintiffs contend supplies "ample evidence that the Project will cause disproportionate harm to tribal citizens who depend on subsistence resources."  *Id.* at 19.  But the EA also describe efforts undertaken to consult with Tribes and address potential impacts resulting from Enbridge's construction of Replacement Line 3.  *See, e.g.*, JA 78–79/AR400–01; JA 134–50/AR 456–70.

---

[8] Enbridge discusses in detail the extensive consultation with Tribes underlying the environmental justice review conducted for the State EIS, which was based on "CEQ and APA guidance."  *See* Enbridge's Opp'n & Cross-Mot. at 22–26.  Enbridge correctly notes that the Corps reviewed this information and specifically referenced it in its EA. *See id.* at 22 (citing JA 150/AR 472).

Moreover, the Corps notes that Plaintiffs do not identify any examples in their briefs of places where Plaintiffs show that the impacts on Tribal subsistence activities will occur "within the area of the [Corps]-permitted activities." Fed. Defs.' Reply at 8 (citing *Standing Rock 2016*, 205 F. Supp. 3d at 30). For example, although Plaintiff point to evidence that the Anishinaabe depend on the presence of "*specific* resources" at "*specific* locations," they offer no evidence to demonstrate that such specific locations are tied to areas implicated by the activities authorized by the Corps' permit. *See* RLB Pls.' Mot. at 13–14. The Court is satisfied that the Corps' EA sufficiently considered whether the activities authorized by its permit would disproportionately affect Tribes, as well as their reliance on and continued use of natural resources.

c.   Potential Impacts to Wetlands, Waterbodies, and Animal Species

Plaintiffs further argue that the Corps' EA failed to "fully" examine the Project's effects on biodiversity and animal species. RLB Pls.' Mot. at 16. The record before the Court does not support such a conclusion. The EA discusses potential effects on wildlife as a result of discharged dredge and fill material. JA 60–62, 113/AR 382–84, 435. Based on this discussion, the Corps noted that the "majority of the impacts . . . would be temporary and those functions and benefits would return after construction and restoration." JA 113/AR 435. The Corps also explained that although there would be small conversion of wooded wetlands in certain watershed that may affect habitats, the overall loss would be relatively small: "population level effects" are "not expected to be detectable given the surrounding landscape and other habitat in close proximity." JA 62/AR 384. And, the Corps noted that the majority of Replacement Line 3 is co-located with Existing Line 3, other pipelines, or highways, which "limits the amount of new corridor . . . reduc[ing] habitat fragmentation." JA 73/AR 395.

In response to Plaintiffs' criticism that the Corps' analysis failed to address effects on animal species with sufficient specificity, the Corps explains that it consulted with the U.S. Fish and Wildlife Service to address potential impacts to local ESA-pertinent species.  Fed. Defs.' Opp'n & Cross-Mot. at 29 (citing JA 58–50/AR 380–81).  Although Plaintiffs' argue that the Corps' analysis lacked specificity, Plaintiffs do not point to any particular animal species that it contends the Corps failed to consider.  *Id.*  Again, Plaintiffs have failed to demonstrate that the Corps' discussion of these considerations was deficient under NEPA.

> d.  <u>Consideration of Alternatives</u>

Finally, Plaintiffs argue that the Corps failed to take a "hard look" at alternatives to the Project.  RLB Pls.' Mot. at 17–19.  NEPA requires agencies to consider alternatives to a proposed action, even if the agency finds no significant impact based upon an EA.  40 C.F.R. § 1508.9(b) (requiring an environmental assessment to include brief discussions of "alternatives as required by section 102(2)(E)," and "of the environmental impacts of the proposed action and alternatives").  To comply with NEPA, an EA must include a "brief discussion of reasonable alternatives to the proposed action."  *Standing Rock 2017*, 255 F. Supp. 3d at 134 (internal citations and quotation marks omitted).  An EA's consideration of "reasonable alternatives" need not be "as rigorous as the consideration of alternatives in an EIS."  *Id.* (internal citations and quotation marks omitted).

An alternative is "reasonable" if it is "objectively feasible as well as 'reasonable in light of [the agency's] objectives.'"  *Myersville*, 783 F.3d at 1323 (quoting *Theodore Roosevelt Conserv. P'ship*, 661 F.3d at 72).  "NEPA requires only that the Corps consider alternatives relevant to the applicant's goals and the Corps is not to define what those goals should be."  *City of Shoreacres*, 420 F.3d at 450 (citing *Burlington*, 938 F.2d at 198)*.*  The agency "bears the responsibility for deciding which alternatives to consider" and need only follow a "rule of reason," which governs

"both *which* alternatives the agency must discuss, and the *extent* to which it must discuss them."
*Burlington*, 938 F.2d at 195 (internal citations omitted).  An agency's "specification of the range
of reasonable alternatives is entitled to deference."  *Myersville*, 783 F.3d at 1323 (internal citations
omitted).

The Corps' EA explained that its consideration of the "range of alternatives" was limited
to the "route corridor designated by MPUC" because the Corps "does not regulate the siting of
pipelines." JA 42/AR 364.  Otherwise put, the route approved by the state agency was "the corridor
in which Enbridge [was] legally obligated to construct the project under Minnesota law."
JA34/AR 356.  Plaintiffs argue that the Corps' failure to consider any route alternatives rendered
its discussion of alternatives deficient under NEPA.  RLB Pls.' Mot. at 17.  They claim that it was
improper for the Corps to "refus[e] to evaluate routing alternatives *rejected* by [M]PUC."  *Id.* at
18 (emphasis added).  This argument makes little practical sense and has already been rejected by
the Court.  *See Red Lake Band of Chippewa Indians v. U.S. Army Corps of Eng'rs*, Civil Action
No. 20-3817 (CKK), 2021 WL 430054, at *14–15 (D.D.C. Feb. 7, 2021).

Where, as here, a federal agency is "not the sponsor of a project," its "consideration of
alternatives may accord substantial weight to the preferences of the applicant and/or sponsor in the
siting . . . of the project."  *City of Grapevine, Tex. v. Dep't of Transp.*, 17 F.3d 1502, 1506 (D.C.
Cir. 1994) (internal citation and quotation marks omitted).  For example, in *Friends of Capital
Crescent Trail v. Fed. Transit Admin.*, 877 F.3d 1051 (D.C. Cir. 2017), the court concluded that
the federal agency's discussion of alternatives was sufficient under NEPA even though it addressed
only two alternatives: a no build option and Maryland's preferred light rail line. *Id.* at 1063. The
court observed that *the state* had "initially considered numerous alternatives," and "eliminated
from  further  consideration"  alternatives  not  considered  reasonable.   *Id.*   After  the  state's

elimination of alternatives, the federal agency's role was "narrowed": "[i]ts ultimate decision was to decide whether or not to fund the preferred alternative." *Id.*

The Corps faced a similar decision here: whether or not to permit the Project based on the route that had been proposed by Enbridge, subject to extensive state administrative scrutiny, and ultimately selected by the state agency with authority to do so. The Corps was not required to "reinvent the wheel" by reviewing alternative routes in which Enbridge was not legally authorized to construct the replacement pipeline. *See Hoosier Envtl.*, 722 F.3d at 1061. Based on the state's elimination of other proposed routes for a new pipeline, the Corps' "specification of the range of reasonable alternatives" was not arbitrary or capricious. *Myersville*, 783 F.3d at 1323; *see also Friends of Cap. Crescent*, 877 F.3d at 1064 ("Requiring more detail on rejected alternatives would elevate form over function."); *Envtl. Prot. Info Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1016 (9th Cir. 2006) ("[A]n agency's obligation to consider alternatives under an EA is a lesser one than under an EIS.") (internal quotation marks omitted).

### 4. Failure to Prepare an EIS

Plaintiffs also contend that the Corps' decision not to prepare an EIS was "arbitrary and capricious." RLB Pls.' Mot. at 19–23. The Court's "role in reviewing [the Corps'] decision not to prepare an EIS is a limited one, designed primarily to ensure that no arguably significant consequences have been ignored." *Nat'l Parks Conserv. Ass'n v. Semonite*, 916 F.3d 1075, 1082 (D.C. Cir. 2019) (quoting *Myersville*, 783 F.3d at 1322 (internal quotation marks omitted)). "An agency decision that an EIS is not required may be overturned 'only if it was arbitrary, capricious or an abuse of discretion.'" *Grand Canyon Trust*, 290 F.3d at 340 (quoting *Sierra Club v. U.S. Dep't of Transp.*, 753 F.2d 120, 126 (D.C. Cir. 1985)). Judicial review of an agency's finding of "no significant impact" is not, however, "merely perfunctory as the court must ensure that the

agency took a 'hard look' at the environmental consequences of its decision." *Peterson*, 717 F.2d at 1413 (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)).  Courts reviewing an agency's finding of "no significant impact" must consider whether the agency:

> (1) has accurately identified the relevant environmental concern, (2) has taken a hard look at the problem in preparing its [FONSI or Environmental Assessment], (3) is able to make a convincing case for its finding of no significant impact, and (4) has shown that even if there is an impact of true significance, an EIS is unnecessary because changes or safeguards in the project sufficiently reduce the impact to a minimum.

*Sierra Club v. Van Antwerp*, 661 F.3d 1147, 1154 (D.C. Cir. 2011) (quoting *TOMAC v. Norton*, 433 F.3d 852, 861 (D.C. Cir. 2006)). "In so doing, courts in this circuit apply a rule of reason to an agency's NEPA analysis and decline to flyspeck the agency's findings in search of any deficiency no matter how minor." *Standing Rock 2017*, 255 F. Supp. 3d at 122 (internal citation and quotation marks omitted).

As set forth in the previous section, the Court is unpersuaded by Plaintiffs' arguments regarding the Corps' alleged failure to take a "hard look" at the environmental consequences of its decision to authorize Enbridge's construction activities for Replacement Line 3.  However, Plaintiffs also challenge the Corps' finding of "no significant impact" as "arbitrary and capricious" because "the Project is highly controversial," its "impacts remain uncertain," and it "carries a material risk of 'grave' or 'catastrophic' harm." RLB Pls.' Mot. at 19.  Again, the Court addresses each of these arguments, in turn, after presenting the applicable legal context.

Whether a project has "significant environmental impacts, thus triggering the need to produce an EIS, depends on its 'context' (region, locality) and 'intensity' ('severity of impact')." *Semonite*, 916 F.3d at 1082 (citing 40 C.F.R. § 1508.27).  Plaintiffs' arguments touch on two enumerated "intensity" factors: the "degree to which the effects on the quality of the human

environment are likely to be highly controversial" and the "degree to which the possible effects on the human environment are highly uncertain." § 1508.27(b)(4), (5).[9] They separately argue that the Project presents a "risk of grave or catastrophic harm" in further support of their claim that the Corps' finding of "no significant impact" was improper.  *See* RLB Pls.' Mot. at 23 (citing *Standing Rock 2021*, 985 F.3d at 1049–50).

Plaintiffs first contend that the Corps failed to consider the extent to which the Project is "highly controversial."  *Id.* at 20.  The term "controversial" refers to cases in which  "substantial dispute exists as to the size, nature, or *effect* of the major federal action[.]"  *Semonite*, 916 F.3d at 1083 (quoting *Town of Cave Creek v. FAA*, 325 F.3d 320, 331 (D.C. Cir. 2003)).  To be "highly controversial," "*something more* is required besides the fact that some people may be highly agitated and be willing to go to court over the matter."  *Id.*

Other courts grappling with what "*something more*" is required to render the effects of a federal action "highly controversial" have focused on whether "scientific or other evidence . . . reveals flaws in the methods or data relied upon by the agency in reaching its conclusions.'"  *Id.* (internal citations and quotation marks omitted).  In *Semonite*, the D.C. Circuit considered whether the Corps had acted arbitrarily and capriciously in declining to prepare an EIS when it granted a permit allowing a utility company to construct a series of electrical transmission towers across the "historic James River."  916 F.3d at 1077.  In that case, the Corps had concluded that such authorization would have no "significant impact" on historic sites along the river.  *Id.*  In assessing whether the effects of that project were likely to be "highly controversial," the court pointed to examples in the record of criticism of the Corps' scientific methodology by experts in the relevant

---

[9] Enbridge notes that the revised CEQ regulations (effective after the Corps' analysis in this case, *see supra note* 3) eliminated the consideration of "controversy."  85 Fed. Reg. 43,304, 43,322 (July 16, 2020).

field and other "government agencies with 'special expertise.'" *Id.*; *see also Found. for N. Am. Wild Sheep v. Dep't of Agric.*, 681 F.2d 1172, 1182  (9th Cir. 1982) (criticism from conservationists, biologists, two state agencies, and "other knowledgeable individuals" represented "precisely the type of 'controversial' action for which an EIS must be prepared"); *Friends of the Earth, Inc. v. U.S. Army Corps of Eng'rs*, 109 F. Supp. 2d 30, 43 (D.D.C. 2000) (project classified as "genuinely and extremely controversial" where three federal agencies, one state agency, and the public "all disputed the Corps evaluation of the environmental impacts . . . and pleaded with the Corps to prepare an EIS").  The *Semonite* court found that the "consistent and strenuous opposition, often in the form of concrete objections to the Corps' analytical process and findings, from agencies entrusted with preserving historic resources and organizations with subject-matter expertise constituted the "something more" needed to show that the "effects on the quality of the human environment are likely to be highly controversial." *Id.* at 1086 (citing 40 C.F.R. § 1508.27(b)(4)).

Similarly, in *Standing Rock 2021*, the D.C. Circuit reviewed four "unresolved scientific controversies" pertaining to the Corps' decision to grant an easement to construct an the Dakota Access Pipeline ("DAPL") beneath Lake Oahe, an artificial reservoir covering 56,000 acres of the standing Rock Reservation and 10,420 acres of the Cheyenne River Sioux Tribe's trust lands.  985 F.3d at 1039, 1040, 1045–49.  The court discussed, for example, scientific and methodological disputes regarding the Corps' review of the effectiveness of the DAPL's leak detection system, operator safety, winter conditions, and its "word case discharge scenario." *Id.* at 1045–49.  The court concluded that these existing "serious scientific disputes" demonstrated that the effects of the easement and DAPL construction were likely to be "highly controversial."

In contrast to these discussions of scientific and methodological disputes underlying the D.C. Circuit's discussion of what "*more*" is required than mere public criticism or opposition to make a project "highly controversial," Plaintiffs here contend that the Corps failed to address "criticism" from Tribes and environmental groups regarding effects on climate change, environmental justice, and tribal rights to natural resources, and the effects on native habitats and species. RLB Pls.' Mot. at 20. That there was criticism about the Corps' review does not render it "controversial." *See Standing Rock 2017*, 255 F. Supp. 3d at 127 ("Such controversy is not measured by newsworthiness[.]"); *Nat'l Park Conserv. Ass'n v. United States*, 177 F. Supp. 3d 1, 33 (D.D.C. 2016) ("*Something more* is required besides the fact that some people may be highly agitated and be willing to go to court over the matter."). Although Plaintiffs indicate that the Corps failed to "address and resolve several 'serious objections' to its analysis," they point only to one specific example, claiming that the Corps failed to "acknowledge and rebut substantial scientific criticism" regarding the Corps' oil spill analysis. *See* RLB Pls.' Mot. at 21.

Plaintiffs argue that the oil spill analysis contained in the State EIS, and cited by the Corps, had "been struck down" by the Minnesota Court of Appeals for failure to "consider how an oil spill might impact Lake Superior Watershed," RLB Pls.' Mot. at 21 (citing *In re Enbridge Energy Ltd. P'ship*, 930 N.W.2d 12, 27–28 (Minn. Ct. App. 2019)), an issue that Tribes and other organizations had previously raised to the Corps, *id.*; *see* JA 1497–1500/AR 97765–68. The Corps notes that the state court did not disagree with the entirety of the State EIS's oil spill analysis, but concluded that the decision not to model spill impacts on the Lake Superior watershed to be inadequate. Fed. Defs.' Opp'n & Cross-Mot. at 38 (citing *In re Enbridge*, 930 N.W.2d at 28). And, as the Corps and Enbridge point out, DOC-EERA has since revised its oil spill analysis, which was ultimately affirmed by the Minnesota Court of Appeals. *See* Enbridge Opp'n & Cross-

Mot. at 28; Fed. Defs.' Opp'n & Cross-Mot. at 38.  The Corps indicates that it considered both the revised State EIS (addressing the spill risk at Lake Superior watershed), as well as Plaintiffs' comments on that issue.  *See* Fed. Defs.' Reply at 15.  Plaintiffs' sole citation to a since-revised oil spill analysis does not rise to the level of scientific and methodological criticism determined by the D.C. Circuit to be "highly controversial" requiring the Corps to prepare an EIS.

Next, Plaintiffs argue that the Corps' EA failed to resolve the "degree to which the possible effects on the human environment are highly uncertain."  RLB Pls.' Mot. at 22 (citing 40 C.F.R. § 1508.27(b)(5)).  Plaintiff argue that the Corps "refused" to consider how Line 3 "will affect climate, tribes, tribal resources, or local species."  *Id.*  But the Court's discussion *supra* Section III(A)(3) belies this assertion (which lacks any citations to the administrative record).  Rather, the Court agrees with the Corps that its review of the impacts of its permitting decisions led to a reasonable conclusion that the effects of temporarily discharging dredge or fill material in waters of the United States are not "uncertain."  *See* Fed. Defs.' Opp'n & Cross-Mot. at 39–40.

Finally, Plaintiffs contend that the Project carries a "material risk of grave or catastrophic harm," which, by definition, required the Corps to prepare an EIS.  RLB Pls.' Mot. at 23.  Plaintiffs' argument does not derive from the applicable regulations, but instead from the D.C. Circuit's decision in *Standing Rock*. *Id.*  There, the court reasoned that a "finding of no significant impact is appropriate only if a grave harm's probability is so low as to be remote and speculative, or if the combination of probability and harm is sufficiently minimal."  *Id.* (quoting 985 F.3d at 1049-50).  But, as the Corps notes, the *Standing Rock* court discussed the question of "grave risk" not as a standalone consideration, but within its assessment of whether the easement granted in that case was likely to be "highly controversial"—which, again, was based on "several serious scientific disputes" regarding that pipeline's leak detection system, operator safety record, worst

case discharge model, and spill response in winter conditions.  *See* Fed. Defs.' Opp'n & Cross-Mot. at 40 (citing *Standing Rock*, 985 F.3d at 1044–50).  As previously discussed, Plaintiffs here cite no parallel scientific disputes.

***

The Court concludes that the Corps did not act arbitrarily or capriciously by failing to take a "hard look" at the effects of the Project or declining to prepare an EIS based on its finding of no significant impact associated with the activities authorized by its permits.  The Corps has satisfied its obligations under NEPA, and so it is entitled to summary judgment as to Plaintiffs' NEPA claims.

## B.  CWA Claims

The Court turns next to Plaintiffs' claims under the Clean Water Act.  As noted *supra* Section I(A)(2), before issuing a Section 404 permit, the Corps must determine that there  is "no practicable alternative" to the proposed activity "which would have less adverse impact on the aquatic ecosystem."  40 C.F.R. § 230.10(a).  And it must also evaluate the "probable impacts" of the proposed activity and consider whether or not the proposed activity would be "contrary to the public interest."  33 C.F.R. § 320.4(a)(1).  Plaintiffs argue that the Corps' analysis of alternatives, potential "degradation" of waters of the United States, and its public interest review was insufficient.  For the reasons discussed below, the Court disagrees, and finds that the Corps' discussion satisfies CWA and the associated implementing regulations.

### 1.  Analysis of Alternatives

As with NEPA, the CWA also requires the Corps to consider alternatives to the proposed project before authorizing any activities covered by Section 404.  The regulations implementing Section 404 of the CWA provide that "no discharge or no discharge of dredged or fill material

39

shall be permitted if there is a *practicable* alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences."  40 C.F.R. § 230.10(a) (emphasis added).  A "practicable" alternative is one that "is *available* and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." *Id.* § 230.10(a)(2) (emphasis added).  Where, as here, the activity associated with a discharge is not water dependent, *see* JA 42/AR 364, the CWA regulations create a rebuttable presumption that there are practicable and environmentally preferable alternatives to discharging dredged and fill material into wetlands.  40 C.F.R. § 230.10(a)(3).  Plaintiffs argue that the Corps violated the CWA by failing to consider "status quo" alternatives or less environmentally damaging route alternatives.  FOH's Mot. at 6.

          a.   <u>"No Action" Alternatives</u>

The Corps' EA discusses multiple "no action" alternatives—the options available if the Corp did not issue a "permit for the discharge of dredged and fill material into the waters of the United States."  JA 44/AR 366.  The Corps considered, for example, continued use of Existing Line 3, alternatives involving transportation of oil by rail or truck, and combinations involving Existing Line 3 and other methods of transportation.  JA 44–48/AR 366–70.  The Corps considered in reasonable detail each of these alternatives and rejected each as impracticable in light of the Project's purpose.  *Id.*

FOH argues that the Corps' discussion of a "no action" alternative was deficient because the Corps did not consider a "no build" alternative of "leaving the status quo as it is."  FOH Mot. at 7.  It is not clear if Plaintiffs suggest that the Corps should have considered decommissioning existing Line 3 entirely (without replacement) or continuing to use Existing Line 3.  If the latter, the Corps' discussion of that option in the EA plainly illustrates why it was not practicable.  As

the Corps notes, the EA addresses the fact that Existing Line 3 was deteriorating and risked greater

environmental intrusion and harm.  Fed. Defs.' Opp'n & Cross-Mot. at 42.  As to the alternative

of shutting down Existing Line 3 without replacement, the Corps argues that this too would not be

a "practicable" alternative to consider in light of the overall project purposes.  *Id.* at 43 (citing 40

C.F.R. § 230.10(a)(2) (requiring analysis of alternatives to take into consideration the "overall

project purposes)); *see also Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1270 (10th Cir.

2004) (recognizing that the Corps "has a duty to take into account the objectives of the applicant's

project") (internal citations and quotation marks omitted).

     Although Plaintiffs argue that the Corps merely accepted Enbridge's "purpose and need

statement" uncritically, the Corps responds that it *did* perform an "independent assessment of the

need for the project," even though it was not required to do so, and explained its "independent

conclusion that the project is needed."  Fed. Defs.' Opp'n & Cross-Mot. at 45 (citing JA 41–42,

83/AR 363–64, 405).  Plaintiffs have failed to demonstrate that the Corps' selection of "no action"

alternatives and discussion thereof was arbitrary or capricious.

              b.  Route Alternatives

     Plaintiffs next argue that the Corps' analysis of alternatives was deficient because the Corps

limited "the range of alternatives . . . to the route corridor designated by the MPUC."  FOH's Mot.

at 8.  Plaintiffs argue that the Corps' failure to consider pipeline routes other than the route

identified by MPUC violated the CWA.  *Id.*  As with its analysis of alternatives under NEPA, the

Corps responds that its CWA analysis of alternatives was appropriately constrained by the route

permitted under state law—the route designated by the responsible state agency, the MPUC.  *See*

Fed. Defs.' Opp'n & Cross-Mot. at 44.

     The "practicable alternatives" the Corps must consider include, but "are not limited to":

"[a]ctivities which do not involve a discharge of dredged or fill material into the waters of the

United States" and "discharges of dredged or fill materials at other locations in waters of the United States."   40 C.F.R. § 230.10(a)(1)(i), (ii).   The Corps' analysis addressed both potential alternatives.   First, the Corps discussed alternatives activities which do not involve discharge of dredged or fill material into the United States, including transportation of oil by rail or truck.   JA 44–46/AR 366–68.   And second, the Corps considered the alternative of continuing to use the same route occupied by Existing Line 3, but noted that construction would require a wider workspace and more time with open trenches, risking greater environmental harms including "greater environmental impacts at wetlands and waterbody crossings."   JA 23–24/AR 370–71. Moreover, Existing Line 3 crosses the Chippewa National Forest and easements through the Leech Lake and Fond du Lac Reservations, which are set to expire in 2029.   JA 49/AR 371. The Corps concluded that none of these potential alternatives were "practicable."   JA 49–50/AR 371–72.

Plaintiffs, however, argue that the Corps should have considered additional alternative routes, including those that had been rejected by the state agency.   FOH Mot. at 9.   They argue that the Corps has improperly "presumed" that any route not previously approved by a state regulator is "not available."   *Id.*   However, as Federal Defendants have pointed out, Enbridge was not *legally* permitted to construct Replacement Line 3 anywhere other than where the state agency authorized it to.   Fed. Defs.' Cross-Mot. at 44; *see supra* Section III(A)(3)(d).   In other words, an alternative pipeline route that has been rejected by the state agency is not one that is "available and capable of being done," and therefore is, by definition, not "practicable."   40 C.F.R. § 230.10(a)(2).

Based on this practical reality, it would be futile for the Corps to expend resources on considering additional alternatives routes that had been rejected by state authorities.   The Corps' discussion of the practicable alternatives to the Project was reasonable and appropriate under the circumstances.

### 2.   Consideration of "Significant Degradation"

Next, FOH argues that the Corps improperly evaluated whether granting Enbridge a Section 404 permit complied with 40 C.F.R. § 230.10(c), which provides: "[N]o discharge of dredged or fill material shall be permitted which will cause or contribute to significant degradation of the waters of the United States."  The regulation then enumerates four examples of "effects" that should be considered in assessing "degradation *related to the proposed discharge,*" which include "[s]ignificantly adverse effects of the discharge of pollutants" on human health or welfare (including effects on municipal water supplies), life stages of aquatic life and other wildlife, aquatic ecosystem diversity, and recreational, aesthetic, and economic values." *Id.* § 230.10(c)(1)–(4) (emphasis added).  FOH argues that a potential oil spill would implicate all of these considerations.  FOH Mot. at 10.

FOH's argument rests on an overly generous reading of this regulation.  By its text, § 230.10(c)(1) addresses consideration of potential degradation "*related to the proposed discharge.*"   § 230.10(c)(1).   In other words, the Corps' analysis of potential "significant degradation of the waters of the United States" was appropriately tailored to potential effects arising from the "discharge of dredged or fill material" authorized by its permits.  *Id.*  The Corps was not required under this provision to assess a potential oil spill that could result from the operation of the new pipeline.  Accordingly, FOH has failed to demonstrate any CWA violation based on its reading of § 230.10(c)(1).

### 3.   Public Interest Review

Plaintiffs argue that the Corps failed to conduct a sufficient "public interest" review under the CWA. The Corps' regulations direct that its decision of whether to issue a permit will be "based on an evaluation of the probable impacts, including the cumulative impacts, of the proposed

activity and its intended us on the public interest." 33 C.F.R. § 320.4(a)(1). The Corps' evaluation must be based on "a careful weighing of all those factors which become relevant in each particular case" and must balance the "benefits which may reasonably accrue from the proposal" against its "reasonably foreseeable detriments." *Id.* A permit may not be granted if it is "contrary to the public interest." *Id.*

Section 320.4(a) specifies that the Corps must consider "[a]ll factors which may be relevant to the proposal," including: "conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, considerations of property ownership and, in general, the needs and welfare of the people." *Id.* The weight accorded to each of these factors is "determined by its important and relevance to the particular proposal," that is, "how important a factor is and how much consideration it deserves will vary with each proposal." *Id.* § 320.4(a)(3). The Corps must give "full consideration and appropriate weight" to "all comments, including those of federal, state, and local agencies, and other experts on matters within their expertise." *Id.* The Corps "has significant expertise in making this [public interest] determination." *Coeur Alaska, Inc. v. Se. Council*, 577 U.S. 261, 285 (2009).

Plaintiffs challenge the Corps' consideration of various factors enumerated in § 320.4(a)(3). As set forth below, the Court concludes that the Corps' discussion of these factors was sufficient.

        a.  <u>Economics</u>

For "private enterprise" permit applications, the Corps may "generally . . . assume[ ] that appropriate economic evaluations have been completed, the proposal is economically viable, and

is needed in the market place."  § 320.4(q).  "However, the district engineer in appropriate cases, may make an independent review of the need for the project from the perspective of the overall public interest."  *Id.*  The Corps' EA notes that the Project is likely to have "positive effects" on employment, income, and tax revenue.  JA 74/AR 396.  The Corps considered the increased employment of from workers in local unions during construction activities, as well as an increase in State and count tax revenues resulting both from income tax receipts.  *Id.*

FOH argues that the Corps' analysis of "economics" associated with the Project was insufficient, because the Corps did not address "out-of-pocket costs for consumers" arising from the pipelines' construction and operation.  FOH's Mot. at 13.  FOH does not cite to any portion of the record containing any comment about such considerations that the Corps should have considered.  Nor does FOH grapple with the presumption applicable to "private enterprise" applicants in § 320.4(q).  FOH, therefore has not demonstrated that the Corps' discussion of economics was insufficient based on the requirements set forth in § 320.4(q).

   b. <u>Energy Needs</u>

Section 320.4(n) directs that "District engineers will give high priority to the processing of permit actions involving energy projects."  § 320.4(n).  The EA indicates that the Project will "support United States consumers' energy demands" and "ensur[e] that the region continues to have access to affordable energy and other refined products."  JA 83/AR 405.  To reach this conclusion, the Corps considered "detailed information and testimony" provided by Enbridge to the state agencies regarding the "need for the Project, demand for petroleum, and benefits of the Project."  *Id.*  The EA notes that Replacement Line 3 would serve the same markets as Existing Line 3, and would transport oil more safely.  *Id.*

FOH cites to a portion of a decision by the environmental resources department of the State Department of Commerce from 2017, which concluded that Enbridge had not "established a need for the proposed project" based on "[o]il market analysis.[10]   FOH Mot. at 13 n.21 (citing JA 4033–35/AR 151894–97).   Red Lake Band Plaintiffs also cite portions of the record indicating that demand for "crude oil" is unlikely to increase in the coming years due to the adoption of electric vehicles and efforts by the governments of the United States and Canada to reduce greenhouse gas emissions.   *See* RLB Pls.' Mot. at 29 (citing JA 1513/AR 97781).   Despite these discrete examples, the Corps notes that the Minnesota Court of Appeals recently concluded that the MPUC's decision to grant Enbridge a "certificate of need" was supported by substantial evidence, including of "demand" for oil.   Fed. Defs.' Opp'n & Cross-Mot. at 49; Fed. Defs.' Reply at 26.

          c.   Climate Change & Greenhouse Gas Emissions

FOH also argues that the Corps insufficiently addressed "climate change" as part of its obligation to consider "general environmental concerns."   FOH Mot. at 14.   As detailed *supra* Section III(A)(3)(a), the Corps found that the proposed construction activities would "result in a negligible release of greenhouse gas into the atmosphere."   JA 76/AR 398.   Though brief, FOH's argument appears to be that the Corps should have considered climate change implications associated with the scope of the entire Project as opposed to the discrete activity authorized by the Corps.   FOH's Mot. at 14.   Relatedly, Red Lake Band Plaintiffs argue that the Corps arbitrarily

---

[10] The Corps notes that MPUC (not DOC-EERA is "charged with determining whether there is sufficient need for the pipeline based on demand and other factors").   Fed. Defs.' Mot. at 49.

declined to consider "increased greenhouse gas emissions" associated with the production of "[t]ar sands oil." RLB Pls.' Mot. at 27.

But, for the reasons discussed *supra* Section III(A)(1), the Court is not persuaded that the Corps was required to conduct such an expansive analysis. Moreover, the regulation setting forth the requirements for the Corps' "public interest" analysis direct the Corps to evaluate the "probable impact which the *proposed activity* may have on the public interest[.]" § 320.4(a) (emphasis added). Plaintiffs do not dispute that the proposed activity for which Enbridge sought a "DA permit" was the temporary discharge of dredged and fill materials into waters of the United States during Enbridge's construction of Replacement Line 3. The Court finds that the Corps' CWA public interest review appropriately reflected the scope of the activity authorized by the Corps.

d. Wetlands

FOH next objects to the Corps' discussion of the adverse impacts of construction on wetlands, claiming that the Corps "makes no attempt to estimate" such effects and "concludes that Enbridge's obligation to avoid or minimize those impacts can be ignored[.]" FOH's Mot. at 14. The EA belies these brief, conclusory criticisms of the Corps' public interest review. The Corps' EA discusses in detail the measures Enbridge proposed to avoid and mitigate impacts to wetlands. *See*, *e.g.*, JA 46–47/378–79 (discussing "environmental procedures and mitigation measures that the contractor will implement during construction); JA 59–60/AR 381–82 (noting that there is "no permanent loss of aquatic habitat proposed as part of this Project"); JA 66–70/AR 388–92 (section of EA discussing "actions to minimize adverse effects" to wetlands); JA 76–77/AR 398–99 (section of EA discussing effects to wetlands); JA 85–87/AR 407–09 (discussing wetland compensatory mitigation); JA 92–124/AR 414–46 (detailing effects on "watershed conditions and impacts to wetlands" affected by construction of Line 3 replacement). And, as the Corps notes,

the Permit contained "Special Conditions" addressing mitigation requirements.  *See* JA 4–7/AR

5–8.  The Corps' EA also discusses at length wetlands affected by the Project, as well as the

temporary and post-construction effects of the authorized activities on them.  *See* JA 53–54/AR

375–76; JA 60–61/AR 382–83; JA 92–124/AR 414–46.  FOH's arguments that the Corps'

assessment lacked sufficient discussion of effects to wetlands lacks merit.

        e.   <u>Risk of an Oil Spill</u>

Red Lake Band Plaintiffs argue that the Corps' public interest analysis was incomplete

because it failed to consider the risk of an oil spill.  RLB Pls.' Mot. at 26.  Plaintiffs argue that this

potential impact touches on many of the factors enumerated in § 320.4(a)—including wetlands,

cultural values, recreational values, fish and wildlife, water quality, food production, and the needs

and welfare of the people.  *Id.*  Moreover, Plaintiffs cite to comments on the record addressing

risks posed by a potential oil spill.  *Id.*

The Court has previously concluded that the Corps' discussion of the risk of an oil spill

sufficiently addresses these public interest factors.  *See Red Lake Band of Chippewa Indians*, 2021

WL 430054, at *11–12 . The Court noted that the Section 408 EA discuss the effects of an oil spill

on aquatic life, birds, mammals, and wild rice.  *See* JA 246–49/AR2550–53.  And the Section 404

EA indicates that the Corps undertook "robust coordination with Tribes to ensure mitigative

measures would be taken to reduce any adverse effects to tribal resources."  JA 127/AR474.  The

Court concluded that the worst-case discharge model upon which the Corps relied in its Section

408 EA "was carefully and deliberately selected to address a broad spectrum of terrain, land-cover

types, watercourses, waterbodies, wetlands, associated freshwater and riparian habitat types,

vegetation, environmentally-sensitive areas, and human land uses . . . to consider the range of

consequences that may be possible should there by an accidental release of crude oil along the

proposed route[.]" JA 244/AR 2548. Similarly, the mitigative measures discussed in the Section 408 EA address areas spanning the pipeline, including "rural, sparsely populated areas." JA 250/AR2554. Plaintiffs' present arguments do not compel the Court to changes its previous conclusion that the Corps' discussion of a potential oil spill discharged its obligation to consider environmental effects under the CWA. *Id.*

***

The Court concludes that the Corps complied with its obligations under the CWA to consider practicable alternatives, address whether discharged dredged or fill material would cause significant degradation to the waters of the United States, and to evaluate appropriate public interest factors. Accordingly, the Corps is entitled to summary judgment as to Plaintiffs' CWA claims.

## IV.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** Federal Defendants' [61] Cross-Motion for Summary Judgment and Enbridge's [63] Cross-Motion for Summary Judgement and **DENIES** Plaintiffs' [52], [53] Motions for Summary Judgment. This case shall be dismissed with prejudice. An appropriate Order accompanies this Memorandum Opinion.

_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge

**Date:** October 7, 2022